# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

**Robert M. Goforth,**

         Plaintiff,

   vs.

**Tennessee Valley Authority and Day & Zimmerman NPS, Inc.,**

         Defendant.

Case No. 1:20-cv-254

U.S. District Judge McDonough

Magistrate Judge Lee

## <u>JOINT APPENDIX</u>

Plaintiff and Defendants respectfully submit this agreed list of documentary evidence, referred to henceforth as "the Joint Appendix," which contains the documentary proof upon which the parties will rely in support of and in opposition to Defendants' Motions for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. The parties agree and stipulate that the attached documents are authentic and may be considered by the Court in ruling on the parties' motions for summary judgment, but otherwise preserve objections.

| EXHIBIT | DOCUMENT DESCRIPTION | JOINT APPENDIX NO. |
|---|---|---|
| 1. | Robert Goforth Deposition Excerpts Pages: 11-12, 16, 114-119, 128, 206-207, 234-244, 247-304, 307-308, 312 | JA 0001-079 |
| 2. | Jeffrey McGuire Deposition Excerpts Pages 8-20, 23, 29-49, 55-66, 69, 70-81, 83-102, 111-117, 123-131 | JA 0080-177 |
| 3. | Jesse James Deposition Excerpts Pages: 5-14, 20-41, 45-47, 51, 56-64, 66-70 | JA 0178-229 |
| 4. | John Rhodes Deposition Excerpts Pages: 18-19, 27-28 | JA 0230-235 |
| 5. | Walter Lee Sanders Deposition Excerpts Pages: 17-22, 26-30, 32, 34-36, 39, 42-46, 49-63, 66, 80-81, 83-116, 119-127 | JA 0236-322 |

| | | |
|---|---|---|
| 6. | Meshelle Augustin Deposition Excerpts<br>Pages: 11-17, 21-28, 32-37, 45-53, 58-64, 67-68, 70-73, 76-78, 82-86 | JA 0323-376 |
| 7. | Rebecca Whiteman Deposition Excerpts<br>Pages: 16-26, 28-73, 76-95 | JA 0377-443 |
| 8. | Freddie Gibson Deposition Excerpts<br>Pages: 8-12, 16-20, 23, 26, 32-39, 47-55, 61-73, 74-77, 80-81 | JA 0444-493 |
| 9. | DeWarren Washington Deposition Excerpts<br>Pages: 11, 17, 20, 23-24, 26-33, 52-55, 64-65, 76-79, 149, 150-151 | JA 0494-515 |
| 10. | John Reeves Deposition Excerpts<br>Pages: 12-15, 18, 32-34, 130-132, 154-157, 161-165 | JA 0516-533 |
| 11. | Gregory Whitehorn Deposition Excerpts<br>Pages: 8-9, 12-18, 25-64, 69, 75-121, 125-126, 202-211 | JA 0534-644 |
| 12. | DZ Marked Ex. 05 – R. Goforth Resume | JA 0645-647 |
| 13. | DZ Marked Ex. 06 – Goforth Offer Letter | JA 0648-649 |
| 14. | DZ Marked Ex. 07 – Certification of Understanding of DZNPS Employee Orientation Book, Project Work Rules and Jobsite Safety | JA 0650 |
| 15. | DZ Marked Ex. 08 – Feb 28, 2011 Certification of Understanding of Policies and Procedures | JA 0651 |
| 16. | DZ Marked Ex. 10 – Craft Employee Orientation Information & Work and Safety Rules Excerpt Related to Non-Retaliation | JA 0652-656 |
| 17. | DZ Marked Ex. 11 – Craft Employee Orientation Information & Work and Safety Rules Excerpt Related to Category One Violations | JA 0657-661 |
| 18. | DZ Marked Ex. 12 – Certification of Understanding of DZNPS Employee Orientation Book, Project Work Rules and Jobsite Safety Rules | JA 0662 |
| 19. | DZ Marked Ex. 13 – TVA Placekeeping Procedure | JA 0663-664 |
| 20. | DZ Marked Ex. 14 – Stop When Unsure Policy | JA 0665 |

2

| 21. | DZ Marked Ex. 16 – Jan 5, 2017 Goforth Offer Letter | JA 0666-667 |
|---|---|---|
| 22. | DZ Marked Ex. 17 – 2017 WO | JA 0668-787 |
| 23. | DZ Marked Ex. 18 – Plaintiff's Responses to DZ's First Set of Interrogatories | JA 0788-801 |
| 24. | DZ Marked Ex. 20 – Oct 22, 2018 Statement of Derek Pair | JA 0802 |
| 25. | DZ Marked Ex. 21 – Oct 22, 2018 Statement of Freddie Gibson | JA 0803 |
| 26. | DZ Marked Ex. 24 – Oct 22, 2018 Robert Goforth Statement | JA 0804-805 |
| 27. | DZ Marked Ex. 29 – 2018 WO, including data sheets | JA 0806-851 |
| 28. | Pl's Marked Ex. 2 – Jan 5, 2017 Goforth hire letter | JA 0852-853 |
| 29. | Pl's. Marked Ex. 4 – Photo of TPBAR Assembly | JA 0854 |
| 30. | Pl's. Marked Ex. 5 – Oct 27, 2017 Goforth Evaluation | JA 0855-866 |
| 31. | Pl's. Marked Ex. 6 – Oct 3, 2017 Cusick email | JA 0867 |
| 32. | Pl's. Marked Ex. 7 – Oct 5, 2017 Cusick Email to Fordham, fw: Tritium | JA 0868 |
| 33. | Pl's. Marked Ex. 8 – Sept 25, 2017 McGuire email | JA 0869-870 |
| 34. | Pl's. Marked Ex. 9 – Sept 25, 2017 McGuire email | JA 0871-872 |
| 35. | Pl's. Marked Ex. 10 – Nov 17, 2017 Cusick CR | JA 0873-875 |
| 36. | Pl's. Marked Ex. 12 – Nov 7, 2017 Goforth emails | JA 0876-877 |
| 37. | Pl's. Marked Ex. 16 – NRC 2017 Confirmatory Order | JA 0878-906 |
| 38. | Pl's. Marked Ex. 17 – Nov 28, 2018 Follow up for NRC Confirmatory Order | JA 0907-919 |
| 39. | Pl's. Marked Ex. 18 – Goforth Access (UAA) Denial and Appeal denial | JA 0920-923 |
| 40. | Pl's. Marked Ex. 19 – Nov 20, 2018 Final ERB Packet | JA 0924-933 |
| 41. | Pl's. Marked Ex. 20 – Oct 20, 2017 TVA ERB policies | JA 0934-972 |

3

| 42. | Pl's. Marked Ex. 21 – TVA Interrogatory Answers to Goforth | JA 0973-991 |
|---|---|---|
| 43. | Pl's. Marked Ex. 23 – Excerpt Nov 6, 2018 draft ERB package (complete exhibit) | JA 0992-1002 |
| 44. | Pl's. Marked Ex. 24 – Sanders Nov 19, 2018 email | JA 1003-1004 |
| 45. | Pl's. Marked Ex. 27 – 2018 Work Order excerpts (complete exhibit) | JA 1005-1019 |
| 46. | Pl's. Marked Ex. 28 – Revised Work Order after 2018 | JA 1020-1022 |
| 47. | Pl's. Marked Ex. 30 – TVA Work Management Planning and Procedures Excerpts (complete exhibit) | JA 1023-1030 |
| 48. | Pl's. Marked Ex. 31 – Oct 22, 2018 Rhodes CR | JA 1031-1034 |
| 49. | Pl's. Marked Ex. 32 – Oct 31, 2018 Rogers email | JA 1035-1036 |
| 50. | Pl's. Marked Ex. 35 – Aug 20, 2018 Goforth ECP contact | JA 1037 |
| 51. | Pl's. Marked Ex. 36 – Excerpt, TVA Site Tech. Procedures, (complete exhibit) | JA 1038 |
| 52. | Pl's. Marked Ex. 37 – Nov 13, 2018 Reeves email | JA 1039 |
| 53. | Pl's. Marked Ex. 38 – Nov 20, 2018 Reeves emails | JA 1040-1041 |
| 54. | Pl's. Marked Ex. 41 – Nov 6, 2018 Washington email with draft ERB package | JA 01042-1057 |
| 55. | Pl's. Marked Ex. 42 – Nov 6, 2018 Rogers emails | JA 1058-1062 |
| 56. | Pl's. Marked Ex. 44 – Nov 12, 2018 Washington email with draft ERB package | JA 1063-1083 |
| 57. | Pl's. Marked Ex. 45 – Nov 20, 2018 Washington emails with draft ERB package | JA 1084-1105 |
| 58. | Pl's. Marked Ex. 49 – Nov 20, 2018 Sanders email with draft ERB package | JA 1106-1119 |
| 59. | Pl's. Marked Ex. 50 – Nov 26, 2018 Washington email with revised ERB documents | JA 1120-1133 |
| 60. | Pl's. Marked Ex. 54 – Nov 20, 2018 Fact Finding Notes signed by Washington | JA 1134-1135 |
| 61. | Pl's. Marked Ex. 55 – Nov 22, 2018 Goforth email | JA 1136 |
| 62. | Pl's. Marked Ex. 57 – Nov 26, 2018 DZ emails on Goforth pay | JA 1137-1138 |

| | | |
|---|---|---|
| 63. | Pl's. Marked Ex. 61 – Oct 18, 2018 Human Performance Alert | JA 1139 |
| 64. | Pl's. Marked Ex. 62 – Prompt Investigation Report | JA 1140 |
| 65. | Pl's. Marked Ex. 63 – Manway Cover CR | JA 1141 |
| 66. | Pl's. Marked Ex. 64 – Oct 21, 2018 Gibson statement | JA 1142 |
| 67. | Pl's. Marked Ex. 65 – TVA Discovery Responses to Goforth | JA 1143-1179 |
| 68. | Pl's. Marked Ex. 66 – Nov 29, 2018 Sanders email "ERB Package" and "Mitigation Plan" | JA 1180-1195 |
| 69. | Pl's. Marked Ex. 67 – Nov 27, 2018 Washington email | JA 1196 |
| 70. | Pl's. Marked Ex. 68 – Nov 7, 2018 Augustin, Poland emails | JA 1197-1198 |
| 71. | Pl's. Marked Ex. 72 – Excerpts from 305 pages of complete Exhibit; excerpted for the sake of brevity; excerpts are the Bates pages referenced in Whitehorn Deposition | JA 1199-1503 |
| 72. | Pl's Marked Ex. 73 – Oct 17, 2017 McGuire Email to Poland re: ERB | JA 1504 |
| 73. | Pl's Marked Ex. 74: DZ emails on Goforth pay | JA 1505-1507 |
| 74. | TVA Marked Ex. L – Sept 8, 2017 & Sept 11, 2017 Goforth Emails to McGuire, Assessment | JA 1508-1510 |
| 75. | TVA Marked Ex. M – Oct 6, 2017 Goforth Email and Oct 6, 2017 Cycle 14 Tritium Project Assessment & Evaluation | JA 1511-1524 |
| 76. | TVA Marked Ex. O – Nov 17, 2017 CR 1357390, "Cycle 14 Tritium Consolidation Campaign Gaps" aka "Cusick CR" | JA 1525-1627 |
| 77. | Nov 29, 2018 Employee Information Form | JA 1628 |
| 78. | Exit Package | JA 1629-1633 |
| 79. | Apr 9, 2018 Estimate CWA Cover Sheet | JA 1634-1637 |
| 80. | Feb 12, 2019 Tenn. DOL Unemployment Claim Notice | JA 1638 |
| 81. | Goforth's "Appellant's Jurisdictional Response" to MSPB, excerpt | JA 1639-1644 |
| 82. | TVA's "Agency Response" to MSPB, excerpt | JA 1645-1648 |

5

| | | |
|---|---|---|
| 83. | Goforth's Reply to Agency Response to MSPB , excerpt | JA 1649-1664 |
| 84. | Admin. Judge Order in MSPB case, 9/6/18 | JA 1665-1670 |
| 85. | UAA Decisions and Review Materials, 12/7/18 – 1/18/19 | JA 1671-1728 |
| 86. | John Reeves Phone Interview with Goforth, recording to be hand delivered to Chambers on thumb drive | |
| 87. | Video recording of June 22, 2017 TPBAR incident, to be hand delivered to chambers on a thumb drive | |
| 88. | Robert Goforth Deposition Excerpts (Cont.) Pages: 3, 11-12, 15-16, 22, 24-26, 29, 37-38, 57, 63, 66-67, 69, 73-74, 78-84, 86-88, 90-91, 93-94, 96, 98, 100-101, 103-104, 114-122, 125-126, 156, 158, 167, 172-174, 176, 178-179, 182-183, 185-186, 191, 193, 196-197, 201, 208-209, 211-213, 245 | JA 1729-1823 |
| 89. | John Reeves Deposition Excerpts (Cont.) Pages: 67-68, 117-118, 153 | JA 1805-1811 |
| 90. | Gregory Whitehorn Deposition Excerpts (Cont.)  Pages: 133, 138-139, 141 | JA 1812-1817 |
| 91. | DeWarren Washington Deposition Excerpts (Cont.)  Pages: 38-39, 48-49 | JA 1818-1823 |
| 92. | Freddie Gibson Deposition Excerpts (Cont.)  Pages: 15-16, 27 | JA 1824-1828 |
| 93. | Walter Lee Sanders Deposition Excerpts (Cont.)  Page: 117-118, 131 | JA 1829-1833 |
| 94. | Meshelle Augustin Deposition Excerpts (Cont.)  Page: 89 | JA 1834-1836 |
| 95. | DZ Answers to Plaintiff's Interrogatories | JA 1837-1865 |
| 96. | October 28, 2021 email from Plaintiff's counsel | JA 1866-1868 |
| 97. | Rebecca Whiteman Deposition Excerpts (Cont.) Pages: 97-98 | JA 1869-1872 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November 2021, the foregoing was filed electronically through the ECF system, is available for viewing and downloading from the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filings as follows:

James M. Johnson
Law Offices of James M. Johnson
620 Lindsay Street, Suite 210
Chattanooga, TN 37403
jj@jamesmjohnsonatty.com

Justin S. Gilbert
Gilbert McWherter Scott & Bobbitt
100 Martin Luther King Blvd., Suite 500
Chattanooga, TN 37402
justin@schoolandworklaw.com

Michael Bernier
Stephen T. Mealor
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
865.632.8968
mvbernier@tva.gov
stmealor@tva.gov

*/s/ J. Christopher Anderson*
J. Christopher Anderson

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
2                         AT CHATTANOOGA
    _____
3
    ROBERT M. GOFORTH,
4
            Plaintiff,
5
    vs.                            Case No: 1:20-cv-254
6
    TENNESSEE VALLEY AUTHORITY
7   and DAY & ZIMMERMANN NPS,
    INC.
8
            Defendants.
9
    _____
10
                    Chattanooga, Tennessee
11                    September 9, 2021

12              DEPOSITION OF ROBERT GOFORTH
    _____
13
    APPEARANCES:
14
              FOR THE PLAINTIFF:
15
              JAMES M. JOHNSON, ESQ.
16            Attorney at Law
              620 Lindsay Street, Suite 210
17            Chattanooga, TN 37403
              (423)648-4093
18            jj@jamesmjohnsonatty.com

19                -and-

20            JUSTIN S. GILBERT, ESQ.
              Gilbert Law, PLC
21            100 W. MLK Blvd., Suite 500
              Chattanooga, TN 37402
22            (423)756-8203
              justin@schoolandworklaw.com
23

24

25

1  Q.      And not suggesting that you are, but I've got

2  to ask it for the record.  Are you under the

3  influence of any alcohol, medication or other

4  substance that would impact your ability to

5  understand my questions and answer them truthfully

6  today?

7  A.      No, sir.

8  Q.      And is there any other reason that you

9  couldn't provide truthful, complete and accurate

10 testimony here today?

11 A.      No, sir.

12 Q.      Mr. Goforth, who made the decision to

13 termination your employment from Day & Zimmermann?

14 A.      DeWarren Washington.

15 Q.      And on what facts do you support that belief?

16 A.      Mr. Washington called me and terminated my

17 employment by telephone call.

18 Q.      Other than the fact that Mr. Washington

19 called you and informed you of your termination, do

20 you have any other facts to suggest or to support

21 your contention that he made the decision to

22 terminate your employment?

23 A.      Yes, sir.

24 Q.      Okay.  And what are those?

25 A.      He -- I asked him verbally on the phone when

1    had -- when we first saw the documents, it was

2    DeWarren that was proposing the adverse action.  John

3    Reeves' name was not on any of that.

4    Q.    Okay.  So the fact that DeWarren's name was

5    on the ERB paperwork is why you dispute the fact that

6    John Reeves made the decision to terminate your

7    employment; is that correct?

8    A.    That's part of it, yes, sir.

9    Q.    And what else?

10    A.    DeWarren, through the entire process, he was

11    the one that had met with me.  He's the one that

12    suspended me on October 22nd.  He's the one who

13    terminated me.  He's the one that -- as far as filled

14    out most of the paperwork as far as proposing adverse

15    action, and that's the best of my recollection on

16    that part of the question.

17    Q.    Is there anything else other than what you

18    just told me?

19    A.    None that I can think of at this moment, sir.

20    Q.    Is there anything you would need to look at

21    that would change your mind about -- you said none

22    that I can say at this moment.  We're here at your

23    deposition today.

24    A.    Yes, sir.

25    Q.    So that's why I'm asking.  Is there anything

1  interviewed me there was no -- I was just in the

2  process of the assessment before I even -- before I

3  even knew about that Howard Cusick even existed.

4  Q.      Okay.  You said he interviewed you during

5  that time?

6  A.      Yes, sir, he did.

7  Q.      When did he interview you?

8  A.      It was in September when I was called as --

9  to provide witness testimony in his investigation.

10  Q.      Got it.  When did you first raise the safety

11  concerns out of cycle 14?

12  A.      The safety concerns were -- again, I was not

13  the person -- I was only -- I was called to be a part

14  of a safety concern.  An unknown party raised the

15  concern.

16  Q.      Okay.  So you never submitted a specific CR

17  related to those concerns that you had?

18  A.      No, sir, I was a part of -- my evaluation

19  became the CR word for -- almost word for word in

20  Mr. Cusick's CR during his investigation.

21  Q.      Got it.  Understand.  Okay.  And DeWarren

22  Washington, he left TVA in June of 2017; is that

23  correct?  Or sometime I guess in the late spring, or

24  somewhere in there?

25  A.      Yes, sir, but he came back.

1  process?

2  A.       No, sir, I didn't.

3  Q.       You were informed -- I believe you said you

4  were being terminated by DeWarren; is that correct?

5  A.       That's correct, sir.

6  Q.       And that was on, what, November 29, 2018?

7  A.       Yes, sir.

8  Q.       Tell me everything you can recall about that

9  phone call.

10 A.       He called.  I don't remember a lot about the

11 phone call.  It didn't last but five or six minutes,

12 I think.  He explained to me why.  He told me about

13 the process.  We already talked about it.  He said it

14 was collectively.  I asked him why he's doing this, I

15 think.  I'm really sketchy on the thoughts, but, I

16 mean, I remember the phone call.  I remember the

17 things that I said, but I don't -- he told me about

18 the Day & Zimmermann employee concerns, I think, if I

19 wanted to appeal the decision, I think.

20       What stood out is -- oh, and I asked him how

21 long my access -- he told me my access is being

22 revoked, removed, and I asked him for how long, and I

23 told him -- he told me 90 days.  Then I asked him

24 would my suspension -- I got suspended on October

25 22nd, would that time come off my 90-day suspension?

He said he didn't know, but he would check and see,

and that was about it.

Q.     Okay.  And you said the comment of you asked

him if he made the decision; he said no?

A.     That's correct, sir.

Q.     And then you said did TVA make the decision;

he said no?

A.     That's correct.

Q.     And then what did he ultimately say?

A.     He said it was collectively.

Q.     Okay.  He said it was collectively meaning --

A.     I thought him and TVA.

Q.     But you don't know that?

A.     I do not know that, sir.

Q.     Okay.  And do you know if Day & Zimmermann

has anything to do with your access, like whether or

not your access is for 90 days, or 100 days, or 80

days?  Do you know if that's something with their

purview or if that's someone else?

A.     I thought it was part of the ERB process as

far as the paperwork, but I don't have enough

experience in that part of it to be able to give an

honest answer.

              MR. LANTIS:  25.

              (Document was marked for identification

1  of Energy; is that right?

2  A.      Yes, sir.  The Department of Energy owns the

3  project, to my knowledge.

4  Q.      Were you working with -- who were you working

5  with in terms of who was buying the tritium and how

6  you were shipping it?

7  A.      I don't -- I don't know that.  I know the --

8  I worked for Mr. Maguire, the senior tritium program

9  manager, and I know at least several of the stops

10 once it leaves Watts Bar.

11 Q.      All right.  Who was Maureen Holloway?

12 A.      She was the tritium sustainment group

13 coordinator.

14 Q.      What was her role?

15 A.      She was the coordinator for the sustainment

16 group for all -- she was the coordinator for all the

17 agencies that I know of.

18 Q.      And were there other contractors or

19 individuals involved that she communicated with?

20 A.      Yes, sir.

21 Q.      Like who?

22 A.      Savannah River site; PNNL, Pacific National

23 Nuclear Laboratory; Energy Solutions, NAC; Leidos;

24 the Tennessee Highway Patrol; NNSA, National Nuclear

25 Safety Security Administration, I think that's how

1    you pronounce it; and I forgot the organization that

2    done -- done the waste shipments.  But there were

3    several others that were usually on our conference

4    call, but I don't -- I don't remember what agency

5    they represented.

6    Q.      Were they enforcing the -- or relying on

7    deadlines for TVA to get the tritium out or remove

8    the waste?

9    A.      Can you repeat the question, sir?

10   Q.      Were those agencies and other organizations

11   setting deadlines for TVA to move the tritium or the

12   waste?

13   A.      No, sir.  The tritium is TVA procedurally.

14   As far as when you can harvest, when you can move it,

15   that starts at TVA, but that would be a -- TVA Watts

16   Bar is the first domino in the chain.

17   Q.      How important were meeting deadlines?

18   A.      Very.  Once a schedule was set, every

19   agency -- every agency's schedule adapted -- made

20   their resources to TVA's schedule -- our schedule.

21   Q.      Can you help clarify this in terms of when we

22   refer to a cycle, like cycle 14, what is that cycle?

23   A.      A cycle is where tritium-producing burnable

24   absorbing rods are within the new fuel assemblies

25   that stay inside the nuclear core for a period of

1   18 months and that it completes a cycle,

2   approximately.

3   Q.      So what is -- the cycle 14 harvest, would

4   that occur at the end of 18 months when y'all harvest

5   the tritium from that and transport it?  Is that what

6   that means?

7   A.      The harvesting cycle -- if we're using cycle

8   14, the harvesting -- tritium cycle 14 starts

9   immediately after the outage 14 of that unit because

10  that's when the rods come out of the reactor and make

11  their way to the spent fuel pool.

12  Q.      I've seen a lot of documents refer to the

13  consolidation.

14  A.      Yes, sir.

15  Q.      What is that term -- what is that term

16  referring to?

17  A.      The term is -- that is the -- that term is

18  used -- that is the harvesting.  That is harvesting

19  the rods out of the fuel assembly.

20  Q.      Is consolidation more or less interchangeable

21  with harvesting?

22  A.      It's just another word.  Consolidation,

23  harvesting, to me they are the same.

24  Q.      Thank you.  And were there different phases

25  in terms of the harvesting and then the

1    transportation?  And I also saw in some of the

2    documents waste removal as well?

3    A.        Yes, sir, there was.

4    Q.        Were they going on at the same time or were

5    they distinct phases?

6    A.        Phases, sir.

7    Q.        We'll go into a little bit more detail on

8    that, but thank you for the high level review.  And

9    just very briefly, the work that you were doing on

10   the moisture separator reheater that was the issue

11   with the manway cover, did that have anything to do

12   with tritium --

13                 THE REPORTER:  I'm going to have to ask

14   you to repeat that whole question again.

15   BY MR. MEALOR:

16   Q.        Did your work on the moisture separator

17   reheater that is at the heart of the issue with the

18   manway covers, did that have anything to do with your

19   work on the tritium project?

20   A.        No, sir, it did not.

21   Q.        What was your title when you were working

22   with the tritium project?

23   A.        Tritium task manager.

24   Q.        And what is the tritium mechanical field

25   engineer that I saw at the bottom of some of your

1    e-mails?

2    A.      The tritium field engineer was the person

3    who -- let me -- I don't want to step outside my

4    boundary there.  Could you ask that question one more

5    time, sir?

6    Q.      In many of your e-mails your title says,

7    "tritium mechanical field engineer."  I was asking

8    for clarification of what that is.

9    A.      I was assigned to the tritium program when I

10   was -- when I signed a contract in 2006 -- end of

11   2015 to be the field engineer for the tritium program

12   cycle 13.  I re-signed a contract January 2017 to be

13   the task manager once Greg Whitehorn, TVA maintenance

14   service manager, during the restructuring from MODS

15   to maintenance services, I was taking over his

16   position, sir.

17   Q.      And sometimes the word "oversight" is

18   included with your title or your function.  Can you

19   clarify what that meant?

20   A.      In order to be able to give direction or

21   oversight to TVA employees, I had to at least be

22   augmented, sir.

23   Q.      Right.  So like on your assessment report it

24   says, "tritium task manager/oversight."

25   A.      Yes, sir.

1  Q.      So you oversaw other employees, both DZ

2  employees and TVA employees, is that what you meant?

3  A.      I oversaw the program itself.  Jaycen West,

4  TVA out of maintenance -- out of the maintenance

5  service shop was the supervisor over the employees.

6  I could not -- I have to give -- I provided oversight

7  and guidance to him as he directed the employees.

8  Q.      Kind of like a counselor, giving advice on

9  what to do?

10  A.      No, sir.  Oversight to make sure that he is

11  following the directions and the procedures of the

12  program.

13  Q.      How hands on were you during the work --

14  A.      I was a --

15  Q.      -- during cycle 14?

16  A.      Sorry.  I didn't mean to interrupt you.  I

17  was a non-manual, sir.

18  Q.      Did you have to rely -- so you relied on

19  supervisors.  Did you rely on foremen?

20  A.      What was the last part of that, sir?

21  Q.      Did you rely on foremen?

22  A.      Did I rely on the foreman?

23  Q.      Yes, to help get the work done.

24  A.      I relied on everybody, but the -- I relied on

25  Jaycen West.  He was the supervisor.

1  Q.      Were you ever involved in any capacity for

2  hiring someone or firing someone or disciplining

3  someone?

4  A.      No, sir.  I was not, sir.

5  Q.      Did they come to you for advice on those

6  issues, Jason or others?

7  A.      Yes, sir, they did.

8  Q.      In what capacity?  Were you just giving an

9  assessment of how well someone performed, or were you

10  giving an assessment of what the discipline should

11  be?

12  A.      Oh, I'm sorry, sir, I misunderstood your

13  question.  Are we talking about discipline?

14  Q.      Discipline, hiring and firing, yes, those

15  kinds of managerial decisions.

16  A.      No, sir.  That came from his chain of command

17  through the maintenance service shop.

18  Q.      You did mention earlier SCWE, which is safety

19  conscious work environment, and you explained that

20  had to do with making sure that people felt free to

21  raise safety concerns?

22  A.      Yes, sir.

23  Q.      Did you get any training on SCWE concerns?

24  A.      Yes, sir, at Watts Bar.  It's an annual

25  training.

1  Q.      Do you understand what the connection between
2  SCWE and the ERB is?
3  A.      I never heard of the ERB until my process
4  went through it, sir.
5  Q.      Okay.  Have you ever looked at the process
6  for adverse actions with SCWE?  Have you reviewed the
7  process for adverse employment actions and the ERB?
8            MR. JOHNSON:  Object to the form of the
9  question.  Are you referring to at the time before
10  his ERB, or are you meaning up to today?
11            MR. MEALOR:  Before then, when you
12  were -- when you were the tritium task manager.
13            THE WITNESS:  In the training that I
14  received at Watts Bar, the majority of the training
15  was -- the ERB was never really discussed, sir.
16  BY MR. MEALOR:
17  Q.      Were you ever in a situation where someone
18  had maybe been terminated or suspended and the
19  manager called a meeting to discuss what happened?
20  A.      Have I -- have I ever been involved in that?
21  Q.      Yes, even just as a participant sitting and
22  listening to someone explain why someone was
23  terminated or suspended.
24  A.      Not that I can recall, sir.
25  Q.      Are you at all familiar with the mitigation

1    process when someone is suspended or terminated?

2    A.       The what process, sir?

3    Q.       Mitigation.

4    A.       Am I familiar with it?  No, sir, I'm not.

5    Q.       Is that typical of a contract employee, you

6    know, to have -- to go through some trainings, but

7    just to have minimal knowledge of the ERB process?

8              MR. JOHNSON:  Object to form.

9              THE WITNESS:  Our training was always

10   roughly a one- or two-hour deal, a one- or two-hour

11   process.  I can't remember much going longer than

12   that.  I think there might have been an eight-hour.

13   The main focus on the training was your avenues of

14   listed employees, and there's a couple of training

15   films with scenarios that you would go through.  But

16   it's basically knowing the avenues to take if

17   somebody had a nuclear safety concern, or if they

18   were experiencing a chilled work environment.

19   BY MR. MEALOR:

20   Q.       Thank you.  As part of your duties as the

21   tritium task manager, were you responsible for the

22   safety of the project, the people working on the

23   project?

24   A.       I was one of everybody.  Everybody was

25   responsible.

1  Q.      Were you aware of any safety violations --

2  let me rephrase.

3          Did you or anyone under your supervision

4  violate a safety rule?

5  A.      There was some rules that were -- no, not

6  safety, no, sir.  Not that I can remember.

7  Q.      Are you aware of any time that you or someone

8  who worked on the project underneath you violated an

9  NRC rule?

10  A.      Not to my knowledge, as far as a specific NRC

11  rule, sir.

12  Q.      Are you aware of any safety violations that

13  occurred during the cycle 14 harvesting or

14  consolidation, tritium consolidation?

15  A.      Well, there was gaps.  If you're referring to

16  the gaps as concerns in cycle 14, then I was aware of

17  a lot of things that happened there.  But some of

18  them may not be safety, or you could say everything

19  is safety.  I don't -- I'm not -- I don't know -- I

20  don't know how to answer the question.

21  Q.      That is fair.  We will go over the answer

22  that you described in those gaps.  So in terms of

23  individual incidents that may not have been reported,

24  were they handled immediately?

25          So if there was a safety incident, were they

1    handled immediately, or do you know of any safety

2    incidents that were not handled immediately?

3    A.      Well, the one safety issue that was not

4    handled would be the -- not just the dropping of the

5    TPBAR in cycle 14, but it was the direction to turn

6    off the cameras to make an unauthorized fix.  That

7    safety concern -- that nuclear safety concern was --

8    that was the problem.  That was -- it wasn't the

9    drop.  You could deal with a drop.  But telling

10   people to violate procedures to turn off cameras

11   while you make an unauthorized fix, that is the

12   problem.  To me --

13   Q.      How --

14   A.      Go ahead.

15   Q.      No, please.

16   A.      I probably went too far into that question.

17   I apologize.

18   Q.      We will return to that.  I think I'm just

19   trying to get an assessment of your work at a high

20   level.  You also mentioned lessons learned; correct?

21   A.      Yes, sir.  The entire evaluation was a

22   lessons learned.

23   Q.      The consolidation assessment was part of a

24   lessons learned, is that what you're saying?

25   A.      Yes, sir, it was.

1    A.       Yes, sir, I do.

2    Q.       What is it?

3    A.       I said, yes, sir, I do.

4    Q.       And what is that document?

5    A.       This right here is going to be a lessons

6    learned.  It's adding with Energy Solutions, a

7    tritium sustainment group organization that deals

8    with waste.

9    Q.       Is this a different type of lessons learned

10   than what we saw in Document G?

11   A.       Yes, sir.

12   Q.       And what was the purpose -- going back to

13   Document G, what were the concerns that they were

14   looking for in that lessons learned?

15   A.       Every lesson learned is something to make us

16   better, no matter how small it is, no matter how

17   large it is, whether it be a procedural change,

18   procedural guidance, equipment, rad pad issues.  Rad

19   pad, radiological pad where we park things inside the

20   containment area.  There's just a whole list of

21   things.

22   Q.       And Document I, do you have that in front of

23   you?

24   A.       Have what, sir?

25   Q.       Document I.

1              THE REPORTER:  One moment.  Are you

2    marking this document, Counsel?

3              MR. MEALOR:  Yes, I'd like to admit that

4    as the next exhibit.

5              (Document was marked for identification

6    as Exhibit Number I.)

7    BY MR. MEALOR:

8    Q.      Let me know when you're ready.

9    A.      Yes, sir, I'm ready.

10   Q.      Is this a third lessons learned with the

11   agencies?

12   A.      Yes, sir, it is.

13   Q.      Is this different in any way in terms of the

14   main purpose of the lessons learned?

15   A.      Well, my memory is a little faint on some of

16   these, but all of these are a collective part of the

17   process from the cycle 13 with waste.  Cycle 14 you

18   had two different functions there.  You had the

19   actual harvest and production, and then you had

20   waste.  Two totally separate.  The time frame's a

21   span of over eight months, eight or nine months, sir.

22   And I wouldn't have the best memory.  I recognize

23   what they are, but nothing -- I'll try to answer your

24   questions as best as I can remember, sir.

25   Q.      Thank you.  Well, that -- what you're telling

1  me is that you have several of these lessons learned,

2  they are ongoing, and they cover a multitude of

3  issues?

4  A.      Yes, sir, they do.

5  Q.      And they are with other agencies for the next

6  dominos, so to speak, in the chain?

7  A.      Each agency has to provide the tritium chair

8  with lessons learned to make the program better to

9  Ms. Holloway, and then she distributes those

10  collectively with all agencies involved and makes one

11  big, gigantic lessons learned.

12  Q.      Would you say their primary concerns are

13  scheduling, costs, efficiency?

14  A.      Yes, sir.  I think that would be a fair

15  assessment, sir.

16  Q.      And you had said that the assessment that you

17  do builds up to these lessons learned.  Can you talk

18  about that a little bit?

19  A.      My assessment or these?

20  Q.      Your assessment.

21  A.      The assessment I wrote was by direction of

22  Mr. Jeff Maguire for in-house use.

23  Q.      Thank you.

24          MR. MEALOR:  Let's pull up Document K and

25  maybe for simplicity sake we can have G admitted as

1  Exhibit 1, H as Exhibit 2, I as Exhibit 3, and

2  Document K can be Exhibit 4.

3           MR. JOHNSON:  We've already labeled them

4  according to the letters, and that might be better.

5  I mean, it's up to you because that will distinguish

6  them from the other numbered exhibits that have been

7  admitted today.

8           MR. LANTIS:  Yeah, if I may, I would

9  suggest that we just approach them by labeling them

10 Exhibits H, K, G, whatever.  Like we'll just do it

11 that way.

12          MR. MEALOR:  Wonderful.

13          MR. JOHNSON:  Yeah, I think it's fine.

14          MR. MEALOR:  Okay.  Thank you.  I thought

15 there was some confusion there.  This is Document K.

16 I would like to enter this as an exhibit.

17          (Document was marked for identification

18 as Exhibit Number K.)

19          THE WITNESS:  I'm ready sir.

20 BY MR. MEALOR:

21 Q.      Thank you.  You said that Mr. Maguire had

22 asked you to do an assessment.  Is this an e-mail

23 that he's asking you to do the assessment, giving you

24 advice?

25 A.      For the tritium sustainment group, yes, sir.

1    Not for in-house TVA.

2    Q.       What is the difference?

3    A.       Everything here is for the tritium

4    sustainment group and equipment -- equipment needs

5    that goes for the tritium sustainment budget as a

6    whole.

7             MR. MEALOR:  And let's pull up

8    Document M, please.  "M," as in Mary.

9             (Document was marked for identification

10   as Exhibit Number M.)

11            THE WITNESS:  I have it in front of me,

12   sir.

13   BY MR. MEALOR:

14   Q.       Thank you.  I'd just point out that in that

15   e-mail dated October 6th, it's titled, "Assessment

16   and Evaluation File."  Was this your final version?

17   A.       Yes, sir, I believe it was, sir.

18   Q.       And is this the assessment evaluation that

19   was the source of Cusick's CR report and is the

20   evaluation that figures largely in your complaint?

21   A.       Yes, sir, I believe it is, sir.

22   Q.       And when did Mr. Maguire ask you to do this?

23   A.       I'm not exactly sure of the date, but I can

24   give you a ballpark.  I think it was -- him actually

25   asking me was in the month of August, I think, sir.

1   Maybe -- I think it was the end of July, August, in
2   that neighborhood.
3   Q.     What were his instructions?
4   A.     He wanted an evaluation of the program and
5   all the events that occurred during the cycle 14 so
6   he could have a further discussion with upper TVA
7   management.  And that's as far as I knew.  He didn't
8   go any further in details about it, sir.
9   Q.     He did not express any concerns to you?
10  A.     Excuse me, sir?
11  Q.     He did not -- he did not express concerns to
12  you that he wanted you to spill over?
13  A.     Not that I can remember, sir.
14  Q.     What was the conclusion that you reached?
15  A.     The conclusion was that we had lessons
16  learned.  From my take of it, we had lessons learned,
17  issues that happened, things we overcame, things we
18  needed to get better on, and they were all listed in
19  the summary part of it.  And pretty much everything
20  in my conclusions were listed in here, sir.
21  Q.     You said a lot of the problem was about the
22  use of TVA workers who were inexperienced?
23  A.     Yes, sir, that's correct, sir.
24  Q.     Do you know why TVA started using their own
25  workers, even though they were inexperienced?

1  A.      Yes, sir.

2  Q.      What was that?  What was the reason?

3  A.      Mr. Maguire told me that they wanted to

4  supplement their budget because now that we are a

5  dual unit operation facility, Units 1 and 2 at Watts

6  Bar, the number of personnel needed to be matched by

7  Sequoyah's personnel.  And Watts Bar Nuclear Plant,

8  as far as -- not tritium, just TVA maintenance

9  department as a whole, were heavy in personnel, and

10  that people would have to be let go to get to the

11  same number, but adding them to the tritium program

12  would supplement their budget.

13          Anything beyond that, I would just be -- it

14  would be more speculation.  I don't have any

15  knowledge any more than that.

16  Q.      Did Mr. Maguire think this was a bad idea?

17  A.      Yes, sir.

18  Q.      Can you go on?

19  A.      Yes, sir.  The TVA employees that came to the

20  tritium program did not want to be there.  They were

21  very vocal about it to the entire tritium staff, the

22  tritium team.

23  Q.      When did y'all realize that was a problem?

24  A.      Immediately, sir.  In March, April, every

25  month during the harvesting, sir.

1   Q.      Did that cause safety problems?

2   A.      Not just safety, but it caused -- it caused

3   issues throughout just the harvesting, sir.

4   Q.      So how did the -- how did the year end?  Was

5   it successful in the end?

6   A.      As far as getting all the shipments out of

7   Watts Bar and to their destinations, yes, but if my

8   memory serves me correct, I think we had to push some

9   schedule dates.

10              MR. MEALOR:  Can we look at Document N

11  and admit it?

12              (Document was marked for identification

13  as Exhibit Number N.)

14              THE WITNESS:  I have it, sir.

15  BY MR. MEALOR:

16  Q.      That speaks to deadlines, does it not?

17  A.      Yes, it does.

18  Q.      And what are you saying in this e-mail?

19  A.      The last couple of days of the harvesting --

20  this e-mail right here was dated December 21st.  This

21  is a part of the process of the waste shipment only.

22  Not the harvesting.  Just the waste shipment.  We had

23  been in a standstill for the outage, and this part of

24  the process right here was absolutely -- this has

25  nothing to do with the harvest shipment.  This right

1  here was strictly waste, and it went smooth.

2  Q.      Okay.  And who is it written to?

3  A.      Carla Borrelli and Jeff Maguire.  Contact --

4  CC'd to Steve Cook, the TVA maintenance MMG

5  supervisor -- I mean, manager; Benny Crownover, the

6  foreman; Charles Theobald, radiological protection

7  supervisor; Frank Jasper, manager; Maureen Holloway,

8  tritium sustainment group chair; and Morgan Blair,

9  foreman of the laborers.

10  Q.      So what I'm hearing is that by December, by

11  that stage, things were better, but in the summer

12  things were not great, to keep it simple?

13  A.      That is correct.  The waste shipment was

14  absolutely smooth, yes, sir, and it's completely

15  different than a harvest -- harvesting shipments.

16  Q.      The assessment that you did, did Greg

17  Whitehorn help out with it?

18  A.      He proofread it.  He proofread the

19  evaluation, sir.

20  Q.      Did he have any suggestions that you

21  remember?

22  A.      I don't remember that, sir.

23  Q.      What was his response in general?

24  A.      I can't remember that, sir.

25  Q.      Okay.  And did Mr. Maguire coach you on this

1  after the instructions he gave you?

2  A.      I sent my evaluation to him electronically,

3  and Mr. Maguire would -- and I sent it to him in

4  Word -- he would make changes in red, have me look at

5  it, and then come back and redo some of the -- redo

6  some of the changes, and my thoughts on some of the

7  changes and reason for.  So, yes, he -- he had a lot

8  to do with my evaluation, sir.

9              MR. MEALOR:  Can we look at Document L?

10             THE REPORTER:  Counsel, are you admitting

11 this document?

12             MR. MEALOR:  Yes.

13             (Document was marked for identification

14 as Exhibit Number L.)

15             THE WITNESS:  I have it, sir.

16 BY MR. MEALOR:

17 Q.      You were just referring to corresponding with

18 Mr. Maguire for the changes.  Is that what these

19 e-mails are about?

20 A.      Yes, sir, I think that it is, sir.

21 Q.      Can we look at the -- look at the last page

22 dated September 8th.  And the e-mail says that you've

23 been working all week on this, that it is time

24 consuming, and you wanted to record everything from a

25 daily log.  What daily log or what were you trying to

1  record?

2  A.      Sir, what -- from what date, sir?  The last

3  page has September 8th.

4  Q.      Yes, September --

5  A.      I'm sorry.

6  Q.      4027 is the number at the bottom.

7  A.      Yes, sir, I have it.  Now, could you repeat

8  your question?

9  Q.      Yes.  You wanted to cover everything from

10 your daily log?

11 A.      Yes, sir.

12 Q.      What issues were you wanting to cover?

13 A.      I had to give Mr. Maguire and Ms. Borrelli a

14 daily log, but it wasn't really sent every day, but

15 it was sent to them of where we were at so they

16 could -- but also Ms. Holloway, for the tritium

17 sustainment group, so they knew the progress of where

18 we were at during the harvesting, because I couldn't

19 attend some of the conference calls.  So everything

20 that happened during the day was recorded on a daily

21 log.

22 Q.      Everything was recorded on a daily log, and

23 you wanted to cover everything in the report?

24 A.      In the evaluation assessment, sir.  I tried

25 to, yes, sir.

1  Q.      What -- what was the substance or the

2  issues -- can you describe what kind of things you

3  put in that log that you were trying to cover?

4  A.      How many rods that we -- how many TPBARs,

5  tritium-producing -- known as TPBARs,

6  tritium-producing burnable absorbing rods -- how many

7  we harvest during the day, any issues during the day,

8  anything that generated a CR.  Just everything as a

9  whole.  Equipment failure.  It covered everything in

10 the log.

11 Q.      And to whom was this assessment evaluation

12 written to?  Who was your audience?

13 A.      Mr. Maguire and Carla Borrelli, the two

14 tritium senior managers, and Ms. Holloway.

15 Q.      And Ms. Holloway would read this, too?

16 A.      Yes, sir.

17 Q.      And --

18 A.      Wait.  Now she wouldn't -- she didn't -- not

19 the assessment evaluation.  The daily log.

20 Q.      The daily log.  Okay.

21 A.      Not the assessment evaluation, sir.

22 Q.      So the sentence that says, "My intention is

23 to send it to you and Carla," is "it" the assessment

24 evaluation or the daily log?

25 A.      Yes, sir.  My instructions, per Mr. Maguire,

1  the only two people that gets a copy of that

2  assessment evaluation would be them.

3  Q.      And what does the last sentence of that

4  paragraph mean?

5  A.      They wanted to know all good and bad,

6  everything, lessons learned, the evaluation and

7  assessment.  They were going to go to Jesse James

8  with it, the maintenance director, and because at

9  first wanting a -- was never got, was a memorandum of

10 understanding, which is covered in the FHI procedure.

11 But other than that, I don't have any knowledge about

12 why they wanted to go talk with Jesse James.

13 Q.      Did you hear anything about that conversation

14 with Jesse James afterwards, after they had it?

15 A.      I have no memory of that, sir.  I don't know.

16 Q.      Earlier you had said that you were asked to

17 do the assessment evaluation so that Mr. Maguire

18 could talk to TVA higher-ups.  Were you referring to

19 this incident, what you're talking about now, with

20 Jesse James?

21 A.      Well, not only Jesse James, but the people

22 above him as well.  My goal was to give it to him and

23 Carla Borrelli.  That was my instruction.  Write it

24 as detailed as possible and give it to them.

25 Q.      But you do not know what their purpose was

1  for it?

2  A.      I do not know 100 percent.  No, sir, I do not

3  know.

4  Q.      All right.  Would you look back at Document

5  M, the actual assessment?

6  A.      Document N?

7  Q.      "M," as in Mary.  It should already be in

8  front of you.  This is the actual assessment that

9  we --

10 A.      Yes, sir.

11 Q.      Okay.

12 A.      Yes, sir.

13 Q.      And you mentioned gaps?

14 A.      Yes, sir.

15 Q.      What is a gap?  How do you know what a gap

16 is?

17 A.      Gap, I had something else there when I first

18 sent my first draft.  Mr. Maguire changed it to gap.

19 I had issue there.  Mr. Maguire changed it to gap.

20 For whatever reason, I do not know.  But I had issue.

21 Q.      What did you originally mean by "issue"?

22 What kind of things were you looking for?

23 A.      Issue, an event that is part of the lessons

24 learned, whether it be good or bad.  It was issues

25 that we faced, issues that the team faced during the

1  cycle 14, sir.

2  Q.      Well, let's turn to -- it's Page 6.  The

3  Bates number is 4037.

4  A.      Yes, sir, I have 4037.

5  Q.      And we have the first gap.  What was that

6  about?

7  A.      The refuel team laid off all their people at

8  the end of the outage, and there was nobody left, and

9  all of their stuff was left up on the floor.  Stuff

10 that weighs tons, multiple tons.  We had to remove

11 that stuff off the floor for them before we could

12 start the harvest, which impacted our schedule.

13 Q.      It affected your schedule.  When did that

14 happen?

15 A.      Right after the outage.  I want to say

16 April-ish.  I'm not -- that's an approximation.

17 Q.      Okay.  Thank you.  But you're noting a gap

18 that impacted schedule?

19 A.      Yes, sir.

20 Q.      Number 2.  And you have some dates here of

21 May?

22 A.      Yes, sir.

23 Q.      And in the note it mentions schedule delays.

24 Was this gap also about scheduling?

25 A.      Yes, sir.  There was people on the floor

1  without the first line supervisor, Jaycen West, and

2  the TVA foreman, Benny Crownover, so they had to set

3  up a temporary foreman until they got back.

4  Q.      All right.  Well, look at Number 3.

5  A.      Yes, sir.

6  Q.      And what was the issue there?

7  A.      We had an agreement prior to the start with

8  TVA MMG.  When I say "we," I was at the meeting with

9  Mr. Maguire, Carla Borrelli, Greg Whitehorn with TVA

10 MMG management, and it was agreed that the tritium

11 would work in order to meet the schedule.  They'd

12 harvest as many -- our daily necessity rods.  It

13 would have to be on a ten-hour shift because of our

14 radiological concerns in our RWP, radiological work

15 permit.  And that was the agreement.  And some of the

16 TVA employees, the annual guys, left in eight hours

17 and went home.

18 Q.      What problems did that cause?

19 A.      You had to have -- in order to perform an

20 operation of harvesting, everybody has to be in

21 place.

22 Q.      So was it delayed?

23 A.      Yes, sir, it was delayed.  We had -- we had

24 to shut down harvesting because of radiological

25 concerns.  Only so many people can be in the zone for

1　dose, what they call a jump, and the TVA employees,

2　some went home.  The annual boilermakers said that

3　they didn't have to work ten hours, and they left in

4　eight.

5　Q.　　　Number 4, gap number 4.

6　A.　　　Yes, sir.

7　Q.　　　This refers to something that occurred in May

8　is what it looks like?

9　A.　　　Yes, sir.

10　Q.　　　What was the impact of this problem?

11　A.　　　The impact of this problem right here is

12　where a TVA employee, annual boilermaker, dropped a

13　stainless steel large clip into the cask loading area

14　of the spent fuel pool, and instead of trying to

15　retrieve what was dropped, he left the floor and went

16　home.  So the remaining personnel, not just him,

17　other boilermakers went home, and we had to get

18　people dressed out to go in the zone, the C zone,

19　known as the containment zone, get dressed out and be

20　around the spent fuel pool, which is highly

21　radioactive, to retrieve the FME, "foreign material

22　exclusion," that was dropped in the pool.  We

23　couldn't proceed further until it was removed.

24　Q.　　　Did you witness that --

25　A.　　　Yes.

1  Q.       -- the removal?

2  A.       Yes, sir, I did.

3  Q.       And you said there was a CR.  Did you do the

4  CR?

5  A.       I think I did, sir.

6  Q.       Was safety compromised in the cleanup

7  process?

8  A.       Personal safety, if you're referring to that.

9  As far as a nuclear safety concern, it was the -- you

10 can make an issue on it, but personal safety we

11 had -- people had to go back in for a jump that had

12 already been in there for a possible dose exposure.

13 On millirem, you're picking up dose.

14 Q.       When you arrived, did you handle that

15 properly?

16 A.       Did I what, sir?

17 Q.       Handle the situation properly.  Was it

18 properly handled in the aftermath?

19 A.       As far as removing the piece, yes, sir.

20 Q.       Was the person disciplined in any way, to

21 your knowledge?

22 A.       I do not know that.  I turned that over to

23 Mr. Maguire.  And I want to say -- I don't know on

24 the TVA side of the house which direction that took,

25 really.  The CR -- the CR itself would have been

1    addressed in a corrective action, a CAP, a C-A-P.

2    Q.      Do you know when that was wrapped up, the

3    corrective actions were wrapped up?

4    A.      I do not know that, sir.

5    Q.      Was that no longer your concern at that

6    point?

7    A.      No, it was always my concern, but as far as

8    discipline and coaching and whatever, that was

9    handled through the MMG side of the house.

10   Q.      The corrective action program, was that

11   completed?

12   A.      I do not know that, sir.  All I did was

13   generate the CR, establish the condition --

14   Q.      Oh, it's frozen.  Can you hear me?

15   A.      I can hear you, but you're frozen.

16   Q.      Hello.

17   A.      Yes, sir.  I'm here, sir.  Mr. Mealor, I can

18   hear you, sir.

19   Q.      Hey.  Okay.  We were gone for a little bit.

20   A.      That's okay, sir.

21   Q.      I had asked whether the corrective action

22   program, or the CAP, was completed.

23   A.      I'm not -- I have no knowledge of that, sir.

24   Q.      Okay.

25   A.      I don't have memory of it, sir.

1  Q.      Was it -- was this still a hot concern in

2  July, this incident?

3  A.      This incident, sir?  It's a trend.

4  Q.      Yeah.

5  A.      It's a trend.  Yes, sir.

6  Q.      Okay.  So it was one among many incidents,

7  but this particular thing that happened between

8  May 4th and May -- in May, was that resolved?

9  A.      I cannot remember, but I just want to

10 clarify.  Things are dropped in the spent fuel pool

11 frequently.  The problem is leaving -- leaving it

12 there.

13 Q.      Okay.  Thank you.  That clarification does

14 help.  Number 5.

15 A.      Yes, sir.  Number 5 is that the tritium

16 sustainment group -- I'm sorry, ask the question.

17 I'm sorry, sir, I'm leading you.  I'm sorry.

18 Q.      Well, we are establishing our own trend here.

19       Do you know what the problem was?  And I see

20 at the bottom of the first paragraph there,

21 unnecessary delay?

22 A.      Where are you at, sir?

23 Q.      Page 4039.

24 A.      Yes, sir.

25 Q.      Number 5.

1   A.     Yes, sir.

2   Q.     And that paragraph starts, "During the

3   initial harvesting process," and ends with the

4   sentence, "this caused several unnecessary delays and

5   added time to the project."

6   A.     Yes, sir.

7   Q.     So was timing, scheduling delays, was that

8   the main concern here?

9   A.     Yes, sir.  We had a -- we had a window.  We

10   had a window before the outage, the fall outage in

11   2017.  This was our window.

12   Q.     Number 6.

13   A.     I'm there, sir.

14   Q.     What was the issue?

15   A.     A FATF, F-A-T-F, is known as a fuel assembly

16   transfer form, the FATF -- I'll note it as the

17   FATF -- is obtained -- that document is obtained from

18   Reactor Engineering at Watts Bar.  They're the ones

19   who tell us which fuel assembly has tritium rods in

20   it and which ones we can harvest.

21        So I am given this document by Reactor

22   Engineering and this FATF list has to go in our work

23   order, our tritium work order.  The problem here was,

24   there was assemblies that we had to harvest within

25   8 feet of the weir gate inside the spent fuel pool.

1    Q.      What cost or problem did that cause the

2    project?

3    A.      At the time the -- I want to make sure I say

4    this right -- inside the weir gate -- the weir gate

5    is a large metal door that weighs several tons.  It

6    acts as a big stop for the transfer -- the fuel

7    transfer canal.  That's how fuel assemblies are moved

8    out of the core and moved to the spent fuel pool.

9           Without water in it, the radiological effect

10   within 8 feet of the weir gate can cause a shine

11   effect, like a mirror.  An example, you flash a

12   flashlight into a mirror and the reflection will show

13   up on the wall somewhere.  But it's the same concept

14   with a shine effect with radiological dose,

15   contamination.

16   Q.      And it looks like y'all had decided on a plan

17   to fix this issue?

18   A.      Yes, sir.  Over a weekend is to fill these

19   transfer canals with water.  Water is shielding for

20   radiological contamination.

21   Q.      And what was the -- did that cause delays?

22   Did that cost money?  What was the problem?  Why

23   would this raise eyebrows?

24   A.      It was just -- it was an issue that we had to

25   stop.  We couldn't harvest those rods within the

1    8 feet till the water got in the canal.  Had to get

2    Reactor Engineering.  It was a lessons learned for

3    everybody.

4    Q.        Okay.  Gap 8 and --

5    A.        I'm there, sir.

6    Q.        Yeah.  Real briefly, what was this about?

7    A.        This right here is where the TPBAR, the

8    tool -- I'm sorry, the bridge crane had had a loaded

9    TPBAR assembly baseplate/hub on the hook, and it was

10   dropped onto the pitchfork, the tritium -- the upper

11   tritium consolidation fixture, known as the TCF, and

12   it was dropped on the pitchfork, bending a thimble,

13   which procedurally they have to go in a pitchfork a

14   certain way, and they're harvested by our cameras,

15   our cameras for viewing.  And this is where the

16   tritium -- the hub was dropped, bent the thimble, and

17   had the unauthorized fix.  This was the date.

18   Q.        Okay.  This is the one that has been

19   discussed quite a bit, this thimble plug that you

20   mentioned earlier in your conversation as a safety

21   issue, or is that gap 9?

22   A.        Yes, sir.  I'm sorry, you are correct.  I

23   misspoke.  What I said earlier is not correct.  This

24   is where the same employee was jamming the de-torque

25   tool on top of the tritium BAR and -- if I can

1  remember this correctly -- when he jammed it on

2  there, he jammed it on like -- it's hard to -- I

3  don't even know how to give an example, but he

4  couldn't pull the tool off.  And on camera -- this is

5  how you watch things.  We have cameras and big screen

6  TVs that we can see, everybody can see what's going

7  on -- he started jerking it.

8           Now, the jerking of the hex nut on top of the

9  TPBAR is right around 50 inch pounds, not foot

10 pounds, inch pounds, roughly finger tight, depending

11 on who you are.  And he could have dropped the rod.

12 So instead of just stopping, he get going and jerking

13 this thing, nearly jerking the hub off the pitchfork.

14 Q.       And was this one of these inexperienced TVA

15 employees?

16 A.       Yes, sir, it was.

17 Q.       And I see there's an action.  This was

18 addressed at the time, immediately?

19 A.       Yes, sir, and it was addressed not just

20 there, but it was addressed in the morning pre-job

21 brief that we conducted with all members, as a whole,

22 so we all were on the same page.

23 Q.       How did you learn of this incident?

24 A.       If I'm not mistaken, I was there when it

25 started happening, sir.

1  Q.      And who decided to make it an incident and

2  share it with other people?

3  A.      Well, that would come from me.  Anybody can

4  coach anybody, contractor, TVA alike, at Watts Bar,

5  coaching, human error.

6  Q.      Okay.  But -- okay.  Do you remember who it

7  was?

8  A.      Yes, sir, I do.

9  Q.      Okay.  Who?

10  A.      Anthony --

11  Q.      I'm sorry.  Let me be more clear.  Who was

12  the person that said, let's do, I guess, a lessons

13  learned or a briefing and brief other people about

14  this incident?

15  A.      Lessons learned are pretty much discussed at

16  a -- coachings are done daily, sir.

17  Q.      Okay.  So this was a coaching like to the

18  team?

19  A.      Yes, sir.

20  Q.      Okay.  Who did the coaching to the team?

21  A.      Myself and Jaycen West, the TVA supervisor.

22  Q.      Okay.  Thank you.  I do want to go back to

23  gap 7.  Is gap 7 related to gap 6?

24  A.      Yes, sir, it is.  That was on the ALARA plan.

25  ALARA stands for as low as reasonably achievable.

1  And you have to have a radiological ALARA plan to be

2  around the spent fuel pool and everything; the

3  radiological effects inside containment.  And one,

4  there was conflict between a -- there was conflict

5  between two different -- our ALARA plan, which was

6  given to us by radiological protection, known as

7  RADCON, radiological control, that was in our

8  conflict with the RCI procedure, which stands for, I

9  think, radiological control instruction.

10  Q.     How did you hear of this problem?

11  A.     The -- I believe one of the RAD -- I don't

12  know.  I believe it was one of the RADCON personnel,

13  but I could be wrong about that.

14  Q.     Was this a well-known problem?

15  A.     It was more or less discovered during our --

16  during our tritium harvesting, we would be pretty

17  much the only ones doing work in a spent fuel pool

18  without a -- without water in the canal or around the

19  weir gate.  During refueling and outages, the water

20  is full for transfers.  So that's -- that's about as

21  much as I can comment on it, and I could be wrong

22  about that.

23  Q.     Okay.  It sounds like y'all were handling

24  this as a team; is that correct?

25  A.     Say again, sir.

1   Q.      Were you handling this as a team?

2   A.      Yes, sir.  We got the right people involved.

3   RADCON personnel ops involved, and Mr. Maguire was

4   involved with some of this.

5   Q.      Thank you.  All right.  Let's go back to --

6   up to gap 9.  And, you know, keeping an eye on this

7   document, can we pull up Document Q?

8              THE REPORTER:  Are you marking this one,

9   Counsel?

10             MR. MEALOR:  Please.

11             (Document was marked for identification

12   as Exhibit Number Q.)

13  BY MR. MEALOR:

14  Q.      Are you ready?

15  A.      Give me one second, sir.  I'm trying to get

16  these out of my way.  Okay, yes, sir, I think so.

17  Q.      All right.  Do you recognize this e-mail?

18  A.      Yes, sir, I do.

19  Q.      And is this about the same incident that is

20  discussed in gap 9?

21  A.      Yes, sir, it is.

22  Q.      And this mentions that you were -- were you

23  on a conference call when this happened?

24  A.      Yes, sir, I was.  Jaycen West, the TVA

25  supervisor was with me.  He had never been a part of

1 the conference call. And I was on a tritium

2 sustainment group conference call with the other

3 agencies.

4 Q. How did you hear about the incident then?

5 A. I got a phone call during the meeting.

6 Q. Who called you?

7 A. Steve Romines, the camera operator.

8 Q. All right. And you said West was with you.

9 So who was in charge at that time then?

10 A. The foreman, Benny Crownover.

11 Q. Okay. And was Mr. Crownover, was he on top

12 of things? Was he handling the situation well?

13 A. No, sir, obviously, he wasn't.

14 Q. Okay. So Romines discovered and realized

15 there was a problem. He brought it to you and to

16 West?

17 A. I don't know if he brought it to West. He

18 brought an issue to me, a safety concern to me.

19 Q. Okay. And --

20 A. Once I got to the floor, the refuel floor.

21 Q. All right. And who all heard about this? I

22 mean, was this a topic of conversation around the

23 proverbial watercooler?

24 A. No, sir. There is -- we work -- do you want

25 me to explain, sir?

1  Q.      Yes.  Yes.

2  A.      All of our team members have headsets,

3  voice-communicated activated headsets.  The entire

4  team has a headset on their head that's either in the

5  zone or part of the evolution.  So at any given one

6  time, there would be 15 people with a headset on.

7  The only way to communicate -- the only way to

8  communicate in the zone, outside the zone, is by

9  voice-activated headset.  The entire team heard and

10  seen.

11      We have cameras, TVs, 60-inch TVs mounted on

12  the wall, plus our recording -- our mandatory

13  recording device units, known as a MOCU, M-O-C-U,

14  motor operated control unit, that records everything

15  when irradiated parts are moving through the water.

16  Everybody on the headsets is watching TVs, monitors,

17  and everybody saw it, everybody heard the

18  communications.

19  Q.      And it looks like, by this e-mail, afterwards

20  you reported to Jeff and Carla what had happened?

21  A.      Yes, sir, and Lukus Barnes and Andrew Huth.

22  They are both -- at the time, Lukus Barnes was the

23  radiological engineer manager, and Andrew Huth was

24  the radiological -- Reactor Engineering.  I

25  rephrase --

1   Q.      Were other people -- go ahead.

2   A.      Lukus Barnes was the Reactor Engineering.

3   They're the engineer manager and engineer over the

4   tritium program, are for the tritium program.

5   Q.      Were there other people who were looped in

6   that day or maybe by the next day?

7   A.      I'm sorry.  What was the question?

8   Q.      Who else had been looped into this issue?

9   A.      Did you say "looped," L-O-O-P-E-D?

10  Q.      Yes, yes.  Who else was notified?

11  A.      On my -- I notified Jeff Maguire, Carla

12  Borrelli.  I spoke about it with Greg Whitehorn.  The

13  entire team.  Radiological protection part of the

14  team.  But there was discussions with folks within a

15  quick -- that day -- that day was mainly just to get

16  rid of the -- just get the hub harvested and make the

17  hub waste and get the BARs off of it.

18  Q.      The last sentence of the e-mail says, Steve

19  Cook told Jaycen West to do a CR"?

20  A.      Yes, sir.

21  Q.      Did you -- so was that decision made apart

22  from you?

23  A.      Yes, sir.  Jaycen West, being a TVA MMG

24  supervisor, would have answered to Steve Cook

25  concerning issues of TVA MMG employees.

1  Q.      And were they alerting their superiors of

2  this issue as well?

3  A.      I do not know that, sir.

4  Q.      Okay.  And I'm looking back to your

5  assessment, Exhibit M, and back at, you know,

6  Page 4042, and that action mentions having to shut

7  down the process; correct?

8  A.      Hold on one second, sir.  I'm trying to get

9  there.

10 Q.      Sure.

11 A.      Oh, I've got "M" already opened.  I'm sorry.

12 Where are you at?  4042.  I'm sorry.  I've got it.

13 Q.      Yeah, so I'm at 4042, gap number 9, that

14 paragraph on action, and it mentions shutting down,

15 what, five days?

16 A.      Yes, sir, for a safety stand-down.

17 Q.      What's a safety stand-down?

18 A.      To -- when you have a trend of issues

19 starting to happen -- now this is my version.  When

20 you have a trend of issues, regardless of how they

21 happen, you do a safety stand-down.  You talk about

22 it.  You take people away from the job and try to get

23 refocused through coaching, whatever.  But I was not

24 a part -- I was a part of the stand-down, but the

25 employees, at that point, for that part of the

1  stand-down, were with Steve Cook.

2  Q.      All right.  So you believe that Steve Cook

3  was probably the one handling the safety stand-down?

4  A.      Yes, sir, he came in that morning, the

5  following morning, in our morning pre-job brief, and

6  that was his decision.  I believe Mr. Maguire was

7  there.  I'm not for sure, but I know he stated that

8  there would be a safety stand-down concerning the

9  incident and the trends that were happening.

10  Q.      Thank you.  Gap 10, and the dates indicate

11  something happened in late June, early July, and the

12  project was suspended; is that correct?

13  A.      That's correct, sir.

14  Q.      And the conclusion -- the following

15  paragraph, right there at the bottom, discusses the

16  consolidation could not be completed, and there were

17  empty hubs on spent fuel assemblies that could not be

18  moved.  Does that mean you had to spend extra time

19  doing, I guess, additional tasks?

20          MR. JOHNSON:  Excuse me.  Can you tell me

21  what the question is on the floor?  So I guess I'm

22  objecting to form.  If you can tell us what your

23  question is.

24  BY MR. MEALOR:

25  Q.      My question is, is my summary correct that

1  there was a skeleton crew, that the project was

2  suspended, and the problem was the consolidation

3  could not be completed, and there was extra work?

4  A.      There was other work scheduled for the Fourth

5  of July holiday that was outside of tritium that

6  prevented us to go further.  Throughout the plant

7  the -- Watts Bar had other schedules for -- for those

8  holidays, which involved activities that helped or

9  was part of the tritium program crane, the aux crane,

10 auxiliary crane, things like that, outside the

11 facility.

12         The water was drained in the canal.  There

13 was another issue there.  It was just -- so that just

14 caused an issue, and we picked back up when those

15 items -- when the canal was filled back up and when

16 the crane was fixed.

17 Q.      By "issue," do you mean more delays and more

18 work to be done?

19 A.      It -- I don't have a recollection of that

20 really.  I would be speculating on what we done

21 there.  I could read off of this what we done, but

22 that would be the answer that I would give.  But as

23 far as --

24 Q.      All right.  Number 11 uses a term RWP hours.

25 What is "RWP" hours?

1  A.        Radiological work permit.  To go inside

2  containment, you have to scan your badge.  You have

3  to log in electronically on a RWP number, and that

4  when you scan your badge, the electronic system

5  records your time inside containment on your RWP that

6  you signed in on.

7  Q.        Why is this a gap?

8  A.        Because all of our work -- the TVA employees

9  that were -- every month Carla Borrelli and

10  Mr. Maguire sent me the monthly hours charged to

11  tritium.  It's a particular cost code.  And I knew

12  with the amount of hours that was being represented

13  being charged, I knew that wasn't the case.  So I was

14  supplied through RADCON the RWP hours for each

15  employee.

16         All of our work is done on the refuel floor,

17  nowhere else but the refuel floor, and the hours of

18  some of the TVA employees did not match.

19         But there was also a cost code, a charge code

20  set up for a TVA foreman and TVA supervisor.  Then we

21  had multiple TVA employees charging to that number as

22  well, which is higher pay, and it brought up flags,

23  sir.

24  Q.        Gap 12, was this about overtime being

25  charged?

1  A.      Yes, sir.

2  Q.      And also of TVA employees leaving the over

3  and hour.  What does that mean?

4  A.      Okay.  The entire gap also involved Day &

5  Zimmermann employees.  They were augmented to TVA

6  when they were not on tritium.  When we were doing

7  the safety stand-down and other issues where we

8  couldn't work, they were responsible and answered to

9  Steve Cook.  These people were put onto other TVA

10 assignments doing regular mechanical work somewhere

11 within the facility, but yet they were charging their

12 time to the tritium program.  And the MMG employees,

13 we got a record from their badge in, badge out, and

14 some hours are being charged, but they wasn't even on

15 site.

16 Q.      Thank you.  What was the issue for gap 3 --

17 13, gap 13?

18 A.      Okay.  A lot of this right here came from

19 Mr. Maguire.  I can speak on the ones that I know of,

20 that I can speak about, that I remember he did

21 explain these to me, but we'll start with the first

22 one.

23 Q.      Well, I think that's okay.  Is this coming

24 from Mr. Maguire?

25 A.      I can answer for the second one, the second

1 bullet.

2 Q.      Okay.

3 A.      That is the fatigue rule.  Working on a

4 safety-related component inside the facility falls

5 under a fatigue rule.  You can only work so many

6 hours, then you have to have a mandatory day off or

7 you have an NRC rule violation and a fine from the

8 NRC.  This is a very strict guideline.

9       So with the employees being put on other --

10 we on the tritium was excluded from the fatigue rule,

11 known as the fatigue rule, fatigue procedure.  But

12 when the employees went to work, they were utilized

13 somewhere else and charging to tritium, they were put

14 on other work safety related, which put them into the

15 fatigue rule.  And then because of their hours, they

16 couldn't work past a certain hour, which they had to

17 be sent home because of they worked outside the

18 tritium program on something else.

19 Q.      And that -- was that one from Mr. Maguire?

20 A.      What was the question, sir?

21 Q.      Did Mr. Maguire make that point and put that

22 point in there?

23 A.      Yes, sir.

24 Q.      Is that one that you had identified and

25 reported to him?

1    A.       Yes, sir.  That was part of the -- when I was
2    doing the TVA -- I mean, the tritium program gets an
3    audit from TVA OIG, and the tritium sustainment
4    group, DEO, on the money being spent, and I had to
5    sign my name.  Those e-mails exist from between me
6    and Carla Borrelli, and I have to sign my name on
7    their hours.  And the craft hours were noticed by me.
8    As part of our monthly signoff, I started seeing
9    issues with things I knew weren't true.
10   Q.       And was OI -- you said OIG.  Is OIG --
11   A.       Those do not -- that's what Mr. Maguire told
12   me because it's DOE funds.  So I'm only repeating
13   what he told me.  I've never seen -- the TVA OIG
14   would never come to me and audit anything as far as
15   tritium is concerned, but that's above me.
16   Q.       Did anyone investigate the problem you
17   mentioned with the fatigue program?
18   A.       I do not know an answer to that, sir.
19   Q.       Were you the one that discovered the problem
20   with the fatigue program?  Were you the first one?
21   A.       I don't -- I discovered it when the
22   employees, the TVA guys, told me that their hours --
23   they have to go home, they're being forced to go
24   home.  There is a fatigue person assigned to every
25   contractor and TVA that monitors people's hours

1  against the fatigue rule and safety-related items.

2  So they would come to Jaycen West and myself, and

3  they would have to be excluded from the tritium

4  activities that day and be sent home.

5  Q.     Okay.  And the problem with this gap that you

6  mentioned to us, that people are having to leave

7  work, was that the problem?

8  A.     Yes, sir.  They were a tritium resource, and

9  they couldn't be used because they had moved out to

10  something else.

11  Q.     And that caused delays?

12  A.     It caused other people to be exposed to

13  radiological dose, but some of these employees were

14  also brought in on a weekend when tritium was not

15  going on, where they would work on a safety-related

16  item.  Part of a TVA MMG function, which knocked them

17  out of working so many hours.

18      Our tritium program is not designed for this

19  many people, this many days a week, this many hours a

20  day.  Anything that interrupts that is a problem to

21  the -- is a problem to the tritium program,

22  harvesting.

23  Q.     Okay.  Thank you.  Now, hold onto this

24  document.  We'll come back to it.  But can we look at

25  Document O?  This will be the big one.

1          MR. MEALOR:  And, yes, we should admit

2    this.

3               (Document was marked for identification

4    as Exhibit Number O.)

5    BY MR. MEALOR:

6    Q.      Let me know when you're ready.

7    A.      I have it, sir.

8    Q.      Thank you.  Do you recognize it?

9    A.      Yes, sir, I do.

10   Q.      And is this the condition report authored by

11   Mr. Cusick that adopted --

12   A.      It appears to be.

13   Q.      This is the one that adopted the gaps that we

14   had just gone through; correct?

15   A.      Yes, sir, it appears to be so.

16   Q.      Okay.  Earlier today you had mentioned that

17   Mr. Cusick had called you in to discuss a safety

18   concern?

19   A.      Yes, sir.

20   Q.      And just kind of backtracking a little bit,

21   that's what led to this CR; right?

22   A.      Yes, sir.

23   Q.      You said you did not know who raised the

24   safety concern, but did Mr. Cusick discuss with you

25   what the safety concern was?

1  A.      Yes, sir, he did.

2  Q.      What was the safety concern?

3  A.      The safety concern was a trend of issues that

4  had been occurring on the tritium sustainment group,

5  but where an employee was asked to violate procedure

6  and turn off cameras where an authorized fix was to

7  occur, as though it never happened.

8  Q.      And is this referring specifically to the

9  June incident that you were called out of your

10  meeting?

11  A.      Yes, sir.

12  Q.      And how was turning off the camera safety

13  related?

14  A.      The TVA procedure states in our -- the

15  F-fueling handling instructions state that all parts

16  that are moved and are irradiated have to be recorded

17  by camera for the entire move.  We don't -- the hub

18  was suspended, and no camera can be turned off.  No

19  exceptions.

20  Q.      So when did he -- what did Mr. Cusick ask you

21  about this?

22  A.      He asked me if I was there when it occurred.

23  Q.      And what all did you tell him?

24  A.      I told him that I wasn't there.  He asked

25  questions, and I answered the questions.

1    Q.      Okay.  Was that the end of the conversation

2    then?

3    A.      No, sir.  It wasn't very long.  He asked me

4    if -- who was the foreman at the time.  I told him

5    who it was.  He asked me was I told that if the

6    camera was asked to be turned off.  I told him that I

7    was.  I was told about that situation.  He asked me

8    did I see it.  I said I did on a -- when we rewound

9    the tape, the videos, and I saw it for myself.

10        And he had asked me my steps.  I told him I

11   contacted my chain of command, which was Mr. Maguire,

12   and that we got ahold of RADCON engineering to

13   successfully remove the rods, turn it around

14   backwards to get them off.

15        And then I informed him that I was already in

16   progress of writing an assessment that will

17   address -- there was other -- he said, was there a

18   lot of other issues during the campaign?  I said,

19   yes.  I told him I was doing an assessment that would

20   explain everything.  He asked me if I would give him

21   a copy.  I told him that I could not.  That when I'm

22   done with it I'll give it to Mr. Maguire, and

23   Mr. Maguire and Ms. Borrelli would be the ones if he

24   wanted it.

25        Then he e-mailed me, asked me a question

1  about bending a thimble plug.  I told him there was a

2  procedure that does that, but that procedure does not

3  apply to tritium.  Only a fuel assembling for new

4  fuel.  It doesn't apply to us.

5  Q.     And you earlier had said that you told people

6  that you were going to talk to somebody about a

7  safety concern and afterwards.  You've already

8  testified about that.

9      Did you get into the details about what the

10 safety concern was and what the conversation was with

11 these other people?

12 A.     I'm sorry.  What was the question again, the

13 first part of your question?  I'm sorry.

14 Q.     Earlier today you testified that you told

15 people that you were meeting Cusick?

16 A.     Yes, sir, I did.

17 Q.     Did you tell them what the conversation was

18 about?

19 A.     Yes, sir, I did.

20 Q.     In what level of detail?

21 A.     Pretty much everything that I told you; that

22 there was a safety concern, nuclear safety concern.

23 I've been called to testify.  And it involved Day &

24 Zimmermann, TVA personnel, and that he's

25 investigating, and other people might be questioned

1    on this besides me.

2    Q.      Did you talk to any TVA employees about this

3    besides Mr. Maguire?

4    A.      Yes, sir, I did.

5    Q.      Who?

6    A.      Greg Whitehorn.  Over a period of time or

7    immediately?  Just the interview?  I don't understand

8    your question.

9    Q.      Immediately.

10   A.      You just want TVA employees?

11   Q.      Yes.

12   A.      Okay.  Greg Whitehorn, Ruth Traugott, she was

13   there.  I talked to her after I left his --

14   Mr. Cusick's office.  Their office is right there.  I

15   talked with Jeff Maguire, if I hadn't already said

16   him.  Jeff Maguire.  Jaycen West, the TVA supervisor.

17   I think that's all I can remember right now, sir.

18   Q.      Were they already -- did any of them already

19   know about this investigation by Cusick?

20              MR. JOHNSON:  Object to form.  You can

21   answer.

22              THE WITNESS:  I think so.  I don't think

23   I was the first one up to bat.  There was already

24   some chitchat between Jaycen West and myself.  There

25   was -- Benny Crownover had mentioned it to me, the

1   TVA foreman over it, that he was interviewed by

2   Cusick.  And he told me that he admitted to turning

3   off the camera, or asking a man to turn off the

4   camera.  He didn't think it was a problem.  But

5   that's about as much as I remember about mine and his

6   conversation.

7   BY MR. MEALOR:

8   Q.      And the CR that we have in front of us,

9   Document O, this is the CR that came out of that.

10  Was there another CR that came out that would be more

11  specifically related to turning off the camera?

12  A.      This right here, to my understanding, is just

13  the CR for the investigation in the nuclear safety

14  concern.  If I'm not mistaken, Jaycen West was

15  directed by Steve Cook to generate a CR as well

16  concerning the drop.

17  Q.      You said the CR is about a nuclear safety

18  concern, the one we have in front of us --

19  A.      Yes, sir.

20  Q.      -- 1357390?  Where does it say that?

21  A.      That's what Mr. Cusick told me.  I'm only --

22  he told me it was about a nuclear safety concern.

23  That's what was reported to him.

24  Q.      Okay.  Where does the CR say it is nuclear

25  safety?

1  A.      Do what, sir?

2  Q.      Where does this condition report say that it

3  is about nuclear safety?

4  A.      I do not know, sir.  All I can tell you is

5  what Mr. Cusick called me to be a witness to.

6  Q.      Okay.  Look on Page 719.

7  A.      What is it, sir?  What page?

8  Q.      Page 719.  719.

9  A.      Okay.  I'm there, sir.

10 Q.      Thank you.  You see where it says, "potential

11 safety"?

12 A.      I do see that, sir.

13 Q.      "Potential safety, N.  Violation notice

14 required.  No."

15 A.      Yes, sir, I see that.

16 Q.      Is that where this would say this would be

17 about safety?

18 A.      Excuse me, sir, what was the question?

19 Q.      Is this where a condition report -- you

20 filled out condition reports before, you said.  Is

21 this where a condition report would indicate that

22 this is about safety?

23 A.      I guess it is, sir, but when I -- I just do

24 the current condition.  All of this other comes from

25 the corrective action review board.

1 Q.      Oh, okay.  Is your name mentioned in this

2 condition report, do you recall?

3 A.      No, sir, it is not.

4 Q.      Are you mentioned by title?

5 A.      No, sir, I am not.

6 Q.      This report does list the senior tritium

7 project manager.  Who is that?

8 A.      It mentions what, where, sir?

9 Q.      The senior tritium project manager.

10 A.      Yes, sir.  That title belongs to either Jeff

11 Maguire or Carla Borrelli.

12 Q.      Is there any way someone who is just reading

13 this condition report would be able to link it to

14 you?

15           MR. JOHNSON:  Object to form.

16           THE WITNESS:  I would be speculating on

17 that, sir.  I can't answer that.

18 BY MR. MEALOR:

19 Q.      All right.  So it's not evident?

20           MR. JOHNSON:  Object to form.

21           THE WITNESS:  The only way this could be

22 related to me right here, that my evaluation is

23 nearly written word for word in the condition

24 details.  It's an identical match page for page, line

25 by line, gap by gap.

1  BY MR. MEALOR:

2  Q.     Okay.  Let's go back to your assessment

3  report then.

4  A.     Yes, sir.

5  Q.     Where does your safety report mention a new

6  safety violation?

7  A.     A what, sir?

8  Q.     A safety violation.  Where does it mention a

9  safety violation?

10  A.     Are you talking about the actual word,

11  "safety"?

12  Q.     We could start there.  Does it mention --

13  does it have the word "safety"?

14  A.     I don't know.  I would have to reread the

15  whole thing.

16          MR. JOHNSON:  Yeah, I object to the form

17  of the question.  You've got a huge document here.

18  BY MR. MEALOR:

19  Q.     And this is -- this is the report that you

20  wrote?

21  A.     Yes, sir, that's correct.

22  Q.     That's what we are looking at?

23  A.     Yes, sir.

24  Q.     Did you, in your report, report a safety

25  violation that had never been reported or raised

1  before?

2  A.      Everything in this assessment right here was

3  raised and reported, not only to Howard Cusick, but

4  my chain of command in TVA tritium.

5  Q.      Prior to your report?

6  A.      Yes, sir.  This was collective -- this was a

7  collective over the harvesting.  The report here is a

8  collection of events that led up to everything that

9  was reported by either a CR or reported to my chain

10  of command at TVA.

11  Q.      Does this evaluation assessment mention any

12  NRC violations?

13  A.      I do not know the NRC violations, but what it

14  does do is -- I can't comment on the NRC and their

15  regulations, but I can -- procedural violations, TVA

16  procedure violations, yes.

17  Q.      Okay.  And the main point, you said this

18  before, is about the use of inexperienced employees

19  or employees who are not always available for one

20  reason or another; is that correct?

21  A.      Yes, sir, that would be a fair statement.

22  Yes, sir.

23  Q.      Well, in your experience, how are new

24  employees -- are new employees seen as a safety

25  violation?

1  A.     Could you repeat the question, sir?

2  Q.     Are having new employees work on a task a

3  safety issue?

4  A.     It can lead to one because of their lack of

5  wanting to participate, yes, sir.

6  Q.     It's a potential one based on their attitude;

7  is that what you're saying?

8  A.     Not just that.  It could be a number of

9  things, but that would be part of it, yes, sir.

10 Q.     And were you trying to make the position that

11 TVA would need to retain or continue to use DZ's

12 staff aug employees on the tritium project?

13 A.     Okay.  I'm -- I'm sorry, Mr. Mealor.  I don't

14 mean to -- could you just repeat the entire thing one

15 more time, sir, so I make sure I answer you clearly?

16 Q.     Was it your position that it was a safety

17 concern for TVA to retain the staff aug employee

18 contract workers from DZ?

19 A.     No, sir, that's not a true statement.  My

20 concern was inexperienced people who did not want to

21 be there were being forced to be a part of a highly

22 radioactive, dangerous work, and at the time only

23 Day & Zimmermann augmented employees had the training

24 and experience to perform the job successfully with

25 limited bumps.  They wanted to be there.

1        If -- my concern was, is what I had brought

2   up to my management, my TVA boss, was they need to

3   have people involved over a period of a couple of

4   cycle harvestings and watch and learn and be a part

5   slowly, to be a part of it, if they're going to fully

6   take it over.

7   Q.      Thank you.  Was Mr. Maguire troubled by these

8   gaps?

9   A.      He didn't like them, but he was going to go

10  discuss them for future event -- I mean, to the

11  proper people.  And I'm not the -- I wasn't.  He went

12  up his management and across the board to upper

13  management.  I'm below him.  That was a conversation

14  for him and above.

15  Q.      Did -- were you expecting cycle 15 to go

16  better than cycle 14 in terms of these problems

17  you've mentioned?

18  A.      Yes, sir.  We resolved a lot of the gaps.

19  Yes, sir.

20  Q.      Would you have wanted to write another report

21  just like this for cycle 15?

22  A.      Would I want to?  There would be another

23  assessment and evaluation in-house, yes, sir.  But,

24  yes, the goal was not to have one with a lot of

25  negatives in it for lessons learned.

1  Q.      The goal was so you would not have to write
2  another bad report like this again?
3  A.      Yes, sir, that would be correct.  That's in
4  every goal, yes, sir.
5  Q.      Who else was troubled by the gaps?  I mean,
6  did anyone else express concern at the gaps you
7  mentioned?
8  A.      Do you have a time frame, or up until now?
9  Q.      Up until now.
10 A.      The tritium team, the sustainment group, TVA
11 management, Mr. Jesse James, by what I was told and
12 what I've learned through Mr. Maguire, what I had
13 heard from Mr. Maguire, between not only his
14 deposition but prior to my termination.  But prior to
15 the end of 2017, early 2018, all the way up to Paul
16 Simmons.
17 Q.      What was Jesse James' concern that you heard?
18 A.      Mr. Maguire told me he wasn't happy with it.
19 He was having lengthy discussions on this.  He was
20 upset because there wasn't an answer to the CAP.  The
21 CAP had been put into place.
22 Q.      Did you talk to or hear from Mr. James about
23 this, directly from him?
24 A.      No, sir, I did not.
25 Q.      Did you hear that he was upset with the

1  scheduling delays that you mentioned in the gaps?

2  A.      He wasn't very happy with it as a whole, the

3  assessment and the evaluation that brought to light

4  many issues.  That's as far as I can tell you of that

5  with accuracy.

6  Q.      Do you know anything differently about

7  Mr. Simmons?

8  A.      Mr. Maguire told me that there's been three

9  serious nuclear safety concerns that made it to

10  Paul -- that's ever made it to Paul Simmons, and this

11  was one of them.

12  Q.      Mr. Maguire said a safety concern?

13  A.      A nuclear safety concern, yes, sir.

14  Q.      Why is this a nuclear safety concern?

15  A.      Because that's how it was reported, a nuclear

16  safety concern, at a nuclear facility that involved

17  nuclear radiological issues.

18  Q.      Are you saying Maguire framed this as a

19  safety concern?

20  A.      Yes, sir, he did.

21  Q.      Was Mr. Simmons upset that there was -- I'm

22  going to scratch that.  Let me go back.

23          You mentioned Mr. James, Mr. Simmons as being

24  upset.  Was there anyone else at TVA at that level,

25  above Mr. Maguire's level, who was upset?

1  A.      When the CR came out, that is as far as I

2  knew when the CR came out.

3  Q.      And afterwards, do you know of any other

4  TVA's officials, besides Maguire -- I mean, besides

5  James and Simmons who were upset by the information

6  in that CR?

7  A.      As far as the corrective action, it would

8  have addressed Mr. Tony White, when he took over from

9  Jesse James.  Maguire had told me that he had met

10  with Mr. White concerning upcoming cycle 15, and they

11  had a conversation concerning that.  I was not privy

12  to a lot of that, and I can't remember what he told

13  me, but that was above my pay scale.

14  Q.      Do you know whether these people who were

15  upset, and you've identified James and Simmons, were

16  upset with you personally?

17  A.      Was who upset with me, sir?

18  Q.      Was Jesse James upset with you personally?

19  A.      I cannot remember that.  I do believe -- I

20  think Mr. -- I want to say that Mr. Maguire told me

21  that it brought some -- using his exact words -- some

22  negative light on exposing some issues that he was

23  not aware of that he got -- his exact words -- he got

24  called to the carpet on, and my name is all over the

25  front page of it.  And so I would say the answer to

1  your question is yes.

2  Q.      That is an inference, though, is that not?

3  A.      I do not -- I don't understand what that

4  means.

5  Q.      That was a conclusion you drew together,

6  based on what Mr. Maguire told you that Mr. James

7  said?

8  A.      Yes, sir.  So the answer to your question

9  would be, yes.  Jesse James was pissed off with me,

10  upset with me, about this evaluation report that got

11  him called to the carpet.

12  Q.      But do you believe that Mr. James had

13  preferred that the report never occurred?

14  A.      I do not -- I would be speculating.  I don't

15  want to -- I don't have an answer to that.

16  Q.      Was Mr. James more upset over, I guess, the

17  scheduling problems and how to put the two teams

18  together, the two groups together that led to this

19  change --

20              MR. JOHNSON:  Object to the form of the

21  question.

22  BY MR. MEALOR:

23  Q.      -- or was he concerned about safety?

24  A.      I do not know.  I don't know what the

25  answer -- to give what Mr. James was thinking or

1  doing or what he thought.  I don't know.

2  Q.     Do you know whether Mr. Simmons was upset

3  with you personally?

4  A.     I know that Mr. Maguire's told me that he had

5  a conversation with Mr. Simmons concerning this right

6  here and that he was shown this or this made it to

7  his desk, but that's as far as I know with it -- know

8  about that.

9  Q.     Isn't it possible that these people would be

10 upset over the fact that there were problems?

11            MR. JOHNSON:  Object to the form of the

12 question.

13            THE WITNESS:  Is it possible they would

14 be upset?

15 BY MR. MEALOR:

16 Q.     Yes, just to the fact that there were gaps in

17 their program.

18 A.     I don't know that to be true.  I would be

19 speculating.  I'd be assuming.  I don't -- I don't

20 know how to answer that.

21 Q.     Okay.  You indicated that your managers were

22 Maguire and Carla Borrelli; correct?

23 A.     That is correct, sir.

24 Q.     Mr. Maguire's the one who brought you on.

25 It's something that you've alleged before in the

1  complaint and other places; correct?

2  A.      That is correct, sir.

3  Q.      Would he have the power to terminate you?

4  A.      Mr. Maguire?  Yes, sir, he would.  From the

5  tritium program, yes, sir, he would.

6  Q.      Did he?

7  A.      Did he terminate me, sir?

8  Q.      Yes.

9  A.      No, sir, he did not.

10  Q.      Did Mr. Maguire or Ms. Borrelli or anyone

11  else in your chain of command notify you of your

12  termination?

13  A.      No, sir.  I notified them.

14  Q.      Did they or anyone in their chain of command

15  cause you to be terminated?

16  A.      In -- could you repeat the question again,

17  sir?

18  Q.      Did Mr. Maguire or Ms. Borrelli or anyone in

19  their chain of command cause you to be terminated?

20  A.      No, sir.

21  Q.      You said that Tony White had called and

22  talked to Mr. Maguire about your impending

23  termination.  Did you hear anything from Mr. White

24  directly?

25  A.      I did not, sir, no.

1  Q.      Do you know how much Mr. White was involved
2  in DZ's decision process?
3  A.      Only by his e-mails that have been found in
4  discovery.  He was attached to a lot of the e-mails.
5  Q.      Is it possible that White, when he was
6  talking to Mr. Maguire, was just relating
7  information?
8  A.      I can't answer that.  I would be speculating.
9  I wasn't part of the conversation.
10 Q.      You also mentioned that you had a
11 conversation with Greg -- was that Greg Whitehorn?
12 A.      That is correct, sir.
13 Q.      Whitehorn about the manway incident?
14 A.      Yes, sir.
15 Q.      Why did he call you, or how did y'all come to
16 talk?
17 A.      He called me.  He told me that he was
18 directed to follow this up.  It was my day off.
19 Apparently, it was his.  He had been directed to
20 investigate this, the manway incident, and he wanted
21 to know what was going on.  I told him what I knew of
22 at the time, and that I had come in to put the manway
23 on.  I had been called in by Freddie.  It was found
24 off.
25          I came in to put the manway on.  And the two

1   people -- he asked me who put it on.  And I said it
2   was night shift, Terry Johnson and Kevin Davenport.
3   And that's pretty much that -- I don't remember any
4   more of the conversation.  But he was directed to do
5   that.
6   Q.      This is Whitehorn who had helped you with
7   your assessment?
8   A.      Same one.  He's the one I took the job over
9   from him as the tritium task manager.
10  Q.      Were you aware of whether Tony White was
11  upset with your assessment?
12  A.      I have no direct evidence of that, sir.
13  Q.      Are you aware of anyone at TVA who caused you
14  to be terminated?
15  A.      Yes, sir.  I believe -- I believe Lee Sanders
16  was helping DeWarren write the ERB process for
17  termination; helping him what to say, by the
18  discovery we had.  I believe that Meshelle Augustin
19  was a part of it.  She was also helping along of what
20  to say, what not to say, what to change.  I believe
21  that Mr. Maguire was purposely left out.  I believe
22  that Tony White was on the e-mails, too.  He knew
23  about it.  He knew about the protected activities as
24  of at least November the 6th of 2018.  I believe that
25  Paul Simmons was involved, that we've also learned

1          MR. MEALOR:  Thank you.

2          MR. JOHNSON:  Well, I have a question

3   that I want -- Paul, where are you?  Are you going to

4   need to ask anything?

5          MR. LANTIS:  I don't think so right now.

6          MR. JOHNSON:  I'm going to have one

7   question, and I think it's going to take 60 seconds

8   so far.

9          MR. LANTIS:  Fire away, Steve.

10          MR. MEALOR:  Okay.  Thank you.

11   BY MR. MEALOR:

12   Q.     Do you know -- of the people that you

13   mentioned -- of the people that you mentioned, who

14   was involved in your termination outside of the ERB

15   process?

16   A.     TVA personnel or anybody?

17   Q.     Yes.  Yes.

18          MR. JOHNSON:  I'm still confused.  He

19   said TVA personnel or anybody, and you said, yes.  So

20   which?

21          MR. MEALOR:  I'm sorry.  All I heard was

22   TVA personnel.

23   BY MR. MEALOR:

24   Q.     Which TVA personnel caused your termination

25   outside of the ERB process?

1  A.      The only one person who wasn't part of the

2  ERB process by name would have been Tony White.

3  Q.      And you told me that he knew of your

4  protected activity.  What did he do to cause your

5  termination?

6  A.      I believe that he was directing DeWarren,

7  just like he told Mr. Maguire, that it is his belief

8  that I am to be terminated over the weekend that the

9  manway was found off, that following weekend before I

10 came in on that Monday morning.

11 Q.      That is your belief.  You said you never

12 spoke with Mr. White?

13 A.      No, sir.

14 Q.      Did Mr. Maguire tell you that Mr. White had

15 talked to Mr. Washington?

16 A.      Yes, sir.

17 Q.      Did Mr. Maguire tell you that Mr. White

18 directed Mr. Washington to terminate you?

19 A.      He did not say it in those words, no, sir.

20 Q.      Do you have any idea, any fact that you can

21 give me that shows that Mr. White caused your

22 termination?

23 A.      Only by Mr. Maguire telling me, sir.

24 Q.      Thank you.  I'm going to switch subjects real

25 fast now to letter O, the MSPB --

1  addressed, and that was confirmed to me by

2  Mr. Maguire.

3  Q.     Do you know whether those documents had

4  anything to do with Mr. Simmons' decisions that may

5  or may not have happened at the ERB?

6  A.     I have no -- I don't know what -- what

7  Mr. Simmons' actions or thoughts were at the time,

8  sir.

9  Q.     And back to this review form, Number 2 --

10 A.     Yes, sir.

11 Q.     -- mentions veteran's preference

12 violations --

13 A.     Yes, sir.

14 Q.     -- leading to the MSPB board.  Which case

15 were you talking about, the 2015 or the 2017 MSPB

16 appeal?

17 A.     This would be the 2017 complaint because of

18 my -- are you wanting me to explain this, or just

19 answer yes or no to your question?

20 Q.     Yeah, yes or no, which one.  Yes.

21 A.     This would be the 2017 complaint.  The

22 veteran's preference was only part of the complaint.

23 Q.     Why didn't you mention the other part to the

24 complaint?

25 A.     Because I had got a -- just received a letter

1                    REPORTER'S CERTIFICATE

2

3    STATE OF TENNESSEE

4    COUNTY OF HAMILTON

5            I, PAULA McGUIRK, RPR, LCR#789, CCR-GA, in

6    and for the State of Tennessee, do hereby certify

7    that the deposition of ROBERT GOFORTH was reported by

8    me, and that the foregoing 319 pages of the

9    transcript is a true and accurate record to the best

10   of my knowledge, skills and ability.

11           I further certify that I am not related to

12   nor an employee of counsel or any of the parties to

13   the action, nor am I in any way financially

14   interested in the outcome of this case.

15               I further certify that I am duly licensed

16   by the Tennessee Board of Court Reporting, as

17   evidenced by the LCR number and expiration date

18   following my name below.

19               In witness whereof, I have hereunto set

20   my hand this 27th day of September, 2021.

21

22

23           PAULA McGUIRK, RPR, LCR, CCR-GA
             LCR#789 - Expires:  6/30/2022

24

25

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2              EASTERN DISTRICT OF TENNESSEE

3                   AT CHATTANOOGA

4   -------------------------------------------------
                                    )
5   ROBERT M. GOFORTH,              )
                                    )
6         Plaintiff,                )
                                    ) Case No.:1:20-cv-254
7      vs.                          )
                                    )
8   TENNESSEE VALLEY AUTHORITY      )
    and DAY & ZIMMERMANN NPS,       )
9   INC.,                           )
                                    )
10        Defendants.               )
    -------------------------------------------------
11                       Chattanooga, Tennessee
                         August 17, 2021
12

13         DEPOSITION OF JEFFREY MCGUIRE
               (Appearing remotely)
14  -------------------------------------------------

15  APPEARANCES:

16              FOR THE PLAINTIFF:

17              JAMES M. JOHNSON, ESQ.
                Attorney at Law
18              620 Lindsay Street, Su 210
                Chattanooga, TN 37403
19              (423) 648-4093
                jj@jamesmjohnsonatty.com
20
                    -and-
21
                JUSTIN S. GILBERT, ESQ.
22              Gilbert Law, PLC
                100 W. MLK Blvd., Su 500
23              Chattanooga, TN  37402
                (423) 756-8203
24              justin@schoolandworklaw.com

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50   Filed 11/15/21   Page 87 of 672   PageID #:
JA-0080
357

1    audibly, out loud.  If you are nodding your head or

2    shaking your head or making some other gesture, she can't

3    pick that up.  So you have to be sure to verbally answer

4    all my questions.  Is that, is that good with you?

5        A    Yes.

6        Q    Okay.  So, I want to ask you first about your

7    education.  Tell me about your higher education.

8        A    I have a bachelor of science in nuclear

9    engineering technology and a master's in engineering

10   management.

11       Q    And what -- where were those from?

12       A    The bachelor's of science in nuclear engineering

13   technology is from New York State University.  The master

14   of science in engineering management is from University

15   of Tennessee at Chattanooga.

16       Q    Have you ever served in the military?

17       A    I have served in the military.

18       Q    And in what service were you?

19       A    I was in the Navy.

20       Q    And did your service in the Navy have anything to

21   do with what your professional career turned out to be,

22   in terms of the substance of the types of things you were

23   doing?

24       A    It did.  It did.  I was, I was in naval nuclear

25   power.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 85-1  Filed 11/15/21  Page 88 of 672  PageID #:
JA 0081
358

1    Q   I see.  And how many years did you do that?

2    A   Six years.

3    Q   So, once you got out of the service, I take it you

4    began employment in civilian life?

5    A   That's correct.

6    Q   So when you did that, just give me a quick rundown

7    of the places you worked and whether that work had

8    anything to do with the nuclear industry.

9    A   For sure.  I worked for four years for Pacific

10   Gas & Electric.  I was a chemistry and radiological

11   protection technician at Diablo Canyon.  And I worked for

12   13 years at Portland General Electric.  I was a --

13   started out as an auxiliary operator at the Trojan

14   Nuclear Power Plant.  At the end of those 13 yours I was

15   a shift manager, senior licensed reactor operator.

16       And then I came to Tennessee Valley Authority,

17   where I was a senior reactor operator, licensed reactor

18   operator, and a shift technical adviser at Watts Bar

19   Nuclear Power Plant.  Then --

20   Q   Approximately when did that begin?  I'm sorry to

21   interrupt you.  But before we get away from that, let me

22   just ask that.

23   A   So, that began in 1993.

24       In 1999 I went to Sequoyah Nuclear Power Plant as

25   a quality assurance program manager, and then at -- in

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 85-10 Filed 11/15/21   Page 89 of 672   PageID #: 359
JA 0082

1   2009 I became a workweek manager at Sequoyah Nuclear

2   Power Plant, and in 2010 I became the tritium program

3   manager.

4       Q   At -- I'm sorry.  At where?

5       A   No, that's okay.  Go ahead.

6       Q   Was that at Watts Bar?

7       A   That was at Watts Bar.  Watts Bar and at

8   corporate.  I have a desk in corporate and an office at

9   Watts Bar, and I go back and forth between the two.

10      Q   I'm particularly interested in what you said about

11  being -- I think you called it a senior reactor operator

12  during your career, and a licensed operator.  You also

13  used that term.

14          Explain those to me, in terms of what you, you

15  know, sort of do day to day at the plant when you're one

16  of those people?

17      A   So, if you're a unit supervisor or a shift

18  technical adviser on an operating crew, then you have to

19  have a senior reactor operator's license from the NRC,

20  and you manage the operating crew during the day-to-day

21  things they do.  And you also manage the operating crew

22  if there are any abnormal or accident conditions.  Same

23  with the -- that's for the unit supervisor.

24          For the shift technical adviser, you do the same

25  thing, you manage -- help manage the crews.  But during

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 85-1 Filed 11/15/21   Page 90 of 672   PageID #:
360
JA 0085

1  accident conditions you step back and you just monitor

2  the plant and give technical advice to the senior reactor

3  operators and reactor operators.

4  Q   So would you say in either of those roles that as

5  SRO -- a licensed SRO, you're basically in charge of the

6  operation of the reactor for the time that you're on

7  duty?

8  A   That's correct.

9  Q   And it may've gotten by me, but were you -- did

10  you say you were senior reactor operator and a licensed

11  operator while working for TVA?

12  A   That's correct.

13  Q   And was that at the Watts Bar plant?

14  A   At the Watts Bar plant.

15  Q   Do you have any other special qualifications for

16  your present job that you had at TVA, which you said was

17  the person operating the tritium program?

18  A   I have a project management certification from

19  Project Management Institute.  And that's pretty much,

20  pretty much it, anything that would be recognized.

21  Q   Okay.  Well, to go back a step, tell us again what

22  your job in the tritium program is and when you began

23  assuming that job.

24  A   My job in the tritium program was to interface

25  with the Department of Energy through their National

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-7   Filed 11/15/21   Page 91 of 672   PageID #: 361
JA-0084

12

1   Nuclear Security Administration and coordinate the
2   radiation of -- we call them TPBARs.  They're
3   tritium-producing burnable poison rods -- absorber rods.
4   Tritium-producing burnable absorber rods.  And that's how
5   we produce the tritium by irradiation of those rods in
6   our reactor core.
7        And it's, it's more of a project management type
8   role, to where you coordinate and manage the loading of
9   the TPBARs, and then the -- and the core design for the
10  tritium-producing cores; help manage the effluence from
11  the tritium at the plant; and then also manage the
12  harvesting of the tritium-producing burnable
13  poison -- burnable absorber rods, and shipping of the
14  TPBARs to the Savannah River site where the tritium is
15  extracted.
16  Q   I know there must be a tremendous amount of
17  technical information that goes from the first step of
18  what you described when the TPBARs are in the reactor,
19  and the last step when you're shipping it, the BARS.  But
20  describe, as briefly and succinctly as you can, what's
21  involved from pulling them from the reactor and kind of
22  how does that flow, and what does it flow through until
23  they're ready to ship.
24  A   So let me make sure I answer your question.  You
25  want to know how it flows from placing them in the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 92 of 672   PageID #:
362
JA-0085

1   reactor to shipping them off-site?  Would that be...

2      Q   Yes.  Well, I'm talking more about the extraction.

3   How long do they live inside the reactor before you're

4   ready to -- before they're fully irradiated and you pull

5   them out?

6      A   Their -- our cycles are approximately 18 months

7   long.  So, what we -- we load the TPBARs when we do a

8   refueling outage, and they go in with the new fuel.  And

9   then when we do the next refueling outage, we take those

10  TPBARs out that have been irradiated and put new TPBARs

11  in for the next irradiation cycle.

12     Q   So would that mean that the TPBARs were in the

13  reactor core with the radioactive uranium for 18 months?

14     A   Approximately 18 months.  The cycles are all

15  different.  It's, you know -- when I say 18-month cycles,

16  it depends, you know.  It could go plus or minus two

17  months.  Just depending on what the cycle is, how it

18  falls.  We try not to have the same refueling outages

19  scheduled at Watts Bar as we do at Sequoyah.  We spread

20  it out through the valley.  We have our refueling outages

21  in fall and spring when we don't have any power demand.

22         So, it -- a lot of things go into exactly when

23  it's going to be.  So I guess what I'm saying, it's not

24  exactly 18 months, but there is a set schedule for it.

25     Q   Okay.  Well, this seems to work, kind of taking

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150   Filed 11/15/21   Page 93 of 672   PageID #: 363
JA-0086

1    this step by step to go through the process all the way
2    to where they're shipped.  So let me ask you about when
3    you extract these rods from the reactor, how do you do
4    that and how do they flow to getting into some shape to
5    be shipped?
6        A    All right.  So, after the outage is over we will
7    take -- the TPBARs are in an assembly that fits inside of
8    the fuel assembly.  And there is up to 24 TPBARs on a
9    baseplate holding the TPBARs.  They go anywheres from 12
10   to 24 of these TPBARs on a baseplate.
11            We'll take that baseplate out of the spent fuel
12   assembly in the spent fuel pool, take it over to a
13   consolidation fixture, and in the consolidation fixture
14   we'll untorque the TPBARs from that baseplate, place them
15   in a canister.  And when the canister's full, we'll put
16   the canister back into the spent fuel pool and complete
17   that evolution.  The Canisters hold 300 TPBARs.  And when
18   I say "full," probably if you looked at them you'd think
19   it was only about 60 percent full.
20            And then we will take the baseplates -- or at the
21   site they call them the hubs.  They no longer have the
22   TPBARs on them.  We'll put those aside.  And then once
23   the consolidation part of the campaign is over, we'll
24   disassemble the consolidation fixture.  And I forgot to
25   say that the first step is assembling the consolidation

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 85-12   Filed 11/15/21   Page 94 of 672   PageID #:
364
JA-0087

1    fixture.  It takes us about two weeks to mobilize for

2    this, pairing the consolidation fixture, getting it in

3    the right spot in the spent fuel pool, getting the camera

4    system working, that type of thing.

5          But anyhow, after we are done harvesting the

6    TPBARs, they're in these shipping canisters with about

7    300 TPBARs in them.  We'll disassemble the consolidation

8    fixture, store it in the spent fuel pool, and then we'll

9    bring in casks that will ship the TPBAR -- the canisters,

10   the storage canisters.

11         And it takes approximately a week to go through

12   this process, to load those canisters in that cask in the

13   spent fuel pool for irradiation.  It's all got to be done

14   underwater, for dose reasons.  Take the production casks,

15   and we'll send those to Savannah River where the tritium

16   is extracted from the TPBARs.  We'll also usually send

17   anywheres from one to four -- they're called

18   post-irradiation examination rods, to Pacific Northwest

19   National Laboratories in Richland, Washington, where

20   they'll cut those apart and hot seal them to make sure

21   that, one of two things, either everything looks like it

22   should in a regular production TPBAR, or sometimes

23   they'll put -- they call them "lead use assemblies."

24   They'll make some minor design changes that, you know,

25   might make the program better.  But anyhow, those are the

1   PI, post-examination irradiation shipments.  So --

2      Q   Well, again, not to interrupt you, but we're

3   talking about post work after you're done with them at

4   Watts Bar, right?  Now you're speaking --

5      A   That's correct.  I'm talking about we're done with

6   them and we're shipping everything off, out of the plant.

7          So the two shipments -- what I'm saying is the two

8   shipments we make with the TPBARs are production

9   shipments and PI shipments, two different places.

10     Q   I see.

11     A   Shipments go to Savannah River.  The PI rods go to

12  Richland, Washington, to PNNL, Pacific Northeast National

13  Laboratories.  And the third type of shipment we make are

14  the waste shipments that have the hubs or the baseplates,

15  whatever you want to call them, that the TPBARs were --

16  that were supporting the TPBARs when they were in the

17  fuel.  They're highly irradiated.  And that goes to

18  the -- that's a different type of cask, and it goes to

19  the Nevada Test Site to a government waste repository.

20         So, those are the three type of shipments we make.

21     Q   I see.  So, let's talk for a moment, then, about

22  the degree of radioactivity of the TPBARs when you first

23  extract them from the reactor core.

24     A   Okay.

25     Q   What is the level of radiation of those TPBARs

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-1   Filed 11/15/21   Page 96 of 672   PageID #:
JA 0085
366

1  when they come out?

2      A   Well, they're highly irradiated.  A TPBAR assembly

3  would -- let's say with 24 TPBARs, probably reads --

4  underwater, about 20,000 rem per hour.

5      Q   And at what point, in terms of rems, does an

6  object become a threat to human health and safety?

7      A   So, you know, that's a long answer.  I'll try to

8  make it as short as I can.  There's something called

9  LD3050.  And it's 400 rem -- you get -- if a person was

10  to get 400 rem, a large population, within 30 days 50

11  percent of the population would die, without medical

12  attention.

13     Q   And that's 400 rems, as opposed to the 20,000 that

14  are in the TPBARs and assembly when they come out of the

15  reactor?

16     A   Correct.

17     Q   And do the TPBARs and the assembly retain that

18  level of radiological risk, let's call it, throughout the

19  process until they're shipped?

20     A   Yes.  Even after they're shipped.  They, they

21  ended up buried in a concrete-lined vault at Savannah

22  River.  Most of the radiation coming from that is

23  cobalt-60, which has a half life of a little over five

24  years.

25     Q   And you mentioned -- you've been mentioning

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-9   Filed 11/15/21   Page 97 of 672   PageID #:
JA 0090
367

1  "pools" and "underwater."  How much of the process you

2  just described, from the time they're extracted from the

3  reactor core until the time you ship them, is done

4  underwater?

5      A   Everything is done underwater until it's loaded

6  into a cask that has the right amount of shielding so

7  that it -- so that people won't be irradiated once the

8  cask comes out.

9      Q   How long are these TPBARs?

10     A   Approximately 12 feet.

11     Q   And how many can fit on an assembly?

12     A   Say that again, please.

13     Q   How many TPBARs can fit on an assembly?

14     A   So, we don't ship TPBARs on the assembly.  The

15  TPBARs are on -- a TPBAR assembly has 12 to 24 TPBARs on

16  it.  What we ship after we harvest them is a shipping

17  canister which holds 300 TPBARs.  That's what gets

18  shipped.

19     Q   But when they come out of the reactor and through

20  the process until you put them in this canister, they are

21  in the assembly?

22     A   Until they're put into the canister, they're on

23  the assembly.

24     Q   And do the -- does the assembly -- I think you've

25  referred to it as "the hub," the stuff that you said you

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 85-1   Filed 11/15/21   Page 98 of 672   PageID #:
368
JA 0091

1  put in the waste to go --

2      A    Right.

3      Q    -- to be buried or whatever's done with it

4  afterwards, does it -- does that assembly bear the same

5  radioactivity as the TPBARs themselves?

6      A    Yeah.  If you look at it as high-level

7  radioactivity, yes, they're highly radioactive also.

8      Q    How much water do you have to have on top of the

9  work that you're doing above the radioactive stuff in

10  order to be safe?

11     A    We're required to have eight feet of water.  You

12  know, to be safe, you could probably have less, but our

13  requirements are -- specifications are for eight feet of

14  water.

15     Q    How deep are these pools that the assemblies

16  travel --

17     A    About 40 feet.

18     Q    -- through?  Forty feet?

19     A    Yeah.

20     Q    So if you were to lose control of an assembly, it

21  might fall as far as 40 feet or -- I guess less -- you

22  know, 30 feet?

23     A    Yeah, it -- yeah, it could fall as far as 30 feet,

24  that's correct.

25     Q    Has any testing been done to determine if an

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 85-2  Filed 11/15/21   Page 99 of 672   PageID #:
369
JA-0092

1  assembly can withstand a fall of that without destructive

2  effect on the TPBARs?

3     A   No, there haven't been.  Pacific Northwest

4  National Laboratories is working on that.

5          However, for certain, if they were to fall that

6  far you would go past the point of plastic deformation

7  with the cladding on the TPBAR.

8          So, it's, it's -- actually, if you went past about

9  a foot and a half, two feet, you would go past the point

10  of plastic deformation, with the cladding on the TPBAR.

11  Now, would that cause it to breach?  Probably not, but

12  you don't know.  So, all the equipment is designed to

13  handle the TPBARs to where they will not -- nothing will

14  happen that will cause them to go past the point of

15  plastic deformation.

16          For instance, when we drop a TPBAR into the

17  canister, there's a roller brake assembly and it slows

18  down the descent of the TPBAR so that it won't hit and go

19  past the point of plastic deformation.

20     Q   All right.  Well, let's slightly shift gears here

21  and talk about your professional relationship with

22  Mr. Goforth.  Before we do that, let's talk about your

23  reporting structure in your job.

24          And I'm going to be referring, for the benefit of

25  counsel, to a document that's Document 3.  And,

1    about in the suit.  So, that would be correct?

2        A    That's correct.

3        Q    And then Keck reports to the general manager for

4    reactor engineering and fuels, right?

5        A    That's correct.  David Brown.

6        Q    So your reporting structure -- and I believe you

7    said you had an office at corporate as well as an office

8    at Watts Bar -- is up through the nuclear fuels program,

9    it's not through the plant management itself?

10       A    That's correct.

11       Q    If you would look at the second page, then, of

12   that handout.  And we see at the top, do we not, that

13   Paul Simmons was at this time the vice president of Watts

14   Bar Nuclear?

15       A    That's correct.

16       Q    So was he the senior person from TVA at the plant?

17       A    Yes.

18       Q    And another name that I'm interested in, because I

19   think it's somebody you reacted -- or acted with, is --

20   if you look at the third name down, in the first column,

21   you see director of maintenance, Jesse James?

22       A    Yes.  He was director of maintenance.

23       Q    And so that would accurately --

24       A    Well, it depends what time period you're talking

25   about.  During the -- I believe if we're talking about

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-1  Filed 11/15/21  Page 101 of 672  PageID #: 371
UA 0094

1   other people like that, but it was basically maintenance,

2   mechanical maintenance?

3     A   So, it'd -- yes.

4     Q   So I'm going to refer you now to your Document

5   number 2.  Let me know when you're able to look at that.

6     A   Okay.  I've got that open.

7     Q   Can you tell me what that is?

8     A   Let's see.  It appears to me to be a document from

9   DZ to Robert Goforth, giving him the -- offering him the

10   manager -- the position of task manager for the tritium

11   program.

12     Q   And what, if anything, did you have to do with

13   Mr. Goforth being offered this job?

14     A   I requested that he be given that job.

15           MR. JOHNSON:  Before we proceed further, let

16   me get this marked as Exhibit 2.

17           THE REPORTER:  Sir, this has a prior exhibit

18   letter, A as in apple.  Do you want me to cover over that

19   or put this beneath?

20           MR. LANTIS:  Why don't you cover --

21           MR. JOHNSON:  Yeah, let's cover it.

22           THE REPORTER:  Sure.

23           MR. LANTIS:  I think that'll make it less

24   confusing.

25           (Exhibit 2 was marked for identification.)

1          MR. MEALOR:  Can we identify the exhibit

2   number and the blackout and other alterations?

3          MR. JOHNSON:  The blackout is just a

4   redaction of personal information that the court wants us

5   to do.  It's his address.

6          Does that answer your question?

7          MR. MEALOR:  Yes.

8          MR. JOHNSON:  Mr. Mealor, are you -- you're

9   handling the -- defending the deposition, not

10  Mr. Bernier?  Just to be clear.

11         MR. MEALOR:  I am.  What I would say is if I

12  have some technical difficulties, Mr. Bernier would be

13  the person to step in, if that would be okay.

14         MR. JOHNSON:  Understood.

15         MR. MEALOR:  Thank you.

16  BY MR. JOHNSON:

17  Q    Okay.  You said, if I'm quoting you correctly,

18  that you requested that Mr. Goforth have this position?

19  A    That's correct.

20  Q    And did you discuss this in advance with

21  Mr. Goforth?

22  A    You know, I can't remember specifically discussing

23  it with him, but I'm certain that I did.  I just can't

24  remember any specific discussions about that.

25  Q    And why did you want Mr. Goforth for this role?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 135-17   Filed 11/15/21   Page 103 of 672   PageID #:
373
UA 0096

1    A    So, cycle 13, the first consolidation, he was a

2    field engineer.  That was his role and responsibility.

3    He took a very keen interest in the consolidation.  He

4    wanted to learn, and he picked things up very fast.  And

5    he really wanted to be involved with it.

6         I wanted to get more people who knew how to do

7    this.  It takes about -- to be the task manager for

8    tritium consolidation and shipping campaign, it takes

9    about two times through this process to where you really

10   have it down pat and you know what's going on.

11        Greg Whitehorn had been doing the task manager's

12   position.  I wanted other people who knew how to do that,

13   instead of having to just rely on one person to do it.

14   Up until that point, there were only two people who could

15   do that and had the knowledge to do it.  That'd be Greg

16   Whitehorn and myself.

17        So, Robert Goforth took an interest in it, he was

18   a fast learner, and he was willing to push and learn.  So

19   I wanted him to become -- take up the task manager's

20   role.

21        Also, we were increasing production of tritium in

22   the TPBARs, and it was evolving to a position that we

23   would need year-round instead of just during the

24   consolidation and shipping parts.

25   Q    So was this a full-time, year-round position?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-57   Filed 11/15/21   Page 104 of 672   PageID #:
374
JA 0097

1    A   At the -- yes.  There was, there was work around

2  full -- around the year, getting ready for the campaigns

3  and demobilizing for the campaigns.

4    Q   All right.  So you were his immediate line

5  supervisor within the tritium program?

6    A   I think that would be yes.  Yes.

7    Q   Was it your understanding, when this process was

8  worked through for Mr. Goforth to get this position, that

9  he was going to be an augmented TVA employee for the --

10    A   That's correct.  It was my understanding that he

11  was going to be an augmented TVA employee.  It would

12  be -- if he was an augmented TVA employee, then you could

13  say he worked directly for me.  If he wasn't an augmented

14  TVA employee, then technically he would be working for

15  somebody at DZ.

16    Q   And you've already testified that he was working

17  directly for you in the tritium program in a full-time

18  position, with this position?

19    A   Full-time, yeah.  Full-time augmented position.

20  That's correct.

21    Q   Okay.  I'm going to show you another document,

22  which is Document 1.

23            MR. LANTIS:  Did you move Document 2 in as an

24  exhibit?

25            MR. JOHNSON:  I did.

1           MR. LANTIS:  Document 2 became <u>Exhibit 2</u>.
2  Okay.  Sorry about that.
3           MR. JOHNSON:  It was Document 2, wasn't it?
4           THE REPORTER:  Yes.
5           MR. JOHNSON:  Can you pause?
6           THE REPORTER:  That was the one that had that
7  Exhibit A on it.
8           MR. LANTIS:  Got it.  Thank you.
9           And this is Document 1?
10  BY MR. JOHNSON:
11    Q   Let me know when you have that document in from of
12  you, Mr. McGuire.
13           THE REPORTER:  Was that Document 1?
14           MR. JOHNSON:  Yes.
15    A   I have it.
16    Q   All right.  This is a document you will likely not
17  have seen before, but I'll ask you, just to be sure,
18  because someone from TVA may've shown it to you.  Have
19  you ever seen this before?
20    A   No, I haven't.
21    Q   All right.  This is Mr. Goforth's lawsuit.  And it
22  has the date stamp of the court at the bottom that shows
23  it was filed in the court.  So I'm going to ask you some
24  questions about that.
25           Okay.  Let's look on the third page, at paragraphs

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 106 of 672   PageID #:
UA 0099
376

1    13 through 16.  Are you with me?

2        A    I am.

3        Q    And you've already, I think, testified to this but

4    let's make sure we've got it right.  It says:  "McGuire

5    recruited Goforth for his TVA augmented employee position

6    and was responsible for DZ offering Goforth the position

7    as shown as Exhibit A."  Exhibit A being the contract

8    that we just went over.

9            Would that be a correct statement?  I think you've

10   already basically testified to this.

11       A    That's correct.

12       Q    Number 14:  "TVA, through McGuire, controlled how

13   Goforth did his job."

14       A    That's correct.

15           MR. MEALOR:  Objection.  Calls for an

16   opinion.

17           MR. JOHNSON:  Objections are to form of the

18   question and privilege only.  But I'll take that as a

19   form of the question objection, and we'll proceed.

20   BY MR. JOHNSON:

21       Q    Occasionally there may be objections.  And if

22   there are, you can just ignore those unless your attorney

23   directs you not to -- well, it's not your -- TVA's

24   attorney directs you not to answer.  So, just kind of

25   ignore these objections.  They're for the record.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-1  Filed 11/15/21  Page 107 of 672  PageID #:
JA 0100
377

1    They're for the lawyers and perhaps the judge at some

2    point.  Okay?

3        A    All right.

4        Q    So, you answered yes to number 14, correct?

5        A    That's correct.

6        Q    Okay.  15.  "TVA, through McGuire, provided

7    Goforth with all means for doing his job."

8        A    That's correct.

9        Q    16 here is "TVA, through McGuire, determined when

10   and how long Goforth worked on a daily basis."

11       A    That's correct.

12            MR. MEALOR:  Objection.  Form.

13       Q    Okay.  Let's look at 17 while we're at it also.

14   Just reading it, it says "The TVA tritium program" -- and

15   please read along with me -- "was a part of the regular

16   business of TVA."  And the rest of it just gives a

17   statutory reference.  But is that a correct statement,

18   that at this point --

19       A    That's correct --

20            MR. MEALOR:  Objection.  Form.

21       Q    I'm sorry, I couldn't hear the answer.

22       A    That's correct.

23       Q    Is Watts Bar the only site for production of

24   tritium for use by the Department of Energy for --

25            MR. MEALOR:  Objection.

1    Q  -- for nuclear weapons production?

2    A  I'm reading it.  (Reviewing document.)  I would

3 have to say that is correct.  The only place -- the only

4 site that -- the only place that tritium for the US

5 nuclear weapons are produced is at Watts Bar.

6    Q  Now, are you responsible, in part, in your job

7 duties for preparing the budgets for the tritium program

8 that will be presented to DOE for approval?

9    A  Okay.  So, yes.  However, there is another program

10 manager besides myself.  The other program manager is

11 more involved with the budget than I am.  But as far as

12 preparing the budget and getting the inputs to the

13 Department of Energy, I'm responsible for that also.

14    Q  So, you would have seen all of the budget

15 proposals that go to DOE and all of the approvals that

16 come back?

17    A  That's correct.

18          MR. MEALOR:  Objection.

19          MR. JOHNSON:  (To the reporter) Did you hear

20 the answer?

21          THE REPORTER:  Yes.  "That's correct."

22          MR. LANTIS:  Just since there's a technology

23 delay, if I could suggest that maybe Mr. McGuire wait one

24 second so that Mr. Mealor can state an objection.

25 Because I'm having a hard time hearing the answers as

Case 1:20-cv-00254-TRM-SKL  Document 250-17  Filed 11/15/21  Page 109 of 672  PageID #: 379

1  well over the objection.

2        So, I'm just trying to be helpful there.

3        MR. JOHNSON:  And since he's going to be

4  answering the question regardless of the objection, if

5  it's to form, Mr. Mealor, you -- you know, I'm not -- if

6  you don't object until after he finishes the answer,

7  we'll take that as an objection, if he starts to answer.

8  Is that -- we're not going to be technical with you on

9  that if you state the objection after the answer.

10        MR. MEALOR:  Agreed.

11        MR. LANTIS:  Thanks.

12  BY MR. JOHNSON:

13     Q   I'm looking at paragraph 19 now, but more -- maybe

14  asking it in a more specific way.  Can you give me a

15  range of the dollar amounts of the budgets that you

16  prepared for -- well, maybe I should ask this first:

17  Were the budgets for a cycle, or for some time period?

18     A   The budget is for a fiscal year, starting in

19  October.

20     Q   So, can you give me a range of the amount of the

21  budgets that TVA gave and were approved for the tritium

22  program for, say, cycle 14?

23     A   The total budget?  Are you asking for the total

24  budget?  Because the majority of the budget is for extra

25  uranium-235.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 25-13  Filed 11/15/21  Page 110 of 672  PageID #:
380
JA 0103

1    Q   Yeah.  Well, you can -- why don't you just give me
2   the total budget.
3    A   So the total budget is probably in the
4   neighborhood of $150 million a year.
5    Q   Okay.  And if you took out the uranium that you
6   just spoke of, what are we talking about?
7    A   You're probably talking -- once again, it depends
8   on what we're doing.  We have different projects that we
9   implement, and we're still trying to raise tritium
10   production.  But you're probably looking at between 40
11   and $90 million a year.
12    Q   And that would be -- that would've been true for
13   cycle 14?
14    A   That would've been true for cycle 14.
15        Now, I'm just -- and let me say, I'm just shooting
16   from the hip here.  I would -- I could go back and could
17   find the exact figures, but, you know, this is just a
18   rough estimate from my knowledge.
19    Q   And do you know approximately how much of that
20   would be for personnel involved, including Mr. Goforth
21   and all augmented TVA workers in the program and the --
22   I'm sorry -- yeah, the augmented workers who may've come
23   from Day & Zimmermann and the TVA workers in the program?
24    A   It would've been a couple million dollars.
25            MR. LANTIS:  Objection to the form.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1  Filed 11/15/21  Page 111 of 672  PageID #:
381
JA0104

1    Q   Okay.  Let me lay a little better foundation for

2    it then.  Working in the program as craft and foremen and

3    general foremen and Mr. -- on up to Mr. Goforth, were

4    some of workers DZ TVA augmentees?

5    A   That is correct.  Some of the workers were

6    supplied by DZ and were in an augmented status to the

7    program.

8    Q   But they were short-term workers just for that

9    cycle, in the budget?

10   A   They were short-term workers just for the

11   consolidation and shipping campaigns.

12   Q   And then some of those workers, general foremen,

13   foremen, superintendents, could've been from the TVA

14   maintenance department that we described earlier on the

15   organizational chart?

16            MR. MEALOR:  Objection.  Form.

17   A   That's correct.

18   Q   So in your previous answer, in the range of -- and

19   correct me if I'm saying it wrong, I think it was 2 to 4

20   million, or something like that, would that include all

21   the workers as you've just described them when I broke it

22   down for you?

23   A   Yes, that's correct.

24   Q   And what number again did you put on that?  I'm

25   not sure I said it right.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 112 of 672   PageID #:
JA 0105
382

1    A    Approximately $2 million.

2    Q    Now, getting away from the complaint and back to

3  discussing Mr. Goforth's job.  Was he essentially the

4  front line senior manager; that is, the guy on the ground

5  who was supervising the consolidation programs in

6  tritium?  I know you've testified you had an office at

7  corporate, you're involved at that level.  But was he

8  your guy on the ground for cycle 14 who was running

9  things there at the plant on the ground?

10             MR. MEALOR:  Objection.  Form.

11    A    He was.  He was the task manager that oversaw all

12  the craft and the actual work going on.

13    Q    And as I understand it from Mr. Goforth, he was

14  kind of the first point of contact for the tritium

15  sustainment group?  And first let me lay a little

16  foundation for that.  What's the tritium sustainment

17  group?

18    A    It -- I do recognize that term, but that's really

19  a term that overarches into -- it's a term that the

20  Department of Energy uses.  TVA is a part of the tritium

21  sustainment group, as well as Savannah River and PNNL.

22        So, the point of contact between TVA and the

23  tritium sustainment group would either be myself, the

24  senior program manager, or actually on paper it would be

25  my boss, the nuclear fuels oversight manager.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-1 Filed 11/15/21   Page 113 of 672   PageID #:
JA 0106
383

1    Q    Okay.  So would it be fair to say the tritium

2    sustainment group was the collection of agencies --

3    United States agencies and sites that were involved in

4    the harvesting of tritium and then the uses it was put

5    to?

6              MR. MEALOR:  Objection.  Form.

7    A    So -- yeah.  The tritium sustainment group was a

8    collection of all the stakeholders in the production of

9    tritium.

10   Q    And so that -- I think you've already testified

11   that would include the Department of Energy?

12   A    That would include the Department of Energy.  It's

13   the Department of Energy's group.  Everybody else is a

14   stakeholder in that group.

15   Q    And so this was the Department of Energy's dollars

16   that were funding this entire program via budget

17   proposals that were submitted by TVA to it?

18   A    That is correct.

19             MR. MEALOR:  Objection.  Form.

20   Q    So Mr. Goforth's salary was paid through some sort

21   of flowthrough to -- by DOE money?

22             MR. LANTIS:  Objection to form.

23   A    So, yes.  TVA is reimbursed monthly for what we

24   have to spend for tritium production.  So, we'll

25   essentially give the Department of Energy a monthly

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 25-1  Filed 11/15/21  Page 114 of 672  PageID #:
JA 0107
384

1  invoice, this is what we spent, and they reimburse that

2  to us.

3    Q   So the position we described earlier that you saw

4  the contract for, task manager, that would be on those

5  monthly invoices to make TVA at least whole with -- and

6  DZ at least whole with respect to paying Mr. Goforth?

7            MR. LANTIS:  Objection to form.

8            MR. MEALOR:  Objection.  Form.

9    A   Yes.

10   Q   How did Mr. Goforth perform in his new role when

11  he was augmented to TVA, as you've testified, as the task

12  manager for the program?

13           MR. MEALOR:  Objection.  Form.

14   A   So, he performed very well.

15   Q   Did you ever have any occasion to administer any

16  discipline to him for any reason?

17   A   No.

18   Q   How frequently when he was serving in this

19  position would you talk to him or have contact with him

20  in the course of, say, a week?

21   A   It depends what period we're talking about.  If

22  it -- outside of the scope of consolidating, harvesting

23  and shipping of the TPBARs, I would say a couple of times

24  a week.

25   Q   Okay.  And how about when you were doing the --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-4   Filed 11/15/21   Page 115 of 672   PageID #:
JA 0108
385

1             MR. MEALOR:  Objection.  Form.

2      Q    -- actions that you just mentioned, what was the

3  level of contact?

4      A    Daily to hourly.

5             MR. MEALOR:  Objection.  Form.

6      Q    And that occurred up until the time that he was

7  terminated?

8             MR. MEALOR:  Objection.  Form.

9      A    That's correct.

10      Q    And in your experience with him during that time

11  period, was he professionally competent?

12             MR. MEALOR:  Objection.  Form.

13      A    Yes, he was.

14      Q    Was he reliable?

15      A    Yes, he was.

16             MR. MEALOR:  Objection.

17      Q    Was he trustworthy?

18      A    Yes, he was.

19             MR. MEALOR:  Objection.

20      Q    How was his work ethic?

21      A    His work ethic was excellent.

22             MR. MEALOR:  Objection.

23      Q    Did he perform successfully in the assignments

24  that you gave him?

25      A    Yes, he did.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35 Filed 11/15/21   Page 116 of 672   PageID #:
JA 0109
386

1          MR. MEALOR:  Objection.

2     Q    From your daily and then your sometimes

3    biweekly -- roughly biweekly contacts with him over this

4    entire time period, do you feel like you have a good idea

5    of his professional reputation for honesty?

6     A    I do.

7          MR. MEALOR:  Objection.

8     Q    What was his professional reputation for honesty

9    there in the Watts Bar community?

10    A    He was totally honest.

11          MR. MEALOR:  Objection.

12    Q    How were his relationship with his craft

13   subordinates, like the foremen and the craft under the

14   foremen?

15    A    So, he was overseeing the foremen.  So, he was,

16   you know -- I think, you know, he had a good -- he had

17   good communications with the foremen.

18         Would you -- please restate the question.

19    Q    I'll withdraw the question.  It's really not that

20   significant.  I can understand how it would be confusing.

21         With regard to the tritium sustainment group,

22   before we leave that topic entirely, I know that you

23   talked about who was organizationally the primary contact

24   with the tritium sustainment group, but what degree of

25   contact as the program task manager would Mr. Goforth

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-10  Filed 11/15/21  Page 117 of 672  PageID #:
JA 0110
387

1   have had with the sustainment group?

2           MR. MEALOR:  Objection.

3     A   He -- different -- he would have direct contact

4   with them in different stages of the program.  We would

5   have anywheres from monthly to weekly meetings with the

6   Department of Energy, phone conferences, to ensure that

7   everything was on track and that everything was going

8   along as it should and we didn't need any help and they

9   didn't need any help.

10      So, it depends, you know.  It could go anywheres

11   in the cycle from four weeks, to two weeks, to -- you're

12   getting close to doing a consolidation -- weekly.  And in

13   the midst of consolidation it could be two or three times

14   a week where he was in direct contact with the DOE,

15   tritium sustainment program.

16     Q   Thank you.

17      Okay.  Let's turn back to the complaint for a

18   moment.  And go to page 6 and look at number 38 so we can

19   talk a little bit about health and safety risks of the

20   program.

21     A   Okay.

22     Q   And I'll try to make this fast.  I can represent

23   to you -- and I think counsel would agree, TVA counsel,

24   that paragraphs 38 to 48 are agreed by the parties.  They

25   were alleged in the suit and admitted by TVA.

1          So what I'd like you to do, rather than go through

2     each of those, is just look at 38 through 48, and tell me

3     if those all, based on your experience with the program,

4     appear to be accurate statements.  And if they're not,

5     when you see something that's not, just let us know?

6               MR. MEALOR:  Objection.

7     A    (Reviewing document.)  One more time.  How far do

8     you want me to go on this?  Through --

9     Q    Through the end of paragraph 48.

10    A    Through the end of paragraph 48.  Okay.  The only

11    thing I would say -- I would agree with everything -- I

12    might've worded it different, but I would agree with

13    everything except on 45:  "The harvesting, containing,

14    storing and shipping of the TPBARs at Watts Bar begins

15    with a new program 'cycle' approximately every 18 months.

16    The cycles have been numbered consecutively since the

17    startup of the program."

18         The cycles are numbered by the core refueling

19    cycle.  So the first cycle that ever had any TPBARs was

20    unit 1 cycle 8.  And then I believe cycle 10 was when

21    they first started actual large-scale production.  So, in

22    other words, when we talk about cycle 5, there is no

23    cycle 5 consolidation.  There weren't any TPBARs in that

24    fuel cycle.

25    Q    Thank you for that correction .

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-12  Filed 11/15/21  Page 119 of 672  PageID #:
389
JA 0112

1          Okay.  Now I want to spend a little time on

2    paragraph 49.  And I'm going to read it, and follow along

3    with me if you will, please, sir.

4          "For example, were a TPBAR accidentally dropped,

5    it could crack, allowing high pressure tritium gas to

6    escape into the water and atmosphere.  More dangerous to

7    public health and safety, the cracked TPBAR, or pieces of

8    it, could be propelled by escaping high pressure tritium

9    gas into other TPBARs, causing them to crack or break.

10   Any cracked or broken TPBAR could fly out of the water at

11   high speed like shrapnel.  The TPBARs, or fragments of

12   them, due to their irradiation in the reactor, are

13   radioactive at such a high level that human exposure to

14   them in the air of the facility would be extremely

15   hazardous to health and safety.  In short, a damaged

16   TPBAR could cause serious bodily injury or death."

17         So, let me ask the question to you.  Is a

18   hypothetical scenario like as was just described there,

19   is that something that is described to workers in the

20   program in order to impress them with the gravity of the

21   nature of the work?

22               MR. MEALOR:  Objection.  Form.

23     A   So, I would've worded this differently.  But in

24   general, the answer would be yes, especially the, you

25   know -- I would say especially the last two sentences of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 150-13  Filed 11/15/21  Page 120 of 672  PageID #:
390
JA0113

1  that paragraph.

2      So, we do impress on them that, you know, that the

3  TPBARs are highly radioactive, and by the time we

4  consolidate and ship they're pressurized, and that we

5  really don't know what would happen if a TPBAR had a

6  major breach.  There's a lot of speculation on that, what

7  would happen.  But, you know, it, it definitely could

8  cause some problems to the health and safety of the

9  workers.

10  Q    And how thick is the skin -- I think -- I can't

11  remember the word you used to describe it, the skin on

12  these TPBARs that contains them?

13  A    It's, it's a cladding.  And it's -- the exact

14  thickness is export control, falls under the export

15  control laws of the Department of Commerce.  So I don't

16  really want to give you an answer on that.

17      But it is possible -- as I said before, if these

18  are dropped more than, I believe it's 18 inches, 18

19  inches to two feet, you could have a major breach on a

20  TPBAR, because they have never been tested like that.

21  What you will have is you will go past the limit of

22  plastic deformation if it's dropped more than 18 inches.

23  Whether that means it'll breach or not, don't know.  So

24  you just -- the best assumption is that it would breach.

25          MR. MEALOR:  Objection to form on that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-11  Filed 11/15/21  Page 121 of 672  PageID #: 391
JA0114

1    question.

2        Q   If it would breach, is the scenario described in

3    paragraph 49 one of the possible scenarios that could

4    occur in the event of a breach?

5                MR. MEALOR:  Objection.  Form.

6        A   It is one of the possible scenarios that has been

7    discussed on what would happen if there was a breach.

8        Q   And has this been discussed with the foremen, the

9    craft -- well, let me ask it this way:  Was this

10   discussed with Mr. Goforth?

11       A   Yes, it was.

12               MR. MEALOR:  Objection to form.

13       Q   Do you know whether it was then discussed with

14   foremen and craft as well?

15       A   I don't, I don't remember discussing it myself or

16   when it was discussed, but I'm totally certain that

17   during the -- you know, we have training with them and

18   impress on them, you know, how important these things are

19   handled right and by procedure.  So...

20               MR. MEALOR:  Objection to form of the

21   question.

22       Q   I'm going to show you a photograph.  And I

23   apologize for the quality of this copy.

24               MR. JOHNSON:  You may want to look at it,

25   Paul, in your --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-15   Filed 11/15/21   Page 122 of 672   PageID #:
JA 0115
392

1          MR. MEALOR:  Yes.

2          THE REPORTER:  Thank you.

3          Sorry, sir.

4     Q   During this time when he went over to the -- to

5   perform outage activities, did he still perform tritium

6   work in which you communicated with him and he

7   communicated with the sustainment group?

8     A   Yes, but very insignificantly.  I mean, he was

9   mainly working for the plant.  We would discuss -- I

10  might call him up and ask him about, you know, have you

11  got the -- you know, has the work order been approved yet

12  to put the consolidation fixture together, you know,

13  something like that.  But he was not on the -- he was not

14  being paid by DOE funds then.

15          MR. MEALOR:  Objection.  Form of the

16  question.

17    Q   So, you considered this, I take it then, to be a

18  temporary assignment just for the outage and then he

19  would be back to his full-time tritium job?

20    A   That's correct.

21          MR. MEALOR:  Objection.

22    Q   And there was communication between you and he

23  during the outage regarding his tritium duties?

24    A   There was.  Not much, but there was communication.

25  And I couldn't tell you exactly what.  But with the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-1  Filed 11/15/21  Page 123 of 672  PageID #:
393
JA 0116

1 tritium campaign coming up at the end of that outage,

2 there would've been some questions or some communication

3 going on.

4     Q   Do you recall him communicating with the tritium

5 sustainment group by emails or otherwise during that

6 outage time period?

7     A   I would say -- I don't recall it, but I'd say it's

8 very possible.

9            MR. MEALOR:  Objection.

10     Q   Are outage activities, for want of a better word,

11 pretty much an all-hands-on-deck type of activity at

12 Watts Bar?

13            MR. MEALOR:  Objection.

14     A   At Watts Bar and any nuclear plant.

15     Q   And so I, I've heard things from Mr. Goforth, like

16 even secretaries were used to be fire control watches, to

17 stand fire control watches, and things like that.  Is

18 that correct?

19     A   That's correct.  I mean, the -- let me put it this

20 way, people who don't directly support those type of

21 maintenance or activities get pulled out of their regular

22 job to do that.  It's pretty common.

23            MR. MEALOR:  Object to form of the prior

24 question.

25     Q   I want to get specifically now to cycle 14.  So,

1   when, approximately, did the actual, as you call it,

2   consolidation of the tritium begin in cycle 14,

3   approximately?

4       A   It was going to begin -- it began directly after

5   the end of cycle 14 refueling outage.

6       Q   And was that --

7       A   At the startup of cycle 15.

8       Q   Okay.  And you're talking about the refueling at

9   Watts Bar Unit 1?

10      A   Watts Bar Unit 1.  Correct.

11      Q   So that would've been approximately spring, summer

12  of 2017?

13      A   Let me think.  Oh, I'm sorry.  You're talking

14  cycle 14?

15      Q   Yes, sir.

16      A   Yes.  Spring, summer of 2017, correct.

17      Q   During cycle 14, was there a change made in the

18  craft personnel and foremen who were going to be working

19  in the program from the way it had been in prior cycles?

20      A   Yes.  The maintenance department -- prior to that,

21  the consolidation and shipping was done by the

22  maintenance support department who used DZ employees.

23  The maintenance department on cycle 14 wanted to do it, I

24  guess the best term would be "in-house," using people

25  from the maintenance shop, not from the maintenance

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-11 Filed 11/15/21   Page 125 of 672   PageID #:
JA 0118
395

1  services department but actually from the mechanical

2  maintenance shop.

3    Q   And who was responsible for making that decision

4  that the cycle 14 would be handled by the TVA maintenance

5  group instead of the DZ workers?

6    A   That was the maintenance -- director of

7  maintenance, Jesse James, and -- primarily, and then my

8  boss, Mike Keck, also.

9    Q   Okay.  Did that have to be approved, or do you

10  know if it was shown in any way to Paul Simmons?

11   A   Yes, I --

12            MR. MEALOR:  Object to form.

13   A   It was.

14   Q   How --

15   A   Paul Simmons --

16   Q   How do you know that?

17   A   You know, I don't know exactly when, where and

18  what was said, but I know that Paul Simmons had voiced

19  some concerns to maintenance that they really thought

20  that they had the personnel to do that and keep up with

21  the plant maintenance, normal plant maintenance.

22   Q   And what was your view on that --

23            MR. BERNIER:  I think he was objecting to

24  both those questions.

25   Q   What was your view on that?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-19   Filed 11/15/21   Page 126 of 672   PageID #:
396
JA0119

1    A  My view on it was I didn't want to -- and this is

2  just a personal thing.  I mean, it's pretty subjective.

3  But I didn't want to go through the maintenance -- the

4  in-house mechanical maintenance shop.  I wanted to

5  keep -- we got a system that worked and I wanted to keep

6  that system working the way we had been doing it.

7    Q  So the workers --

8          MR. MEALOR:  Objection.

9    Q  The workers --

10         MR. MEALOR:  I was objecting to the prior

11  question.  All right.  I'm done.

12    Q  So the workers from DZ were experienced workers

13  who had handled prior consolidation programs?

14    A  That's correct.

15    Q  And the workers from --

16         MR. MEALOR:  Objection.

17    Q  -- TVA maintenance were inexperienced in doing any

18  of this tritium program activities?

19    A  That's correct.

20         MR. MEALOR:  Objection.

21    Q  Did they have zero experience?

22    A  I'm thinking.  And that would be correct.  They

23  had zero experience.

24    Q  And you expressed that to Mr. Simmons and you

25  think he maybe shared that?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-1  Filed 11/15/21  Page 127 of 672  PageID #:
UA 0120
397

1     A   I don't --

2              MR. MEALOR:  Objection.

3     A   -- think I expressed that to him directly.  I

4  expressed it to Jesse James, the director of maintenance,

5  and I expressed that to my boss.  But I do know that Paul

6  Simmons was aware of that and that he had a similar

7  concern.  And also he was concerned that there wouldn't

8  be enough resources in the shop if they cut shop people

9  loose to go do this.  It's quite -- you know, it's a

10 fairly long evolution.

11    Q   What do you think were the motivations of James

12 wanting to do this?

13             MR. MEALOR:  Objection.

14    A   It's my opinion --

15    Q   Sure.

16    A   This is totally my opinion.  I think that what he

17 wanted to do was he wanted to supplement his budget with

18 some DOE dollars.

19    Q   And would this change have resulted in a greater

20 flow of dollars to TVA and a lesser flow of dollars to

21 DZ?

22             MR. MEALOR:  Objection.

23    A   So, it would have resulted in a lesser flow of

24 dollars to DZ, but it wouldn't make any difference to

25 TVA.

1    Q   And describe for me how that is.

2    A   TVA pays DZ for their services.  So, whether we're

3   paying for a boilermaker from the Watts Bar maintenance

4   shop or whether we're paying for a boilermaker from DZ,

5   from the hall, the money is still getting paid by DOE

6   through TVA.

7        TVA does not make a profit.  We do this under --

8   maybe I'm running a little too much, but we do this under

9   the Economy Act.  We cannot make a profit and we cannot

10  make a loss.  We can just get reimbursed for the money

11  that was spent.

12   Q   But would it be true that TVA would get DOE money

13  for the hours that TVA maintenance department workers put

14  on the project?

15           MR. MEALOR:  Objection.

16   A   Yes.

17   Q   And that number would've been a higher number of

18  reimbursement for whatever they were being paid than it

19  was before this change was made from DZ workers?

20   A   That's --

21           MR. MEALOR:  Objection.

22   A   It would've been for the budget for the

23  maintenance department.  It would have -- the money that

24  maintenance -- mechanical maintenance spent that year

25  would have been augmented by that DOE money.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-12   Filed 11/15/21   Page 129 of 672   PageID #: 399
JA-0122

1      For instance, if they sent ten people and now

2  for -- say for four months you don't have to pay for four

3  of them, even though those people are getting paid, then

4  it's going to make your budget look better.

5      Q   Got it.  You just answered my next question.  So,

6  thank you.

7      Did Mr. Goforth express any views to you about the

8  change from the DZ workers to the TVA workers?

9      A   You know, I can't remember specifically, but I

10  know that we were all anxious, because the DZ workers

11  were experienced and the TVA workers weren't.  And

12  Mr. Goforth did have some input on what DZ workers we

13  were going to get, make sure they were experienced.  And

14  he had no -- we had no input on the workers we were going

15  to get from the maintenance shop.

16          MR. MEALOR:  Object to that prior question.

17      Q   Did it -- so, was part of the reservations that

18  you had and that Mr. Goforth had about using the TVA

19  maintenance workers under Jesse James, that being

20  inexperienced it increased some of the risk involved in

21  these operations that we've talked about earlier with

22  highly irradiated material?

23          MR. MEALOR:  Objection.  Form.

24      A   That's true.

25      Q   So how did it turn out in cycle 14, in June of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 130 of 672   PageID #: 400
JA 0123

1  2017, by using these inexperienced workers?

2    A   It -- we had a lot of problems.  More problems

3  than were typical.  And we always do a lessons learned in

4  the end.  So, we had cataloged all the problems we had

5  with the maintenance shop.

6    Q   Okay.  I'm going to ask you to take -- open up

7  your Document 8.  And let me know when you've got it.

8    A   I got it.

9    Q   Okay.  Can you identify this document?

10   A   So that was an assessment we did on cycle 14.

11   Q   So that's what you just spoke of in your

12  immediately prior testimony?

13   A   That's correct.  It's a little more comprehensive

14  than what we normally do.  We normally just list some

15  lessons learned and some things that we need to change

16  and some things that went right that we don't ever want

17  to change again.  But this one, because of the amount of

18  problems we had, we went ahead and did an assessment, not

19  only for us, in the program, but for TVA and also for the

20  Department of Energy.  This was shared with the

21  Department of Energy, as is all our lessons learned.

22              MR. JOHNSON:  Let's mark this as the next

23  exhibit, please.  And what exhibit will it be?

24              THE REPORTER:  Number 5.

25              (Exhibit 5 was marked for identification.)

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-12   Filed 11/15/21   Page 131 of 672   PageID #: 401
JA 0124

1    BY MR. JOHNSON:

2        Q    And I notice on page one of Exhibit 5 that the

3    author of it is Robert Goforth; is that correct?

4        A    On this one.  On the one -- the final one, it

5    was -- we were both co-authors of this.

6        Q    Okay.  Was the final one essentially what we were

7    looking at -- what we are looking at here?

8        A    I would have to -- essentially, I would have to

9    compare them page to page.  Or if there's any question on

10   anything, I could look.  But I would say essentially.

11       Q    But in --

12               MR. MEALOR:  Objection.

13       Q    -- any event, at least this one, on October the

14   17th, was drafted -- or Mr. Goforth is shown as the

15   author of?

16       A    Correct.

17               MR. MEALOR:  Objection.

18       Q    And so to -- and I take it that you asked

19   Mr. Goforth to work on this?

20       A    He was assigned to work on this.  That's correct.

21       Q    This was, I think you've testified, above and

22   beyond his -- what he would normally do to perform his

23   duties, because of the extra problems that you had

24   experienced?

25               MR. MEALOR:  Objection.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1 Filed 11/15/21  Page 132 of 672  PageID #:
JA 0125
402

1    A   That's correct.

2    Q   To try to shorten this a little bit, the point of

3  this assessment was to identify, specifically, gaps in

4  the performance of cycle 14; is that correct?

5    A   That's correct.  To document those gaps --

6    Q   And --

7            MR. MEALOR:  Object --

8    Q   -- there were 13 --

9            THE REPORTER:  Wait a minute.  Wait a minute.

10           Sir, you were still speaking, and then

11  Mr. Mealor objected, and I didn't hear what you said at

12  the end.

13           You said, "That's correct.  To document those

14  gaps."

15   Q   Anything after that?

16   A   I'm sorry, I'm having a hard time hearing.

17   Q   Let me just re-ask the question.

18   A   Okay.

19   Q   The format of this assessment was to identify gaps

20  in the performance of cycle 14?

21   A   It was to identify gaps, that's correct.  To

22  expound on that a little bit, so that the gaps can be

23  closed and corrective actions taken to close those gaps.

24  So the real purpose of it was so that you could close

25  those gaps.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-12   Filed 11/15/21   Page 133 of 672   PageID #: 403
JA 0126

1      Q    And --

2                MR. MEALOR:  And I was objecting to that.

3      Q    In your view at the time of the assessment, would

4    closing these gaps make the plant a safer operation?

5      A    So I, I -- yes.  However, I don't want to imply

6    that the plant was operating in an unsafe manner either.

7      Q    Well, we're talking relatives here.  That was not

8    the purpose of the question, to try to say that it was

9    being operated in an unsafe manner.

10        I just -- so the word was "safer."  Was the

11    purpose to make sure that in cycle 15 things could be

12    safer than they turned out to be in 14?

13      A    Yes.  That was part of the purpose.  The other

14    part of the purpose was also so that we could better

15    schedule performance and, you know, and add efficiency to

16    the process.  That's --

17                MR. MEALOR:  Objection to the question.

18      A    -- (indiscernible) was another part of it.

19      Q    Well, I'm going to kind of --

20                THE REPORTER:  Wait a minute.  Wait a minute.

21            Sir, Mr. Mealor was objecting and I didn't

22    hear what you said was "another part of it."  I missed it

23    in between.

24      A    Okay.  So -- and I'm really having a hard time.

25    Sorry.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-1  Filed 11/15/21  Page 134 of 672  PageID #:
JA 0127
404

1      A    Gap 11 was performance by TVA maintenance.

2           Gap 12 was performance by TVA maintenance.  Once

3    again, that was more of a management type thing.

4      Q    Yeah.  And it says there that this gap 12 "was

5    discussed with the maintenance manager who will inform

6    tritium program management of any actions."  It says

7    that, doesn't it, on page 10, after gap 12?

8      A    I think that's all the gaps.  Thirteen is --

9    that's more management -- that's maintenance management.

10     Q    So, I've counted eight of the gaps -- eight of the

11   13 gaps as being either TVA maintenance workers or TVA

12   maintenance management, or some combination of the two.

13     A    That's correct.

14     Q    And TVA management, again, you've testified would

15   be Jesse James?

16     A    It would be Jesse James, with the exception of the

17   radiation protection.

18     Q    Okay.

19     A    And -- yeah.  Yeah.

20     Q    And I take it that would've been someone in

21   another department that involved radiation protection?

22     A    That's correct.

23     Q    I want to focus on gap 9.  And it may take me a

24   minute here.  I need to boot up a video to show everyone.

25               MR. JOHNSON:  This is not in your list of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-12   Filed 11/15/21   Page 135 of 672   PageID #:
JA 0128
405

1  exhibits because we're all going to be looking at this

2  simultaneously during the testimony, and it'll display up

3  on the screen.  Let me this up.  Just bear with me for a

4  minute.

5  BY MR. JOHNSON:

6      Q    In the meantime, why don't you just read for the

7  record what gap 9 states.

8      A    Gap 9.  "On 22 June '17, in the latter part of the

9  shift, the same TVA boilermaker mentioned above bent a

10  thimble plug on a TPBAR assembly while placing in it the

11  consolidation fixture.  The boilermaker stated the crane

12  fast button was inadvertently pushed.  This caused a

13  TPBAR assembly to catch on the tombstone part of the

14  pitchfork, bending a thimble plug attached to the hub to

15  45 degree angle.

16          "Action:  The severity of the incident was enough

17  for the task manager to raise a concern to the first line

18  supervisor to have him removed from operating the bridge

19  crane or harvesting TPBARs from a hub.  TVA maintenance

20  manager shut the tritium project down until there was

21  confidence in the crew being able to be successful.  Shut

22  down from 23 June '17 to 28 June '17.  Refer to CR

23  1310118.

24          "Note: The action was captured on video recording.

25          "Clarification:  A TPBAR baseplate/hub has

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 136 of 672   PageID #:
JA 0129
406

1  positions for 24 12-footlong TPBARs.  Depends on where

2  the baseplate was in the core ...  how many TPBARs are

3  attached to a baseplate.  Example:  If a hub has 12

4  TPBARs attached, it will have 12 eight-inch thimble plugs

5  attached as well to fill up an empty position."

6      Q   So that's consistent with your earlier testimony

7  about -- when you looked at the picture, about which were

8  the TPBARs and which were the thimble plugs in --

9      A   That's correct.

10     Q   -- the picture?

11     A   And that is correct.

12     Q   All right.  Well, let me show you the video that

13 is referred to in the note there, that this was captured.

14 And this lasts only about a minute and a half, so it's

15 not going to take up a lot of time.

16            (Off the record for technical adjustments.)

17 BY MR. JOHNSON:

18     Q   All right.  Mr. McGuire, we're going to start this

19 video.  And maybe just looking at that still shot, can

20 you describe for us what we're looking at?

21            (Video plays.)

22     A   I believe we're looking at a TPBAR assembly,

23 coming through the rear gate door.

24     Q   What are those -- are those long rod-looking

25 things hanging down there, are those TPBARs?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-15  Filed 11/15/21  Page 137 of 672  PageID #:
UA 0130
407

1      A    I believe they are.

2      Q    Okay.  Well, let's start it up and then maybe it

3   will become more certain.

4            (Video plays.)

5      A    So yeah, that's, that's a TPBAR assembly coming

6   from the spent fuel pool into the cask loading area.

7      Q    I've stopped it for a minute.  So to be clear,

8   this is the stage where you've pulled these TPBARs out of

9   the reactor core and they're in the assembly that you

10  looked at the still picture of earlier, and they're now

11  ready for the next step, which is what?

12     A    Which would be placing it in the consolidation

13  fixture and de-torquing the TPBARs from the baseplates.

14     Q    All right.  Let's see what happens. (Video plays.)

15          Are those the TPBARs that are moving around there?

16     A    That's correct.  Like I said, there's nothing

17  supporting them on the bottom, so they're going to move.

18     Q    Okay.  So now I've stopped it again.  What are we

19  looking at there?

20     A    So you're looking at the -- at a support fork on

21  the consolidation fixture.  That's what the TPBAR

22  assembly will rest on while it's being de-torqued.

23     Q    Okay.  And is -- I understand that that's called a

24  pitchfork; is that right?

25     A    That's -- yeah, that's called a pitchfork.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-1   Filed 11/15/21   Page 138 of 672   PageID #:
JA0131
408

1          THE REPORTER:  Is there a tape counter

2     number, sir?

3               MR. JOHNSON:  Oh.  That is 30 seconds.

4     Q    Okay.  Resuming.  (Video plays.)

5          Okay.  What did we just see happen there?

6     A    We saw one of the thimble plugs get hung up on

7     what the maintenance people call the tombstone, that

8     square piece of metal.  And then they lowered the TPBAR

9     assembly, and when they did, because the thimble plug was

10    hung up, it bent.

11    Q    And was that lowering of the assembly what was

12    described in gap 12?

13    A    Let me go back and read that.

14    Q    Gap 9.

15    A    Give me a second to go back.

16    Q    Sure.

17    A    (Reviewing document.)  Yes.

18               MR. MEALOR:  Object.  Form.

19    Q    So the fast button was inadvertently pushed.  So

20    was the descent of the assembly that bent the thimble

21    plug, was that -- how would you describe that?  A fall?

22    A controlled fall?  I mean, it -- first of all, clearly

23    something was wrong.  I mean, what explains --

24               MR. MEALOR:  Objection to form.

25               MR. LANTIS:  Yeah.  Objection --

1    A    TPBAR assembly --

2    Q    The question was not clear.  It was multiple.  Let

3    me ask it again.

4         Describe for me what occurred, in the video at

5    this point, with relation to the identified gap?

6    A    So, that was the thimble plug hanging up on the

7    tombstone, and then the weight of the TPBAR assembly and

8    the weight of the tool bending the thimble plug when it

9    was lowered.

10   Q    I see.  And was it lowered in a proper fashion?

11   A    Let -- well, obviously not.

12   Q    Well, in the gap it says the boilermaker stated

13   the crane fast button --

14   A    Let me add this, that we have changed our process

15   going forward because of this.  So, it wasn't lowered in

16   a proper fashion.  We had never bent one before.  This

17   has never happened before.  But it was, you know, it was

18   wrong.  We've taken action since then.

19        When we, when we -- an action we've taken is when

20   we go to place it in -- the TPBAR assembly in the

21   pitchfork, that we bring it in and we stop before we get

22   to that tombstone.  We lower it until the thimble plugs

23   are below the level of that tombstone.

24            MR. MEALOR:  Object to the question.

25   Q    So in the gap, it says that the boilermaker stated

1  the crane fast button was inadvertently pushed.  So that

2  means the assembly went down and bent the thimble plug at

3  a faster rate than the assembly should've been going

4  down?

5     A  It went down -- that's correct.

6     Q  Okay.  So --

7     A  It went down faster than it can be controlled.

8           MR. MEALOR:  Objection.  Form.

9     Q  Now, those thimble plugs you testified earlier are

10  used when there's not a TPBAR in a given location.  And

11  so what -- if there were a -- would it have been possible

12  that a TPBAR could've been in that location?

13           MR. MEALOR:  Objection.

14     A  It's -- sure, it's possible.  But if it was a

15  TPBAR, it wouldn't have been -- it wouldn't have been

16  above the height of that tombstone.

17           THE REPORTER:  Excuse me, sir.  Could we get

18  the counter on that?

19           MR. JOHNSON:  Yes.  It's a minute 20.

20          (Video plays.)

21  BY MR. JOHNSON:

22     Q  So I've continued the video. (Video plays.)  Let

23  me stop that there.

24      In the video are you able to tell whether the

25  TPBAR has come into contact with the pitchfork?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-13   Filed 11/15/21   Page 141 of 672   PageID #:
JA 0134
411

1    A   No, I wasn't.  But if the TPBAR did come in

2   contact with the pitchfork, that's okay.  That's --

3    Q   That's expected.  Sorry.  I don't mean to

4   interrupt you.  Go ahead.

5    A   If a TPBAR came in contact with the pitchfork,

6   that's still within design of the consolidation fixture

7   and the TPBAR.  So that's...

8    Q   So what does appear to be happening there, at this

9   point?

10    A   Here's -- at this point it looks like they're just

11   trying to figure out if it's bent or, you know -- I don't

12   know.  I really don't know what's happening.

13                THE REPORTER:  Time?

14                MR. JOHNSON:  2:20.

15                (Video plays.)

16   BY MR. JOHNSON:

17    Q   All right.  That's the end of that one.  Anything

18   else of note in the remainder of it?

19    A   No.

20    Q   Okay.  I'm going to show you another one, which is

21   even shorter.

22        Okay.  It's already started. (Video plays.)

23        So, I'm going to stop it at 09 seconds.  And can

24   you identify whether that's the same --

25    A   It's the same TPBAR assembly.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-15   Filed 11/15/21   Page 142 of 672   PageID #:
JA 0135
412

1    Q   Okay.  I've started it again.  (Video plays.)

2        Can you identify what's happening at this point?

3    I stopped it at 23.

4    A   Yeah.  It appears that they're using a tool we

5    call the shepherd's hook to straighten -- see if they can

6    straighten the thimble plug.

7    Q   I've resumed it.  (Video plays.)

8        All right.  So, I've stopped it at 47.  What did

9    you observe since the last stop?

10   A   So, I observed that they attempted to straighten

11   the thimble plug, but it put a lateral force on the TPBAR

12   assembly, moving it sideways and possibly even hitting

13   the wall of the spent fuel core.  Can't tell if it hit

14   the wall or not, but it definitely put a lateral force on

15   it and got the TPBAR assembly out of the perpendicular

16   position.

17   Q   What risk, if any, is being associated with this

18   maneuver?

19   A   So, the risk is these TPBAR assemblies aren't

20   designed, in the tool, to have lateral forces put on

21   them.  And the TPBAR connections to the baseplates aren't

22   designed for any type of lateral forces.  So they were

23   pretty much outside of design spec when they were doing

24   that.

25   Q   So was there elevated risk of an accident with the

1   TPBARs occurring as a result of this attempted maneuver?

2          MR. MEALOR:  Objection.

3   A    Yes.  Maybe a better way to put it was there's an

4   unbounded risk.

5   Q    And can you describe what you mean by "unbounded"?

6   A    That it was outside of -- it was outside of the

7   kind of tool, the TPBAR assembly, to put those type of

8   forces on it and then push the TPBAR up through the -- or

9   did hit the side of the spent fuel core.

10  Q    Let me ask you a little bit about these camera

11  videos we've been watching.  Is that a requirement of

12  DOE, that all of the harvesting be -- that's done

13  underwater be filmed?

14         MR. MEALOR:  Objection.

15  A    The only requirement that the DOE has is that

16  actually dropping the TPBAR into the canister is on film

17  that can be verified.  But it's our requirement that

18  everything we do be videoed.  Two reasons.  One, so we

19  have a record and, two, so we can see what's going on

20  while we're doing it.

21  Q    Is there ever a time when TPBARs are in motion

22  under, as you described, as TVA's procedures, when it is

23  acceptable to turn the cameras off?

24         MR. MEALOR:  Objection.

25  A    No.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-17   Filed 11/15/21   Page 144 of 672   PageID #:
JA 0137
414

1    Q   Describe for me what attempts may have been made

2   to turn the cameras off, if any, during this maneuver

3   with the tool or wrench that -- or the shepherd's hook, I

4   think you called it?

5    A   Would you say that again, please?

6    Q   Describe, if any, for me any attempts that were

7   made to turn the cameras off during this maneuver with

8   the shepherd's hook?

9    A   So, I do not know of -- I have no personal

10  knowledge of any attempts to turn the cameras off.

11  Everything I heard was hearsay, I guess.  And I do know

12  that the employees -- the TVA employee concerns

13  investigated something about requesting turning the

14  cameras off, you know.  But I -- I can give you what I

15  was told.  You know, once again, hearsay.  But I have

16  no -- don't have any knowledge of that, but I do know

17  employee concerns does -- or did.  But I was told that

18  the electrician was asked by the foreman to turn off the

19  camera so that what we just saw couldn't be seen, I

20  guess.

21   Q   And so can you tell me who the source of this

22  information was?

23   A   Robert Goforth told me, and I believe Greg

24  Whitehorn might've told me about that.  And employee

25  concerns.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 145 of 672   PageID #:
JA 0138
415

1    Q    And they --

2    A    They were investigating that.

3    Q    And did employee concerns say anything about who

4    raised the concern?

5    A    No.  No.  That's all confidential.

6    Q    But in fact, the cameraman involved did not turn

7    off the camera, because we've got the video, correct?

8    A    Correct.

9         MR. MEALOR:  Objection.

10    Q    Do you know who the cameraman was that did not

11    turn off the video?

12    A    Steve Romines.

13         THE REPORTER:  I'm sorry.  Last name?

14         MR. JOHNSON:  It's Steve Romines.

15    R-o-m-i-n-e-s.

16         THE REPORTER:  Thank you, sir.

17    BY MR. JOHNSON:

18    Q    Okay.  I'm going to continue it.

19         THE REPORTER:  Time?

20         MR. JOHNSON:  One minute.  We've only got 50

21    seconds left or so.

22         (Video plays.)

23    BY MR. JOHNSON:

24    Q    Okay.  That's the end of the video.  Anything to

25    note between the last time we stopped and the end, that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1   Filed 11/15/21   Page 146 of 672   PageID #:
JA 0139
416

1  you saw in the picture?

2     A    No.  I didn't note anything.

3     Q    So --

4              MR. MEALOR:  Objection to form.

5     Q    So you were referring to the fact that the design

6  of the assembly was not designed to handle lateral

7  movements like what occurred with the shepherd's hook,

8  correct?

9     A    I would say that's correct.  And I hate to go off

10 track.

11    Q    Well, let me ask you some particulars about that,

12 and it may get where you want to go.  But if not, you

13 know, complete your answer whenever you wish.

14           If you look at the top of the assembly, there's

15 some sort of knobs coming up above each TPBAR and

16 thimble.  Are you seeing what I'm referring to?

17    A    It's, it's the shank.

18    Q    Is the shank what's used to secure the TPBARs to

19 the assembly?  Somehow it screws it in or bolts it in?

20    A    The shank is where you put the -- I'm trying to

21 think of the right term for it -- the torque wrench or

22 the -- on to unscrew the TPBAR from the baseplate.  So

23 the shank -- our de-torque tool has a fitting on it that

24 fits on that shank, and then below that shank is a thread

25 pack with about nine threads on it.  And the torque

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-17  Filed 11/15/21  Page 147 of 672  PageID #:
JA 0140
417

1    gotten on-site, but I couldn't be a hundred percent

2    certain of that.

3          But I was, I was on-site.  Had been doing

4    something while that was going on.  That had nothing to

5    do with the consolidation.  It was a different part of

6    the program.

7    Q    How did you find out that this had occurred or was

8    in the process of occurring?

9    A    Got a call from Robert Goforth.

10   Q    And what did Robert say?

11   A    That basically --

12              MR. MEALOR:  Objection.

13   A    -- that they had bent the thimble plug and tried

14   to unbend the thimble plug, unsuccessfully.  And I told

15   Robert to stop work until we get this all sorted out.

16   Q    Did he mention the camera, attempt to turn the

17   camera off, during that conversation?

18   A    No.  I don't believe it was mentioned then.

19   Q    And could you tell, from that conversation or at a

20   later time, whether Robert was on the floor where these

21   events were occurring at the time that they occurred as

22   depicted on the video?

23              MR. MEALOR:  Objection.  Form.

24   A    I do not believe Robert was on the floor during

25   that time.  The foreman was the person in charge.  Robert

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1   Filed 11/15/21   Page 148 of 672   PageID #:
JA 0141
418

1    left him in charge.  I believe Robert was in his office

2    attending to some other work when that happened.

3       Q   Robert says that at the time of this he was on a

4    conference call with the sustainment group.  Is that

5    possible?  Or does that refresh your memory about that?

6       A   Yeah.  That's undoubtedly what happened.  At this

7    time of the process we're on phone calls almost daily,

8    you know.  He doesn't have to be up there the whole time,

9    I don't have to be up there the whole time, but he should

10   be up there -- or should've been up there most of the

11   time.  But he could get called away for other things and

12   leave the foreman in charge.  Same thing we do now with

13   the task manager.

14      Q   So not --

15      A   What's that?

16      Q   Not unusual or unacceptable for him to have to

17   leave the floor to participate in a sustainment group

18   call?

19      A   No, it's not.

20      Q   So, what update, if any, did you get from Robert

21   about what was occurring, after that?

22      A   I think that was basically it, you know.  It's

23   this is what happened.  I said, "Stop work.  Let's write

24   a CR and then, you know, sort this thing out before we

25   move on."

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-12  Filed 11/15/21   Page 149 of 672   PageID #:
JA 0142
419

1     Q   Well, did he, or anyone else for that matter,

2  propose to you a solution for getting these TPBARs into

3  the pitchfork after the accident?

4     A   So we, we talked about it.  We -- and this is the

5  way it should've proceeded.  I'm not going to say that

6  bending that TPBAR was a good thing, but it wasn't, you

7  know -- things happen and it was recoverable.

8        What should've happened is what we did after that,

9  is work should've stopped.  We should have, and we did,

10  get on the phone with Pacific Northwest National Labs,

11  the designer of the TPBAR, and on the phone with Savannah

12  River Solutions, the people who we send the TPBARs to,

13  and talked things over, as, you know, what can we do to

14  recover from this.  And then get that information, how

15  we're going to recover from it, into a work order so that

16  we have instructions on what to do.

17        And I mean it was -- and this -- one other time I

18  think we had done this, and I forget the circumstances

19  behind it.  But it -- you take the TPBAR assembly and you

20  turn it 180 out and put it in that way and continue

21  harvesting the TPBARs.  But you don't just do that.  You

22  make sure that you talk to the designer and you talk to

23  the end user, everybody -- and also WGS, Westinghouse

24  Government Services, the manufacturer of the TPBARs, and

25  DOE.  You get everybody together, come up with a

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 150 of 672   PageID #:
JA 0143
420

1  solution, put that solution in a procedure in the form of

2  a work order or something, and then carry it out.

3    Q  So --

4    A  But that's what happened.  And that's what

5  should've happened before they had tried to straighten it

6  out.

7    Q  Did Robert participate in that process with those

8  other stakeholders in coming up with the solution?

9    A  Yes.

10    Q  And who was it that executed placing the TPBARs

11  180 -- reverse 180 back into the pitchfork?  Was that

12  Robert?

13    A  That was Robert, yeah.  A hundred percent

14  oversight on that.

15    Q  And the -- was the person that was operating the

16  movement when the bent thimble occurred a TVA maintenance

17  employee?

18    A  They were.

19    Q  If you could go to Document 9, please, in your

20  documents.  Do you recognize this document?

21    A  I do.

22    Q  It appears to be an email from Howard Cusick to

23  you, subject: tritium, dated October 3, 2017; is that

24  correct?

25    A  That's correct.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-14 Filed 11/15/21  Page 151 of 672  PageID #:
JA 0144
421

1  Q   All right.  Take a look at that as we mark it the
2  next exhibit.
3           (Exhibit 6 was marked for identification.)
4  BY MR. JOHNSON:
5  Q   So let's talk about who Howard Cusick is first.
6  Who's Howard Cusick?
7  A   Howard Cusick was the -- he's a retired TVA
8  employee who was brought back to help out in employee
9  concerns.  He had been a -- he'd worked as the employee
10 concerns person at Watts Bar; retired, then brought back
11 to augment employee concerns as a contractor.
12 Q   Okay.  And so in what capacity was he operating
13 when he sent you this email?
14 A   As the employee concerns manager.  It's like you
15 said, investigator or...
16 Q   So this would've been in response to some employee
17 making -- expressing a concern to employee concerns?
18 A   That's correct.
19           MR. MEALOR:  Objection.
20 Q   And he never identified who that employee was,
21 correct?
22 A   No, he did not.
23 Q   Do you know who it was?
24 A   I have no direct knowledge of that.  Hearsay, it
25 was Steve Romines.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-15   Filed 11/15/21   Page 152 of 672   PageID #:
JA 0145
422

1    Q   The camera --

2              MR. MEALOR:  Objection.

3    Q   -- operator?  The camera operator we discussed

4    earlier?

5    A   Yes.

6    Q   So as a result of your having gotten this email,

7    what actions did you take?

8    A   I sent him the assessment, a copy of the

9    assessment.

10   Q   And so the assessment was dated -- that we looked

11   at was dated October 17th.  So that would've been a

12   couple of weeks later?

13   A   That's correct.  We had been working on that

14   assessment, and he knew we'd been working on it.

15   Q   And he's saying in this email, is he not, that

16   he's requesting a review of Robert Goforth's assessment

17   and asking you to share it with him, correct?

18   A   That's correct.

19             MR. MEALOR:  Objection.

20   Q   Look at Document 10, please, sir.  And that

21   appears to be an email chain.  And the email at the top

22   is from Howard Cusick to Ruth Fordham, correct?

23   A   Yes, that's correct.

24   Q   And it's dated October 5th?

25   A   That's correct.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-4  Filed 11/15/21  Page 153 of 672  PageID #:
JA 0146
423

1    Q   And so who is Ruth Fordham?

2    A   She was the employee concerns manager at Watts Bar

3    at the time.

4    Q   So would she likely have been the person that

5    engaged Cusick to investigate this?

6              MR. MEALOR:  Objection.

7    A   I don't know.  I don't know how things operate

8    over there.

9    Q   Well, that's fine.  You don't have to answer.  I

10   don't want you to speculate.

11       But what does -- when Cusick sends this to Ruth

12   Fordham, he's giving you the -- he's giving her the email

13   from you to Jeff McGuire.  So would you just review that,

14   please, and then explain what happened?

15   A   Yeah.  So, I went and, as we were writing the

16   assessment, wanted to give James a chance to input on it

17   and know what was it in.  So I -- and I had been in

18   contact with Howard Cusick because I knew there had been

19   problems.  And also there were -- I don't -- you know, if

20   it's employee concerns it's out of my wheelhouse.  But I

21   knew there were some other problems going on that he

22   might be aware of, and if he was working on those

23   problems I didn't really want to put it in the

24   assessment.

25            For instance, I'd heard -- and once again,

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-17  Filed 11/15/21  Page 154 of 672  PageID #:
JA 0147
424

1   hearsay -- that some of the TVA employees were leaving

2   the floor early and were checking out of work early

3   and --

4   Q   And who had you heard that from?

5             MR. LANTIS:  Why don't you let him finish his

6   answer.

7             THE WITNESS:  What's that?

8   Q   Were you finished with your answer?

9   A   I'm sorry, say that again.

10  Q   Were you finished with your answer?

11  A   Yeah.  I, I just -- I knew I'd heard some things

12  going on.  And what I wanted to do was, if he wasn't

13  investigating it I was going to have him look into it and

14  investigate it.

15            MR. MEALOR:  Objection to that question --

16  prior question.

17  Q   Would those other concerns you're talking about

18  have been the gaps that were identified in the

19  assessment?

20  A   Some of them.  The one main thing that I wanted

21  him to -- honestly, the one main thing I wanted him to

22  investigate was I'd heard that the TVA maintenance

23  employees were leaving work early but still putting down

24  the time on their time cards.

25  Q   Let me just ask you a more general question,

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-14   Filed 11/15/21   Page 155 of 672   PageID #:
JA 0148
425

1  following up on that.  What did it appear to you to be

2  the attitude of the TVA MMG workers towards being

3  assigned to the tritium program?

4          MR. MEALOR:  Objection.

5      A   So, once again this is just my perception.  But it

6  seemed that their attitude was that they didn't want to

7  do it, they didn't want to be part of the project, and

8  that they just were unwilling to do the job.

9      Q   And does your opinion lead you to a further

10  opinion about whether that was a cause of some of the

11  problems that you experienced with cycle 14?

12          MR. MEALOR:  Objection.

13      A   I think, I think that it was a large part of the

14  cause.

15      Q   Did you talk to Jesse James about that?

16      A   I did.

17      Q   What was his response?

18      A   He would check -- he would look into it.

19      Q   Did he ever get back to you?

20      A   No.  And the same thing with this email.  His

21  response was that he would look into it, and -- he was

22  aware of it now and he would look into it.

23          MR. JOHNSON:  Let's mark this, Document 10,

24  as the next exhibit, please.

25          (Exhibit 7 was marked for identification.)

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 251-1 Filed 11/15/21  Page 156 of 672  PageID #: 426
JA 0149

1    BY MR. JOHNSON:

2        Q    I'm going to show you -- or would you please look

3    for the --

4        A    I'm sorry.  Did you say Document 7?

5        Q    Document 11.  Document 11 is what we're going to

6    do next.  Do you recognize this email chain?

7        A    I do.

8        Q    And it's an email chain between you and Howard

9    Cusick, with copies to Ruth Fordham, correct?

10       A    That's correct.

11       Q    And then the last email in the chain, on the

12   second page, is an email from you to Jesse James,

13   correct?

14       A    That's correct too.

15       Q    So would it be fair to say, to correctly summarize

16   this, that Howard Cusick asked you if you would share the

17   assessment with Jesse James, and you replied "I'll send

18   it to him now"?  So did you send the evaluation to --

19   that Mr. Goforth had done, to Mr. James?  It's dated the

20   same day as he -- that the assessment is dated that we

21   went over earlier.

22       A    I -- you know, without going through my emails, I

23   don't know exactly when I did, but I do know I did send

24   it to him.

25       Q    Okay.  And it's dated October 17th, which was the

1  same day as the assessment we went over earlier that we

2  identified as being authored, on its face, by

3  Mr. Goforth?

4      A    That's correct.

5      Q    Okay.  So, you are saying in your email to

6  Mr. James, "Have you had the opportunity to discuss with

7  your reports the lessons learned we discussed in your

8  office?"  I do not see an email response.  I haven't been

9  given one in document production, to that.

10          Was that part of the we'll get -- I'll get back to

11  you, and never got back to you?

12              MR. MEALOR:  Objection.

13      A    Yeah, he never did get back to me, that I

14  remember.  I was -- I do remember being frustrated.

15      Q    And your last sentence in your email to him was

16  "We need to address these to get ready for the

17  consolidation and shipping work this winter."

18          So, would that have been cycle 15 scheduled to

19  begin in...

20      A    No.  That was the --

21      Q    Oh, this was back in '17.  Yeah, I see what

22  you're -- yeah.

23      A    Yes.

24      Q    All right.  Let's just leave it there then.  Thank

25  you.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-15   Filed 11/15/21   Page 158 of 672   PageID #:
JA0151
428

 1              MR. JOHNSON:  So let's identify this one

 2      as...

 3              THE REPORTER:  Number 8.

 4              (Exhibit 8 was marked for identification.)

 5      BY MR. JOHNSON:

 6      Q    Let's take a look at Document 12.  Are you with

 7      me?

 8      A    I am.  I am.  I'm looking at it.

 9      Q    Let me know when you're done looking at it.

10      A    I'm looking at it now.  (Reviewing document.)

11      Q    Are you saying you're ready?

12      A    I'm ready.

13      Q    Okay.  So this appears on its face to be an email

14      from you to Jesse James, with a copy to Carla Borreli and

15      James Keck.  So to identify the players here, we already

16      know who Jesse James is.  You identified Mr. Keck as one

17      of your superiors.  Who's Carla Borreli?

18      A    Carla Borreli -- there's two senior program

19      managers for tritium.  We split some of the -- certain

20      responsibilities up.  Carla is the other senior program

21      manager.  She is responsible for interfacing with the

22      Department of Energy for budget, is one of her

23      responsibilities.

24      Q    So that's who you were referring to earlier that

25      was primarily responsible for the budget?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-12   Filed 11/15/21   Page 159 of 672   PageID #:
429
JA 0152

1     A   That's correct.

2     Q   Okay.  So, it appears, correct me if I'm wrong,

3  that in this email you're sort of nudging Jesse James

4  into actually responding to an email that you had sent,

5  what, 19 days before, correct?

6     A   That's correct.

7     Q   So your earlier email on September 6th said "Carla

8  Borreli and I would like to meet with you sometime the

9  week of September 18th to 22nd to discuss cycle 14 TPBAR

10 consolidation future shipping efforts."

11        So, when you sent that email, I take it you never

12 got a reply, and so you had to send the one of September

13 25th?

14            MR. LANTIS:  Objection to form.

15     A   That's correct.

16            MR. JOHNSON:  Let's mark this as the next

17 exhibit.

18            (Exhibit 9 was marked for identification.)

19 BY MR. JOHNSON:

20     Q   We're getting towards the end.

21        Please look at Document 13, please.

22     A   Okay.  I'm ready.

23     Q   What is this document?  Can you identify it?

24     A   Let me make sure.  (Reviewing document.)

25        Yeah.  Okay.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-53   Filed 11/15/21   Page 160 of 672   PageID #:
JA 0153
430

1    So, we did the assessment.  And then someplace in
2 there I did meet with Jesse James and had told him I was
3 going to write a CR on this, a condition report, so that
4 we could document everything.  And --
5    Q    What was his reaction to that?
6    A    Well, he -- there was no reaction to it.
7    Q    All right.  And so who actually authored this CR?
8    A    I can't remember if it was Robert Goforth or me.
9    Q    Well, look on page 2 of the exhibit, about
10 two-thirds of the way down, where it says User
11 Information.
12    A    I'm looking.  (Reviewing document.)  Oh, I take it
13 back.  Originator.  So, Howard Cusick.  All right.  All
14 right.  So there's probably another email in there where
15 Howard and I were discussing about who's s going to put
16 this in, who's going to put this CR in.
17    Q    And what was the content of that conversation and
18 its result?
19    A    The content was just we both knew about the
20 assessment, and it kind of went like this:  Do you want
21 to put it in or do I want to put it in?
22    I wanted -- I would have preferred that Howard
23 Cusick had put it in, just because I felt that that would
24 have more gravity coming from employee concerns, and
25 because I wasn't getting any action from the maintenance

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-17  Filed 11/15/21  Page 161 of 672  PageID #:
JA 0154
431

1  director.

2     Q   All right.  And if you look at the first page, the

3  condition details, there -- and it continues on to the

4  second page.  There are 13 condition details listed.  Can

5  you review those and tell me if those correspond to the

6  13 gaps identified in Mr. Goforth's evaluation of October

7  '17?

8     A   They do.  They do.

9     Q   So it pretty much just tracks Mr. Goforth's

10  evaluation?

11    A   That's correct.

12            MR. MEALOR:  Objection.

13    Q   Do you know if Mr. Cusick interviewed Mr. Goforth

14  as a part of his investigation before doing this CR?

15            MR. MEALOR:  Objection.

16    A   I don't have any knowledge of that.

17    Q   Did Mr. Goforth -- I'm sorry.  Go ahead.

18    A   I, you know -- once this goes to employee

19  concerns -- anything that goes to employee concerns, I

20  just stay out of it, in principle, and just respond to

21  anything that they want or ask.  So, I don't --

22    Q   Did you --

23    A   -- know if Robert talked to Mr. Cusick or not.

24    Q   Did you --

25    A   I would be surprised if he didn't.  But -- and now

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-15  Filed 11/15/21  Page 162 of 672  PageID #:
432
JA 0155

1  that I'm thinking about it, I believe Robert told me he

2  did talk to employee concerns.  Exactly who, I don't

3  know.

4      Q   Did you follow up on this CR to see what, if

5  anything, it wound up accomplishing?

6      A   So, yes, I did follow up on the CR, and I did not

7  feel that the conditions were answered sufficiently.

8  However, there were changes made, and that the next

9  consolidation campaign was much better.  So, I think the

10  CR had its intended effect.  But I, I -- if you look --

11  if you read how it was answered, you know, at least the

12  written answers I didn't feel were sufficient.  But

13  overall it did have its intended effect.

14            MR. JOHNSON:  Let's mark this Cusick CR as

15  the next exhibit.

16            (Exhibit 10 was marked for identification.)

17  BY MR. JOHNSON:

18      Q   Who would've been responsible for responding to

19  this CR?

20      A   The mechanical maintenance department supervisor

21  was responsible for that.

22      Q   Was that Jesse James?

23      A   No.  That would be one of his reports.

24      Q   Let's look back at -- for you it's Document 3.

25  And it's the third page of Document 3.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-5   Filed 11/15/21   Page 163 of 672   PageID #:
433
JA 0156

1    A    Okay.

2    Q    And maybe you can't tell from this, but do you

3    know who that would have been that was, you believe,

4    would've been responsible for responding?

5    A    Yeah.  That would've been -- and I don't even see

6    it here but I know who it was.  It was Steve Cook.

7    Q    Okay.  And --

8    A    Oh, there it is.  Yeah.

9              MR. LANTIS:  When he says "there it is,"

10   where is that?  If you could identify that.

11             THE WITNESS:  That's -- it says -- top of,

12   top of the page it says TVA Nuclear (12 of 39.)

13   Q    So, looking at what you have just referred to, it

14   shows the director of maintenance as of -- as Tony White,

15   and Steve Cook working for him.

16        By the time the responses for the CR were done,

17   was Tony White had then replaced Jesse James?

18   A    I would have to, I would have to look at that.  I

19   would have to look it up to be certain.

20   Q    Well, you had the expectation that Tony white,

21   whether he addressed the CR with Steve Cook, would have

22   in any event known about it coming on as the new director

23   of maintenance, replacing Jesse James?

24             MR. MEALOR:  Objection.

25   A    I would expect him to be knowledgeable of it.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-17 Filed 11/15/21  Page 164 of 672  PageID #:
JA 0157
434

1    Q   Did you ever discuss it with Tony White; that is,
2 either the Cusick CR or the evaluation that you and/or
3 Mr. Goforth wrote?
4    A   I don't have any memory of discussing it with him.
5 I could have.
6    Q   How widely -- I'm sorry.  I'll let you think for a
7 minute because I know you're trying to recall things.
8    A   I, you know, frankly, I don't think that I
9 discussed it directly with Tony White.  I did discuss it
10 directly with Steven Cook, and I wasn't given a very
11 satisfactory response from him.
12        They had promised us -- "us" being the tritium
13 program, to take some actions when we first started to
14 use the shop for this; such as do a change management
15 plan and to do a memorandum of understanding with us.
16 And they wouldn't -- they said they would, but they never
17 did, and then about this time they said they weren't
18 going to do it.  And if I discussed anything with Tony
19 White, it might've been complaining that I wasn't getting
20 a memorandum of understanding or a change in management
21 plan.  But I truly can't remember whether I did or
22 didn't.  If I did, it would've been face to face,
23 catching him in the hall or something like that.
24    Q   But you do remember having that discussion with
25 Steve Cook?

1      A    Oh, I, I definitely remember that.

2      Q    And would that have been in reference to the

3   Cusick CR and the evaluation by Mr. Goforth, both?

4      A    Yes.

5      Q    Let me ask you a more general question about CRs.

6   What's the distribution for CRs at Watts Bar?

7      A    CRs are --

8                MR. MEALOR:  Objection.

9      A    CRs are distributed daily.  There is a report that

10  goes out.  It doesn't go to everybody, but you can get

11  put on the distribution to it, that tells every CR that's

12  written in the last 24 hours.

13     Q    Do CRs automatically go to certain people at a

14  certain management level without their asking for it?

15     A    Yes.

16     Q    And what is the cutoff sort of for that?

17     A    Well, there's a review committee every morning

18  that meets and decides who's going to own that CR, and

19  then that goes to that manager.

20          And so, for instance, if this one went to

21  mechanical maintenance, Steve Cook, then Tony White would

22  also get a -- be on a distribution, at least to say that,

23  you know, here's -- or whoever the maintenance director

24  was at the time, that, hey, you know, you're getting this

25  CR and here's the subject of it.

1    Q   So if there were responses to the CR by people

2    following the CR, those responses would also go to Tony

3    White if he were there managing at the time those

4    responses to the CR were made?

5    A   No --

6                MR. MEALOR:  Object to form.

7    A   -- not necessarily.  If you'll look at the CR, I

8    believe it was an Echo level CR, lower level CR.

9    Something like an Alpha or a Bravo, I would expect the

10   maintenance director to be knowledgeable of.  But an Echo

11   level, I would -- the knowledge he would have of it is

12   the due dates are coming up and it's on the radar screen

13   because the time to have the action written is coming up.

14   Then he would get together with his directors responsible

15   for that and make sure that the corrective actions were

16   done.

17   Q   And so whoever was responsible for that would have

18   the responsibility to tell Tony White what was done as

19   responsive to the CR?

20   A   Once again, not, not procedurally.  So, I, I don't

21   know -- I really don't know if Tony White knew exactly

22   what the responses were to that CR.  I know that -- so, I

23   don't know.

24   Q   All right.  Would the distribution for CRs also go

25   to DZ employees?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-1  Filed 11/15/21   Page 167 of 672   PageID #:
JA 0160
437

1  dry cask campaign was rescheduled.  So let's see.

2  October 16th.  So, "current schedule shows first

3  production and a waste shipment..."  So that, that is

4  rescheduling our production and waste shipments to align

5  with the dry cask campaign.

6    Q   All right.  And the subject matter is, is it not,

7  "Cycle 15 Tritium TPBAR Consolidation and Shipments"?

8    A   Cycle 15.  (Reviewing document.)  Okay.  So...

9    Q   So would it be true, then, that being the case,

10 that this October 16, 2018 email is Robert beginning

11 planning and scheduling for the upcoming cycle 15?

12          MR. MEALOR:  Objection.

13   A   Yes.

14   Q   Now, the manway cover, I will tell you it's clear

15 in the record, was found off on October 19th.  Robert was

16 suspended on October the 22nd, and then he was terminated

17 a little more than a month later.

18      So, after this message about getting ready for

19 cycle 15 and up to the time he was terminated, did anyone

20 from DZ talk to you about the manway cover incident

21 underlying the termination?

22          MR. MEALOR:  Objection.

23   A   So, from this time up to the time he was

24 terminated.  Yes.  But it was because I initiated contact

25 with them, not because they contacted me.  I was trying

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 150-15  Filed 11/15/21  Page 168 of 672  PageID #:
JA 0161
438

1  to find out what was happening with Robert.

2      Q   And who did you contact?

3      A   I'm trying to think.  Freddie Gibson was one, but

4  he wasn't -- there was -- I can't remember the guy's

5  name, it was his boss.  And I really can't remember his

6  name.  But I was, I was trying to get everybody I could

7  think of, DeWarren Washington and Freddie Gibson and --

8  gosh darn, I'm trying to think of the guy's name.  It was

9  like Freddie's --

10     Q   Was it Dusty Rhodes?

11     A   No, it was not.  No.  Dusty is TVA.  This was --

12  it was a DZ person above --

13     Q   Was it John Reeves?

14     A   Bingo.  Thank you.

15     Q   Okay.  So when you tried to find --

16     A   And I believe he was the one who contacted me.

17  Because I wanted to know what was going on.  We've got a

18  campaign coming up, you know, and am I going to be able

19  to keep continuity of Robert.  Because he was -- you

20  know, he's essential to be on that team.

21     Q   Did you initiate that conversation with

22  Mr. Reeves?

23     A   I initiated -- I think I made some phone calls.  I

24  got some numbers and made some phone calls, said please

25  call me back.  And he called me, he called me back.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1 Filed 11/15/21  Page 169 of 672  PageID #:
JA-0162
439

1    Q   Did any of the others that you contacted call you

2   back?

3    A   No.

4    Q   Who were the others that you contacted, to the

5   best of your memory?

6    A   I think Freddie Gibson and DeWarren Washington.

7    Q   Did you call them more than once when they didn't

8   return your call?

9    A   I called DeWarren Washington a couple of times.  I

10  didn't call Freddie Gibson, because the other gentleman

11  had got back with me by then.

12   Q   And when you called DeWarren Washington a couple

13  of times, you got no response?

14   A   Yeah, I got no response.  I don't really ever

15  remember talking to DeWarren Washington after this

16  happened, about anything.

17   Q   When you had the conversation with Mr. Reeves, can

18  you tell me about the content of that conversation?

19         MR. MEALOR:  Objection.

20   A   Well, I was asking them, you know, when are they

21  going to make a decision on Robert and what do you think

22  the decision is going to be made.  I forget exactly when

23  he told me they would be making the decision.  I remember

24  it was going to be soon.  And he said, "It doesn't look

25  good."  And I said -- basically I was -- it was "Do I

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-3   Filed 11/15/21   Page 170 of 672   PageID #: 440
JA 0163

1   need to go out and get -- you know, make some other

2   arrangements for a task manager?"

3       And he said, "It doesn't look good.  I would if I

4   were you."

5   Q   Do you recall approximately when that was in

6   relation to October 19th when the manway was discovered

7   off and October 22nd when Robert was suspended?  Maybe

8   that's the best time.  Let me ask it -- change the

9   question.

10      When Robert was suspended, that's something you

11  probably found out about fairly promptly, would that be

12  correct?

13  A   Right.

14  Q   Did Robert tell you he was suspended?

15  A   Yes.  I talked with Robert.  DZ never told me he

16  was suspended.

17  Q   So how soon after you talked --

18  A   And I was, I was never formally advised, from DZ

19  or TVA, that he was suspended.

20  Q   Did anybody from TVA or DZ invite your input into

21  the decision-making process on the termination?

22  A   No.

23  Q   Did anybody from TVA or DZ ever invite you to

24  participate in a decision about revoking his clearance?

25  A   No.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95  Filed 11/15/21  Page 171 of 672  PageID #:
441
JA 0164

1       MR. JOHNSON:  Let's mark this as the next

2   exhibit, please.

3           (Exhibit 14 was marked for identification.)

4   BY MR. JOHNSON:

5   Q   So going back for a moment to Howard Cusick's CR.

6   We talked a little bit about who you talked to about

7   that, and it was Jesse James.  I'm going to give you some

8   other names.  And we talked about Tony White.  You

9   couldn't remember but you kind of had the expectation

10  that he would've known about it.  But let me ask -- run

11  some other names by you just to make sure whether you

12  ever talked to any of these people about either

13  Mr. Goforth's evaluation or the Cusick CR.

14          How about Dusty Rhodes?

15  A   No.

16  Q   DeWarren Washington?

17  A   No.  I tried to talk to DeWarren but he wouldn't

18  ever get back with me.

19  Q   You tried to talk to him about the Cusick CR and

20  the evaluation?

21  A   No.  Not the Cusick CR.  No.  About the suspension

22  of Robert.  Sorry.

23  Q   Okay.  Well, I'm talking about the Cusick CR and

24  the evaluation now.

25          Did you talk to Paul Simmons about the Cusick CR

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1 Filed 11/15/21   Page 172 of 672   PageID #: 442
JA 0165

1    or the evaluation or the events that occurred during

2    cycle 14?

3        A    Not that I can remember.

4        Q    Did you know that Robert had filed an

5    MSPB complaint about his treatment with regard to getting

6    a job at TVA?

7        A    I did.

8        Q    And what, if anything, did Robert inform you about

9    that?

10            MR. MEALOR:   Objection.

11       A    That he was working through, I believe it was VFW,

12   with a lawyer at VFW, and he'd filed a complaint for not

13   getting veterans' preference.

14       Q    Did he inform you that within his complaint he

15   also said that he was being retaliated against for having

16   done the evaluation and the Cusick CR?

17       A    He might have.  I, you know, I don't -- I can't

18   recall.  He might have.

19       Q    Did there come a time in that MSPB process when he

20   informed you anything about the scheduling of events to

21   occur procedurally in that proceeding?

22       A    He did.  He did.  We did talk about that.  I

23   did -- I can't remember if he called me or I called him.

24   I probably got in contact with him one way or another to

25   try to figure out if and when he'd ever come back.  And I

Wilson Reporting Agency   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-1   Filed 11/15/21   Page 173 of 672   PageID #:
443
JA 0166

1  know we had talked about it.

2    Q   Did he tell you that the proceeding was to go into

3  a mediation and he thought there was a solution to be had

4  of giving him a position?

5           MR. MEALOR:  Objection.

6           (Answer given simultaneously with the

7           objection.)

8    Q   He did?

9           THE REPORTER:  I'm sorry, sir?

10           (To Mr. Johnson) Was that a yes?

11           Mr. McGuire, could you repeat your answer,

12  please, sir?

13    A   Yes.  Yes.

14           THE REPORTER:  Thank you, sir.

15  BY MR. JOHNSON:

16    Q   And was it your understanding from Robert that the

17  position he was applying for that he didn't get would've

18  allowed him to do his tritium job but as a full-time,

19  permanent employee of TVA, direct employee of TVA?

20           MR. MEALOR:  Objection.

21    A   So -- no.  From my memory, I think we're getting

22  positions mixed up.  There is no -- at this time, no

23  full-time tritium task manager.  We're using a task

24  manager from the maintenance shop who a lot of this time

25  is towards that.  But nobody has filled Robert's position

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-17   Filed 11/15/21   Page 174 of 672   PageID #:
JA 0167
444

1  right?

2      A    That's correct.

3      Q    Will that CR committee do something to alert the

4  person responsible or the persons responsible in that

5  particular department about the need to develop

6  corrective action?

7      A    Yes.

8      Q    So that would be in addition to being on the list

9  to receive the CR reports; is that correct?

10     A    That's correct.  Once it goes through the CR

11 screening committee, then the department -- the person

12 who's head of the department would get a notification

13 that -- and if they assign it to a specific person, that

14 would get a notification that, you know, you have to do a

15 corrective action plan with the CR.

16     Q    And when you say "a notification," is that like

17 another report that comes out?  Or is someone from the CR

18 committee going to send an email or pick up the phone and

19 call this person?

20     A    No.  It would be, it would be a report.  And I'm

21 kind of just shooting from the hip on this also.  I'm not

22 that familiar with -- lately with how it works as far as

23 the notifications.  My familiarity goes back probably ten

24 years, and I used to sit on that committee.

25     Q    Understood.  So if there is a CR that's raised

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-1  Filed 11/15/21  Page 175 of 672  PageID #: JA 0168
445

1  that doesn't specifically impact your department, other

2  than it may be listed in one of these ten to 50 CRs on a

3  day-to-day basis, you're not going to get additional

4  notification beyond that; is that correct?

5     A   That would be correct.

6     Q   I want to shift -- we talked a little bit -- if

7  you'll wait one second.  There's a fire truck right

8  outside.  I'd like to let this pass by before I continue.

9  That wasn't as bad as the last one.

10        We talked a lot today about what I'm going to call

11  the TPBAR cycle 14 issue.  Does that -- if I say that,

12  "the TPBAR cycle 14 issue," in reference to the video

13  that Mr. Johnson showed you and then the CR that came out

14  as a result of that, and I think it was gap number 9 in

15  the assessment, do you know what I'm referring to?

16    A   Yeah.  Yes, I do.

17    Q   Did anyone ever -- at TVA, rather, did any

18  employee, manager, director -- I use that term broadly,

19  did anyone at TVA ever express to you anger or upset

20  about Mr. Goforth reporting that issue?

21    A   No.

22    Q   Same question for DZ.  And I mean "DZ" in the same

23  broad, expansive definition.  Employee, officer,

24  director, manager, supervisor.  Anyone from DZ ever

25  express anger or upset about Mr. Goforth reporting that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 255-1   Filed 11/15/21   Page 176 of 672   PageID #:
446
JA 0169

1  issue to you?

2    A    No.

3    Q    Did anyone from TVA or DZ -- and I'm using the

4  phrases "DZ" and "TVA" like I just defined them for the

5  last question.

6        Did anyone from DZ or TVA ever express any anger

7  or upset to you about Mr. Goforth's involvement not just

8  in the 2017 TPBAR issue but his involvement in the -- I

9  think what we've called the Cusick CR or the assessment

10 or the evaluation?

11   A    No.

12   Q    I want to be very specific.  Did Paul Simmons ever

13 express any upset or anger to you about Robert Goforth

14 for any reason?

15   A    No.

16   Q    Same question for Tony White.

17   A    I have to think about this.  Give me the question

18 again.

19   Q    Did Tony White ever express any anger or upset

20 about Robert Goforth for any reason to you?

21   A    Yes.  For the, for the cover not being off of the

22 MSR.  Yes.

23   Q    And what did he say to you, that you recall?

24   A    He said that -- and the phone call was on a

25 Saturday after the Friday, I believe, that it happened.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-17   Filed 11/15/21   Page 177 of 672   PageID #:
JA 0170
447

1  That he was giving me a heads-up that I wouldn't be able

2  to use Robert Goforth for the upcoming campaign that

3  Monday.  And he said that Robert had confessed or

4  admitted to not -- signing off a verification that those

5  covers weren't put on -- or were put on when he hadn't

6  done that, and that Robert had refused to give in writing

7  what happened.

8      Q   Other than -- I'm sorry.  Go ahead, if you're not

9  done.

10     A   I am.  I think that's...

11     Q   Okay.  Other than arising out of the, what I'll

12  call the manway cover issue, did Tony White make any

13  other comment to you where he expressed anger or upset

14  with Robert Goforth for any reason?

15     A   I asked Tony White what he thought the chances

16  were that we might be able to use Robert Goforth and that

17  he might not be removed from the site.  And he asked me a

18  question.  He said, "Do you know that Robert has a

19  conflict with TVA?"  And I said yes, although I wasn't

20  sure what he was talking about, looking back on it.  And

21  that if, if -- so -- and if I wanted to keep Robert

22  on-site, I need to talk to Paul Simmons.

23     Q   And do you recall when that conversation occurred?

24     A   It was the Saturday after the Friday that they

25  noticed -- they found the covers off.  I could look at a

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-17   Filed 11/15/21   Page 178 of 672   PageID #: 448
JA-0171

1    calendar and I could probably give you a date.

2         But we were starting -- I believe it was Friday

3    when they came in and they had -- they called everybody

4    in and had their investigation, put the cover back on.

5    It was Saturday when Tony called me.  And the campaign

6    was supposed to start on a Monday.  It was, you know,

7    sometime around the middle of October 2018.

8    Q   Did you ever talk to DeWarren Washington about

9    Mr. Goforth?

10   A   I asked him once -- now that I thought about it --

11   face to face about what the outcome was going to be with

12   Robert, and didn't get an answer.  And I left him a phone

13   call.  I'd have to go back and check my email.  I

14   might've emailed him.  I was trying to figure out if I

15   was going to be able to use Robert or not.

16   Q   In your capacity within the tritium program, did

17   you have any involvement in the oversight of

18   Day & Zimmermann personnel working during the outage?

19   A   No.

20   Q   Were you involved in the decision to terminate

21   Mr. Goforth?

22   A   No.

23   Q   Were you involved in the ERB process that arose

24   out of Mr. Goforth -- the decision to terminate his

25   employment?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-17   Filed 11/15/21   Page 179 of 672   PageID #:
JA 0172
449

1    A    No.

2    Q    Did anyone from TVA ever express to you that they

3  felt that Mr. Goforth should be terminated?

4    A    Say it again, please.

5    Q    Did anyone from TVA ever express to you that they

6  felt Mr. Goforth should be terminated?

7    A    Should or should not?

8    Q    Should.

9    A    Should.  Tony White.

10   Q    When did Mr. White say that?

11   A    It was that phone call on the Saturday.

12   Q    Shifting gears again to the issue of the

13  Albuquerque trip.

14       Sorry.  There's no reasoning for the order of

15  these questions.  They're just where they came in my

16  notes.

17       Do you know why Mr. Goforth wasn't able to attend

18  that conference?

19   A    The only thing I know is that the authorization

20  from DZ wasn't done.  That's all I know.

21   Q    And where did you learn or where did you obtain

22  that piece of information from?

23   A    From Robert.

24   Q    Based on a conversation you had with him?

25   A    Right.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1  Filed 11/15/21   Page 180 of 672   PageID #:
UA 0173
450

1   Q   Did you ever talk to DeWarren about what the issue
2   was?

3   A   No.

4   Q   Did you ever inquire from anyone at
5   Day & Zimmermann what the issue was?

6   A   No.

7   Q   Did Robert ever tell you that he just needed to
8   submit his expenses after the fact because they didn't
9   have a corporate credit card available?

10  A   No.

11  Q   Again switching gears.  Am I correct that
12  Day & Zimmermann site management did not have any direct
13  involvement in the tritium program?

14  A   That's correct.

15  Q   And so just to be clear, in other words, there was
16  no Day & Zimmermann counterpart to you within the tritium
17  program?

18  A   No.

19  Q   If there was a CR that arose out of a need for
20  corrective action for an incident that occurred within
21  the tritium program, is that something that you would
22  expect someone from Day & Zimmermann would be assigned to
23  perform some sort of corrective action?

24  A   Not if -- not for the CR that was written.  I
25  mean, it's possible they could've gotten a corrective

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-17   Filed 11/15/21   Page 181 of 672   PageID #:
JA 0174
451

1    action from something stemming from tritium, but not from

2    that assessment.

3        Q    And when you're saying "that assessment," we're

4    talking about the cycle 14 CR and assessment that we've

5    talked about extensively today?

6        A    That's correct.

7        Q    John Reeves.  You mentioned his name earlier.

8    Other than that call that you talked about that you got

9    from him with respect to Mr. Goforth, had you ever talked

10   to John Reeves before?  Did you know who he was?

11       A    No, I did not.

12            MR. LANTIS:  All right.  Mr. McGuire, those

13   are the only questions I had for you.  Thank you so much.

14                    RE-EXAMINATION

15   BY MR. JOHNSON:

16       Q    I have just one follow-up question to those

17   questions by Mr. Lantis, Mr. McGuire.  This was something

18   that I heard for the first time.  You said that Tony

19   White said to you, in your conversation on the Saturday

20   after the manway covering incident occurred, that Goforth

21   had a conflict with TVA.  That's what I heard you to say.

22   Is that correct?

23       A    That's correct.

24       Q    And so we talked earlier about the fact that

25   Goforth had pending an MSPB complaint against TVA that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-1  Filed 11/15/21  Page 182 of 672  PageID #:
JA 0175
452

1   seemed headed towards a resolution.  Was that the only

2   conflict that you are aware of going on between Goforth

3   and TVA at the time that you had that conversation with

4   Tony White?

5       A   Yes.

6           MR. JOHNSON:  That's all the questions I

7   have.  Thank you, sir, so much.

8           May the witness be excused?

9           MR. LANTIS:  Unless there's anything from

10  TVA's counsel.

11          MR. MEALOR:  Yes.  Thank you.  You'll be

12  excused very soon, I believe.

13                    EXAMINATION

14  BY MR. MEALOR:

15      Q   I just wanted to clarify some terminology that had

16  been used earlier in questioning about working an outage,

17  in terms like -- in terms of like "all hands on deck" and

18  discussion about secretaries doing other jobs during an

19  outage.

20          When there was mention of people doing different

21  jobs during an outage, do you mean different positions,

22  that they were reassigned with new managers?

23      A   Not reassigned to be managers, but to do things

24  that were outside their normal scope of work.  I'm trying

25  to think.  For instance, Robert, normally he would work

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-17   Filed 11/15/21   Page 183 of 672   PageID #:
JA 0176
453

1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4         I, Sheila D. Wilson, Licensed Court Reporter #268
     and Notary Public, in and for the State of Tennessee, do
5    hereby certify that the deposition of JEFFREY MCGUIRE was
     reported by me, and that the foregoing 134 pages of the
6    transcript is a true and accurate record to the best of
     my knowledge, skills, and ability.
7         I further certify that I am not related to nor an
     employee of counsel or any of the parties to the action,
8    nor am I in any way financially interested in the outcome
     of this case.
9         I further certify that I am duly licensed by the
     Tennessee Board of Court Reporting, as evidenced by the
10   LCR number and expiration date following my name below.
          In witness whereof, I have hereunto set my hand
11   this 20th day of September 2021.

12

13

14

15

16

17   _____
     Sheila D. Wilson, LCR #268
18   Expiration date: 6/30/2022.
     Notary Public Commission
19   Expires: 1/25/2023.

20

21

22

23

24

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 184 of 672   PageID #:
UA-0177
454

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF TENNESSEE

 3                     AT CHATTANOOGA
     --------------------------------------------------------
 4   ROBERT M. GOFORTH,                    :
                                           :
 5           Plaintiff,                    :
                                           :
 6   vs.                                   :   NO:  1:20-CV-254
                                           :
 7   TENNESSEE VALLEY AUTHORITY            :
     and DAY & ZIMMERMANN NPS, INC.,       :
 8                                         :
             Defendants.                   :
 9   --------------------------------------------------------
                                    Chattanooga, Tennessee
10                                  October 1, 2021

11            ZOOM DEPOSITION OF JESSE JAMES
     --------------------------------------------------------
12   APPEARANCES:

13                 FOR THE PLAINTIFF:

14                 JAMES M. JOHNSON, ESQ.
                   Attorney at Law
15                 620 Lindsay Street, Suite 210
                   Chattanooga, Tennessee  37403
16                 (423) 648-4093
                   jj@jamesmjohnsonatty.com

17

18                 FOR DEFENDANT TENNESSEE VALLEY AUTHORITY:

19                 MICHAEL V. BERNIER, ESQ. (Remotely)
                   STEPHEN T. MEALOR, ESQ.
20                 Tennessee Valley Authority
                   Office of the General Counsel
21                 400 West Summit Hill Drive
                   Knoxville, Tennessee  37902
22                 (865) 632-3045
                   mvbernier@tva.gov
23                 stmealor@tva.gov

24

25
```

Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 185 of 672   PageID #: 455

JA 0178

```
 1                     JESSE JAMES,

 2   called as a witness at the instance of the Plaintiff,

 3   having been first duly sworn, was examined and

 4   testified as follows:

 5                     EXAMINATION

 6   BY MR. JOHNSON:

 7    Q    Mr. James, I'm Jim Johnson, and I represent

 8   Robert Goforth in the lawsuit that he presently has

 9   pending against TVA and Day & Zimmermann regarding his

10   termination back at the end of 2018.  So the purpose of

11   your deposition today is for us to explore things that

12   you may know surrounding the allegations in the lawsuit

13   that would be helpful to the parties and the court to

14   understand what, what went on back then.  So I'll be

15   asking you questions, and you'll be answering them.

16   And you are under oath subject to penalty of perjury, I

17   would remind you.

18          So let me ask you this question, first.  Well,

19   let's identify you for the record in full.  What --

20   what's your name?

21    A    My name is Jesse James.  I'm the Strategic

22   Alliance Director for TVA.

23    Q    And please give us your address.

24    A    My address is 9660 Hamby Road, Soddy-Daisy,

25   Tennessee 37379.
```

1    Q    Have you given a deposition before?

2    A    No.

3    Q    All right.  Well, I'll, I'll explain to you a

4  few things that may help us out as we go forward.  The

5  court reporter, who's sitting across the table from me,

6  is taking down every word that I say and every word

7  that you say, and will make a transcript of what we

8  said.  So it's very important for her benefit to make a

9  clear record that when I ask questions, you allow me to

10 completely finish asking the question before you begin

11 your answer.  Frequently you may think you know the

12 answer, but if we talk over one another, she has a lot

13 of difficulty in determining who's saying what.  So

14 please let me finish the questions, and I will do my

15 very best to try to make sure that you finished your

16 answers before I ask another question.  So does that

17 sound fair enough as we proceed?

18    A    It does.

19    Q    Okay.  And that brings up another point.  When I

20 ask a question, you have to answer out loud and

21 audibly.  She cannot pick up nods of the head, shakes

22 of the head, gestures, things like that.  So be sure

23 that you're answering all the questions audibly.  Okay?

24    A    Yes, sir.

25    Q    All right.  So you mentioned your job title when

1    you gave your name, but go ahead and tell me again what

2    your present job is.

3       A    I am the Strategic Alliance Director for TVA

4    Nuclear.

5       Q    And explain to me what you do in that job.

6       A    My job, I have five alliance contractors that I

7    manage their contracts in making sure they comply with

8    TVA policies and procedures.

9       Q    Is one of those contractors Day & Zimmermann?

10      A    Yes, sir.

11      Q    Okay.  So with respect to your position at --

12   well, let me ask you this.  How long have you held that

13   position?

14      A    I started this job April 1st, 2018.

15      Q    Was that the time -- at the time when you left

16   your position as a manager in the maintenance

17   department at -- at TVA?

18      A    Prior to this job I was the maintenance director

19   at Watts Bar Nuclear.

20      Q    In your job, the performance of your duties as

21   the Strategic Alliance Director with managing the

22   relationship with Day & Zimmermann, did Mr. Goforth

23   come up as a topic within your role as that after you

24   took that role as Strategic Alliance Director?

25              MR. BERNIER:  Objection to form.  Jesse,

1    you can answer.

2                    MS. LINDGREN:  Objection to form.

3                    THE WITNESS:  Did Mr. Goforth come up?

4    BY MR. JOHNSON:

5      Q    Yeah.  Let me -- let me try to make it a little

6    bit easier on you.  Once you became the Strategic

7    Alliance Director in April of 2018, did you, in your

8    new role, have anything to do with Mr. Goforth's

9    termination up to the time that he was terminated?

10     A    No, sir.

11     Q    Did -- in your new role, up to the time of

12   Mr. Goforth's termination, did Mr. Goforth ever come up

13   as a topic of communication between you and anyone at

14   Day & Zimmermann?

15                   MR. BERNIER:  Objection to form.

16                   MS. LINDGREN:  Objection to form.

17                   MR. BERNIER:  You can answer.

18   BY MR. JOHNSON:

19     Q    Let me --

20     A    Before --

21     Q    Go ahead.

22     A    So, am I aware of Mr. Goforth's termination?  Is

23   that what you're asking?

24     Q    I'm asking in your role as the Strategic

25   Alliance Director that began in April of 2018, did you

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 189 of 672   PageID #:
JA 0182
459

1   have any communications with DZ people about

2   Mr. Goforth prior to his termination?

3       A     Yes.

4       Q     And who would those people have been?  And we

5   can deal with them one at a time.

6       A     During, that would be John Reeves.

7       Q     Okay.  And when did you have a conversation with

8   John Reeves -- or a communication with John Reeves?

9       A     After the determination of what was the

10  employment condition of Goforth.

11      Q     All right.  Tell me what that communication was.

12      A     The communication was making sure the adverse

13  action review board process was followed for any

14  employment-related conditions with any individual,

15  including Goforth.

16      Q     So who called -- who initiated the

17  communication?  Was it you or Mr. Reeves?

18      A     It would be Mr. Reeves letting me know.

19      Q     And so what did Mr. Reeves say to you -- or what

20  type of communication was that?  Was that an email?

21  Was it a, a phone conversation?  A text?

22      A     I would -- pretty standard would be a -- an

23  email, if there was any adverse action being taken on

24  any employees.

25      Q     Do you recall, beyond what the usual practice

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 190 of 672   PageID #:
460
JA 0183

1  is, what type of communication it was that you were

2  having with Mr. Reeves?  Meaning telephone, in person,

3  email?  Do you recall?

4    A    It would not be in person, because that would be

5  handled at the site for any employment-related concerns

6  with any site employee.  My communication would be

7  email and making sure that -- again, at the time, we

8  were going through some scrutiny by the NRC with an

9  adverse action review process, so my concern was making

10 sure any of my alliance partners, when they're going

11 through any adverse action, was following the process

12 correctly.

13   Q    All right.  So let's get into what the

14 communication was.  Did you tell me who initiated --

15 and I know I asked that question, and now I'm not

16 remembering the answer.

17   A    It would be John Reeves.

18   Q    And so what did John Reeves say when he made the

19 communication to you?

20   A    It was -- I mean, there's a communication

21 around -- or taken an employment action with an

22 individual.

23   Q    And the individual was Mr. Goforth?

24   A    I don't recall that email being specific by

25 name.  I look -- I never worry about the name.  I'm

1    more worried about the process we're following.

2    Q    Well, do you know if in fact that was about

3    Mr. Goforth, regardless of what names may have been

4    mentioned?

5    A    No.

6    Q    All right.  Tell me about the rest of the

7    conversation.

8    A    The conversation --

9    Q    Or --

10    A    -- would be --

11    Q    Go ahead.

12    A    So the conversation would be around if you're

13    taking an adverse action, you got to follow our

14    processes and procedures for TVA to do that, which is,

15    you know, get with the site.  You know, the site's

16    going to implement that.  You have to follow the -- you

17    know, get through the maintenance director and site VP

18    and plant manager to follow that process correctly and

19    get the adverse action process completed.

20    Q    Did you have any further communications with

21    Mr. Reeves concerning this adverse action?

22    A    Not to my memory.

23    Q    Did you have any conversations about this

24    adverse action with Mr. Sanders?

25    A    No.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35   Filed 11/15/21   Page 192 of 672   PageID #:
462
JA 0185

1    Q    Did you have any communications regarding this

2    adverse action with anyone else that you haven't

3    already told me about?

4    A    No.

5    Q    And now, let me specifically talk about

6    Mr. Goforth.  Did you have any communications regarding

7    Mr. Goforth between the time that you assumed this role

8    in April 2018 and the time of his termination?

9                MR. BERNIER:  Jim, I'm, I'm going to

10   object, just out of an abundance of caution, to the

11   extent that it includes any conversations with

12   attorneys that would be subject to attorney/client

13   privilege.  I don't think that's what you're asking,

14   so...

15               MR. JOHNSON:  Well, it's not what I'm

16   asking in terms of any legal advice, but I think I can

17   ask him if he had communications with an attorney --

18   just not get into legal advice.

19   BY MR. JOHNSON:

20   Q    So let me kind of translate that exchange I just

21   had with Mr. Bernier for you, Mr. James.  I'm not -- I

22   don't want you to tell me any advice that a lawyer may

23   have told you -- but included within people you may

24   have had contact with about Mr. Goforth would be

25   lawyers.  You can tell me that you had contact with a

1    particular lawyer, just don't tell me what the lawyer

2    advised you about that.  Are we clear about that?

3      A    I am.

4      Q    Okay.  So let me repeat the question.  What

5    communications, if any, did you have with persons at

6    TVA or Day & Zimmermann about Mr. Goforth between the

7    time you assumed your role in April 2018 and

8    Mr. Goforth's termination?

9               MS. LINDGREN:  Object to the form.

10   BY MR. JOHNSON:

11     Q    And, and there -- let me just say a word about

12   these objections.  When objections occur, you can

13   disregard the fact that the objection has been made.

14   It's just for the record for the lawyers to deal with

15   at a later time, and you still have to answer the

16   question unless one of the lawyers instructs you not to

17   answer the questions, okay?  So that will be throughout

18   the deposition.  When you hear those objections, just

19   continue with your answer unless instructed not to

20   answer.  Are we -- are we clear on that?

21     A    Yes, sir.

22     Q    Okay.  So I'll repeat the question for you

23   again, and the objection is preserved, Ms. Lindgren.

24          What communications, if any, did you have with

25   anyone at TVA or DZ regarding Mr. Goforth between the

1  time you assumed your position on April 1st, 2018 and

2  Mr. Goforth's termination?

3      A    I have talked to lawyers.  I have talked to the

4  NRC about, about Mr. Goforth.

5      Q    Okay.  Now, I want to -- so have you -- you now

6  told me all communications you've had with anyone

7  between April of 2018 and Mr. Goforth's termination

8  that concerned Mr. Goforth?

9      A    That is correct.  That -- and including the DZ

10  email that we've talked about.

11      Q    Right.

12      A    Yes.

13      Q    Okay.  So let's, let's move then to pre-April of

14  2018 for the questions that I'm going to ask now.  And

15  if you will, in connection with that, look at the

16  Document No. 1 that we sent to you earlier.

17      A    Document No. 1?

18      Q    Yes, sir.

19      A    Okay.  Maybe I'm not prepared to -- let me...

20          Can you resend that -- what email are you

21  talking about?  What date did that come in?

22              MR. BERNIER:  Jesse, these are the

23  documents that were in the link of the -- like the Box

24  link that we sent you this morning.

25              THE WITNESS:  All right.  Hang on.

1    A     Specifically, I don't know why.  I think it was

2  retirement.

3    Q     Did you hear anything from anyone at TVA

4  suggesting why he left --

5              MR. BERNIER:  Objection to form.

6  BY MR. JOHNSON:

7    Q     -- other than retirement?

8    A     No.  Other than retirement, no.

9    Q     So who made the -- was there a decision made in

10  2017 for TVA/MMG workers to replace Day & Zimmermann

11  workers within the tritium program?

12    A     Yes.

13    Q     Who made that decision?

14    A     Myself.

15    Q     Did you have to get approval for that decision

16  from anyone else?

17    A     No approval.  Just making sure I was on line

18  with my leadership, be it the plant manager.

19    Q     Did that approval of a lineman extend to

20  Mr. Simmons?

21    A     I would not know that.  I assume the plant

22  manager talked with Paul to make sure he was in line

23  with that move.

24    Q     At that time was there a struggle within MMG to

25  keep its workers full-time employed --

1          MR. BERNIER:  Objection.

2    BY MR. JOHNSON:

3      Q    -- in terms of enough work for them?

4      A    They're full-time employees.  There was no issue

5    with them being full-time employees.

6      Q    Okay.  And so I guess my question might better

7    be phrased as, was there a push to reduce full-time

8    employees such that there was concern that you might

9    lose some TVA/MMG workers?

10     A    No.

11     Q    What was the reason, as best as you can explain

12   it to me, that you decided you wanted to replace the

13   Day & Zimmermann tritium program workers with TVA/MMG

14   workers?

15     A    It was a business, financial decision.

16     Q    All right.  Let's open up Document 2 then.

17     A    I have Document 2 open.

18     Q    Okay.  And before we leave that prior topic of

19   discussion, was part of the business financial decision

20   that there would be more revenue flowing towards TVA if

21   you made the change?

22          MR. BERNIER:  Objection to form.  You

23   can answer.

24          THE WITNESS:  No more money would come

25   to TVA.

1  BY MR. JOHNSON:

2    Q    Okay.  Then what -- I take it that you saw it as

3  a financial, business change for the better for TVA, or

4  you wouldn't have made the move, right?

5    A    That is correct.

6    Q    So how would it have been better financially and

7  business wise?

8    A    It would allow me to use my in-house resources

9  to harvest the tritium, and that would be funded by

10  BOE.

11   Q    Okay.  Understood.

12        Let's go to Document 2 then.

13   A    Okay.

14   Q    And since this is an email chain, let's look at

15  the second page first -- or, wait a minute.  Let's see.

16  Hang on, before you answer that.  Let me check my times

17  on these emails.

18        Okay.  Well, since you didn't get the email on

19  the first page, let's start with the second page.  Are

20  you with me on the second page?  There appears to be an

21  email from Jeff McGuire to you dated October 17 of '17.

22   A    Yes.

23   Q    Do you recall having received this email?

24   A    Memory, no.  But obviously I see I have it.

25   Q    Well, do you want to read through it then to

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 198 of 672   PageID #:
468
JA 0191

1    make sure you're familiar with it, and then let me know

2    when you're done?

3            (Brief pause).

4                    THE WITNESS:  Okay.  I've read it.

5    BY MR. JOHNSON:

6      Q    And it refers, does it not, to an attached

7    evaluation in the first sentence?

8      A    Sorry for the interruption.

9      Q    Do you see that it refers to an attached

10   evaluation in the first sentence?

11     A    I do.

12     Q    Do you recall looking at the attached evaluation

13   when you received this?

14     A    Yes.

15     Q    And he is asking the question in the second

16   sentence; have you had an opportunity to discuss your

17   reports for the lesson learned we discussed in your

18   office.

19           Did you -- well, just comment on that for me if

20   you will as to whether you did have an opportunity to

21   discuss with your subordinates the lessons that Jeff

22   McGuire was bringing to your attention.

23     A    Yes.  I did have that, that conversation.

24     Q    And with whom was that conversation?

25     A    Steve Cook and some, some of the tritium folks.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 199 of 672   PageID #:
JA 0192
469

1    I wouldn't know their names, but I know we had a

2    meeting in my office about this post-job critique.

3        Q    All right.  So let's look at Document 3 now.

4        A    Okay.

5        Q    And if we're looking at the same document, it

6    should say Cycle 14 Tritium Project, Assessment and

7    Evaluation.  Is that what you're seeing?

8        A    Yes.

9        Q    And before we get off the subject of the

10   Document 2 that we were just looking at, that has been

11   previously marked as Exhibit 8.

12        All right.  And do you see on the front page of

13   the Cycle 14 Tritium Project, Assessment and

14   Evaluation, that it's been previously marked as Exhibit

15   5?

16        A    Yes.

17        Q    And who is it showing as the author of the

18   assessment and evaluation?

19        A    Goforth, Robert M.

20        Q    And he was, at that time, as it says on there,

21   the Tritium Task Manager/Oversight?

22        A    Yes.

23        Q    And it's dated October 17th, 2017, which was the

24   date of Mr. McGuire's email to you that we just

25   discussed.  Right?

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 200 of 672   PageID #: 470
JA 0193

1    A    Correct.

2    Q    So do you recall, is this evaluation that -- the

3   evaluation that he sent to you as an attachment to his

4   email?

5    A    I don't recall, but it would make sense that

6   this would be the attachment.

7    Q    And is this the document that you discussed with

8   your reports, as you previously mentioned Steve Cook

9   and others in MMG that were in the tritium program?

10   A    I don't recall specifically having this

11  document, but I would -- this would be standard -- post

12  any project, they do a post-job critique.  So this

13  could have been the document.

14   Q    Do you recall sharing this document with others?

15   A    I -- other than the folks in the room?  Is that

16  what you're asking?

17   Q    The folks in the room?  Tell me what you mean by

18  folks in the room.

19   A    So when we do our post-job critique, I bring in

20  the superintendent, a supervisor and, you know, the,

21  the people doing the evaluation with the post job.

22   Q    So at that time I think you said Steve Cook, who

23  would have been the -- that was the superintendent.

24  Who would have been the other folks?  You mentioned

25  some job titles.  I may not be able to shout them back

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35   Filed 11/15/21   Page 201 of 672   PageID #:
JA 0194
471

1    at you, but do you remember who those -- maybe give me

2    the job title, and then if you can recall the person's

3    name.

4       A    I don't specifically recall if I had the

5    supervisor in the room.  It might just have been Steve

6    Cook, but it could have been -- but I'm speculating --

7    they might have brought the supervisor.  And I think it

8    would have been -- West would be the last name.  Don't

9    recall the first name.

10      Q    Would that be Jason West?

11      A    Jason.

12      Q    And Jason West was MMG craft?

13      A    My recollection, he was MMG supervisor.

14      Q    Okay.  Okay.  Anyone else there that you can

15   specifically recall as being in, in the room -- I think

16   as you stated?

17      A    The, the room would have been my office.  And

18   no, I don't remember anyone else.

19      Q    Did you instruct Mr. Cook -- and if he were

20   there, Mr. West, to share the evaluation with their

21   subordinates/team members?

22      A    I would go with the process we do with -- the

23   post-job critique is to learn from the previous camp --

24   previous evolution.  Whatever evolution that might be,

25   take that, critique it to make sure we find any and all

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 202 of 672   PageID #:
472
JA 0195

1  gaps in our performance, our procedures, scheduling,

2  work orders, and then go put that into the Corrective

3  Action Program to go close those gaps and, and then do

4  that with -- make sure the team understood what we were

5  doing, and make next evolution even better.

6    Q    So it would be your expectation that they would

7  have followed that pattern as you just described it?

8    A    That is correct.

9              MR. BERNIER:  Objection to form.

10             MR. JOHNSON:  Did you get his answer?

11             THE COURT REPORTER:  That is correct.

12  BY MR. JOHNSON:

13    Q    Turn, please, to the second page -- the page

14  right after the title page to the evaluation.

15    A    I'm on the second page.

16    Q    Okay.  And would you read what it says under

17  summary?  Just read that to yourself.  Just the

18  paragraph under summary.

19    A    Okay.  I've read the summary.

20    Q    All right.  Anything that you see in the summary

21  that appears to you to be inaccurate?

22    A    No, sir.

23    Q    And let's go ahead and read the next section

24  then that's entitled initial work scope agreement.

25  Just read it to yourself and let me know when you're

1    done.

2        A    Okay.

3        Q    Anything that you read in there that appears to

4    be inaccurate?

5        A    No.

6        Q    If you turn to the page in the evaluation we're

7    looking at that's marked page 4 at the bottom -- and

8    we'll talk about that next.

9        A    Okay.  I'm on page 4.

10       Q    All right.  And at the bottom of that page it

11   says, does it not, Cycle 14 consolidation campaign

12   gaps.

13       A    Correct.

14       Q    And you referred earlier in your testimony to

15   gaps that might occur that your expectation would be

16   that they would be identified and then closed once

17   identified.  Correct?

18       A    Correct.

19       Q    So you can quickly look at gap number one

20   there -- and my question to you -- I'll tell you in

21   advance, because it might help speed things up for you.

22   My question in advance is, would, would you agree with

23   me that this particular gap was not the responsibility

24   of, of MMG?

25                    MR. BERNIER:  Objection to form, but you

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 204 of 672   PageID #:
JA 0197
474

1    can answer.

2    BY MR. JOHNSON:

3       Q    I'll ask you the question once you're done, but

4    I'm just trying to make it clear to you that this

5    appears not to involve any kind of responsibility by

6    TVA/MMG people.

7       A    Correct.

8       Q    All right.  So let's go to gap number two.  And

9    go ahead and read that one.

10      A    Okay.  I've read gap two.

11      Q    Okay.  And I want you, in considering my

12   question, to go back to your frame of mind when you

13   received this evaluation on October 17th, 2017 -- and

14   at the time did you have any disagreement with the

15   statement of this gap as explained?

16      A    No.

17      Q    And this gap does appear to involve MMG

18   personnel, correct?

19      A    Correct.

20      Q    Let's go to gap number three.

21      A    I'm sorry.  I coughed in the middle.  Gap number

22   three?

23      Q    Yes, sir.

24      A    Okay.  I read gap three.

25      Q    And again, taking yourself back to October 17th,

1    2017, did you at the time have any problem with this

2    being identified as a gap?  And by -- I shouldn't say

3    did you have any problem.  Did you have any

4    disagreement that this was a gap at the time that you,

5    you took a look at this?

6       A    No.  No.

7       Q    And this gap also concerned MMG personnel,

8    correct?

9       A    That is correct.

10      Q    Let's look at gap number three and --

11                 MR. BERNIER:  That was the three.

12   BY MR. JOHNSON:

13      Q    Oh, I'm sorry.

14           All right.  Let's look at four then, the next

15   one.

16      A    Okay.  I've read gap four.

17      Q    Same question.  Taking yourself back to October

18   17th of '17, did you at that time have any disagreement

19   with this as an identified gap?

20      A    No.

21      Q    And this, this gap involved MMG personnel,

22   correct?

23      A    Correct.

24      Q    Gap number five; again, I want to say that this

25   does not appear to involve TVA/MMG personnel, but if

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-15   Filed 11/15/21   Page 206 of 672   PageID #:
JA 0199
476

1   you'll read it over quickly, and that's what I'll be

2   asking you, whether it appears to not involve any

3   TVA/MMG people.

4       A    Okay.  I've read gap number five.

5       Q    And did gap number five not involve TVA/MMG

6   people?

7       A    That is correct.

8       Q    Same question as to gap number six on page

9   seven.  It does not appear to involve TVA/MMG

10  personnel, and I'll -- that's what I'll be asking you

11  after you've read it.

12      A    Okay.  I've read gap number six.

13      Q    Okay.  And would it be correct that that does

14  not involve TVA/MMG personnel?

15      A    That is correct.

16      Q    Same thing with -- same thing with gap seven.

17  It doesn't appear to involve TVA/MMG personnel, but

18  I'll ask you to -- what your views are on that.

19      A    Okay.  I've read gap seven.

20      Q    Does gap seven appear to involve TVA/MMG

21  personnel?

22      A    No.

23      Q    And when I say involve TVA/MMG personnel, I

24  mean, you know, the performance of TVA/MMG personnel.

25  Are we on the same page with that?

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 207 of 672   PageID #:
JA 0200
477

1    A    Yes.

2    Q    Okay.  Now, take a look at gap eight.

3    A    Okay.  I've read gap number eight.

4    Q    And taking yourself back to October 17th, 2017,

5  did you have any disagreement at the time with this

6  being identified as a gap?

7              MR. BERNIER:  Hey, quick question there,

8  Jim.  Are, are you saying like -- that this as written,

9  do you disagree that it was a gap, or are you asking

10  whether he disagrees with the facts that are laid out

11  here?

12  BY MR. JOHNSON:

13    Q    Well, either one, because I think the second

14  thing that you said is, you know, incorporated within

15  the first one.  So I think the question is fair.  It's

16  just did you agree at the time that you looked at this

17  in October 2017 that this was identifying a, a gap that

18  occurred?

19    A    I agree it identified the gap.  Yes.

20    Q    And this one did involve TVA/MMG personnel?

21    A    That is correct.

22    Q    Okay.  So we're now up to gap nine.

23    A    Okay.  I've read gap nine.

24    Q    Taking yourself back to October 17th, 2017, did

25  you have any disagreement that this was identifying a

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35   Filed 11/15/21   Page 208 of 672   PageID #:
JA 0201
478

1  gap that occurred?

2     A     No disagreement.

3     Q     And this involved TVA/MMG personnel.  Correct?

4     A     Correct.

5     Q     If you look on page nine -- and I'm sure you've

6  read this, it says in a note that, that this was

7  captured on a video recording.  Do you see that?

8     A     Yes.

9     Q     Do you recall having seen that video yourself?

10    A     I do.

11    Q     And do you recall having any discussion with

12 Mr. McGuire about that video?

13    A     I do not.  I remember discussing it with -- I

14 would think Steve Cook, but I don't know who I really

15 talked to it about.

16    Q     Can you tell me about your discussion with Steve

17 Cook?  You know, sort of -- you're not going to

18 remember exact words this, this far, but just the sense

19 of what you and Steve exchanged as communications in

20 your discussion with him.

21    A     Yeah.  They -- it does kind of trigger some

22 memory, and I know I was not satisfied with the

23 performance.

24    Q     Read gap 10.

25           All right.  Well, let me ask you a little bit

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35   Filed 11/15/21   Page 209 of 672   PageID #:
JA 0202
479

1  more about the video.  Was -- at your direction or
2  Steve Cook's direction -- the video shared more
3  generally than just between you and he?
4                    MR. BERNIER:  Objection to form.
5                    THE WITNESS:  I would not, you know,
6  restrict that we shared any of this information.
7  BY MR. JOHNSON:
8    Q    Did you receive any contact from any of your
9  superiors about this video?
10   A    I don't recall getting any communications, but I
11  know I would have reported this to my boss on something
12  this significant.
13   Q    And your boss at the time was again who?
14   A    Sean Connors.
15   Q    And Sean Connors was the plant manager?
16   A    Yes.
17   Q    And I think on the org chart he reported
18  directly to Paul Simmons?
19   A    Correct.
20   Q    Were you aware from any source that Paul Simmons
21  had any comments or views expressed about the video?
22   A    I don't recall, but there would be a line with,
23  with Paul, since he's a site VP, that he would have
24  concerns.
25   Q    So you think the likelihood is high that the

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-7  Filed 11/15/21  Page 210 of 672  PageID #: 480
JA 0203

1  plant manager would have shared this incident with
2  Mr. Simmons?
3           MR. BERNIER:  Objection to form.
4           THE WITNESS:  I know our protocol for
5  reporting issues in the plant.  I would elevate it to
6  Sean Connors and the rest of the leadership team to
7  something of -- that would require a prompt
8  investigation.
9  BY MR. JOHNSON:
10   Q    And was the prompt investigation requirement due
11  to the safety, the nuclear safety implications of the
12  event?
13           MR. BERNIER:  Objection to form.
14           MS. LINDGREN:  Objection to form.
15           THE WITNESS:  I'm going off a lot of
16  like memory.  I'm going off a lot of how our TVA
17  policies and procedures were.  This would have, in my
18  mind, triggered a prompt investigation, which would
19  have been a notification.
20  BY MR. JOHNSON:
21   Q    A notification -- explain to me what you mean by
22  notification.
23   A    Notify the leadership team of an event.
24   Q    And is the reason for the prompt investigation
25  and the notification to leadership of the event that it

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 211 of 672   PageID #:
481
JA-0204

1    involved safety?

2                    MR. BERNIER:  Objection to form.

3                    THE WITNESS:  Involved a human -- it

4    would involve a human performance issue, which would

5    have been a reason to have a prompt investigation to

6    understand how we got there before we restarted work.

7    BY MR. JOHNSON:

8      Q    And the human performance deficiency was a

9    potential safety hazard -- that's my question.  Would

10   you agree with that?

11                   MR. BERNIER:  Objection to form.

12                   MS. LINDGREN:  -- to form.

13                   THE WITNESS:  The -- a safety -- no one

14   would have got -- my concern would have been around

15   damaging this tritium component.

16   BY MR. JOHNSON:

17     Q    And if you damage a tritium component, there is

18   the potential for radiation release that's dangerous to

19   human health, is there not?

20                   MR. BERNIER:  Objection to form.

21                   MS. LINDGREN:  Objection to form.

22                   THE WITNESS:  The tritium -- not to my

23   knowledge.  That would get -- hurt personnel with

24   radiation.

25   BY MR. JOHNSON:

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35  Filed 11/15/21  Page 212 of 672  PageID #:
JA 0205
482

1    Q    Did you --

2    A    Because it's inside of a spent fuel pool that's

3  feet under water -- which is full of radioactive

4  water -- and that's what would have been released.

5    Q    Did you ask Mr. Goforth about what would occur

6  if a TP -- what could occur if a TPBAR were damaged?

7    A    I don't recall.

8    Q    Did you talk to Mr. McGuire about that in any

9  way?

10   A    I don't recall.

11   Q    Were you aware at the time that the TPBARs --

12  the tritium within the TPBARs is under high pressure?

13   A    I did know they're under pressure.  I didn't

14  know the exact pressure.

15   Q    Were you aware at the time that because of the

16  pressure, a damaged TPBAR -- a release of pressure from

17  a damaged TPBAR could cause the TPBAR to eject out of

18  the water?

19              MR. BERNIER:  Objection to form.

20              MS. LINDGREN:  Objection to form.

21              THE WITNESS:  No, I was not aware.

22  BY MR. JOHNSON:

23   Q    All right.  Let's look at gap 10.  And again,

24  just to forecast for you, it, it appears that this does

25  not involve TVA/MMG people, and I'll -- that's what

Case 1:20-cv-00254-TRM-SKL   Document 135-2   Filed 11/15/21   Page 213 of 672   PageID #: 483

JA 0206

1    I'll be asking you about.

2     A    Okay.  I've read gap 10.

3     Q    Would you agree that gap 10 does not appear to

4    in -- involve any performance by TVA/MMG people?

5     A    That is correct.

6     Q    Gap 11.  We're coming into the home stretch

7    here.  Gap 11.  Take a look at that one.

8     A    Okay.  I've read gap 11.

9     Q    If you look under actions within gap 11, it

10   says, does it not (as read):  This was discussed with

11   the maintenance manager who will inform tritium program

12   management of any actions.  It says that, right?

13    A    That is correct.

14    Q    So who would be the maintenance manager as

15   identified there?

16    A    Steve Cook or me.  I don't -- because I'm the

17   maintenance director.  There might have been a

18   miscommunication with maintenance, thinking I'm the

19   maintenance manager.

20    Q    Sure.  Well, did you -- do you recall having a

21   conversation with either Mr...

22         Well, let me -- do you recall having a

23   conversation with Mr. McGuire about this particular gap

24   prior to -- as this says, prior to receiving this

25   evaluation?

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1  Filed 11/15/21  Page 214 of 672  PageID #:
JA 0207
484

1    A    I don't specifically recall having that

2   conversation.

3    Q    This gap does involve TVA/MMG personnel, would

4   you agree?

5    A    I agree.

6    Q    Gap 12.  Let's take a look at that one.

7    A    Okay.  I've read gap 12.

8    Q    Would you agree with me that that involves --

9   well, looks like both TVA/MMG and Day & Zimmermann

10  personnel.

11   A    That is correct.

12   Q    And, finally, gap 13.

13   A    Okay.  I've read gap 13.

14   Q    Would you agree that that involves TVA/MMG

15  people?

16   A    Yes.

17   Q    And I think I forgot to ask with respect to 12

18  and 13.  At the time that you looked at these on

19  October 17th, 2017, did you have any disagreement with

20  these as identified gaps?

21   A    No.

22   Q    So let's look at the conclusion that's written

23  there.  Take, take a look at that, and read that, the

24  conclusion on page 11.

25   A    Okay.  I've read the conclusions.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 215 of 672   PageID #: 485
JA 0208

1   Q    And for cycle -- the remainder of cycle 14 and

2   for cycle 15, TVA/MMG people did continue to work on

3   tritium program activities as they had in cycle 14 up

4   to this point.  Correct?

5   A    That's correct.

6   Q    So evidently, since it says the following needs

7   to be addressed before MMG participates in

8   consolidation with TPBAR shipping activities, these --

9   these things were adequately addressed so that they

10  continued to, to work in the program.  Correct?

11  A    I would say since we're a learning organization,

12  we took action on these gaps and they continued to, to

13  have these critiques afterwards then improve our

14  performance.  So I don't -- I'm not thinking we can fix

15  everything all at once; but from my recollection, the

16  campaigns did continue to improve.

17  Q    When you transferred your job duties over to

18  Tony White in April of 2018 as you previously

19  testified, did you have some turnover -- let's call

20  them turnover sessions with Mr. White to bring him up

21  to speed on the job?

22  A    I did.

23  Q    Do you recall in those conversations with him

24  whether you discussed with him this evaluation and the

25  ongoing progress to improve the program?

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-15   Filed 11/15/21   Page 216 of 672   PageID #:
JA 0209
486

1     A     I don't recall discussing this evaluation, but I

2   did -- I do recall talking about the tritium campaigns

3   and their importance.

4     Q     Did you talk to Mr. White at all about

5   Mr. Goforth having written the evaluation?

6     A     No.

7     Q     Did you talk to Mr. Go -- Mr. White about

8   Mr. Goforth at all during that time?

9     A     Not that I recall.  No.

10                    MR. JOHNSON:  Let's see.  We've been

11  going for a bit over an hour.  Would you-all like to

12  take a break?

13                    MR. BERNIER:  I would.

14                    MR. JOHNSON:  All right.

15                    MS. LINDGREN:  Yeah, that would be

16  great.

17                    MR. JOHNSON:  Let's take a five minute

18  break, okay?  Five minutes enough?

19                    MR. BERNIER:  Sounds good.

20                    MS. LINDGREN:  Yes, that's good.

21                    MR. JOHNSON:  Okay.

22            (Brief recess).

23  BY MR. JOHNSON:

24    Q     All right, Mr. James.  We're back from work, and

25  we're ready to open document number four.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 217 of 672   PageID #:
JA 0210
487

1   due date, but there at least needs to be a plan in

2   motion to close those gaps by that due date.

3       A     That is correct.

4       Q     Do you recall assigning that CAP to anyone

5   within your organization to complete?

6       A     I don't recall assigning this to anyone.

7       Q     Do you recall anyone to -- reporting to you

8   about addressing these issues in a CAP?

9       A     I don't recall, no.  I can talk to TVA process

10  and procedure, where our -- the Corrective Action

11  Program has different meanings which assign the CRs to

12  appropriate levels in the organization.

13      Q     So it would be CAP program people that would be

14  identifying people in the organization to assign

15  responsibilities for addressing gaps?

16      A     Correct.  It would be a committee.

17      Q     And do you recall anything about a committee

18  assuming the duties you just described with regard to

19  this CR?

20      A     I do not.

21      Q     When you did turnover with Tony White, did the

22  subject of this CR come up?

23      A     It did not, to my knowledge.

24      Q     Did this CR come up at any time subsequent to

25  your turnover with Tony White up to the termination of

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 218 of 672   PageID #:
JA-0211
488

1    Mr. Goforth?

2      A    Not to my memory, no.

3      Q    Okay.  Let's open doc -- document five.

4      A    Okay.

5      Q    All right.  Does it show that it was previously

6    marked Exhibit 38 on the first page?

7      A    It does.

8      Q    And this may relate back to your earlier

9    testimony, but it may help prompt your memory somewhat.

10   I want you to take a look at the email about halfway

11   down the page which appears to be an email from John

12   Reeves to you dated November 20, 2018.

13          Are you with me there?

14     A    Yes.

15     Q    And it says, does it not, phone -- per phone

16   con, I would like to get this done today.  And it's

17   electronically signed by John Reeves to you, correct?

18     A    Correct.

19     Q    And you can take some time if you want and look

20   at this entire document, because my question to you is

21   going to be what is he referring to about getting done

22   today?  That's going to be my question.  But just take

23   a look at the whole thing, and that may help you to

24   respond.

25     A    It appears he wants to get the Executive Review

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 219 of 672   PageID #:
JA 0212
489

1   Board completed.

2      Q    And by saying he wants to get the Executive

3   Review Board completed, you mean the actual review of

4   the Executive Review Board of Mr. Goforth's

5   termination?

6                  MS. LINDGREN:  Object to form.

7                  THE WITNESS:  So the Executive Review

8   Board is done after an adverse action is taken to make

9   sure that we mitigate the impact of that adverse

10  action.  We look at all facets of that before it is

11  taken.

12  BY MR. JOHNSON:

13     Q    Okay.  And my, my question was, and maybe I

14  could have made this more clearly, but when I asked you

15  what it was he wanted to get done today, you said the

16  ERB.  And so my question was, do you mean the ERB

17  review of Mr. Goforth's termination?  Is that what he's

18  referring to?

19     A    That's what he appears to, to refer to, based on

20  the email strings.

21     Q    Okay.  And so then above there, there's an email

22  that you were not sent, but it says there from John

23  Reeves to a number of folks.  (As read):  FYI.  I

24  called Jesse and briefed Hickman.  DZ does not want to

25  delay the ERB.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-4   Filed 11/15/21   Page 220 of 672   PageID #:
490
JA 0213

1    BY MR. JOHNSON:

2      Q    And just -- you can just read the letter.  To

3    begin with, there's a fairly long attachment behind

4    it -- or enclosure with it.  But just for immediate

5    purposes you can just read the letter.

6      A    Okay.  I've read the -- just the letter, not the

7    attachments.

8      Q    Do you recall having seen this letter before?

9      A    Not this letter specifically, no.

10     Q    Okay.  Do you recall any communications that you

11   have received that references the matters raised in the

12   letter?

13     A    I recall us having to -- us, TVA Nuclear, having

14   to resolve this issue from the NRC.

15     Q    And with whom did you discuss it in order to

16   come to a resolution?

17     A    This -- this was not mine to resolve.  This is

18   for Joe Shea and his team to resolve.

19     Q    Are you aware of what resolution was arrived at

20   by Joe Shea and his team?

21     A    Numerous revisions to our policies and training.

22     Q    Was any change made to your policies that would

23   require ERBs for the denial of an unauthorized access

24   authorization -- or unescorted access authorization?

25                    MR. BERNIER:  Objection to form.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-4 Filed 11/15/21   Page 221 of 672   PageID #:
491
JA 0214

1    conformity order that began the ERB process, was it
2    not?
3              MR. BERNIER:  Objection to form.
4              THE WITNESS:  I don't know the whole
5    history.  I -- excuse me.  I believe the EA had -- 09
6    means that was issued in 2009, so -- but I do know we
7    were under conformity action for TVA, and we were
8    have -- we were -- still not have that resolved.
9    BY MR. JOHNSON:
10   Q    All right.  So let's look down immediately
11   beneath that failure to adequately implement
12   requirements of the '09 order and read where it begins
13   with the words "the inspector," please.  You can just
14   read it to yourself, that sentence there -- or those
15   couple sentences there beginning with the inspector
16   identified and ending with denial of access.
17   A    Okay.
18   Q    So having read that, does it appear that the NRC
19   was saying that you need to have an Executive Review
20   Board to review additional adverse actions including
21   denial of access?
22             MR. BERNIER:  Objection to form.
23             THE WITNESS:  That is what the inspector
24   identified.  That is correct.
25   BY MR. JOHNSON:

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-15   Filed 11/15/21   Page 222 of 672   PageID #:
JA 0215
492

1    Q    Okay.  We're done with that.  Thank you.

2         So, switching gears.  Were you aware in your

3    role in 2017 as the maintenance director that

4    Mr. Goforth applied for a job in the fall of 2017 as a

5    supervisor within the maintenance department?

6    A    At the time, no.  Based on all these reviews

7    I've been doing with -- where I talked about, yes.

8    Q    Okay.  And when you say reviews -- and again, I

9    don't want you to say anything that a lawyer told you,

10   but tell me what you meant by reviews including any --

11   identifying any that may have been with lawyers.

12        MR. BERNIER:  Let, let -- hold on one

13   second, Jesse.  And this is consistent with what Jim

14   just said, but I want to chime in there.

15        And to the extent your answer would

16   disclose anything from communications with attorneys,

17   those are attorney/client communications, and I'd

18   instruct you not to answer on those.  If we need to

19   talk, we can.  But answer the question to the best you

20   can without disclosing those communications.

21   BY MR. JOHNSON:

22   Q    Okay.  With that understood, let's review a

23   little bit so I can repose the, the question.  When I

24   asked whether you were aware that Mr. Goforth had

25   applied for a job in the maintenance department in

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-14   Filed 11/15/21   Page 223 of 672   PageID #:
JA 0216
493

1   2017, you said you became aware in various reviews.  So
2   what I'm trying to understand is, more specifically
3   what reviews you're talking about.
4     A    Okay.  Let me -- post selection of supervisor, I
5   did have a conversation with OGC, and I've subsequently
6   had a sworn statement with the NRC.  Those -- that's
7   what I mean as reviews.
8     Q    Okay.  And would the OGC counsel that you talked
9   to have been Johnny Slater?
10    A    I don't recall.
11    Q    Was the subject that the OGC counsel you talked
12  to -- and I just want to know the subject, not any
13  advice; was the subject matter a complaint that
14  Mr. Goforth had made with -- about his job, not getting
15  that promotion?
16    A    Yes.
17    Q    Do you recall whether the complaint was with the
18  United States Office of Special Counsel?
19    A    I do not.
20    Q    Do you recall whether the complaint evolved into
21  a MSPB complaint?
22              MR. BERNIER:  Okay.  I'm going to object
23  here, Jim.  I think the more you're drilling down here,
24  the more you're getting into the content of
25  communications.  And to the extent you're getting into

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 224 of 672   PageID #:
JA 0217
494

1    the content of the communications, I'm going to

2    instruct my witness not to answer.

3                    MR. JOHNSON:  Okay.  Well, all -- I hope

4    we're on the same page on this.  All I'm trying to get

5    at is the subject of the communication which -- you

6    know, in a privilege log, what do we always have to

7    put?  We have to put who the communication was from and

8    to, the approximate time as best as can be determined

9    of the communication, and what the subject of the

10   communication was.  And so all I'm asking for is the

11   subject of the communication.  Was the subject of the

12   communication an OSC or MSPB complaint.

13                   MR. BERNIER:  Well, one suggestion --

14   and I think it may short circuit, you know, rather than

15   getting into the subject of the communication; maybe

16   you can just ask him, you know, whether he knew or had

17   knowledge of those things that you're, you're

18   identifying, and then I think that would steer clear of

19   the communications.

20   BY MR. JOHNSON:

21     Q    Have you ever heard of the MSPB?

22     A    No.  I don't recognize the acronym.  If you --

23   what does it stand for, I might --

24     Q    I wish I could tell you.

25                   MR. BERNIER:  I'll, I'll help here.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 225 of 672   PageID #:
JA 0218
495

1   It's Merit System Protection Board.

2   BY MR. JOHNSON:

3   Q    They're -- take it from the authority who's

4   probably defended many.  The Merit System Protection

5   Board -- and that is a civil service job protection

6   entity.

7         Do you recall whether there was a complaint by

8   Mr. Goforth that involved his not getting the job that

9   was other than any complaint with the NRC?

10   A    I don't recall that.

11   Q    And so can you give me the approximate time

12   sequence when these reviews that you're talking about

13   occurred?  And I'll narrow that down for you.

14         Did these reviews you're talking about occur

15   prior to Mr. Goforth's termination?

16   A    Yes.

17   Q    Can you give us an approximation from the time

18   of Mr. Goforth's termination -- which was the end of

19   November 2018 -- the amount of time that these reviews

20   occurred before that termination?  You know, was it a

21   month before?  Two months before?  Just your best

22   estimate of when those reviews occurred.

23              MS. LINDGREN:  Objection to form.

24              THE WITNESS:  So I misspoke.  The NRC

25   was after the termination.  The OGC was after the

1   non-selection prior to termination.

2   BY MR. JOHNSON:

3       Q    Okay.  And so the OGC reviews that you had with

4   the OGC, please give me an estimate of when those were

5   in relation to Mr. Goforth's termination in

6   November 2018.

7       A    You know, I -- I'd be spec -- I don't -- don't

8   really remember that.

9       Q    Were they before the -- were they before the

10  termination?

11      A    Yes.

12      Q    Okay.  Did you speak with anyone else at either

13  TVA or Day & Zimmermann about their having been the

14  subject of these reviews -- about whether they had

15  similar reviews?

16      A    No, I would -- have not.

17      Q    Did you have any discussion with Mr. White --

18  that is, Tony White, about whether he had been named in

19  any of these complaints?

20      A    I have -- no.  No, I have not.

21      Q    Any discussions with Tony White about these

22  complaints of any sort?

23      A    No.

24      Q    Any, any discussions with DeWarren Washington

25  about these complaints of any sort?

1    A    No.  No.  The complaints I'm referring to --
2    I'll answer this to clarify is the, the OGC and the
3    NRC.
4    Q    Right.  Well, are there any other complaints
5    that you did have discussions with DeWarren Washington?
6    A    No.
7    Q    Any other --
8    A    I'm clarifying my no, because didn't want to get
9    too, too loose with no.
10   Q    Sure.
11              MR. BERNIER:  I'd like to clarify one
12   thing, just so it doesn't sound like there's a new
13   complaint regarding OGC.
14              Jesse, do you mean the non-selection
15   case you referred to earlier when you said OGC?
16              THE WITNESS:  That is correct.
17              Thank you.
18   BY MR. JOHNSON:
19   Q    Okay.  Well, were there any other complaints
20   than that that you discussed with DeWarren Washington
21   regarding Mr. Goforth?
22   A    No.
23   Q    And let me just more generalize this.  That may
24   be helpful.  I'm going to ask you about a series of
25   people and whether you had any discussions of any

1   nature with these people about Mr. Goforth.  And I

2   would like for you to really, you know, think about

3   each of these names before you respond.  Really probe

4   yourself.  I know this took a while -- this occurred a

5   while back, but --

6        So my question is -- and this will be my

7   question for all these folks.  Do you have any

8   discussions with these people about Mr. Goforth at any

9   time in 2017 or 2018?

10        And the first one is Tony White.

11   A   Not to my knowledge.  No.

12   Q   Any discussions about Mr. Goforth in 2017/2018

13   with Paul Simmons?

14   A   The only thing that's -- that I'm hesitating for

15   is it would be something that I would say Hey, I have

16   an issue with OGC that I have to go resolve.  I don't

17   know if I would specifically say what it was, but I

18   would probably elevate that to Paul Simmons.

19   Q   And did -- do you recall anything Paul Simmons

20   said in response to your elevation of that to him?

21   A   No.  I don't remember the conversation, if I had

22   it, but Paul was never big into those details.

23   Q   All right.  Same question.  What communications

24   if any regarding Mr. Goforth did you have in 2017 and

25   2018 with Meschelle Augustin?

Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 229 of 672   PageID #:
JA 0222
499

1    A    None that I recall.

2    Q    What conversations about Mr. Goforth can you

3  recall that you had in 2017 or 2018 with DeWarren

4  Washington?

5    A    None that I can recall.

6    Q    What conversations did you have -- other than

7  you've already described to me in 2017, 2018 with

8  Mr. Goforth -- about Mr. Goforth with John Reeves?

9    A    Other than the email and with the ERB, I don't

10  recall any.

11    Q    What conversations have you had about

12  Mr. Goforth that took place in 2017 or 2018 with Dusty

13  Rhodes?

14    A    None that I recall.

15    Q    Do you recall Greg Whitehorn making a complaint

16  about his performance evaluations by Dusty Rhodes in

17  2018?

18    A    That -- yes.

19    Q    What do you recall about that?

20    A    Just that there was a complaint about the

21  performance evaluation.

22    Q    What if anything did Mr. Rhodes tell you about

23  the complaint?

24    A    That Greg was -- did not accept the performance

25  appraisal that -- the feedback on it.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1  Filed 11/15/21  Page 230 of 672  PageID #: 500
JA 01223

1    BY MR. JOHNSON:

2       Q    All right.  So did you have any conversations

3    with Mr. Hickman?

4       A    I did not.

5       Q    Any communications with Mr. Hickman?

6       A    I do communicate with Mr. Hickman, but I

7    don't -- did not communicate about Goforth.

8       Q    Okay.  Did Mr. Reeves tell you anything about

9    what Mr. Hickman had said about Goforth?

10                   MR. BERNIER:  Objection to form.

11                   THE WITNESS:  Did Bill Reeves -- or John

12   Reeves -- Bill Reeves, that was a football coach, I

13   think.

14                   Did John Reeves talk to me about his

15   conversation with Bill Hickman concerning Goforth?  Was

16   that the question?

17   BY MR. JOHNSON:

18      Q    Yes.

19      A    He did not.

20      Q    Do you recall whether one of the TVA attorneys

21   that you talked to about the non-selection was Ryan

22   Dreke?

23           I may not be saying his name right.

24      A    I don't recall who I talked to about the

25   non-selection.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12  Filed 11/15/21   Page 231 of 672   PageID #: 501
JA 0224

```
1                    MR. JOHNSON:  Okay.  All right.  That
2      may be all the questions I have.  Let me just take a
3      few minutes here.  Do you-all want to take five, and
4      then I'll likely be done?
5                    MR. BERNIER:  Sounds good.
6                    MS. LINDGREN:  Sounds good.
7               (Brief recess).
8                    MR. JOHNSON:  Are we ready to proceed?
9                    MR. BERNIER:  We are.
10                   MR. JOHNSON:  Mr. James, I want to thank
11     you very much for your attendance today, and I
12     appreciate your cooperation in answering the questions,
13     and I don't have any further questions for you, but the
14     other lawyers may.
15                   MR. BERNIER:  I've got a few follow-up.
16     But Hannah, do you have any before I go?
17                   MS. LINDGREN:  No.  Nothing from Day &
18     Zimmermann.
19                        EXAMINATION
20     BY MR. BERNIER:
21       Q    Okay.  Mr. James, thank you for your time.  This
22     will be very quick.
23            Earlier on in, in reference to the tritium
24     consolidation report, you likened it to a post-job
25     critique.  Did I hear that correctly?
```

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1 Filed 11/15/21   Page 232 of 672   PageID #:
JA 0225
502

1    A    Yes, sir.

2    Q    Is that kind of post-job critique something that

3    you typically do at TVA, or was it really unique?

4    A    Stand by.  I've got a lot of door slamming going

5    on here.  Let me get my door closed here.  I forgot to

6    close it.

7            (Brief pause).

8            MR. JOHNSON:  I'm going to object to

9    form on that question, Mike.

10           MR. BERNIER:  Sure.

11           THE WITNESS:  Okay.  I'm back.  If you

12   can redo the question.

13   BY MR. BERNIER:

14   Q    I can.  That kind of post-job critique that you

15   described earlier, is that a standard occurrence at

16   TVA, or is that something that you would never do?

17   A    No.  Those are standard for any major projects

18   including tritium, refueling outages, system outage

19   windows.  We, we definitely want to be critical of our

20   performance to improve for next, next time we perform.

21   Q    And I think you just answered my question, but

22   I'll ask it nonetheless.  What's the purpose of doing

23   such a critique?

24   A    To look for any gaps in performance, procedures,

25   scheduling, budgeting.  To really identify those so

1    that next time we lay a project out, a similar project,

2    we have better performance.

3        Q    Were you mad about any of the gaps that were

4    raised in the consolidation report you were shown

5    earlier?

6        A    No.  I was thankful.

7        Q    What do you mean by that?

8        A    I thought that report was a very detailed

9    report, very pinpointed gaps, to allow us to take

10   custody and the maintenance department to take concrete

11   actions to go close those gaps for next performance.

12       Q    So did you welcome it?

13       A    I did welcome it.

14                   MR. JOHNSON:  Just an objection to form.

15                   THE WITNESS:  Yes, I did.  I welcome all

16   critiques.  That's our -- that's the nuclear culture.

17   We are very self critical.  And we -- that's how we

18   always want to perform.  And I will say the quality of

19   that one was better than I'd seen in my own department,

20   so I was very happy with that critique.

21   BY MR. BERNIER:

22       Q    Okay.  Changing subjects here.  You were asked

23   about when you learned about Mr. Goforth's

24   non-selection case.  Did you learn about that, you

25   know, close to Mr. Goforth's termination, or was it

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 234 of 672   PageID #:
JA 0227
504

1    much earlier in time?

2     A     It was much earlier in time.

3     Q     Were you in your previous job when you learned

4    about it?

5     A     Yes.

6                    MR. BERNIER:  Okay.  All right.  I have

7    no further questions.  Thank you, Mr. James.

8                         RE-EXAMINATION

9    BY MR. JOHNSON:

10    Q     Mr. James, following up on that question.  Is it

11    unusual to get an evaluation of the length and detail

12    of the one that Mr. Goforth did that we've been

13    discussing?

14    A     No.

15    Q     Is it unusual to get one that is offered --

16    authored by a particular person and is a standalone

17    document of the length that that one was?

18    A     No.

19                    MR. JOHNSON:  All right.  That's all the

20    questions I have.

21                    MR. BERNIER:  All right.  Thank you,

22    Mr. James.  I think you're released.  You're free to go

23    about your day.  Thank you very much for your time.

24                    THE WITNESS:  Thanks everyone.  Have a

25    great weekend.

1           MR. JOHNSON:  Okay.  We'll see you.

2           (Deposition concluded at 12:34 p.m.)

3                       - - -

4                REPORTER'S CERTIFICATE

5      STATE OF TENNESSEE  )

6      COUNTY OF HAMILTON  )

7           I, Beth Ann Pell, Licensed Court

8  Reporter, do hereby certify that I reported in machine

9  shorthand the deposition of JESSE JAMES, called as a

10  witness in the above-styled cause; that the said

11  witness was duly sworn by me; that the foregoing pages,

12  numbered from 1 to 71 inclusive, were typed under my

13  personal supervision and constitutes a true record of

14  said deposition.

15           I further certify that I am not an

16  attorney or counsel of any of the parties, nor a

17  relative or employee of any attorney or counsel

18  connected with the action, nor financially interested

19  in the outcome of the action.

20           Witness my hand in the City of

21  Chattanooga, County of Hamilton, State of Tennessee,

22  this 25th day of October,

23

24           _____
            Beth Ann Pell, LCR# 267
            Licensed Court Reporter
25           Expiration:  06/30/2022

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
 2                      AT CHATTANOOGA
      _____
 3
    ROBERT M. GOFORTH,
 4
              Plaintiff,
 5
    vs.                              Case No: 1:20-cv-254
 6
    TENNESSEE VALLEY AUTHORITY
 7  and DAY & ZIMMERMANN NPS,
    INC.
 8
              Defendants.
 9
    _____
10
                  Chattanooga, Tennessee
11                  September 16, 2021

12            DEPOSITION OF JOHN M. RHODES
      _____
13
    APPEARANCES:
14
              FOR THE PLAINTIFF:
15
              JAMES M. JOHNSON, ESQ.
16            Attorney at Law
              620 Lindsay Street, Suite 210
17            Chattanooga, TN 37403
              (423)648-4093
18            jj@jamesmjohnsonatty.com

19                -and-

20            JUSTIN S. GILBERT, ESQ.
              Gilbert Law, PLC
21            100 W. MLK Blvd., Suite 500
              Chattanooga, TN 37402
22            (423)756-8203
              justin@schoolandworklaw.com
23

24

25
```

UA 0230

1    Counsel?

2    A.        I'm sure he did.  Mr. Goforth was very

3    detailed in those discussions, and mentioned it on

4    more than one occasion, but he -- he may have told me

5    that.  I don't remember those specific words, but,

6    yes, he did.  He did disclose that he had a pending

7    litigation against, I'm assuming, TVA.

8    Q.        Did he also mention the letters -- it's

9    called MSPB.  Did he mention the MSPB?

10   A.        Not at that time, no.

11   Q.        Do you know what the MSPB is?

12   A.        No.

13   Q.        Okay.  So did you discuss what Mr. Goforth

14   told you about his pending litigation with -- and let

15   me just break it down to various people for you.  Did

16   you discuss that in any way with Tony White?

17   A.        I don't -- I don't remember.  I mean, I -- I

18   don't know if there could have been discussions, you

19   know, just unrelated, but I don't remember

20   specifically.  I definitely didn't go discuss

21   anything with somebody related to Mr. Goforth's

22   pending -- what do you call it, litigation?

23   Q.        Yes, sir.

24   A.        Litigation, yeah.

25   Q.        I know you didn't initiate anything, but do

1   you recall any words that Tony White may have spoken

2   about Mr. Goforth having pending litigation?

3   A.      No, not that I can recall.

4   Q.      Do you recall Mr. White making any negative

5   remarks about Mr. Goforth?

6   A.      No.

7   Q.      All right.  Let me ask the same questions

8   about Jesse James.  Do you recall ever discussing

9   Mr. Goforth's pending litigation with Mr. James?

10  A.      No.

11  Q.      Do you recall anything negative that

12  Mr. James said about Mr. Goforth regarding the

13  litigation or any other matter?

14  A.      No.

15  Q.      Same questions about Paul Simmons.  I know

16  he's kind of above everybody's rank here, but did you

17  ever hear Mr. Simmons making any negative remarks

18  about Mr. Goforth?

19  A.      No.

20  Q.      Do you recall that Mr. Goforth applied for a

21  job with TVA in 2000 -- the range of latter part of

22  2017, 2018, for which -- for a job within your

23  department?

24  A.      Yes.  If that's the -- again, the time

25  frame -- if that's the position when he applied for

1   the page where it says "Number 9 gap."

2   A.      Okay.

3   Q.      If you're with me, just go ahead and read

4   what's written under Number 9 gap, and it goes on to

5   the next page.  Just go ahead and read that, and then

6   let me know when you're done.

7   A.      Oh, not out loud.  You want me to just

8   read --

9   Q.      Yes, sir.  Just read it to yourself.

10  A.      Okay.  I was like, okay.

11  Q.      And I'm not going to quiz you on any details

12  on that.  Just general familiarity.

13  A.      Okay.  I've read it.

14  Q.      Do you recall Mr. James discussing this

15  particular gap, as it's being called, with you?

16  A.      Yes, I do remember discussing issues when we

17  had tritium campaign issues because they were a part

18  of the maintenance department with the mechanical

19  maintenance group.  I don't remember the specific day

20  when we would have discussed this one, but...

21  Q.      Did you ever see the video that was made of

22  this event that it's referring to?

23  A.      I had seen a video.  I do remember one video

24  with the tritium campaign, but I don't know if it was

25  this one.

1   Q.    Well, the video depicted a TPBAR assembly,

2   with all the TPBARs on it, dropping and bending a

3   thimble plug on the assembly.  Does that help you to

4   remember whether you saw that video?

5            MR. MEALOR:  Object to form.

6            THE WITNESS:  I believe the video that

7   I -- the only video I really remember seeing was

8   whenever they damaged some rigging.  I remember

9   seeing that video floating around.

10   BY MR. JOHNSON:

11   Q.    Okay.  Well, do you recall this assessment

12   and evaluation being generally critical of the

13   performance of the TVA MMG workers who got assigned

14   to do tritium that hadn't done it before?

15   A.    I haven't read the assessment, and I can't

16   tell you whether it mainly points to that.

17   Q.    If we go on through the deposition I'm going

18   to be referring to this -- this particular document

19   as Mr. Goforth's evaluation, just as kind of a

20   shorthand to that in the future, but if the way I

21   refer to is ever confusing to you in my future

22   questions, let me know, but I'll call --

23   A.    Okay.

24   Q.    Thank you.

25   A.    And apologize if I'm yawning.  I'm on night

1                 REPORTER'S CERTIFICATE

2

3   STATE OF TENNESSEE

4   COUNTY OF HAMILTON

5        I, PAULA McGUIRK, RPR, LCR#789, CCR-GA, in

6   and for the State of Tennessee, do hereby certify

7   that the deposition of JOHN M. RHODES was reported by

8   me, and that the foregoing 42 pages of the transcript

9   is a true and accurate record to the best of my

10  knowledge, skills and ability.

11       I further certify that I am not related to

12  nor an employee of counsel or any of the parties to

13  the action, nor am I in any way financially

14  interested in the outcome of this case.

15       I further certify that I am duly licensed

16  by the Tennessee Board of Court Reporting, as

17  evidenced by the LCR number and expiration date

18  following my name below.

19       In witness whereof, I have hereunto set

20  my hand this 5th day of October, 2021.

21

22

23      PAULA McGUIRK, RPR, LCR, CCR-GA
        LCR#789 - Expires:  6/30/2022

24

25

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2              EASTERN DISTRICT OF TENNESSEE

3                   AT CHATTANOOGA

4    ------------------------------------------------
                                  )
5    ROBERT M. GOFORTH,           )
                                  )
6         Plaintiff,              )
                                  ) Case No.:1:20-cv-254
7    vs.                          )
                                  )
8    TENNESSEE VALLEY AUTHORITY   )
     and DAY & ZIMMERMANN NPS,    )
9    INC.,                        )
                                  )
10        Defendants.             )
     ------------------------------------------------
11                        Chattanooga, Tennessee
                          August 17, 2021
12

13         DEPOSITION OF WALTER LEE SANDERS

14   ------------------------------------------------

15   APPEARANCES:

16             FOR THE PLAINTIFF:

17             JAMES M. JOHNSON, ESQ.
               Attorney at Law
18             620 Lindsay Street, Su 210
               Chattanooga, TN 37403
19             (423) 648-4093
               jj@jamesmjohnsonatty.com
20
                    -and-
21
               JUSTIN S. GILBERT, ESQ.
22             Gilbert Law, PLC
               100 W. MLK Blvd., Su 500
23             Chattanooga, TN  37402
               (423) 756-8203
24             justin@schoolandworklaw.com

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-12  Filed 11/15/21  Page 243 of 672  PageID #:
UA 0236
513

1     A   If they lost access for that and if it was -- say

2   it was an instance of something with the NRC or -- any

3   reason at all, they have to go through the process of

4   regaining their access.  And that's, that's done.  I've

5   seen it done.  I've seen people lose access for cause and

6   go through some kind of rehabilitation.  Typically that's

7   more often with drugs or alcohol -- alcohol really

8   primarily, and then you can regain access.  But if you do

9   not have access to the plant, you can't work there.

10    Q   You can't work at the plant or -- well, tell me

11   about this.  And this maybe answers the question.

12   Explain the PADS system to us.

13    A   So, when you're in the system you either have a

14   green light or a red light for access, you know.  So if

15   you're at Watts Bar, you're in the PADS system, and you

16   have all your training up to date, you have -- there's

17   nothing on your record that would prevent it.

18       If you go into -- if you go and you're fired for

19   cause, then they would update PADS to say -- they would

20   say terminated -- and I'm not exactly sure on the

21   verbiage, but essentially what would happen is there

22   would be something in there outlining that you lost

23   access at Watts Bar.  I don't know that it would normally

24   go in there and say -- I'm almost certain it wouldn't

25   give a full event of it, you know, the description.  It

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-57   Filed 11/15/21   Page 244 of 672   PageID #:
514
UA 0237

1  would just say you lost access, most likely.

2  Q  Well, so you don't know for sure whether it says

3  lost access for cause or lost access for -- in

4  Mr. Goforth's case, allegedly falsifying a document?

5  Does it say that in the PADS?

6  A  I don't know exactly what it says, but I think, I

7  think that it does have some description of -- if you

8  falsify documents -- which is clearly a violation in

9  every place -- that you would be locked out.

10  Q  Okay.

11  A  I believe that would be the case.

12  Q  And who has access to PADS?

13  A  Just the site utilities, and maybe INPO.

14  Q  So basically, anyone who's running a nuclear power

15  plant in the United States would be able to look and see

16  that a person's clearance was revoked.  And I guess the

17  reason for that is so that before making any kind of

18  hiring decisions, they would know that?

19          MR. MEALOR:  Objection.

20  A  So when you say "anybody," it would be a very,

21  very small group of people.  There's -- probably on each

22  site there's probably two to three people that have

23  access into PADS that can look at all of that.

24          And so -- yeah.  And so the reason for that is you

25  don't want somebody who has broken the rules or -- and

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-13  Filed 11/15/21  Page 245 of 672  PageID #: 515
UA 0238

1  got terminated for cause that would be in -- something

2  that would prevent them from having access at another

3  site to come to your site and all of a sudden gain

4  access.  So, if their behavior was inappropriate

5  someplace else, you would know.

6       Now, you can go through and they can go and try to

7  get access at a new site, and if that new site wanted

8  that person because they felt that they were valuable

9  enough, then they could go through the process of trying

10 to reestablish plant access in some cases.  In some cases

11 the answer is always no.

12      So if you violate some rules with the NRC,

13 specifically if you fail a drug test, there are periods

14 of time where you are locked out from coming back into

15 nuclear power.  And those vary depending on the different

16 circumstances of what you may've...

17  Q   Let me just be clear about your answer.  My

18 question was really does every nuclear power plant site

19 have access to PADS, even though, as you've stated, it

20 would be a very small number of persons at each site, but

21 it's available to every site that's running a nuclear

22 power plant?

23           MR. MEALOR:  Objection.

24  A   So, every utility that has a plant.  I don't

25 know -- I can't speak to every site.  I would imagine

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-5  Filed 11/15/21  Page 246 of 672  PageID #:
JA 0239
516

1  every site.  But every utility has an organization that

2  oversees access to their facilities.

3      Q   Okay.  So, your answer is PADS would be available

4  to every utility that operates a nuclear power plant?

5      A   In the United States.

6      Q   In the United States.

7      A   That's correct.

8      Q   Got it.

9          So, let me show you this.  And it's Document 18.

10 I think this is just showing some of what you have

11 already told us.

12         This is as of June of 2017.  Is that within the

13 framework of time that you came to Watts Bar?

14     A   Yes.

15     Q   So would this be accurate, what it states there,

16 that Paul Simmons was the VP for Watts Bar Nuclear Plant,

17 which you've already testified to, but those folks above

18 that, two of those positions were vacant and one was held

19 by Jennifer Affholder?  But she's only --

20     A   She is executive assistant.

21     Q   Right.  So, did somebody eventually get that job

22 as senior vice president of operations?

23     A   Oh, yeah.  Yes.

24     Q   Who was it?

25     A   Well -- so this was '17.  So, I think -- I

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-2   Filed 11/15/21   Page 247 of 672   PageID #: 517
UA 0240

1    wouldn't be able to answer for sure.  I don't remember

2    who took the job before or after this.

3        Q    That's fine.  We don't need to probe any further

4    on that.

5            Look at the second page of it then.

6        A    Okay.

7        Q    So, that page shows you, right?

8        A    It does.

9        Q    And this is as of November 2, 2018.  And it shows

10   you as director of plant support.  And that's, according

11   to your testimony, I think the only position that you

12   held there at Watts Bar when you came over?

13       A    Other than when I was there from -- I was in a

14   corporate role.  But yes, this is my only direct spot on

15   the Watts Bar org chart.

16       Q    Okay.  And you've described to us what your duties

17   were in that role?

18       A    Yes.

19       Q    And so you reported directly to Paul Simmons?

20       A    That is correct.

21       Q    So what was your frequency of interaction --

22           Well, before we do that, let's mark this one as

23   15.

24           (Exhibit 15 was marked for identification.)

25   BY MR. JOHNSON:

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 56-12   Filed 11/15/21   Page 248 of 672   PageID #: 518
JA-0241

1    Q   So what was the frequency of your interaction with

2    Mr. Simmons during 2017 and '18 while you and he were

3    both at the plant?

4         And maybe I should clarify first.  Are you still

5    there, in that role?

6    A   No.  I retired about two and a half years ago.

7    Q   Oh, I see.  What would've been the date of your

8    retirement?  That might stick in your mind.

9    A   It does.  I think it was April 1st, '18?  '19?

10   I'm trying to figure out -- I've been out two and a half

11   years.

12   Q   That would be two and half years.

13   A   '19, yeah.  April '19.

14   Q   Okay.  So, during that time period, between when

15   you took on that role at Watts Bar and when you retired,

16   what was your frequency of interaction with Mr. Simmons?

17              MR. MEALOR:  Objection.

18   A   It would depend.  I mean, you know, if we were

19   both on site, then I would see him every day.  If we

20   weren't on site, then I may not see him.  But we had

21   frequent and steady interactions.

22   Q   Got it.  This may be a difficult question to

23   answer.  But sort of what was the day like for you and

24   Paul Simmons?  I mean, what was -- what were y'all doing

25   up there at the plant --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-2   Filed 11/15/21   Page 249 of 672   PageID #:
519
JA 0242

1  things that you were talking about in your role as

2  support person, and I guess the role -- the corporate

3  role that you had involved with Watts Bar when they were

4  having these issues.  I want to get into some

5  discussion --

6      A   Sure.

7      Q   -- of that, because that's what I think has

8  pertinence perhaps to this case.

9      A   Okay.

10     Q   So, this is Document 27.  Take a look at that.

11 And it's a long document, but it's one I'm guessing

12 you're familiar with.  So if you can just identify

13 whether this is a document you're familiar with, that

14 would be helpful.

15     A   Okay.  (Reviewing document.)  Yes, I am familiar

16 with the confirmatory order.

17     Q   Okay.  And so that order, which is formally called

18 EA-17-022, is a confirmatory order issued by the NRC,

19 correct?

20     A   That is correct.

21     Q   And so we're going to just use a few pages from

22 this, so try to follow me here.  If you would look at the

23 second page, please, sir.

24     A   Sure.

25     Q   It says that there was a previously issued

1   confirmatory order, EA-09-009, dated December 22, 2009;

2   is that correct?

3       A    It does say that.

4       Q    Are you familiar with EA-09?

5       A    I am familiar in that -- I do know some of what

6   happened.  I didn't, I didn't deal in the response

7   necessarily.  And at that point I was much, I was much

8   more junior in the organization, so I didn't have any

9   involvement at the time when this was issued.  But I am

10  familiar based on why we ended up with this, and the

11  compounding effect of the '09 order and what that meant

12  to this.

13      Q    I see.  So, you were aware at least that the '09

14  order regarded the same kind of issues as the '17 order,

15  and the '17 order was a follow-up to that?

16      A    That's right.

17      Q    Okay.  So, let me just read for you in that

18  indented paragraph there, which kind of summarizes -- is

19  a summarization of the '09 order.

20           It says:  "Confirmatory order modifying license,

21  dated December 22, 2009, states, in part, that by no

22  later than 90 calendar days after the issuance of this

23  confirmatory order, TVA shall implement a process to

24  review proposed licensee adverse employment action at

25  TVA's nuclear plants before actions are taken to

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-2   Filed 11/15/21   Page 251 of 672   PageID #:
JA 0244
521

1  determine whether the proposed action comports with

2  employee protection regulations."

3      Does that conform with what your understanding of

4  the '09 was about, as is recited here in the '07 -- the

5  '17 order?

6  A   So, I would say definitely for the '17 order.  I

7  think the '09 order, I think that TVA probably did not

8  get that right and fully implemented; otherwise, we

9  would've not been sitting with this new order in '17.

10     So, in '09, the way I understand it is that there

11 were some people that were terminated and that the NRC

12 came back and said they believed they were terminated

13 based on raising some concerns, and so the TVA did

14 retaliate, is the way I understand it from that piece.

15     And so in the '17 order, we had to go through and

16 make sure that we protected people's rights to raise

17 issues in a safety consciousness work environment space

18 without having a chilling effect based on that.  And that

19 was our primary responsibility in response to this order.

20 Q   So the '17 order was the second time that this had

21 occurred to TVA regarding making sure that adverse

22 employment actions were not being taken for reporting

23 safety issues?

24 A   Correct.

25 Q   And when it talks about employee protection

1    regulations there at the end of the part that I just read

2    to you, that would refer, would it not, to the protection

3    regulations in 10 CFR 50.7?  I imagine that's a number

4    you're familiar with?

5             MR. MEALOR:  Objection.

6     A   I am familiar with it in that -- I would have to

7    go back and look.  But yes, in the sense that it is

8    protections just as a normal ability for workers to raise

9    any kind of safety concern without fear of retaliation.

10     Q   Sure.  And Section 50.7, is that something people

11    kind of know, well, that's the NRC reg that says that we

12    can't retaliate against people who --

13     A   When you say --

14     Q   -- report --

15     A   -- "people" would know that, I would say probably

16    not a lot of people.  I would think people that were

17    specifically in this work might know that.  But the

18    average worker --

19     Q   Oh, sure.

20     A   -- by far would not have any idea what that means.

21     Q   But somebody like you and somebody like

22    Mr. Simmons would know what that is?

23     A   For me I would say yes, and I would assume he

24    would also.

25     Q   Okay.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-15   Filed 11/15/21   Page 253 of 672   PageID #: 523
JA 0246

1      A    And to be clear, the NRC said to us that -- the

2   second time around, what they told us is that we failed

3   to implement a process to verify these people were

4   protected in the '09 order.  So the way I remember it or

5   the way I understood it in the '09, they said, you know,

6   we'll do some training and we'll do this, but we didn't

7   implement a process that the NRC felt like met all the

8   wickets and it had all the things in there in order to

9   prevent that, by their -- what their internal

10  understanding of what would happen versus what actually

11  happened.

12     Q    And did not the cause of that issue arising, again

13  for NRC, wasn't it prompted by other employees who had

14  made complaints, that they found to have valid complaints

15  about that?

16         MR. LANTIS:  Objection to form.

17     A    So, I, I -- honestly, I don't know that I could

18  say that.  What I would say is I think that the NRC, with

19  Watts Bar 2 coming on and with all the things that went

20  on with that, just the general work environment is what

21  ended up leading to this.

22     Q    Okay.  Well, in any case, let's look at page 3.

23  Well, let me ask this first.  If it didn't come to NRC's

24  attention, the -- let's call it noncompliance with their,

25  NRC's, understanding of the '09 confirmatory order, if

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 56-17 Filed 11/15/21   Page 254 of 672   PageID #:
JA 0247
524

1    laid off because the work was no longer needed.  And what

2    started happening was that employees started making

3    complaints that you would typically see through their --

4    to their supervisor, "Hey, this ladder's not this, or

5    this is not that, or I don't -- you know, I think we're

6    making a mistake here."  And then instead -- or write a

7    CR, a condition report, which we use.  That's how we

8    capture any kind of deficiency that we see.  Almost any

9    deficiency you see would go into this program so you can

10   address it and you'd have record tracking.

11          And so what we, at Watts Bar, saw, prior to me,

12   was that people -- instead of using all those avenues,

13   they were just calling the NRC and they were saying

14   things.  And the NRC was, like, "Why are they calling us

15   about this?  This is something that should be easily

16   handled."  And that number was just incredibly high,

17   compared to the rest of the industry.

18          So, two things were in there.  You know, I believe

19   one is nobody had started up a unit, so we didn't know

20   what that looked like.  And since the last time anybody

21   had done any real work like that, the whole culture

22   around how we treat workers had changed for the better,

23   how we are more open for the better.  And at the time,

24   the station had a site vice president that his culture

25   was a lot different than the culture up an hour north of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-18   Filed 11/15/21   Page 255 of 672   PageID #:
JA 0248
525

1   you just clarified, passing judgement on the validity of

2   these complaints, you were just saying there was a ton of

3   them and there needed to be a process to deal with it?

4       A   There was a process.  What I was saying --

5       Q   A better process.

6       A   What I was saying -- I think the process was fine.

7   The process wasn't being used --

8       Q   I see.

9       A   -- always.  A lot of things were bypassed, instead

10  of talking to your supervisor, talking to their boss,

11  writing a CR, bringing it up in a thing.  So this

12  became -- and that's why -- that's what brought the NRC

13  back to Watts Bar and that's what really got this going.

14  Because the NRC was having to answer questions as to why

15  are there -- what's going on at Watts Bar, why are there

16  so many complaints.  And so they were also, you know --

17  they were getting pressure from their bosses.

18      Q   Well, I mean, at least the NRC found in this

19  order, did they not, that Tennessee -- TVA had failed to

20  comply with the '09 confirmatory order?

21      A   By implementing the process.  Absolutely.

22      Q   Yeah.  And so let's look at that on page 3, the

23  last paragraph on page 3, where it starts with "Contrary

24  to the above..."

25      A   Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-2  Filed 11/15/21  Page 256 of 672  PageID #:
526
JA 0249

1    Q   Would you agree with me that it says as

2  follows: "Contrary to the above, from November 2014 to

3  August 2016, TVA failed to comply with confirmatory

4  order" -- the '09 order, "and that WBN failed to

5  implement a process to review proposed licensee adverse

6  employment actions at WBN before actions were taken to

7  determine whether the proposed action comports with

8  employee protection regulations."

9       That, that was the finding of the NRC, correct?

10   A   That was the finding from the NRC.

11   Q   Okay.  And that that finding, if you read

12  subparagraph 2 there, that that also applied to

13  significant adverse employment actions taken by

14  contractors at the --

15   A   No.

16   Q   -- nuclear plant?

17   A   I would disagree.  What it says is, the second

18  part, that it failed to implement a similar process for

19  contractors.  So, it didn't say that it resulted in -- it

20  failed to implement a process to review --

21   Q   Right.

22   A   -- for significant action -- adverse actions.  So,

23  termination and/or suspension.

24   Q   Well, essentially, 1 and 2 are exactly the same,

25  except that 2 applies to contractors and 1 applies

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 257 of 672   PageID #:
527
JA 0250

1  directly to TVA.  Would --

2              MR. MEALOR:  Objection.

3    Q   -- that be correct, of these two subparagraphs?

4    A   So, yes, 1 applies to TVA employees and 2 --

5  number 2 applies to contractors.  The number 2 piece is

6  for adverse actions for contractors.

7         The definition for an employee was expanded.  If

8  you move an employee from a job location, if you do an

9  involuntary RIF.  So there's more if you were a TVA

10 employee that would be applicable as a full-time employee

11 versus a contractor.  So there's a few more things that

12 went into the 1.

13   Q   And you're reading between the lines here.

14 Literally what it says is that it "failed to implement a

15 process to review significant adverse employment action

16 by contractors performing services in TVA's nuclear

17 plants."

18   A   That is right.

19   Q   Okay.  So evidently -- on page 4, if you look

20 under subheading Roman numeral III on page 4.

21   A   Yes.

22   Q   Evidently, this was mediated in June of '17

23 between NRC and TVA.  Do you recall that?

24   A   I do.

25   Q   Were you -- did you attend that mediation?

1   room.

2           (Mr. Mealor exits deposition.)

3           (Off-the-record for technical adjustments.)

4   BY MR. JOHNSON:

5   Q   So, the second sentence of that paragraph that we

6   were reading about, that the TVA and NRC agreed that it

7   was a violation of regulatory environments, the next

8   sentence says, "The NRC and TVA agree that the violation

9   is a significant matter."  Is that correct?

10  A   It is.

11  Q   And just in your view as you were going through

12  these things and as you look at it now and reflect on it,

13  would you agree that those are accurate statements, that

14  it was a significant matter and it needed to be dealt

15  with?

16  A   Yes.

17  Q   And that was your job, in part?

18          MR. BERNIER:  Object to form.

19  A   Correct.

20  Q   So you were kind of called in to sort of try to

21  help fix this stuff?

22  A   Well, I was called in primarily, initially, to

23  help fix the performance issues and the struggles that

24  they were having.  And then this became part of my

25  purview when I became the plant support director.  So

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1  Filed 11/15/21   Page 259 of 672   PageID #:
529
UA 0252

1    Q   Yeah.  4 -- evidently I misread this.  Page 9

2  does not directly follow page 4, evidently.  So, let's

3  look at the -- you have the full form order?

4    A   I have everything you gave me.

5    Q   Let me take a look at that for a second.

6         MR. LANTIS:  Respectfully, Jim, I'm a little

7  confused about where we're trying to go right now.

8         MR. JOHNSON:  Yeah.  Well, that's -- I am

9  too.

10 BY MR. JOHNSON:

11   Q   So, page 5 -- let's see if we can look at this

12 together a little bit.

13       Page 5 lists the actions that page 4 said were the

14 actions that TVA -- the corrective actions that TVA is

15 going to take, right?

16   A   Correct.

17   Q   So, take a look at page 5, and let me know if this

18 is kind of the birth of the Executive Review Board

19 process.

20   A   Well, so, I would say it's not necessarily the

21 birth of the Executive Review Board.  We had something

22 previously, what we called a consensus call, where

23 anytime anybody was going to terminate an employee from a

24 site, all the other site vice presidents would have a

25 phone call with the senior VP of operations.  And I know

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-53  Filed 11/15/21  Page 260 of 672  PageID #:
530
JA 0253

1  this because this was my job for years, where we would

2  bring in and we would talk about -- which was the belief

3  it was meeting the '09 order.

4       So they -- what they were doing is they were

5  having these phone calls with human resources, ECP

6  potentially, the site VPs, and the supervisor of the

7  person being terminated or suspended.  And they would --

8  and that's how the '09 was implemented -- or attempted to

9  be implemented at the time.

10      And so when the order came out -- when this order

11 came out and said your process is not all in place like

12 we intended it to be in place, that's when these things

13 came in.  And then we created a -- instead of a consensus

14 call, we created -- or we transitioned to an ERB.

15 Q   Okay.  Let me kind of put it this way.  And excuse

16 the analogy, but I might as well continue it since I went

17 down that path.

18      So the consensus --

19 A   Call.

20 Q   -- that you talked about was kind of the embryonic

21 stage, which ended up turning into the full-blown ERB,

22 which was then mandated by the NRC in this confirmatory

23 order?

24 A   That's correct.  Or we agreed to it in the

25 confirmatory.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-17  Filed 11/15/21  Page 261 of 672  PageID #:
531
UA 0254

1    Q   Right.

2    A   That's correct.

3    Q   Okay.

4           MR. BERNIER:  Object to form on that

5    "embryonic" question.

6           MR. JOHNSON:  Just because it's a poor

7    metaphor, or because you really object?  I like that

8    metaphor.  I'm sorry, you're going to have to live with

9    it, but maybe the judge won't.

10   BY MR. JOHNSON:

11   Q   This is talking about hiring some of these

12   consultants to help with the process, to make sure that

13   they were then doing the ERB process properly.  That's --

14   none of that's you, right?

15   A   I did not hire -- yeah, the whole -- this whole

16   thing was put together by -- they had a whole team that

17   came together to write the procedure and do all those,

18   but I did not hire those people directly.

19   Q   Okay.

20   A   I did work with the executive adviser.  He would

21   come, he would review our records and he would ask

22   questions, he would sit in on the meetings and -- to

23   ensure that we were in compliance with the order.  So, I

24   worked with him quite a bit.

25   Q   Okay.  So, continuing on, on page 6 we have

1 paragraph 3, do we not, that says: "Based on TVA's

2 review of the incident," whatever that is, as we've

3 already discussed, "and NRC's concerns with respect to

4 precluding recurrence of the violation, TVA agrees to

5 implement the following corrective actions."

6 So there are corrective actions listed there of

7 communication requirements. Let's not go in those in

8 detail.

9 Correct?

10 A That is correct. It does say that.

11 Q And so on. And let's get to the paragraph that I

12 was trying to get to on page 9 earlier, which falls

13 under --

14 A Training.

15 Q -- Training. And so down at the bottom of the

16 page it says: "How to properly implement the adverse

17 employment action process, including at a minimum

18 discussion of the following."

19 A That's correct.

20 Q And there's two types of things that are supposed

21 to be made sure -- or trained on. And one is that

22 "Disciplinary action is not taken as a result of an

23 employee's engagement in activities protected by CFR" --

24 A 50.7.

25 Q -- 50.7."

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 263 of 672   PageID #:
533
UA 0256

1    A    Correct.

2    Q    And then there's this thing about the safety

3  conscious work environment.  Right?  "... if the action

4  could be perceived as negatively impacting an individual

5  or organizational aspect of the safety conscious" --

6              THE REPORTER:  You lost me there.

7              MR. JOHNSON:  Sorry.  Let me go slower.

8    Q    Number 2 is:  "Determination if the action could

9  be perceived as negatively impacting any individual or

10  organizational aspect of Safety Conscious Work

11  Environment, cause a potential chilling effect or be

12  perceived as retaliatory, independent of disciplinary

13  legitimacy."

14          So that's something that was to be --

15    A    Trained on.

16    Q    Trained on.  Okay.

17          And the training was to be given, if you look a

18  little further down at number 2 there, to "all working

19  status nuclear business group supervisory employees,

20  contractor supervisory employees involved in

21  nuclear-related work activities..."  Correct?

22    A    That is correct.

23    Q    Okay.  Now, you talked about a chilling effect

24  earlier in your testimony.  Did that come out -- a

25  chilling effect letter.  Tell us when that came out in

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-57  Filed 11/15/21  Page 264 of 672  PageID #:
UA 0257
534

1  to review proposed actions, such as demotion, denial of a

2  promotion, an unfavorable performance appraisal, transfer

3  to a less desirable job, and denial of access."

4     Q   So denial of access was one of the things that the

5  NRC cited TVA for at this point at Watts Bar.  And let's

6  clarify that.

7         If you go back to the first page, this was

8  "Follow-up for NRC Confirmatory Order EA-17 and Chilled

9  Work Environment Letter EA-16-061," right?

10    A   Correct.

11    Q   So this involved Watts Bar?  This letter involved

12 Watts Bar?

13    A   That is correct.

14    Q   Okay.  Oh, it says the chilled work environment

15 letter was a 16.  Does that mean it happened in 2016?

16    A   No.  I believe -- I don't, I don't know.

17    Q   Well, so far, I mean, every one we've looked at,

18 like EA-9, was sent in 2009; EA-17 was in 2017.  Have you

19 ever seen one of these that the number doesn't match the

20 year in which it happened?

21    A   I don't know.  You're asking me to speculate, and

22 I'm --

23    Q   Yeah.  I'm just trying to get back to our other

24 question about when the chilled work environment letter

25 was issued.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-53  Filed 11/15/21  Page 265 of 672  PageID #: 535
JA 0258

1    A   Yeah.  It would've come in that time frame.  That

2    certainly would've been reasonable for me to believe,

3    yes.

4    Q   So it's kind of contemporaneous with the

5    development of the confirmatory order that was finally

6    issued in '17?

7              MR. BERNIER:  Jim, if I can help, the chilled

8    work environment letter was in March of 2016.

9              MR. JOHNSON:  Okay.  Thank you.

10   Q   So, among the things that they just listed in the

11   part that you read on page 5, was that there was a

12   failure to provide guidance for the implementation of a

13   process to review proposed adverse actions on denial of

14   access.  That's one of the things that they put, right?

15   A   That is one of the things, yes.

16   Q   And this was that the Executive Review Board, ERB,

17   procedure failed to do that, right?  As you read that,

18   that's what it says?

19             MR. BERNIER:  Object to form.

20   Q   Well, let's read, beginning with "Specifically..."

21   Go ahead, you read it.

22   A   So, it is not that the ERB failed to do that.  The

23   ERB is a function of the requirements from the procedure.

24   So the procedure failed to include all of that in there

25   to the NRC's desire from the original '09 order.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-5  Filed 11/15/21  Page 266 of 672  PageID #:
536
JA 1259

1          So, specifically, the procedure did not have these

2    things in there that would ensure that the ERB completed

3    those reviews associated with these functions.

4    Q    So the ERB was -- the NRC found that the ERB

5    should have provided ERB provisions for the denial of

6    access?

7    A    Not quite.  So, the NRC found that TVA failed to

8    have their procedures fully developed to ensure that the

9    ERB reviewed all these things.  So, the ERB was not at

10   fault, because ERB did not have that.

11   Q    Right.

12   A    It was the process that was not updated.  Not that

13   the actions taken weren't correct, it was just that the

14   process didn't fully meet what they were asking for.

15   Q    Understood.  But isn't this saying that the ER --

16   the failure is that the ERB was not reviewing denials of

17   access?

18          MR. BERNIER:  Object to the form.

19   A    No, that's not what it's saying.  What it's saying

20   specifically -- it says specifically, the procedure, as

21   it lists here -- which the title of the procedure is

22   Adverse Employment Action and the Executive Review Board,

23   those two failed to provide procedural guidance for the

24   process.

25          The ERB would not -- the ERB in itself would never

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-1   Filed 11/15/21   Page 267 of 672   PageID #:
537
JA 0260

1  have anything to do as far as developing a procedure.

2  They would be executing the procedure that was written.

3      Q   Okay.  So isn't this saying that the procedure

4  should be rewritten to have ERB --

5      A   To include those.

6      Q   -- review denial of access?

7      A   That's right.

8      Q   Okay.

9              MR. BERNIER:  Object to the form.

10     Q   Okay.  Well, let's look at it further.  Let's look

11  at page 8.  So, consistent with, I think, what you just

12  testified to, I'm reading halfway down, "The only adverse

13  actions..."  Do you see where I'm starting there?  A

14  little ways down into that --

15     A   You're on page 8?

16     Q   Yes, sir.

17     A   Which paragraph?

18     Q   The first non-italicized paragraph.

19     A   Okay.  So we're where again?

20     Q   "The only adverse actions..."  That's where I'm

21  reading.  I'm just getting you on the same page.

22     A   Yes.

23     Q   "The only adverse actions for which the procedure

24  requires a review include: suspensions (one or more days

25  off without pay), terminations for cause, involuntary

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-4  Filed 11/15/21  Page 268 of 672  PageID #:
538
JA 0261

1 reduction in force, no-fault terminations of employment."

2      So what they mean is those are the only things

3 that the ERB, as presently constituted at this time,

4 reviewed?

5      A    That is -- correct.  That's what it says.

6      Q    Okay.  And it says:  "These four adverse actions

7 are subject to an ERB review.  However, demotions, denial

8 of a promotion, an unfavorable performance appraisal,

9 transfer to a less desirable job, and denial of access

10 are not required to be reviewed."

11      And so then we go down to the bottom, and the last

12 sentence in that block says:  "Therefore, since this

13 procedure revision does not require reviews of personnel

14 actions defined as adverse action, it is not in

15 compliance with the '09 confirmatory order and thus is a

16 failure to ensure that the current CO requirements

17 continue to be met."

18      So I'm just trying to establish what I think

19 you've already testified to, that it clearly does say in

20 this that the ERB should henceforth review denials of

21 access?

22      A    That's correct.

23           MR. BERNIER:  Objection to form.

24      Q    And let's look at the next page, on page 9.  And

25 in that block there is a subparagraph called Severity.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-52   Filed 11/15/21   Page 269 of 672   PageID #:
JA 0262
539

1    A   Okay.

2    Q   And it says there, does it not, that "The NRC

3  determined this violation constituted a more than minor

4  traditional enforcement violation associated with failure

5  to implement the requirements of EA-17."

6    A   That's right.

7    Q   All right.

8    A   And it says that -- we didn't fail to do it, they

9  just said the procedure didn't say that.

10   Q   Right.  And now they wanted you to start doing it.

11   A   That's right.  The procedure.  Right.

12   Q   All right.  Now, this is interesting.  Look at

13  Meeting Summary at the bottom.

14   A   Okay.

15   Q   This -- read those two little paragraphs for me

16  there under Meeting Summary.

17   A   "On September 21, 2018, the inspector presented

18  the inspection results to Mr. Paul Simmons, site vice

19  president, and other members of the licensee staff.  The

20  inspector confirmed that all proprietary information

21  reviewed during the inspection was returned and that none

22  of the potential report input discussed was considered

23  proprietary.

24       "The inspector conducted additional briefings with

25  your staff to the potential findings on November 2, 2018

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-53   Filed 11/15/21   Page 270 of 672   PageID #:
UA 0263
540

1   and November 9, 2018.  On November 28, 2018, the

2   inspector presented the final inspection results to

3   Mr. Paul Simmons, the site vice president, and other

4   members of the licensee staff."

5       Q   So, November 28, '18 is also the date of this

6   letter, is it not?

7       A   I would imagine.  Yes.

8       Q   So it looks as if -- like you say, there was

9   probably a lot of talking back and forth about who was

10  going to be in it and who wasn't.  But the actual letter

11  was put in the hands of Paul Simmons on --

12      A   On November 28.

13      Q   -- November 28th.

14      A   That's correct.

15      Q   And there was -- and "other members of the

16  licensee staff."  Were you present for that?

17      A   Yeah, I'm sure I was.

18          I failed to mention -- you asked me earlier some

19  of my responsibilities.  Licensing actually worked for me

20  also in the organization.  So yeah, I would've almost

21  certainly been present for that.  My -- I would imagine,

22  if I went back, that the entire senior leadership team

23  would've been present at the meeting.  I would've had

24  interactions with the NRC during this review.  They

25  would've been, you know, on site for -- I believe it was

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-5 Filed 11/15/21  Page 271 of 672  PageID #:
541
UA 0264

1   two weeks, two to three weeks they were on site doing

2   these reviews.

3       Q   Okay.  I'm going to show you -- we're looking at

4   28 now.

5               THE REPORTER:  Was that document marked, sir?

6               MR. JOHNSON:  Oh.  No.  We need to mark it.

7               (Exhibit 17 was marked for identification.)

8   BY MR. JOHNSON:

9       Q   Take a look at these documents, what will be the

10  next exhibit, 18.  I don't think you're -- you may or may

11  not have seen those before, but tell me whether you have.

12              MR. BERNIER:  Jim, what document number is

13  this again?

14              MR. JOHNSON:  28.  It's the access denials to

15  Goforth.  It's the original denial of December 7th and

16  then the denial on appeal of January-something.

17      A   January 18th.  I have not seen these documents.

18      Q   Okay.

19      A   I don't remember seeing them.

20      Q   Well, does it appear from those documents as if

21  Mr. Goforth's access was denied to him on December the

22  7th?

23              MR. BERNIER:  Objection to form.

24      A   Yes, it does appear that it was denied on December

25  7th.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 272 of 672   PageID #:
542
JA 0265

1    Q    And does it say anything about cause?

2    A    Yeah.  "Falsifying nuclear records" is the basis.

3    Q    And the appeal is dated when?

4    A    January 18th, for falsifying documents.  The

5    decision was upheld.

6    Q    Okay.  So, both of these were done after the

7    November 28th letter and meeting in Mr. Simmons' office

8    that you attended, right?

9    A    Correct.

10   Q    Okay.

11   A    Well, at the station.  I don't know where the

12   meeting was, if it was in his office or where.

13   Q    I see.  It could've been at corporate or could've

14   been --

15   A    It could've been -- it was probably at Watts Bar,

16   but it wasn't in his office.  It would've been in a

17   meeting room somewhere.

18   Q    I see.  All right.

19            MR. JOHNSON:  So, let's go ahead and mark

20   this one.

21            (Exhibit 18 was marked for identification.)

22   BY MR. JOHNSON:

23   Q    So, was Mr. Goforth given an ERB review for the

24   denial of his access?

25            MR. BERNIER:  Objection to form.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 273 of 672   PageID #:
JA 0266
543

1  A   Mr. Goforth did receive an ERB.  Absolutely.

2  Q   He received an ERB on his termination, correct?

3  A   Within that ERB -- so, I'm not sure how familiar

4  you are with ERBs.  But an ERB does not make a decision

5  whether or not to terminate an employee or not.  That

6  decision has already been made when the process brings

7  the information to the ERB.

8  Q   I'm understanding that, but I'm not asking --

9  A   So at the ERB, when the discussion was made that

10 the individual was going to be terminated, then that also

11 includes denial of access.

12      So, those two things do not exist in several

13 worlds.  We would never fire -- terminate somebody for

14 falsifying records and then not terminate access.  Those

15 are automatic.  They're -- I have never heard of a case

16 where somebody had falsified nuclear records, that was

17 validated and proved to be true, they were terminated and

18 yet they kept their access.

19 Q   Let me go back to my question.

20 A   Okay.

21 Q   Was Mr. Goforth given an ERB review for the denial

22 of his access on or after the termination of his access?

23      MR. BERNIER:  Objection to form.

24 A   I don't want to get twisted around here.  But I

25 want to make it really clear that when he was terminated

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-57   Filed 11/15/21   Page 274 of 672   PageID #:
JA 0267
544

1    and he had the ERB, that discussion -- and that includes
2    the denial of access.

3        So, the NRC's letter that says, "Hey, your
4    procedure does not -- we want it to be bulkier or have
5    more detail," that did not preclude those things from
6    happening.  It just said that they weren't specifically
7    called out.

8        And in the case -- in that chilled work
9    environment letter, it specifically says, "While these
10   things are not in there, we found no evidence that this
11   has not happened."  So it happened the whole time.  The
12   procedure just didn't specifically say, you know, "is
13   this, is this ERB for denial of access," those other
14   things that they called out.

15       So, in their letter, the chilled work environment
16   letter that you handed me, it said "While we specifically
17   didn't find any of these things, these things need to be
18   included in your procedure."

19       And so when we terminated -- so, like I said, I
20   worked on the consensus calls, starting back in 2000 -- I
21   don't know -- '11 time frame maybe, in that time frame,
22   for a couple of years.  And every time that somebody was
23   terminated, that was also the understanding is that they
24   had lost access, and what does that implication mean, and
25   so forth, around that.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-3   Filed 11/15/21   Page 275 of 672   PageID #:
545
UA 0268

1          So, we did not have another ERB after Mr. Goforth

2   was terminated and after the chilled work environment,

3   because the ERB had covered that.  And also, in the

4   chilled work environment letter it probably says you have

5   60 or 90 days to implement these and to make sure these

6   things are added into your process.

7          So there would've been almost no instance in a

8   process where on something that happened mid-November

9   would've been fully implemented in December or early

10  January.  Not to say -- it would've been rare, you know.

11  It wouldn't have been immediately.

12     Q   So are you saying that if it were formally

13  implemented, then it should have provided for an ERB

14  review of the access?

15             MR. BERNIER:  Objection to form.

16             MR. LANTIS:  Objection to form.

17     A   No.  What I'm saying is that the ERB would've done

18  that in the -- when they went through the process of the

19  original termination.

20     Q   Okay.  I'm going to show you the final signed ERB

21  proceedings, and I'm going to ask you to show me in there

22  where it says that this includes a denial of his

23  access --

24     A   Okay.

25     Q   -- or whether Mr. Goforth was noticed in any way

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-12 Filed 11/15/21  Page 276 of 672  PageID #: 546
JA 0269

1    that he might lose his access over this.

2      A   Okay. Well, he would've not seen these forms.

3    So, he would not have been notified with these forms. He

4    would've been notified with the forms you just handed me,

5    that here's your denial of access. That's how, that's

6    how an individual is notified.

7      Q   But he was notified that your access has been

8    denied, not that his access could be denied and there was

9    a process for that, right, on December 7th?

10      A   On December 7th? I'm sorry, let's -- we got a lot

11    of dates floating around here.

12      Q   Well, that was what I handed you, which was his

13    denial of access.

14      A   Okay. Yeah. So --

15      Q   And it said, "Your access is denied."

16      A   That's correct.

17      Q   It didn't say, "Hey, you know, there's a process

18    here. We may deny your access. We're giving you notice

19    of that."

20      He -- so show me where there's a notice of that in

21    the ERB proceedings or that the ERB proceeding said

22    anything about denial of access.

23          MR. LANTIS: What is that document you just

24    provided him, Jim?

25          MR. JOHNSON: I'm sorry. It's --

Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL Document 35-1 Filed 11/15/21 Page 277 of 672 PageID #: 547
UA 0270

1       THE WITNESS:  26.

2       MR. JOHNSON:  -- Document 26.  And we can put

3  both of these in evidence.

4    A   So, I'm not sure exactly what you're asking me.

5  You want me to read on here where Mr. Goforth would've

6  been given information that his access was denied?

7  Because that's not --

8    Q   Anything about access.  Just tell me if there's

9  anything about his access in -- those are the ERB

10  proceedings as given to us by TVA.

11    A   Yeah.  On page 1, termination for cause.  That's

12  the, that's the first conversation about denial of

13  access.  If you terminate somebody for cause -- so, I

14  can't -- you can't ask me to say don't just read here.

15  You've got -- there's a part of this that is what's your

16  responsibility, what do you have to do when these

17  different things happen.

18       And so a termination for cause would've elicited a

19  response that you have a procedure that says access

20  removal, that somebody would've called and said this

21  person's been terminated for cause, or we need to suspend

22  their access based on a myriad of other reasons.  And

23  then that's when he would've been notified that his

24  access had been removed -- terminated.

25    Q   Understood.  Tell me whether anywhere in that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-27  Filed 11/15/21  Page 278 of 672  PageID #:
548
JA 0271

1   document it mentions access.  I mean, specifically that
2   word, "denial of access" or "access," not just implicit
3   from some other words.
4              MR. BERNIER:  Objection to form.
5       A   I don't know that it says that in here.  I mean,
6   if you want, we can take the time and I can read all of
7   it.  But I, I -- there would be no basis for me to know
8   that that's in here.
9       Q   Okay.  Well, would you -- if I tell you that I've
10  looked at it and it doesn't mention access anywhere in
11  there, would you accept that?
12      A   I would not be surprised.  I would accept that.
13      Q   Read it then.
14      A   I would accept it then.  I mean, I'm not doubting
15  you that it doesn't say that access is not called out
16  here.  That's not what I'm saying.  What I'm saying is
17  just because it's not specifically called out here --
18  just as the NRC said, we found no instances where it
19  wasn't -- the right things were not done as a result of
20  termination of access or suspension.  That's what I would
21  say is --
22      Q   So is it fair to say that your testimony is that
23  access is not mentioned in those ERB documents that are
24  in your hands?
25      A   Not directly.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-1 Filed 11/15/21  Page 279 of 672  PageID #:
UA 0272
549

1 would -- that those -- that that would result in access

2 being suspended, at least until all the fact-finding was

3 completed and then the final results.

4      Did we have an ERB -- which, once again, didn't --

5 doesn't have any impact on whether or not Mr. Goforth was

6 terminated or whether or not Mr. Goforth lost his access.

7 That's not what the ERB did.  The ERB reviewed the fact

8 that Mr. Goforth was terminated, and what would that

9 impact be on the rest of the workforce.

10      This isn't about whether or not his termination

11 was right or wrong, and it isn't about whether or not his

12 access should be removed or not.  This process is about

13 was he involved in any protected activities, and would

14 those -- would that involvement -- is there any way that

15 that can be linked to why he was terminated.  If yes or

16 no, then you have to go down a path of that.  And then

17 how does that -- the action of terminating him, what is

18 the perception that that would create on the workforce,

19 especially had he been involved in some kind of protected

20 activity in the past.

21      MR. JOHNSON:  All right.  Let's mark this one

22 as Exhibit 19.

23      (Exhibit 19 was marked for identification.)

24      MR. JOHNSON:  I have a request from

25 Mr. Goforth for a break.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1  Filed 11/15/21   Page 280 of 672   PageID #:
550
UA 0273

1   that I called the NRC and said 'they forced me to do

2   this,'" and then TVA was trying to terminate him for

3   doing that, that would be a whole -- that would be

4   terminating for his protected activity.

5        If somebody said, "We've got him now, because he

6   involved himself in this protected activity, and now we

7   caught him and now we can fire him," that would, that

8   would -- that wouldn't stand.

9        So when we have these meetings -- and OGC is on

10  there and HR is in the room, and everybody like that, and

11  we have this conversation about protected activity, the

12  next question is is there any way that we can perceive

13  these two things tied together?  And if so, we need to

14  understand that and resolve that before we move forward.

15  Q   Are you finished?  Are you finished with your

16  answer?

17  A   I am.

18  Q   Thank you.

19      All right.  Let's go to Staff Augmentation

20  Contractor.

21  A   Where are you at?

22  Q   Would you read that one?  It's right under

23  Retaliation, a few lines down.

24  A   Staff Augmentation Contractor.  "Contractors who

25  supplement the TVA workforce and are under the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1   Filed 11/15/21   Page 281 of 672   PageID #:
JA 0274
551

1  supervision of a TVA employee."

2     Q   Is that your understanding of what a staff

3  augmentation contractor is for purposes of the ERB?

4     A   Yes.

5     Q   Okay.

6             MR. JOHNSON:  Okay.  Let's mark this one as

7  the next one.

8             (Exhibit 20 was marked for identification.)

9  BY MR. JOHNSON:

10    Q   We're looking at Document 21 now.  Would you take

11 a look at that one and let me know if you can identify

12 that for us?

13    A   This looks like part of the ERB package and SCWE

14 mitigation plan.

15            THE REPORTER:  And what?

16            MR. JOHNSON:  SCWE is S-C-W-E, all capitals.

17            THE REPORTER:  Thank you.

18            MR. JOHNSON:  Safety conscious work

19 environment.

20            THE REPORTER:  Well, of course.  That's what

21 I was going to say.

22            THE WITNESS:  How'd you not know that

23 already?

24            MR. JOHNSON:  That's the first time I've

25 heard it referred to as "Ski-wee" (phonetic).  So, I

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-2  Filed 11/15/21  Page 282 of 672  PageID #: 552
UA-0275

1    Q   So, can you tell me the dates for the other

2    signatories on the Executive -- the other members of the

3    Executive Review Board?

4    A   They range anywhere from 11/26 to 11 -- that would

5    appear to be 11/29 of 2018.

6    Q   Who were the members of that Executive Review

7    Board?

8    A   Meshelle Augustin, it shows myself, DeWarren

9    Washington, Ryan Dreke, and then Paul Simmons.

10   Q   So, just go through those and tell me what date

11   they signed.

12   A   This one doesn't have a signature for Meshelle --

13   Q   There's another page.

14   A   Okay.  So hers is on November 26, 2018, same date

15   as mine.  DeWarren Washington signed it and Ryan Dreke

16   both signed it on November 27th, and then Paul Simmons

17   signed it on November 29th.

18   Q   Was there an actual date when the ERB convened

19   together in one place at one time?

20   A   I would imagine so.  I mean...

21   Q   Do you recall whether all the members of the ERB

22   met regarding Mr. Goforth, and they met together at the

23   same place and same time?

24   A   There's a quorum requirement in that procedure

25   that we looked at earlier that would say who absolutely

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 283 of 672   PageID #: 553
JA 0276

1  has to be there and who's optional in that case.  And

2  based on these being signed and based on this being two

3  and a half years ago, I would believe that these were the

4  people that were in attendance, that met for the meeting.

5       I did a lot of ERBs, and Mr. Goforth was not

6  unique in me doing that.  So, calling his out

7  specifically would be very hard for me to know.  But I

8  would presume -- assume that all these people were

9  involved in the ERB.

10  Q   Well, they were involved in the ERB, but you have

11  no recollection of there being a meeting of these people

12  together at one place, at one time, to make decisions on

13  Mr. Goforth?

14  A   I cannot imagine that we were not all together for

15  this meeting.  Because the way the ERBs are managed is we

16  all have to be at the meeting -- the quorum requirements

17  have to be met in order for the ERB to convene.

18  Q   What are the quorum requirements?

19  A   It's in the procedure.  It's two and a half years

20  ago.  I would be guessing or going off my memory.

21  Q   So, did anyone attend the meeting except for the

22  people that are listed there on the -- that you just read

23  to me, the ones who signed?

24  A   If you would've asked me who was at the meeting, I

25  wouldn't have been able to tell you.  That's the reason I

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 254-17   Filed 11/15/21   Page 284 of 672   PageID #:
UA 0277
554

1  can't tell you who wasn't at the meeting -- or who else
2  would've been, I mean, outside of the quorum
3  requirements.  Two and a half years ago, and we did
4  these -- this was not an uncommon practice.  So to
5  differentiate between Mr. Goforth and somebody else would
6  be impossible for me to know.

7      Q   So do you recall whether any witnesses came
8  forward for that proceeding?

9      A   I do not.  If we can go back and look at the
10 calendar invitations, then we could see who was invited
11 to the meeting, potentially, or if anybody else came, or
12 if there's other documentation.  But it's certainly
13 possible that -- for instance, Kim Hulvey, who was --
14 when this email was initially sent out, while I was out
15 she was acting on my behalf.  I may've asked her to come
16 to the meeting just so she would've had exposure to it,
17 or I would've maybe asked someone else in my organization
18 to come so that they would understand how these meetings
19 go so if I wasn't there, somebody else could attend.

20         It's possible that additional -- well, it's
21 actually probably most likely that somebody from DZ,
22 potentially, besides DeWarren, was at the meeting;
23 somebody that DeWarren --

24     Q   My question was, do you know if anyone else was
25 there.  And I think your answer was you don't know, you

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-3   Filed 11/15/21   Page 285 of 672   PageID #:
JA 0278
555

1   can't remember.  Is that correct?

2       A   I think that's what I said.

3       Q   Okay.  Thank you.  I'm not asking you to

4   speculate.  I'm just -- if you don't remember, you don't

5   remember, just tell me that you don't remember.

6       A   I said -- okay.  I thought I said that right

7   upfront, but I'll make it --

8       Q   Well, you did, but then you kept going.

9       A   Well, if that's all you wanted, you could've said

10  "That all I need," too.

11      Q   All right.

12      A   We can help each other out here.

13      Q   That's what I'll do.

14          All right.  So let's look at page 1 of 5 of the

15  final thing that you signed, and then at the draft that

16  was sent to you by DeWarren Washington several weeks

17  before everyone signed it.

18      A   So, there's several different forms in here.  If

19  you'd be clear which form you want to talk to.

20      Q   Well, you're looking at --

21      A   I'm looking at two different ones.

22      Q   The first page of the one that was signed.  That's

23  Exhibit 19.

24      A   Okay.

25      Q   And now I'm asking you to look at the same page in

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-19   Filed 11/15/21   Page 286 of 672   PageID #:
556
JA-0279

1  the draft from DeWarren Washington, which is page 1 of 5.

2      A    Okay.

3      Q    So, on DeWarren's original draft, DeWarren

4  Washington's, it says task manager was his employee

5  title.  Am I correct?

6      A    It does say that.

7      Q    Okay.  And on the final version it says he's a

8  "boilermaker maker," correct?

9      A    It does say that.

10     Q    Do you recall why that correction was made?  Was

11 that at any particular person's insistence?

12     A    No.  No idea.

13     Q    Okay.  So do you know what Mr. Goforth's job --

14 let me put it this way.  My questions now are with

15 reference to what you knew at the time that the board

16 meeting took place.  Okay?

17     A    Okay.

18     Q    That's the page we're on here, is what was in your

19 mind at the time of the board meeting.

20          So, did you know at the time what Mr. Goforth's

21 job was?

22     A    I knew that Mr. Goforth worked for DZ and he was a

23 boilermaker.  That's, that's all I can remember.

24     Q    Did you know that he was a task manager for the

25 tritium project at...

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1   Filed 11/15/21   Page 287 of 672   PageID #:
UA-0280
557

1    A    I did not know that.  I do not believe I knew

2  that.

3              MR. BERNIER:  Object to the form.

4    Q    Okay.  So you did not know that at the time of the

5  board meeting?

6    A    I don't believe so.

7    Q    Okay.  Did you know he was earning close to

8  $200,000 a year?  I don't suppose you knew that if you

9  didn't know his job at the time.

10   A    I know what I made.

11   Q    Okay.  You can share that if you want to, but you

12  don't have to.

13       All right.  So, as far as you knew, he was a

14  boilermaker who was working in the outage at the time

15  that the board met?

16   A    He worked for DZ.

17   Q    Okay.

18   A    And beyond that -- I know he was supporting the

19  outage in this specific case.

20   Q    Okay.  And let's look then at the second page of

21  that.

22            MR. LANTIS:  Second page of what?  We're

23  looking at two exhibits.

24   A    To be clear --

25   Q    We're on page 2 of 5.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-12 Filed 11/15/21  Page 288 of 672  PageID #:
JA 1281
558

1      A   To be clear, when you ask me to look back at these

2   draft documents, I will tell you that I wouldn't consider

3   them to be of much value, because they hadn't been signed

4   and they hadn't been vetted at this point.

5      Q   Right.

6      A   And they also could've been -- I just would say

7   that just because they're checked here doesn't mean a

8   whole lot to me.  The signed ones are what matters.

9      Q   Understood.

10     A   Okay.

11     Q   But I'm just asking you to compare them.

12     A   Sure.

13     Q   That's all we're trying to do here.  Okay?

14     A   Sure.

15     Q   Literally compare them.

16     A   All right.

17     Q   We're not passing judgment on them.  All right?

18         So on the draft that was prepared by DeWarren

19  Washington, please look in paragraph 1, to the fourth

20  answer down.  And that is checked "Yes," correct?

21     A   On which document?  The signed one or not the

22  signed one?

23     Q   The not signed one.

24     A   The not signed one.  It is checked "Yes," that is

25  correct.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5  Filed 11/15/21   Page 289 of 672   PageID #:
559
JA 0282

1    Q    Okay.  And what's the question?  Read the overall
2    question in number 1.  "To your knowledge..."
3    A    "To your knowledge, has the individual engaged in
4    potentially protected activity within the last 12
5    months?"
6    Q    "Contacted the legal department?  Yes."  Correct?
7    A    In the unsigned version, yes.
8    Q    Right.  And that's the version that DeWarren
9    Washington submitted to you and others on the date of
10   this email?
11   A    That's the one -- no.  That's the one he submitted
12   to, I would imagine, either his HR person or his admin,
13   to Rebecca --
14   Q    Okay.  Fair enough.  So he submitted it to Rebecca
15   Rogers, right?
16   A    That's correct.
17   Q    But you were copied on it?
18   A    I was copied on it.
19   Q    And --
20   A    And I was on vacation.
21   Q    Okay.  And so then let's look at, in DeWarren
22   Washington's draft, the unsigned one, the next thing down
23   from "Contacted the legal department," what does that
24   say?
25   A    "Contacted NRC, Department of Labor, or other

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-3  Filed 11/15/21  Page 290 of 672  PageID #:
560
JA 0283

1  external agency?"

2     Q  And what's that checked?

3     A  "Yes."

4     Q  Okay.  Now, on the legal department and the NRC,

5  let's look at the signed version and see how those are

6  checked.

7     A  For the legal and the NRC, they were checked "No."

8     Q  Okay.  And again, what we're doing is comparing

9  here.  That's all we're doing.  Look at the next one

10  down.  And it said "Contacted the Employee Concerns

11  Program."  In the draft by DeWarren Washington, unsigned,

12  what does it say for that?

13     A  It says "Yes."

14     Q  And what does it say in the final version that you

15  signed?

16     A  "Yes."

17      "Contacted the Employee Concerns Program?  Yes."

18     Q  Okay.  And so then the next one is "Participated

19  in an investigation, other than the one currently at

20  issue, by providing a written or signed statement?"  And

21  in the unsigned DeWarren Washington draft, what does it

22  say?

23     A  It says "Yes."

24     Q  What does it say in the draft that you signed?

25     A  "No."

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1  Filed 11/15/21   Page 291 of 672   PageID #: 561
JA-0284

1    Q   What explanation, if any, do you have for why

2   those changes -- well, let me back up a step.

3       DeWarren Washington was, was he not, the reporting

4   DZ manager of these events who then attended the ERB

5   meeting?

6    A   Yes.

7    Q   Okay.  And so you were relying upon, were you not,

8   for the underlying facts of the termination and any

9   protected activity, on what Mr. Washington essentially

10   was telling you?  At least at first blush, that's what

11   you look at?

12        MR. BERNIER:  Object to form.

13    A   So, DeWarren would've been responsible for filling

14   out this section.  So are you asking me is that what I

15   expected, is him to fill these out?

16    Q   Yes.

17    A   Yes.

18    Q   And he was the person on the ground that was

19   supervising Mr. Goforth, correct?

20    A   I do not know who Mr. Goforth's supervisor was.

21    Q   Oh, you don't know?

22    A   I mean, I know DeWarren was the site DZ manager.

23    Q   Yes.

24    A   I don't know if Mr. Goforth reported directly to

25   him or if he had another supervisor in between him.  That

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 292 of 672   PageID #:
JA 0285
562

1  I don't know.

2    Q   Do you remember whether DeWarren attended the ERB

3  meeting?

4    A   I would -- I'm sure he did.  If I -- I mean, am I

5  going to, you know, hand you my phone if I'm wrong?  No.

6  But somebody from DZ attended that meeting, that's in

7  management.  That's what I would say.

8    Q   Okay.  You don't remember, but that would be --

9    A   DeWarren --

10   Q   -- your expectation?

11   A   He signed it.  So, based on his signature on the

12  ERB, I'm saying he was there.  And if he wasn't, I would

13  be really gobsmacked.

14   Q   Well, he signed it on a different day than you

15  signed it.

16   A   That's because we -- that's right.  Because --

17  nobody signs it that day.  Because I go through and I

18  make sure all the paperwork's right; we wait until we

19  talk with legal again and make sure there's nothing

20  there; and then I go around and I have a conversation

21  with HR, "Here's any resolution or any questions or

22  everything's in order," and then they sign it.  And then

23  that's how we go through and -- to make sure that all the

24  paperwork is correct before we turn it over.

25   Q   Did any information ever come to you that he had

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 135-1   Filed 11/15/21   Page 293 of 672   PageID #:
563
JA 0286

1    written an evaluation of the tritium program that was

2    critical of safety issues in the tritium program in

3    October of 2017?  Did anybody ever tell you that?  Or --

4              MR. BERNIER:  Objection to form.

5    Q    Or did that come before the board in any way?

6    A    Did the October of 2017 concerns that Mr. Goforth

7    raised about tritium come to the ERB board?  I don't

8    remember.

9    Q    Okay.  Did the fact that those concerns were put

10   in a CR by Howard Cusick -- do you know who Howard Cusick

11   is?

12   A    Somebody -- so, if it was put into a CR, I would

13   most likely have read it.  You know, I reviewed -- almost

14   every day reviewed all the CRs that were written.

15   Q    I see.

16   A    And then if a CR was of significance, like it

17   called out something significant or we had to address it

18   or it required more action, then I may've known more

19   about that.  So, depending on the level that it rose to,

20   if that makes sense.

21   Q    Okay.  But do you recall, as a member of the board

22   at that time, whether the CR incorporating Mr. Goforth's

23   evaluation came before the board, the fact that that CR

24   was out there?

25   A    I'm looking into documents now to see if I can see

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 150-37  Filed 11/15/21  Page 294 of 672  PageID #:
JA 0287
564

1  anything written or related to it.  (Reviewing document.)

2       Yeah, I don't remember anything.  Yeah, I don't

3  even remember necessarily who was all there.  So I don't

4  know that we had a conversation about Mr. Goforth at the

5  time.  Doesn't mean we didn't have one.  I just don't

6  remember.

7    Q    Okay.  Fair enough.

8       Do you recall whether or not anything came before

9  the board at that time that he had contacted Ruth Fordham

10 at employee concerns saying that he was being targeted

11 for failure, by DeWarren Washington?

12   A    No.

13        MR. BERNIER:  Objection to form.

14   A    Contrary to that, what was brought up by Ruth was

15 that they had casual contact and he had no concerns --

16 that he filed no concern with her on August 30th of '18.

17   Q    Okay.  So you heard that, but did she describe for

18 you that she -- he had said that he was being targeted

19 for failure, by Washington?  Do you recall that?

20        MR. BERNIER:  Objection to form.

21   A    I do not.

22   Q    Okay.  So, reading down, on the unsigned draft by

23 Mr. Washington, to number 3, on page 2 of 5, it says:

24 "Has the individual raised concerns regarding harassment,

25 intimidation, discrimination, or retaliation or hostile

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-4  Filed 11/15/21  Page 295 of 672  PageID #:
565
JA 0288

1 work environment?" And Mr. Washington didn't check
2 either of those boxes, right?
3     A   That's correct.
4     Q   And then in the final version, how is that box
5 handled?
6     A   It's checked "No."
7     Q   Okay. So what information can you tell me about
8 that would have caused the changes and additions between
9 the first draft and the final draft? What information
10 came before the board to do that?
11            MR. BERNIER: Objection to form.
12     A   What information -- so, nothing came before the
13 board to request these changes. I, I -- if this would've
14 come to the board like this, with all these marked "Yes,"
15 and DeWarren believed that Mr. Goforth had been involved
16 or been associated with all these protected activities,
17 or if in this number 3 bullet where "employee has ongoing
18 litigation," the ERB would not have directed anybody to
19 remove that. Contrary, we would've had a lot more
20 conversation -- or further conversation around --
21 especially with OGC, around the legal; we would've talked
22 with NRC, or anything like that. So if any of this
23 would've come to the ERB, it would've not been "You need
24 to go change this."
25           So, my -- what I would imagine happened is that

Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL Document 50 Filed 11/15/21 Page 296 of 672 PageID #:
JA 0289
566

1  DeWarren filled out this pretty quickly, or may've copied
2  an old one and didn't delete something out of it and just
3  kept adding to his baseline, you know, forms, where he
4  just changed the information.  And then it wasn't
5  until -- you know, until I sign off on it and say, yeah,
6  this is, you know -- this all meets the standard for
7  going to the board, it wouldn't have gone to anybody
8  other than -- for the ERB consumption until it had all
9  been fleshed out.
10        Like, it wouldn't have gone to the ERB unless --
11 unless somebody had an oversight with boxes not checked
12 or something, "if yes, then explain" -- not to say that
13 didn't happen.  But the goal was for all the forms to be
14 filled out and go to the board at the same time.
15    Q   I think what you're doing here is hypothesizing on
16 how this might -- these changes might have happened, but
17 you have no --
18    A   Well, that's what you asked me.
19    Q   -- memory --
20    A   You asked me why do I think they changed; or if
21 they did change why would the board -- I think your words
22 were "Would the board -- what would the ERB have done to
23 have them changed?"  So that's what I was answering.
24    Q   All right.  And is it fair to say that your answer
25 is you don't remember, you don't know, but you're giving

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-1 Filed 11/15/21   Page 297 of 672   PageID #:
JA 0290
567

1    me reasons of what you think might have happened?

2            MR. LANTIS:  Objection to the question or to

3    the characterization.

4            You may answer.

5    A    Yeah, I -- no.  This didn't come -- this didn't

6    come to me like this for me to sign off on and then it

7    show up changed to this either at the ERB or by me.  What

8    this was, what I would imagine, would've been DeWarren's

9    initial thing, and then he would've went back and said

10   "past 12 months?"  Well, maybe that wasn't in the 12

11   months, so that changes "yes" to "no;" or this was

12   somebody else who was previously left in there.

13           So, as far as do I think this is what showed up

14   and I asked him to change it?  Did not happen that way.

15   Do I think it came to ERB with all these things checked

16   as "Yes," and then at the ERB we got there and said,

17   "Well, let's not talk about that, so let's just change it

18   to no?"

19           The only way -- if it would've come to ERB with

20   all these checked "Yes" and then we -- then it would've

21   later been checked "No," had it been determined -- or

22   somebody realized, "Oh, that's -- you didn't read the

23   rest of it, this is only in a 12-month period," would've

24   been the case that it would've been potentially changed.

25           So, no, I don't believe that's the case.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1  Filed 11/15/21  Page 298 of 672  PageID #:
568
JA 0291

1    Q    All right.  What -- tell me what you have any

2    specific memory of -- not telling me what might've

3    happened or could've happened or likely happened.  What

4    you have any specific memory of for why the boxes were

5    checked the way they were checked in the final version.

6    A    Because this is what represented the most accurate

7    truth.  I mean --

8    Q    How, how -- and that's what I'm asking you, is

9    what was it that made you believe -- that you heard, that

10   made you believe that instead of what Mr. Washington had

11   put --

12   A    Well, because when we go through these questions,

13   when we go to the ERB I would -- I'd turn to --

14   Q    I'm not asking what would happen.  I'm --

15   A    I'm telling you what --

16   Q    -- asking what --

17   A    -- did happen.

18   Q    -- did happen.

19   A    So, I'm telling you what did happen.  Because --

20   Q    I thought you couldn't remember --

21   A    So I'm telling you --

22   Q    -- what happened at the ERB.

23   A    -- what did happen --

24        THE REPORTER:  Wait a minute.

25   Q    Didn't you -- did you earlier --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 55-12   Filed 11/15/21   Page 299 of 672   PageID #:
UA 0292
569

1    A    Wait --

2    Q    -- testify you --

3    A    Can I finish?  Because you told me I could finish

4    my -- answer the question, so that's what I'm going to

5    do.  Because --

6    Q    What was the question?

7    A    The question was, what did or didn't happen.  So

8    did happen -- because it happened at every ERB that I

9    ran, was we would go through and they'd say, "Is there a

10   condition report?"  And then I would go -- because I had

11   people that worked for me that would pull that report,

12   and we would say "Here's the information.  There was one

13   report or there wasn't a report."

14        And then I would say, "Legal, do you have any

15   reason to believe that they contacted the legal

16   department?"  And legal would say "We've gone through our

17   records and we have not found anything."  We've talked to

18   HR.  For all of these.

19        I'd go to licensing and the NRC, and then we would

20   open it up and we'll say, "Does anybody else have any

21   reason to believe that any of these things -- any of

22   these people may have been contacted by Mr. Goforth

23   within the last 12 months that hasn't spoken.

24        So if somebody knew, that wasn't in my licensing

25   department but they knew that Mr. Goforth potentially did

Case 1:20-cv-00254-TRM-SKL  Document 250-5  Filed 11/15/21  Page 300 of 672  PageID #:
570
JA 0293

1  contact the NRC, then Paul Simmons might say, "Actually,

2  I know this," or I might say "I know this, because I had

3  a conversation with that person."

4       So that I do know happened, factually.

5   Q   Well, every one of your facts that were recited

6  use the word "would" in my --

7   A   Did.  So let's say "did."

8   Q   Okay.  So your testimony that you could not

9  remember what happened at the ERB meeting, your memory

10  has improved since you gave me that answer?

11  A   No, sir.  So, let's, let's kind of like not be so

12  cheeky about it.  I can't tell you specifically the

13  conversation, who started the conversation and who

14  finished the conversation, but what I can tell you after

15  reviewing this -- that I haven't looked at in two and a

16  half years -- there are certain processes and certain

17  orders that I followed that if I had to pick this up

18  again today I would step back in and start doing it the

19  exact same way, because I did it the same way every time

20  because I didn't want to get it wrong, because I didn't

21  want to be sitting here one day, and because it was

22  affecting people's livelihood.  And anytime somebody was

23  terminated or anything was held against them, that was an

24  incredibly crucial point for me.  And so I didn't take it

25  lightly and I still don't.  That's why I'm sitting here.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-1   Filed 11/15/21   Page 301 of 672   PageID #:
UA 0294
571

1    Q   All right.  Let's look at the final version since

2   that's the one you signed, on page 3 of 5.  And it says

3   "Witness:  Derek Pair."  Can you tell me what Derek Pair

4   contributed to the ERB decision, or not?

5    A   He contributed -- "not" is what I would say.

6   Because the ERB -- this witness is in relationship to the

7   investigation for termination.  So that's what this

8   witness is.

9        The ERB is not deciding whether or not to

10   terminate an employee or not.  The ERB is deciding are

11   they involved in protected activities, and how do we

12   communicate that to the workforce that someone who may've

13   been involved in a protected activity it could be

14   perceived as an infringement on that right to do so.

15    Q   How do you determine whether the perception of a

16   termination might affect the safety conscious work

17   environment without making a determination that the

18   termination was validly supported?

19             MR. BERNIER:  Objection to form.

20             MR. LANTIS:  I'm going to join in the

21   objection.

22    A   So the validation of termination is outside of the

23   ERB and it's done by process and it's done by all kinds

24   of experts and people who are paid to make those

25   decisions, including legal, HR, all those folks and their

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-5   Filed 11/15/21   Page 302 of 672   PageID #: 5/2
UA 0295

1  years of experience.

2      So when a determination comes to the ERB, like

3  some things in life, you have to understand or believe

4  that those processes were followed and they were true.

5  So that's what you do.  So, this person is being

6  terminated for a valid reason.  That, that is a fact.  So

7  once it's showed up at ERB, this individual was

8  terminated for a valid reason.

9      Now, how do you ensure that that doesn't lead to

10  deterioration in safety conscious work environment or

11  create a chilled work environment?  You do that by a lot

12  of things that were in the order: through training,

13  teaching people how to communicate that.  There's all

14  kinds of things inside of some of these documents that

15  talk about what you do afterward, you go to the workforce

16  and you have these.

17      We did what's called pulsing surveys, where you

18  would send out things that asked questions to gauge the

19  work environment in specific groups.  Different people in

20  the organization would go in and ask, you know -- spend

21  time in the shops and things like that, asking questions

22  and doing check-ins.  It's not an easy science, you know,

23  to do that, because you've got to get -- people have to

24  trust you and you have to be available to them.  But it's

25  what it was.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-5 Filed 11/15/21  Page 303 of 672  PageID #:
573
JA 0296

1    Q   Okay.  So, I understand there's a process of

2  developing the safety conscious work environment

3  mitigation plan.  And that's what you were just referring

4  to, correct?

5    A   Uh-huh.  That's right.

6    Q   Okay.  And so as I'm understanding you, the ERB

7  takes for granted that the termination was valid and then

8  proceeds to see if any effect from that is being properly

9  mitigated?

10   A   It's ensuring that any effect from a termination

11 is properly mitigated.

12   Q   Okay.

13   A   And then making corrections if there seems to be

14 gaps in that.

15   Q   So the ERB simply accepts as valid -- that was the

16 first part of my question -- that the termination was

17 valid?

18   A   That's correct.

19   Q   Okay.

20        MR. BERNIER:  Objection to form.

21   Q   So, once again -- and again, this is pure

22 comparison.  We're not passing judgment on it, but let's

23 just get it in the record.  On page 4 of 5 of the draft

24 by DeWarren, please read paragraph 14, the A, B and C.

25   A   "A. Contacted" -- off of which form?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-57  Filed 11/15/21  Page 304 of 672  PageID #: 574
UA 0297

1    Q  Off the one that I was directing you to, which is

2  the unsigned one --

3    A  The unsigned version.

4    Q  -- by DeWarren --

5    A  14 A is "Contacted legal?"  The checkmark is

6  "Yes."  B is "Contacted external regulatory agency?"

7  That checkmark is "Yes."  C is "Contacted Employee

8  Concerns?," and that is checked "Yes."

9    Q  Okay.  And how were those checked in the final

10  draft that was signed?

11    A  For 14 A and B they were checked "No," and 14 C it

12  was checked "Yes."

13    Q  Okay.  Thank you.

14    A  So you asked the question earlier if I would've

15  had any reason to believe that Mr. Goforth was being

16  targeted.  If you look on page 5 of 5 of the signed

17  version, there's a question on there that -- 17, "Does

18  the individual believe that the proposed action is a

19  result of the individual engaging in a protected

20  activity?"  That was checked "Yes."  And then

21  specifically, "The individual has had contact with site

22  personnel stating he is being targeted."

23     So, as a result of that statement we would've gone

24  through and had a lot of discussion about how do we

25  mitigate that, conversation around that -- employees, to

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-53  Filed 11/15/21   Page 305 of 672   PageID #:
575
JA 0298

1  ensure that we're not going to prevent them -- or not
2  hinder their desire to come forth with concerns.  So we
3  would've absolutely talked about this during the meeting.
4      Q   Okay.  And you've described that again as "we
5  would have" --
6      A   We did.
7      Q   -- "done these things" --
8      A   So I'm saying --
9      Q   -- and now you're saying --
10     A   -- we would have --
11     Q   -- you did?
12     A   I'm saying, as before, we went through every
13  question in every ERB, and if there was an off answer,
14  meaning not a routine answer that you would hope for,
15  nothing was -- no protected activity, you wouldn't have
16  discussed it any further.  But if you would've got
17  there -- when you did get there and it said yes, this was
18  a protected activity, potential problem, yes, then
19  there's a thing that says yes, explain.  And then we
20  would've discussed that, why that was explained -- what
21  that meant, and then what we did with that.
22          So, during this ERB we would've had conversation
23  around why Mr. Goforth was -- felt like he was being
24  targeted.
25     Q   Okay.  Let's look at the contractor factfinding

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-5  Filed 11/15/21  Page 306 of 672  PageID #:
JA 0299
576

1    notes.  And those are in the unsigned version, which if

2    you flip to them you'll see factfinding notes.  Are you

3    with me?

4        A    Yes.

5        Q    Okay.  And those, I can tell you now, you can

6    look, but they're not on the signed version.

7        A    Okay.

8        Q    And they did, however, appear immediately -- in

9    the records that TVA produced to us they appeared right

10   before the document that I've given you that's the signed

11   version.

12       A    Okay.

13       Q    You could say -- read if you will, what's the

14   Bates stamp number page on the first page of the signed

15   copy?  It's page number 447, right?

16       A    Yes, 447.

17       Q    And on the factfinding notes that I'm going to

18   hand you now, it's 445 and 446, right?

19       A    445 and 446.  That is correct.

20       Q    Okay.  So what I'm explaining to you is that when

21   these documents were given to me by TVA, this was at the

22   front of this.

23       A    Okay.

24       Q    And in the draft that --

25       A    DeWarren.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 125   Filed 11/15/21   Page 307 of 672   PageID #: 577
UA 0300

1    Q    -- DeWarren did, it was in the back of this.

2    A    Okay.

3    Q    So, do you recall those factfinding notes having

4    been a part of what's called the ERB package?  And I'll

5    tell you they're the same in both copies.  You can

6    confirm that for yourself.

7    A    I'm just looking at first and second page.

8    (Reviewing documents.)  I would've seen these forms, yes.

9    Q    Okay.  And is that typically -- you talked about

10   what would've happened and what is the typical thing to

11   happen.  Are typically these finding notes for contractor

12   only a part of what's called the ERB package?

13   A    Without looking at the procedure to validate that,

14   I would say they would be part of that.  I say that also

15   with a little reservation, that I looked at a lot of

16   things.  Like, I looked at everything, where the ERB

17   may've not been required to look at something.

18        So, I could've seen it very easily, and that

19   doesn't necessarily mean that the ERB would've also seen

20   it.

21   Q    Okay.  So, tell me what the ERB package is.

22   A    If you'll hand me the procedure I'll go through it

23   with you.

24   Q    All right.  Well, let me show you something else,

25   and it might be helpful to that.  I'm going to show you

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-4   Filed 11/15/21   Page 308 of 672   PageID #:
578
JA 0301

1  some -- I think I can introduce these.  I think I made
2  copies of them.
3          MR. JOHNSON:  These, for counsel, are the
4  interrogatory answers by TVA.  I don't have a copy to put
5  on the screen.  Do you want to get those up, Mike, from
6  your own documents?  Or you could just follow along as
7  we're discussing it.  But I want to give you a chance to
8  have it in front of you.
9          Mr. Bernier, can you hear me?
10          MR. BERNIER:  Yeah.  I was on mute.  Give me
11  one second.  Okay.  You're looking at TVA's responses?
12          MR. JOHNSON:  Yeah.  To interrogatories and
13  requests for production.
14          MR. BERNIER:  I've got them.
15          MR. JOHNSON:  Are with you, Mr. Lantis?
16          MR. LANTIS:  This is Document 29 in the
17  folder?
18          MR. JOHNSON:  Well --
19          MR. BERNIER:  It is Document 29.
20          MR. JOHNSON:  Oh, it is?  So I did produce
21  it.  Okay.  Good.  So we're all on the same page and I
22  will now try to bring Mr. Sanders along with us.
23  BY MR. JOHNSON:
24    Q   Okay.  So I've turned to page 9 of the responses.
25  And I'm specifically referring to interrogatory number 6.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-12  Filed 11/15/21  Page 309 of 672  PageID #:
579
UA 0302

1   And let me preface this for you, Mr. Sanders, that

2   interrogatories are questions that are posed to parties

3   in a lawsuit, and then they are signed under oath.  And

4   in this case, Meshelle Augustin signed under oath that

5   these answers were correct and true.

6     A   Okay.

7     Q   Do you know who Meshelle Augustin is?

8     A   I do.

9     Q   Who is she?

10     A   She's the HR -- she was the HR manager at Watts

11   Bar when I was there.  And I assume she's still there,

12   but I don't know.

13     Q   Was she a member of the board?

14     A   Yes.

15     Q   The board for Mr. Goforth?

16     A   Correct.

17     Q   So she's one of the people who signed on the board

18   findings that we just -- the board report that we just

19   went through?

20     A   That's correct.

21     Q   Okay.  So, looking at the answer to interrogatory

22   6, the question was:  "Please identify all documents and

23   things in the ERB package ... as completed by the ERB on

24   Goforth's 2018 termination."

25        And the answer is, beginning at "Subject to and

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-3   Filed 11/15/21   Page 310 of 672   PageID #:
580
JA 0303

1  without waiving objections, the term 'ERB package'..."
2  So, could you read that for me?  Are you with me, where
3  it starts with the term "ERB package"?
4      A   So, "Please identify all documents in the ERB
5  package as described in item 8...?  Is that what you want
6  me to read?
7      Q   Yeah.  Well, when you get down into the answer --
8  there's a bunch of objections first.
9      A   There are a bunch of objections.
10     Q   Yeah.  And then about halfway through the answer
11  it begins with the words "the term 'ERB package'..."
12     A   "... the term 'ERB package' is a common term for
13  the form used by the ERB and refers to documents provided
14  to plaintiff's ERB, (the factfinding notes and proposed
15  action review form) and documents prepared during the
16  course of the ERB (the record of action, the SCWE
17  mitigation plan screening, and the safety conscious work
18  environment mitigation plan)."
19     Q   Okay.  And does that conform to your understanding
20  of what would be typically in the ERB package?
21     A   That would be typically in the ERB package.  If
22  you want my, you know, "here's my real answer," I'd have
23  to spend time going through the procedure.  But that,
24  that seems reasonable that that would be in there.
25     Q   All right.  And so it's likely that the contractor

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 125-1   Filed 11/15/21   Page 311 of 672   PageID #:
581
JA 0304

1  notes by DeWarren Washington that were in front of the

2  signed ERB package were -- are part of the package?

3        MR. BERNIER:  Objection to form.

4    A   You're asking me was this, or would it be likely

5  that it would be?

6    Q   Well, answer it either way you want.

7    A   It -- likely it would've been in the package.  Not

8  necessarily, I guess.  Like I said, I would want to

9  review the procedure before I made --

10   Q   Did you -- do you remember seeing it?

11   A   Do I remember seeing this one form?  Not

12  specifically.

13   Q   Okay.  Well, let's go to the second page of it

14  then, please, sir.

15   A   But like I said, I also believe I would've saw it.

16  I don't specifically remember seeing it, but I would --

17   Q   Thank you.

18   A   -- imagine that I saw it.

19   Q   Thank you.

20       All right.  Look at the section under "If you

21  answer yes to any of the questions below, please provide

22  an explanation."  So, what's the first question under

23  that?

24   A   "Was the action confirmed to be willful

25  misconduct, intentional or deliberate?"

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 25-4  Filed 11/15/21  Page 312 of 672  PageID #: 582
JA 0305

1   Q   And what did the factfinding notes provide as an

2   answer to that?

3   A   They said no.

4   Q   Okay.  So, is it your belief that a document can

5   be falsified without the intention to falsify it?

6           MR. BERNIER:  Objection to form.

7   A   Yes.

8   Q   Okay.  Explain.

9   A   If I signed -- if I put any information in a

10  document that's incorrect and I submit that document and

11  I sign it and I say here's this document as completed,

12  and I sign it to all be true, and if something in there

13  is not true but to the best of my knowledge it was true,

14  then that is a document that is signed that has

15  information that's not correct.

16      If I knowingly sign a document for something that

17  wasn't done or I know that number is not correct, I put

18  in 5 on a form that I know is not correct because -- for

19  whatever reason, then that's willful falsification of a

20  document.

21  Q   Okay.  So, let me --

22  A   Intent versus, you know -- intent has a lot to do

23  with it, is the way I would see it.  Was I intentionally

24  trying not to -- trying to cover something up by putting

25  a 5 in versus what I knew the actual number was, for some

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-5   Filed 11/15/21   Page 313 of 672   PageID #:
583
JA 0306

1  different outcome that I was trying to achieve, that

2  would be a willful falsification of documents; versus if

3  I just put 5 on there because I believe 5 to be correct,

4  and I sign for it to be correct, that was just a mistake

5  on my part.  That was an error that I made when I was

6  doing the documents, not that I was intentionally doing

7  it.

8    Q  So what this factfinding form seems to be saying

9  is that when Mr. Goforth signed the document he signed,

10  it was not willful, intentional or deliberate?

11    A  If this was --

12        MR. BERNIER:  Objection to form.

13    A  If this was the final version that was eventually

14  signed -- because it's not signed in this form, and, you

15  know, I don't know the -- just like if it came with this,

16  the pedigree of the original documents that you handed me

17  that were all signed, that weren't -- that were not true

18  in the end, right?  This is the -- this was not the

19  willful intent; this is the I'm taking a run at it and I

20  put 5 on there when it wasn't really the number.  So to

21  me, it kind of holds the same lineage of proof, if that

22  makes sense.  Right?

23        Just like these documents here that aren't signed

24  and don't have any signature on them, I don't put a lot

25  of validity into them the same as this (indicating).

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-57   Filed 11/15/21   Page 314 of 672   PageID #:
584
JA 0307

1    Now, if this was signed and turned over and it said no

2    act of willful misconduct, intentional and deliberate,

3    when that would be what he believed -- DeWarren believed

4    when he did the factfinding.  I would say that's true.

5        Q   So do you recall looking at something that

6    DeWarren had written, as the factfinding person, that

7    said that it was not deliberate?  Do you recall having

8    seen that?

9        A   I don't specifically recall looking at either

10   one -- this or a different one.  I mean, like I said

11   before, I would assume one of these would've been in the

12   package, the ERB package, and then I would've seen it.

13   But do I specifically remember looking at this one or

14   another one, I don't.

15       Q   Thank you.  Do you recall ever talking with Paul

16   Simmons about Mr. Goforth's case?  He was on the ERB.

17   Can you recall any conversations with him about that?

18       A   I do not recall any specific conversations.  I

19   know we would've had a conversation, because the -- in

20   the final ERB package there was a checkmark that he had

21   contacted ECP in the last 12 months and that this could

22   potentially be a, you know -- it would be a communication

23   strategy as we went through and developed a mitigation

24   plan.

25       Q   Okay.  So you don't recall whether you had any

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-53   Filed 11/15/21   Page 315 of 672   PageID #:
JA 0308
585

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2              EASTERN DISTRICT OF TENNESSEE

3                   AT CHATTANOOGA

4   ------------------------------------------------
                                    )
5   ROBERT M. GOFORTH,              )
                                    )
6          Plaintiff,               )
                                    ) Case No.:1:20-cv-254
7      vs.                          )
                                    )
8   TENNESSEE VALLEY AUTHORITY      )
    and DAY & ZIMMERMANN NPS,       )
9   INC.,                           )
                                    )
10         Defendants.              )
    ------------------------------------------------
11                          Chattanooga, Tennessee
                            August 17, 2021
12

13          DEPOSITION OF WALTER LEE SANDERS

14  ------------------------------------------------

15  APPEARANCES:

16              FOR THE PLAINTIFF:

17              JAMES M. JOHNSON, ESQ.
                Attorney at Law
18              620 Lindsay Street, Su 210
                Chattanooga, TN 37403
19              (423) 648-4093
                jj@jamesmjohnsonatty.com
20
                    -and-
21
                JUSTIN S. GILBERT, ESQ.
22              Gilbert Law, PLC
                100 W. MLK Blvd., Su 500
23              Chattanooga, TN  37402
                (423) 756-8203
24              justin@schoolandworklaw.com

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-1  Filed 11/15/21  Page 316 of 672  PageID #: 586
UA 0309

1     A   If they lost access for that and if it was -- say

2  it was an instance of something with the NRC or -- any

3  reason at all, they have to go through the process of

4  regaining their access.  And that's, that's done.  I've

5  seen it done.  I've seen people lose access for cause and

6  go through some kind of rehabilitation.  Typically that's

7  more often with drugs or alcohol -- alcohol really

8  primarily, and then you can regain access.  But if you do

9  not have access to the plant, you can't work there.

10    Q   You can't work at the plant or -- well, tell me

11 about this.  And this maybe answers the question.

12 Explain the PADS system to us.

13    A   So, when you're in the system you either have a

14 green light or a red light for access, you know.  So if

15 you're at Watts Bar, you're in the PADS system, and you

16 have all your training up to date, you have -- there's

17 nothing on your record that would prevent it.

18        If you go into -- if you go and you're fired for

19 cause, then they would update PADS to say -- they would

20 say terminated -- and I'm not exactly sure on the

21 verbiage, but essentially what would happen is there

22 would be something in there outlining that you lost

23 access at Watts Bar.  I don't know that it would normally

24 go in there and say -- I'm almost certain it wouldn't

25 give a full event of it, you know, the description.  It

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-3 Filed 11/15/21   Page 317 of 672   PageID #:
587
JA 0310

1  would just say you lost access, most likely.

2     Q   Well, so you don't know for sure whether it says

3  lost access for cause or lost access for -- in

4  Mr. Goforth's case, allegedly falsifying a document?

5  Does it say that in the PADS?

6     A   I don't know exactly what it says, but I think, I

7  think that it does have some description of -- if you

8  falsify documents -- which is clearly a violation in

9  every place -- that you would be locked out.

10    Q   Okay.

11    A   I believe that would be the case.

12    Q   And who has access to PADS?

13    A   Just the site utilities, and maybe INPO.

14    Q   So basically, anyone who's running a nuclear power

15 plant in the United States would be able to look and see

16 that a person's clearance was revoked.  And I guess the

17 reason for that is so that before making any kind of

18 hiring decisions, they would know that?

19              MR. MEALOR:  Objection.

20    A   So when you say "anybody," it would be a very,

21 very small group of people.  There's -- probably on each

22 site there's probably two to three people that have

23 access into PADS that can look at all of that.

24              And so -- yeah.  And so the reason for that is you

25 don't want somebody who has broken the rules or -- and

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-1 Filed 11/15/21  Page 318 of 672  PageID #:
588
JA-0311

1  got terminated for cause that would be in -- something

2  that would prevent them from having access at another

3  site to come to your site and all of a sudden gain

4  access.  So, if their behavior was inappropriate

5  someplace else, you would know.

6       Now, you can go through and they can go and try to

7  get access at a new site, and if that new site wanted

8  that person because they felt that they were valuable

9  enough, then they could go through the process of trying

10 to reestablish plant access in some cases.  In some cases

11 the answer is always no.

12      So if you violate some rules with the NRC,

13 specifically if you fail a drug test, there are periods

14 of time where you are locked out from coming back into

15 nuclear power.  And those vary depending on the different

16 circumstances of what you may've...

17  Q   Let me just be clear about your answer.  My

18 question was really does every nuclear power plant site

19 have access to PADS, even though, as you've stated, it

20 would be a very small number of persons at each site, but

21 it's available to every site that's running a nuclear

22 power plant?

23          MR. MEALOR:  Objection.

24  A   So, every utility that has a plant.  I don't

25 know -- I can't speak to every site.  I would imagine

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-12   Filed 11/15/21   Page 319 of 672   PageID #:
589
JA 0312

1   every site.  But every utility has an organization that

2   oversees access to their facilities.

3       Q    Okay.  So, your answer is PADS would be available

4   to every utility that operates a nuclear power plant?

5       A    In the United States.

6       Q    In the United States.

7       A    That's correct.

8       Q    Got it.

9            So, let me show you this.  And it's Document 18.

10  I think this is just showing some of what you have

11  already told us.

12           This is as of June of 2017.  Is that within the

13  framework of time that you came to Watts Bar?

14      A    Yes.

15      Q    So would this be accurate, what it states there,

16  that Paul Simmons was the VP for Watts Bar Nuclear Plant,

17  which you've already testified to, but those folks above

18  that, two of those positions were vacant and one was held

19  by Jennifer Affholder?  But she's only --

20      A    She is executive assistant.

21      Q    Right.  So, did somebody eventually get that job

22  as senior vice president of operations?

23      A    Oh, yeah.  Yes.

24      Q    Who was it?

25      A    Well -- so this was '17.  So, I think -- I

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 135-13  Filed 11/15/21  Page 320 of 672  PageID #:
590
UA 0313

1  wouldn't be able to answer for sure.  I don't remember

2  who took the job before or after this.

3      Q    That's fine.  We don't need to probe any further

4  on that.

5          Look at the second page of it then.

6      A    Okay.

7      Q    So, that page shows you, right?

8      A    It does.

9      Q    And this is as of November 2, 2018.  And it shows

10 you as director of plant support.  And that's, according

11 to your testimony, I think the only position that you

12 held there at Watts Bar when you came over?

13     A    Other than when I was there from -- I was in a

14 corporate role.  But yes, this is my only direct spot on

15 the Watts Bar org chart.

16     Q    Okay.  And you've described to us what your duties

17 were in that role?

18     A    Yes.

19     Q    And so you reported directly to Paul Simmons?

20     A    That is correct.

21     Q    So what was your frequency of interaction --

22         Well, before we do that, let's mark this one as

23 15.

24         (Exhibit 15 was marked for identification.)

25 BY MR. JOHNSON:

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-12   Filed 11/15/21   Page 321 of 672   PageID #:
591
JA 0314

1     Q  So what was the frequency of your interaction with

2  Mr. Simmons during 2017 and '18 while you and he were

3  both at the plant?

4      And maybe I should clarify first.  Are you still

5  there, in that role?

6     A  No.  I retired about two and a half years ago.

7     Q  Oh, I see.  What would've been the date of your

8  retirement?  That might stick in your mind.

9     A  It does.  I think it was April 1st, '18?  '19?

10  I'm trying to figure out -- I've been out two and a half

11  years.

12     Q  That would be two and half years.

13     A  '19, yeah.  April '19.

14     Q  Okay.  So, during that time period, between when

15  you took on that role at Watts Bar and when you retired,

16  what was your frequency of interaction with Mr. Simmons?

17          MR. MEALOR:  Objection.

18     A  It would depend.  I mean, you know, if we were

19  both on site, then I would see him every day.  If we

20  weren't on site, then I may not see him.  But we had

21  frequent and steady interactions.

22     Q  Got it.  This may be a difficult question to

23  answer.  But sort of what was the day like for you and

24  Paul Simmons?  I mean, what was -- what were y'all doing

25  up there at the plant --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-4  Filed 11/15/21  Page 322 of 672  PageID #: 592
JA-0315

1    things that you were talking about in your role as
2    support person, and I guess the role -- the corporate
3    role that you had involved with Watts Bar when they were
4    having these issues.  I want to get into some
5    discussion --
6        A    Sure.
7        Q    -- of that, because that's what I think has
8    pertinence perhaps to this case.
9        A    Okay.
10       Q    So, this is Document 27.  Take a look at that.
11   And it's a long document, but it's one I'm guessing
12   you're familiar with.  So if you can just identify
13   whether this is a document you're familiar with, that
14   would be helpful.
15       A    Okay.  (Reviewing document.)  Yes, I am familiar
16   with the confirmatory order.
17       Q    Okay.  And so that order, which is formally called
18   EA-17-022, is a confirmatory order issued by the NRC,
19   correct?
20       A    That is correct.
21       Q    And so we're going to just use a few pages from
22   this, so try to follow me here.  If you would look at the
23   second page, please, sir.
24       A    Sure.
25       Q    It says that there was a previously issued

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-16   Filed 11/15/21   Page 323 of 672   PageID #:
JA 0316
593

1     confirmatory order, EA-09-009, dated December 22, 2009;

2     is that correct?

3        A   It does say that.

4        Q   Are you familiar with EA-09?

5        A   I am familiar in that -- I do know some of what

6     happened.  I didn't, I didn't deal in the response

7     necessarily.  And at that point I was much, I was much

8     more junior in the organization, so I didn't have any

9     involvement at the time when this was issued.  But I am

10    familiar based on why we ended up with this, and the

11    compounding effect of the '09 order and what that meant

12    to this.

13       Q   I see.  So, you were aware at least that the '09

14    order regarded the same kind of issues as the '17 order,

15    and the '17 order was a follow-up to that?

16       A   That's right.

17       Q   Okay.  So, let me just read for you in that

18    indented paragraph there, which kind of summarizes -- is

19    a summarization of the '09 order.

20        It says:  "Confirmatory order modifying license,

21    dated December 22, 2009, states, in part, that by no

22    later than 90 calendar days after the issuance of this

23    confirmatory order, TVA shall implement a process to

24    review proposed licensee adverse employment action at

25    TVA's nuclear plants before actions are taken to

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-17   Filed 11/15/21   Page 324 of 672   PageID #:
594
JA-0317

1  determine whether the proposed action comports with

2  employee protection regulations."

3      Does that conform with what your understanding of

4  the '09 was about, as is recited here in the '07 -- the

5  '17 order?

6  A   So, I would say definitely for the '17 order.  I

7  think the '09 order, I think that TVA probably did not

8  get that right and fully implemented; otherwise, we

9  would've not been sitting with this new order in '17.

10     So, in '09, the way I understand it is that there

11  were some people that were terminated and that the NRC

12  came back and said they believed they were terminated

13  based on raising some concerns, and so the TVA did

14  retaliate, is the way I understand it from that piece.

15     And so in the '17 order, we had to go through and

16  make sure that we protected people's rights to raise

17  issues in a safety consciousness work environment space

18  without having a chilling effect based on that.  And that

19  was our primary responsibility in response to this order.

20  Q   So the '17 order was the second time that this had

21  occurred to TVA regarding making sure that adverse

22  employment actions were not being taken for reporting

23  safety issues?

24  A   Correct.

25  Q   And when it talks about employee protection

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-18  Filed 11/15/21  Page 325 of 672  PageID #:
595
JA-0318

1    regulations there at the end of the part that I just read
2    to you, that would refer, would it not, to the protection
3    regulations in 10 CFR 50.7?  I imagine that's a number
4    you're familiar with?
5                MR. MEALOR:  Objection.
6      A   I am familiar with it in that -- I would have to
7    go back and look.  But yes, in the sense that it is
8    protections just as a normal ability for workers to raise
9    any kind of safety concern without fear of retaliation.
10     Q   Sure.  And Section 50.7, is that something people
11   kind of know, well, that's the NRC reg that says that we
12   can't retaliate against people who --
13     A   When you say --
14     Q   -- report --
15     A   -- "people" would know that, I would say probably
16   not a lot of people.  I would think people that were
17   specifically in this work might know that.  But the
18   average worker --
19     Q   Oh, sure.
20     A   -- by far would not have any idea what that means.
21     Q   But somebody like you and somebody like
22   Mr. Simmons would know what that is?
23     A   For me I would say yes, and I would assume he
24   would also.
25     Q   Okay.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 150-19  Filed 11/15/21  Page 326 of 672  PageID #:
JA-0319
596

1    A   And to be clear, the NRC said to us that -- the

2   second time around, what they told us is that we failed

3   to implement a process to verify these people were

4   protected in the '09 order.  So the way I remember it or

5   the way I understood it in the '09, they said, you know,

6   we'll do some training and we'll do this, but we didn't

7   implement a process that the NRC felt like met all the

8   wickets and it had all the things in there in order to

9   prevent that, by their -- what their internal

10  understanding of what would happen versus what actually

11  happened.

12    Q   And did not the cause of that issue arising, again

13  for NRC, wasn't it prompted by other employees who had

14  made complaints, that they found to have valid complaints

15  about that?

16           MR. LANTIS:  Objection to form.

17    A   So, I, I -- honestly, I don't know that I could

18  say that.  What I would say is I think that the NRC, with

19  Watts Bar 2 coming on and with all the things that went

20  on with that, just the general work environment is what

21  ended up leading to this.

22    Q   Okay.  Well, in any case, let's look at page 3.

23  Well, let me ask this first.  If it didn't come to NRC's

24  attention, the -- let's call it noncompliance with their,

25  NRC's, understanding of the '09 confirmatory order, if

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 327 of 672   PageID #:
JA 0320
597

```
1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4         I, Sheila D. Wilson, Licensed Court Reporter #268
     and Notary Public, in and for the State of Tennessee, do
5    hereby certify that the deposition of WALTER LEE SANDERS
     was reported by me, and that the foregoing 132 pages of
6    the transcript is a true and accurate record to the best
     of my knowledge, skills, and ability.
7         I further certify that I am not related to nor an
     employee of counsel or any of the parties to the action,
8    nor am I in any way financially interested in the outcome
     of this case.
9         I further certify that I am duly licensed by the
     Tennessee Board of Court Reporting, as evidenced by the
10   LCR number and expiration date following my name below.
          In witness whereof, I have hereunto set my hand
11   this 20th day of September 2021.

12

13

14

15

16

17   _____
     Sheila D. Wilson, LCR #268
18   Expiration date: 6/30/2022.
     Notary Public Commission
19   Expires: 1/25/2023.

20

21

22

23

24

25
```

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-13 Filed 11/15/21  Page 328 of 672  PageID #: 598

1         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TENNESSEE
2              AT CHATTANOOGA
   _____
3
  ROBERT M. GOFORTH,
4
        Plaintiff,
5
  vs.                 Case No: 1:20-cv-254
6
  TENNESSEE VALLEY AUTHORITY
7  and DAY & ZIMMERMANN NPS,
  INC.
8
        Defendants.
9
  _____
10
          Chattanooga, Tennessee
11         September 15, 2021
12      DEPOSITION OF MESHELLE AUGUSTIN
  _____
13
  APPEARANCES:
14
        FOR THE PLAINTIFF:
15
        JAMES M. JOHNSON, ESQ.
16       Attorney at Law
        620 Lindsay Street, Suite 210
17       Chattanooga, TN 37403
        (423)648-4093
18       jj@jamesmjohnsonatty.com
19         -and-
20       JUSTIN S. GILBERT, ESQ.
        Gilbert Law, PLC
21       100 W. MLK Blvd., Suite 500
        Chattanooga, TN 37402
22       (423)756-8203
        justin@schoolandworklaw.com
23

24

25

1  you, Mike.

2  BY MR. JOHNSON:

3  Q.     I'm not trying to get at any privileged

4  information, so don't tell me about communications

5  with TVA counsel, but let me ask the question again.

6        Would your -- do you recall exercising your

7  duties, advisory, and as you earlier described them,

8  to others at TVA, aside from the lawyers, regarding

9  that 2017 non-selection by Mr. Goforth?

10 A.     No.

11 Q.     Are you just not remembering, or are you

12 saying that you didn't do that?

13 A.     I didn't do any advisory with it because the

14 decision had already been made related to the

15 selection, and it was just brought to my awareness

16 that there had been a non-select claim related to the

17 position or the position he had applied for.

18 Q.     So at some point in either 2017 or 2018, you

19 became aware that that non-selection issue was in

20 litigation?

21 A.     I don't even believe I knew that it was in

22 litigation.  I just knew that there had been a

23 complaint regarding it.

24 Q.     Were you aware that the complaint included

25 veteran's preference and also retaliation for

1  protected activity?

2  A.      I was aware that there was a vet preference

3  element to it.  I was not aware of any protected

4  activity.

5  Q.      Did anyone, at any time, share any documents

6  with you regarding the complaint that he had filed?

7  A.      No.

8          MR. BERNIER:  Same objection here.  Okay.

9  Let me say this again, Meshelle.  If any lawyers gave

10 you any documents, let's not talk about those, and if

11 anything comes up like that, just say, I might need

12 to talk with Mike, or something like that.

13         MR. JOHNSON:  Well, Mike, can we put a

14 little bit of a finer spin on that?  I'm not asking

15 you what any documents were.  I'm just asking if

16 anyone, including lawyers, shared any documents with

17 you about that complaint.

18         MR. BERNIER:  That's fine.

19         THE WITNESS:  And the answer to that is

20 no.

21 BY MR. JOHNSON:

22 Q.      I'm sorry.  I couldn't hear the answer.

23 A.      The answer to that is no.

24 Q.      So you talked about ERB being part of your

25 duties while you were at Watts Bar.  So who's

1    responsible for creating ERB packages pre the actual

2    ERB meeting?

3    A.       The responsible manager or supervisor is

4    responsible for putting the package together.

5    Q.       I see.  And with whom, if anyone, at TVA does

6    that responsible manager communicate in an advisory

7    capacity?

8    A.       Will you repeat that, Jim?  You broke up at

9    the beginning of that question.

10   Q.       Yeah, maybe I can ask that in a way that's a

11   little bit clearer.

12           Is any particular person tasked with giving

13   advice to the managers, as you just identified, in

14   preparing that ERB package pre-ERB meeting?

15   A.       The director of plant support owns the

16   process for the ERB, so they can provide information

17   and advice relative to the package.  And then HR for

18   TVA situations, TVA employees, we may be asked to

19   review it in advance and provide feedback as well.

20   But the overall responsibility is with the director

21   of plant support.

22   Q.       So to attach names to what you've just

23   described, that first position, the plant support,

24   that would have been Mr. Sanders on Mr. Goforth's

25   ERB?

1  A.      That's correct.

2  Q.      And --

3  A.      Oh, actually, Lee was the director of plant

4  support, but -- so he was involved with that, but for

5  some reason I think he was out of the office for a

6  part of the time that that package was being prepped,

7  and Kim Hulvey assisted with some of the review.

8  Q.      Okay.  So would I be correct saying that

9  Kim Hulvey was involved for a time when Mr. Sanders

10  was out, but then when Mr. Sanders returned, he

11  re-assumed that duty?

12  A.      That's correct.

13  Q.      And that would be with respect to

14  Mr. Goforth's ERB package pre-meeting?

15  A.      That would -- yes, it would have been for the

16  readiness of the actual ERB for the actual board, the

17  prep associated with the package.

18  Q.      Right.  And then the other position I think

19  you identified as assisting with the ERB package

20  pre-meeting was HR.  And so would that have been you

21  for this ERB for Mr. Goforth?

22  A.      Yes.

23  Q.      Who then becomes responsible for maintaining

24  ERB packages once the ERB is over with?

25  A.      So after the ERB is complete, the paperwork

1 is all signed off and all actions are completed, HR

2 has the responsibilities for recordkeeping.

3 Q.     And how long are those records maintained?

4 A.     How long are they maintained?

5 Q.     Yes, ma'am.

6 A.     I can't tell you.  I don't know off the top

7 of my head.  I know it's relatively long term, but I

8 don't know exactly how many years they're maintained.

9 Q.     Okay.  So for purposes of Mr. Goforth's

10 position, if his ERB was in late 2017, all of those

11 documents should be in HR TVA --

12 A.     The ERB package --

13 Q.     Right.

14 A.     -- whatever was part of that package, would

15 be retained as part of the recordkeeping.

16 Q.     Okay.

17         MR. JOHNSON:  Counsel, we're going to be

18 looking at Document 1, and that's for you also,

19 Ms. Augustin.  If you would look at your Document 1,

20 please.

21         THE WITNESS:  Okay.

22 BY MR. JOHNSON:

23 Q.     And that document appears on its face to be

24 Defendant TVA's Responses to Plaintiff's First Set of

25 Interrogatories and Request for Production.  Are you

1   with me on the same document?  If you look at the

2   title of the document.

3   A.      Yes.  It says, U.S. District Court,

4   et cetera, Chattanooga, Goforth, DZ -- or Tennessee

5   Valley Authority and DZ.  And then off to the right

6   it says, 1:20-cv-254.

7   Q.      Yes.  And in the title of the document is

8   Defendant TVA's Responses to Plaintiff's First Set of

9   Interrogatories and Request for Production.

10  A.      Yes.

11  Q.      That's the title you're seeing?

12  A.      Correct.

13  Q.      Okay.  Great, we're on the same page.  And I

14  would ask you to turn to Page 20 of that document.

15  Well, let's make it Page 21.  Page 21.

16  A.      Okay, I am there.

17  Q.      Okay.  At the top of that Page 21, are you

18  seeing in bold capitals the word, "response:"?

19  A.      Yes.

20  Q.      Okay.  And then third line down -- there's

21  some objections made, but the third line down, I'm

22  going to read some language to you, and you tell me

23  whether you're following me with that language.  The

24  third line down.  Okay?

25  A.      Okay.

1  Q.      "TVA will produce documents demonstrating

2  that Goforth was a staff augmentation contractor when

3  working on the tritium project, but was working in a

4  managed task role when he was working at Watts Barr

5  in 2018."  Are you with me?

6  A.      Yes, I see that language.

7  Q.      Okay.  And so this document was provided to

8  us by and signed by TVA counsel as being TVA's

9  responses to questions that we -- or documents that

10  we requested.  And so just having seen that, and you

11  can look at it again, the words I read, would you

12  agree with that statement?

13          MR. BERNIER:  Object to the form, but,

14  Meshelle, you can answer.

15          MR. JOHNSON:  Yeah, Ms. Augustin, you'll

16  hear objections being made, and unless Mr. Bernier

17  instructs you not to answer, those objections are for

18  the record, and you can ignore them and proceed.

19  They're important for the lawyers, but they're not

20  important for you, unless you're instructed not to

21  answer.

22  BY MR. JOHNSON:

23  Q.      So would you then, to repeat the question,

24  agree with me that that is a correct statement, the

25  language that I read to you?

1  BY MR. JOHNSON:

2  Q.      Okay.  So we're now to Document 3.  And thank

3  you for that reminder, Mr. Bernier.  Are you with me

4  in Document 3, Counsel and Ms. Augustin?

5  A.      I am.

6           MR. BERNIER:  Yes.

7  BY MR. JOHNSON:

8  Q.      Okay.  And this is Exhibit 27 to the

9  complaint, so I won't be readmitting it for counsel's

10  purposes.  So I'm going to ask you, please,

11  Ms. Augustin, to go to Page 19.

12  A.      I am on Page 19.

13  Q.      Okay.  Are you showing the word

14  "verification" at the top and then your signature

15  after the verification?

16  A.      I am.

17  Q.      Okay.  And is that your signature?

18  A.      It is.

19  Q.      And it says -- and I'm just going to read it

20  for you for brevity purposes -- "I have read the

21  foregoing responses to Plaintiff's First Set of

22  Interrogatories, and I verify the answers to

23  interrogatories are true and correct to the best of

24  my knowledge, information, and belief."  Signed

25  April 1, 2021.

1          So when you signed this document, were you

2     verifying that the answers were true and correct to

3     the best of your knowledge, information, and belief?

4     A.        I was.

5     Q.        And were you aware that that was under

6     penalty of perjury, as it states in the first

7     sentence there?

8     A.        Yes.

9     Q.        Okay.  So let's go to Page 7 then, please,

10     ma'am.

11     A.        Okay.

12     Q.        And let's look where it says, "Interrogatory

13     Number 1."

14     A.        Okay.

15     Q.        And there's a couple of sentences there of

16     objections, which we can ignore, and then let's begin

17     with the words, "DeWarren Washington."  Are you with

18     me?

19     A.        Yes.

20     Q.        Okay.  Would you like to read, please,

21     beginning with the words, "DeWarren Washington," and

22     ending with the end of that paragraph.

23     A.        "DeWarren Washington, a DZ employee, appears

24     to have made the decision to terminate Plaintiff.

25     TVA convened an Executive Review Board (ERB) to

1  consider whether the contractor's employment action,

2  despite its legitimacy, could be perceived by some of

3  the workforce as in retaliation for raising safety

4  issues, and, if so, actions to mitigate any negative

5  effect of the decision on the workforce.  The members

6  of the ERB are identified in response to

7  Interrogatory Number 3."

8  Q.      Okay.  So is this a correct statement of what

9  ERBs are supposed to do?

10  A.      So the basis of an ERB is to look at the

11  safety conscious work environment impact.  So as it

12  states here, it talks about, you know, if an

13  employment action is taken, whether it's -- despite

14  its legitimacy, it can be concerned as having a

15  retaliation for raising safety concerns.  So ERBs

16  will look at the impact on a safety conscious work

17  environment, and then they look at ways in which we

18  can mitigate that effect.  So what the action is and

19  what the effect is, is part of the ERB.

20          The other piece of ERB is to look at

21  similarly situated events and what employment actions

22  were taken in those similarly situated events from a

23  consistency perspective.

24  Q.      So I take it your answer then is that this

25  answer that was -- that you signed and was provided

1  is a correct answer?

2  A.      Correct.

3  Q.      Okay.  And it appears to me by those words,

4  "despite its legitimacy" -- I'm just trying to

5  characterize what you said -- that the ERB's concern

6  is with perceptions of the workforce, and then

7  mitigating any perceptions, and that you just assume

8  that the decision made by the contractor was

9  legitimate?

10  A.      Right.  In this case because it's a

11  contractor, TVA would not make an employment decision

12  related to their employment status.

13  Q.      Okay.  So let's look now, please, at

14  Interrogatory 2, which is also on Page 7.  And

15  there's some objections there, which we'll skip over.

16  Let's go to the next page, Page 8.  And would you,

17  please, read, beginning with the words, "TVA is

18  aware," and read to the end.

19  A.      "TVA is aware of an investigation by Freddie

20  Gibson, a DZ employee, into the unsecured manway

21  cover incident that led to Plaintiff's termination,

22  and an interview of Plaintiff related to that same

23  incident by John Reeves, another DZ employee.  Aside

24  from Gibson, Reeves, and Washington (see response to

25  Interrogatory Number 1), TVA is aware of no

1  additional person(s) with input or influence on the

2  decision to terminate Goforth."

3  Q.      All right.  And so my question to you, and I

4  think I know the answer based on your previous answer

5  to questions from the prior interrogatory, but I take

6  it you did not interview Freddie Gibson?

7  A.      No, I did not interview Freddie Gibson.

8  Q.      And you did not interview John Reeves?

9  A.      No, I did not.

10 Q.      Did John Reeves ever tell you or the ERB that

11 Mr. Goforth said that he had engaged in protected

12 activity in his --

13             MR. BERNIER:  Object to the form.

14 Q.      -- in his interview of Mr. Goforth?

15 A.      Repeat that question, please.

16 Q.      Did Mr. Reeves ever tell you -- let's just

17 confine it to you to begin with.  Did Mr. Reeves ever

18 tell you that Mr. Goforth had told him, during his

19 interview of Mr. Goforth, that Mr. Goforth had

20 engaged in protected activity?

21 A.      I don't have any recall of that, but I'm not

22 even sure I ever talked with John Reeves.

23 Q.      Okay.  Did John Reeves attend the ERB

24 meeting?

25 A.      I would have to look at the ERB package to

1  answer that.  I don't recall who all was at that.  I

2  don't recall who was there, besides DeWarren.

3  Q.      Okay.  And so do you recall John Reeves or

4  anyone else saying at the ERB meeting that

5  Mr. Goforth had told Mr. Reeves, in his interview by

6  Mr. Reeves, that he had engaged in protected

7  activity?

8              MS. LINDGREN:  Object to the form.

9              MR. BERNIER:  Object to the form.  You

10  can answer.

11  BY MR. JOHNSON:

12  Q.      Do you understand the question?

13  A.      I think I understand the question, but

14  verbally I don't have any recall of that.  But in the

15  ERB package itself, there is a question related to --

16  or a couple of questions regarding contact with ECP

17  and contact -- or writing condition report.  And one

18  of those two led to awareness from an ERB perspective

19  that Goforth may have been involved in protected

20  activity because we look at condition reports as a

21  protected activity.

22  Q.      Understood.  And so what I'm asking is, did

23  anyone say at the ERB meeting that Mr. Goforth had

24  told Mr. Reeves that he had engaged in protected

25  activity?

1  A.       I do not recall anyone stating that.

2  Q.       Do you recall whether anyone, including

3  Mr. Reeves, told you that Mr. Goforth had said other

4  workers who did what he was accused of were not

5  disciplined?

6                MS. LINDGREN:  Object to the form.

7                MR. BERNIER:  Object to the form.

8                THE WITNESS:  Repeat that question,

9  please.

10  BY MR. JOHNSON:

11  Q.       Do you recall at the ERB meeting, or any time

12  before Mr. Goforth was fired, whether Mr. Reeves told

13  you or the ERB that Mr. Goforth had said other

14  workers who did what he did were not being

15  disciplined?

16                MR. BERNIER:  Same objection.

17                MS. LINDGREN:  Same.

18                THE WITNESS:  I have no recall of that,

19  and I don't recall even talking to Mr. Reeves.

20  BY MR. JOHNSON:

21  Q.       Okay.  So I take it, then, whether

22  Mr. Goforth -- whether Mr. Reeves told you or the ERB

23  that Mr. Goforth had mentioned ice condenser workers

24  doing the same thing is not something you would

25  recall either?

 1            MS. LINDGREN:  Object to the form.

 2            THE WITNESS:  I have no recall of that,

 3    having any conversation.

 4    BY MR. JOHNSON:

 5    Q.      So in Interrogatory 3, it -- if we look at

 6    the response to that, the last sentence, are you with

 7    me when I'm reading that the ERB members included

 8    Meshelle Augustin, Lee Sanders, DeWarren Washington

 9    (contractor representative), Ryan Dreke -- I'm not

10    sure I'm saying that right -- and Paul Simmons?

11            Do you recall that those were the members of

12    Mr. Goforth's ERB?

13    A.      I do.

14    Q.      Do you recall whether all of those members

15    were attending in person to the ERB meeting on

16    Mr. Goforth's termination?

17    A.      I believe we were all in person.

18    Q.      Do you recall anyone else attending --

19    A.      I do not.

20    Q.      -- besides the ERB members?

21    A.      I do not recall anyone else in attendance.

22    Q.      So I take it if we move to Page 9 -- and

23    let's look at Interrogatory 5.

24    A.      Okay.

25    Q.      The question there, Interrogatory 5 -- and to

1  of action by the ERB.

2  A.      Yes.

3  Q.      Are you with me?

4  A.      Okay.  Yup.

5  Q.      And that gives what date as the date the ERB

6  convened?

7  A.      November 21, 2018.

8  Q.      And, again, this e-mail forwarding the ERB

9  package is dated November 29, 2018; correct?

10  A.      Correct.

11  Q.      Okay.  And it's saying the ERB convened at

12  12:30 and concluded at 1:00.

13  A.      Yes.

14  Q.      Is it consistent with your memory of the

15  meeting that it took place in approximately

16  30 minutes?

17  A.      That's consistent with my memory, as well as

18  it's consistent with how long ERBs typically take.

19  Somewhere between 15 to 30 minutes, depending on the

20  issue.

21  Q.      Okay.  So this, then, would be the ERB

22  package as completed following the meeting; am I

23  correct?

24  A.      It appears to be that.

25  Q.      Okay.  Let's go to Page 10.

1  A.      Okay.

2  Q.      And we might ought to -- we might ought to

3  read beginning on Page 9 what that interrogatory is

4  asking for because it's not perfectly evident in the

5  answer.  So do you mind if I read that for you?  It's

6  Interrogatory 7, beginning on Page 9, and I'll read

7  it for brevity purposes.  "Please identify any of

8  your policies or procedures, unwritten or written

9  (for written policies and procedures please identify

10 by policy title and number), you contend support the

11 termination of Goforth.  You may provide a copy of

12 the policies as part of your answer, but please be

13 sure the answer is complete, and please specify which

14 documents you produce are responsive to this

15 interrogatory."

16      And then, now, looking at the answer, we'll

17 skip over the objections, and then in the last line

18 just read me what it says there with -- after the

19 objections where it says, "see the fact-finding

20 notes."

21 A.      So which document are you in?  I was still in

22 Document 9.  Did you switch?

23 Q.      I'm sorry.  We're back to Document 3.  I'm

24 sorry.

25 A.      That's all right.  Let me catch up with you.

1  Q.     We're back to Document 3, Page 9.  This is

2  much easier when we're sitting across the table from

3  one another.

4  A.     Understood.

5  Q.     But I think we're doing pretty well.

6  A.     You're in Interrogatory 7.  Tell me where you

7  want to --

8  Q.     I just read Interrogatory 7, and so now I'm

9  looking at the response on Page 10.

10  A.     Okay.  You want me to start at the beginning

11  of the answer?

12  Q.     No.  There's a bunch of objections there, and

13  those end in the last line, and so I just need you to

14  read where it begins, "see the fact-finding notes."

15  A.     So "see fact-finding notes submitted to TVA's

16  ERB."

17  Q.     Correct.  Thank you.  Let's take a look at

18  Document 6 now, and I'll try to remind you when we go

19  back to Document 3 because we will be, but let's take

20  a look at Document 6.

21  A.     Okay.  I'm there.

22  Q.     So let me find the page I would like you to

23  go to, but let's identify it first.  And this is

24  Exhibit 23, so I won't be resubmitting it.

25            MR. JOHNSON:  And by the way, for the

1   record, let's make Document 9 exhibit -- that we just

2   went over together, let's make Document 9 Exhibit 66.

3                 (Document was marked for identification

4   as Exhibit Number 66.)

5   BY MR. JOHNSON:

6   Q.      So getting back to Document 6, that's been

7   previously identified as Exhibit 23, and that appears

8   on its face to be an e-mail from DeWarren Washington

9   dated November 6, 2018, to Rebecca Rogers, with a

10  copy to Kimberly Hulvey, who you've previously

11  identified, Mr. Sanders, who you've previously

12  identified, Alan Anthony White, John Reeves, and

13  Jason Howard.  And are you with me?

14  A.      Yes.

15  Q.      Okay.  And it says, does it not, "Becca, I

16  think this is everything you will need for the ERB."

17  And then it's consistent with what you said earlier,

18  "Also, Lee Sanders is on vacation, so Kim Hulvey is

19  filling in for him."  That's what this e-mail says;

20  correct?

21  A.      Correct.

22                MR. BERNIER:  Jim, I'm going to object to

23  questions regarding this document.  It doesn't appear

24  that Ms. Augustin received it.

25                MR. JOHNSON:  Yes.  I'm just asking her

1  to identify what it appears to be.

2              MR. BERNIER:  Sure.

3              THE WITNESS:  It appears to be what you

4  described, Jim.

5  BY MR. JOHNSON:

6  Q.      Okay.  And I think we'll clear up

7  Mr. Bernier's concerns about this with our next

8  exhibit, but for now, let's take a look at -- well,

9  it might be helpful to put the next exhibit in, just

10 to clear that point up while we're at it.  Take a

11 look at Document 7 for a moment.

12 A.      Okay.

13 Q.      And that appears on its face to be a document

14 from Ms. Hulvey to DeWarren Washington, also dated

15 November the 6th, 2018, like Mr. Washington's e-mail

16 was; correct?

17 A.      I don't remember the date on Document 6, but

18 if that's what it was, then that's correct.

19 Q.      Okay.  So this document is Ms. Hulvey

20 forwarding some comments that you made also on -- I'm

21 trying to see a date on that prior one.  It doesn't

22 give a date on your e-mail, but the date that your

23 e-mail was forwarded to Mr. Washington by Ms. Hulvey

24 is November the 6th.

25              So is that your e-mail to Ms. Hulvey on

1   November the 6th of 2018 that's shown part way down?

2   A.      Yes.

3   Q.      Okay.  And it's commenting, is it not, on

4   Mr. Washington's draft of the documents that were

5   shown in the subject line?

6   A.      That is correct.

7   Q.      Okay.  So going back now to Document 6.  Are

8   you with me?

9   A.      Okay, yup.

10  Q.      And that's dated November 6, 2018.  As you

11  can tell, slightly earlier than your e-mail in

12  Document 7?

13  A.      Sorry, I don't know what the date was on my

14  e-mail.  I just know what date and time Kim forwarded

15  it.

16  Q.      Okay.  But this -- this appears to be the

17  documents in Document 6 that you were commenting on

18  in Document 7; correct?

19              MR. BERNIER:  Object to the form.

20              THE WITNESS:  Can I scroll through them

21  quickly, just to confirm that?

22  BY MR. JOHNSON:

23  Q.      Sure.

24  A.      Yeah, Document 6 appears to align with my

25  comments that I noted in Number 7.

1      MR. JOHNSON:  And so did we ever get an

2  answer to the question about when I asked if she had

3  ever talked to Mr. Slater about the litigation?  I

4  know you made the objection and we dealt with that a

5  little bit in exchange.  Did she answer that

6  question?  I'll just pose it again.

7  BY MR. JOHNSON:

8  Q.      Did you ask Mr. Slater about the litigation

9  that you were aware of?

10  A.      I did not.

11  Q.      Okay.  All right.  Let's look at Document 9

12  again for a moment, please, ma'am.

13  A.      Okay.

14  Q.      And let's look at the last page of that

15  document.

16  A.      Okay.

17  Q.      And the last page is called, "Executive

18  Review Board record of action"; correct?

19  A.      Correct.

20  Q.      And there is a block checked there that says,

21  "The ERB does not object to the proposed employment

22  action."  Am I reading that correctly?

23  A.      You are.

24  Q.      And the contractor cannot go forward with the

25  termination without that finding that the ERB does

1  not object to the employment action; correct?

2  A.      That is correct.

3              MS. LINDGREN:  Object to the form.

4              MR. BERNIER:  Object to the form, too.

5  BY MR. JOHNSON:

6  Q.      All right.  We will go back, again, to

7  Document 3.

8  A.      Okay.

9  Q.      I'm sorry.  Before we get off of Document 7,

10  let's address that a little bit more.  Let's go to

11  Document 7 again first.

12  A.      Okay, I'm on Document 7.

13  Q.      Okay.  And on that first page, look under

14  fact-finding, and it says, does it not, under

15  fact-finding, the second sentence, "need to list

16  similar offenses and actions DZ took for those

17  similar situations"?

18  A.      It does say that.

19  Q.      Okay.  And do you recall any discussion at

20  the ERB meeting about any similar offenses and

21  actions DZ took for the similar situations?

22  A.      I'd have to look at the ERB package again.

23  Nothing readily comes to mind.

24  Q.      Okay.  That's in Document 9, if you want to

25  take a look.

1  A.      Hang on a second.  So the examples in

2  Document 9, and that would be Page 8 is what I'm

3  looking at, it's a TVA example for falsification of

4  records.  Well, actually, I said TVA, but I'm not

5  really sure it's TVA or not.  It says the location is

6  Sequoyah, so it could have been a DZ employee at

7  Sequoyah that was terminated for falsification of

8  records.

9  Q.      Where are we now?

10 A.      I am in Document 9, Page 8.

11 Q.      Page 8.  All right.  Let me count.

12 A.      The top of it says, "fact-finding notes

13 contractor only."

14         MR. BERNIER:  And this is TVA Form 41664,

15 Page 1 of 2.

16         THE WITNESS:  So I would look at this,

17 since DZ completed this form, that their similar

18 offense was in March of 2018.  They had a termination

19 and the location was Sequoyah, and it was for

20 falsification of records.

21 BY MR. JOHNSON:

22 Q.      Do you recall any discussion of that?

23 A.      I do not recall any discussion.

24 Q.      Do you recall whether anyone -- well, let me

25 ask it this way:  Do you recall whether anyone talked

1  to Mr. -- said that they had talked to Mr. Goforth

2  about the issue of similar conduct by other employees

3  that were not terminated?

4             MS. LINDGREN:  Objection to form.

5             THE WITNESS:  Are you asking me if I know

6  if anybody talked to Goforth about similar

7  situations?

8  BY MR. JOHNSON:

9  Q.      Yeah, I'm asking if at the ERB meeting there

10 was any discussion of what Goforth said about whether

11 other employees had not been given similar discipline

12 who did the same thing.

13            MS. LINDGREN:  Objection to form.

14            MR. BERNIER:  Object to the form.

15            THE WITNESS:  I don't have any recall of

16 anybody sharing anything regarding Mr. Goforth's

17 making reference to other incidents.  We would have

18 looked at the package and seen that there was a

19 similar event related to falsification of records and

20 the action that was taken.

21 BY MR. JOHNSON:

22 Q.      All right.  Let's go back to Document 3.

23 A.      Okay.  I'm in Document 3.

24 Q.      Okay.  I'm aware.  I'm just trying to get

25 organized here.

1  A.       Okay.

2  Q.       Okay.  Let's look at Interrogatory 9.

3  A.       Okay.

4  Q.       And the answer to that on Page 11.

5  A.       Okay.

6  Q.       And following the objections, let's read from

7  about halfway down where the objections end, where it

8  says, "The ERB is not a part of."  Can you read the

9  rest of that --

10  A.       "The ERB" --

11  Q.       Go ahead.

12  A.       "The ERB is not a part of the disciplinary

13  decision-making process for TVA employees or

14  contractors.  It is a regulatory review and advisory

15  process, required as a condition of TVA's NRC-issued

16  operating licenses.  It does not undertake

17  investigations, conduct interviews, or invite

18  participation.

19          "Further, Plaintiff's ERB did not make or

20  participate in the decision to terminate his

21  employment, nor did it conduct any investigation.

22  See response to Interrogatory Number 3.  Subject to

23  and without waiving the above-stated objections, see

24  responses to Interrogatory Numbers 1 through 8."

25  Q.       So again -- and I think this was consistent

1  with what you testified to previously -- the ERB

2  process is just to determine whether safety conscious

3  work environment mitigating measures are required,

4  and it's -- whether the contractor was correct or not

5  in the findings for a termination is not what the ERB

6  does?

7              MS. LINDGREN:  I'm going to object to the

8  form.

9              THE WITNESS:  The purpose of the ERB is

10  to look at the impact on safety conscious work

11  environment and consistency of actions, but not to

12  make decisions for the contractor relative to

13  employment actions.

14  BY MR. JOHNSON:

15  Q.     Okay.  Let's take a look now at -- back to

16  Document 2.

17  A.     Okay.

18  Q.     And if you're with me, you're seeing this as

19  TVA's answer to Mr. Goforth's complaint in the

20  present case.  So the document is titled, "Answer to

21  Complaint."  Do you see that?

22  A.     I do.

23  Q.     And so if you go to Item Number 27, which is

24  on Page 4, that's where I am.

25  A.     Page 4, Item 27.  Okay.

1  Q.      Okay.  And this is, as I -- let's -- let's go

2  ahead and read that Paragraph 27.

3  A.      "TVA admits that the reviews established in

4  the NRC confirmatory order do not evaluate

5  investigations into employees' actions, nor do they

6  access the merits of the disciplinary decision unless

7  there is an indication of whistleblower retaliation.

8  The NRC instead charges TVA with reviewing the

9  potential effect of the disciplinary action on the

10 safety conscious work environment, SCWE."

11 Q.      Let me interrupt you there, Ms. Augustin.

12 I'm sorry, because I know I asked you to read the

13 whole thing, and I apologize for that.  But I want to

14 kind of break this down as we go forward.

15      So looking at the first sentence of that

16 where it says, "TVA admits that the reviews

17 established in the NRC confirmatory order do not

18 evaluate investigations into employees' actions, nor

19 do they assess the merits of the disciplinary

20 decision unless there is an indication of

21 whistleblower retaliation," do you agree with that

22 statement that TVA asserted in its answer?

23          MR. BERNIER:  I'm going to object to the

24 form.  Meshelle has no foundation in TVA's answer to

25 answer specific questions regarding it.  But,

1  Meshelle, you can answer.

2           THE WITNESS:  I don't have the technical

3  expertise related to the NRC confirmatory order, so I

4  can't really answer that question one way or the

5  other.

6  BY MR. JOHNSON:

7  Q.      Well, let's divorce it from the NRC

8  confirmatory order.  Is it your understanding of the

9  ERB process that the ERB is not to evaluate

10  investigation and employee's action, or assess the

11  merits of the disciplinary decision, unless there's

12  an indication of whistleblower retaliation?

13          So I'm just --

14              MR. BERNIER:  Same objection.

15              MS. LINDGREN:  Objection.

16  BY MR. JOHNSON:

17  Q.      I'm just asking you whether that's your

18  understanding of what -- do you agree that's what the

19  ERB does?

20  A.      Well, my understanding is the ERB is to look

21  at it from a safety conscious work environment and

22  the consistency of the action.  So it's phrased

23  differently there.  So I'm not comfortable answering

24  it the way it's written.

25  Q.      Okay.  And so the problem you have is where

1  it says, "unless there's an indication of

2  whistleblower retaliation"?

3  A.      Yeah.  Again, I'm looking at it from a SCWE

4  mitigation perspective.

5  Q.      Okay.  And so let's read the next sentence

6  then, please.

7  A.      "TVA shall implement a process to review

8  proposed significant adverse employment actions by

9  contractors performing services at TVA's nuclear

10 plant sites before the actions are taken to determine

11 whether the proposed action comports with employee

12 protection regulations, and whether the proposed

13 action could negatively impact the SCWE.  Such a

14 process will likewise consider actions to mitigate a

15 potential chilling effect if the employment action,

16 despite its legitimacy, could be perceived as

17 retaliatory by the workforce."

18 Q.      Okay.  Well, I'm going to break that down a

19 little bit for you and ask you, that this language

20 here seems to describe several things that the ERB is

21 supposed to do; correct?

22              MR. BERNIER:  I'm going to object to the

23 form.  Same objection as earlier.

24 BY MR. JOHNSON:

25 Q.      Well, does it say that the ERB is supposed to

1    now or back when?  Can you give a time frame?

2              MR. JOHNSON:  Sure.

3    BY MR. JOHNSON:

4    Q.        At any time following the denial of

5    Mr. Goforth's access in December of 2018, what he

6    would have to do in order to get his UAA reinstated.

7    A.        So if an individual's unescorted access

8    authorization is denied, they have an opportunity to

9    appeal that.  The process to appeal a UAA decision is

10   outlined in the letter that they get related to the

11   denial.  If it goes through that appeal process and

12   the appeal process does not change that decision,

13   then that individual, depending on the time frame

14   that's identified -- because UAA can be denied from

15   anywhere from, like, one year, I think, to

16   permanently, depending on what the issue is -- they

17   cannot make, I'll call it, "application" for UAA

18   again until that time frame has been exhausted.

19             And then in order to make application for

20   unescorted access, they have to have a position that

21   requires it.  So it would either be a position

22   through a contractor, or it would be a position

23   through TVA.  And part of that onboarding hiring

24   process is to apply for and obtain unescorted access.

25   Q.        Okay.  Let me make sure if I'm understanding

1  it, and you tell me whether I'm correct or not.
2  First of all, let's establish that Mr. Goforth's UAA
3  was revoked or denied permanently.  Is that what you
4  understand?
5  A.     I don't know whether it was a permanent
6  denial or if it had a time on it.
7  Q.     Okay.  Well, let's assume that it was a
8  permanent denial for purposes of my question.  So a
9  person in his position with a permanent denial, if I
10 understand you correctly, has to have a job offer
11 from a contractor before they may initiate a request
12 for a reinstated UAA?
13           MR. BERNIER:  Object to the form.
14           MS. LINDGREN:  I'm going to join that
15 objection.
16           THE WITNESS:  Access authorization will
17 not make a decision related to access unless there's
18 a job required.  So if an individual doesn't have a
19 job, but they would go to access and say I want to be
20 considered for unescorted access, my understanding is
21 unescorted access would not go through that process
22 because there's no reason to do that.
23 BY MR. JOHNSON:
24 Q.     So it's --
25 A.     So --

1  Q.      I didn't mean to interrupt you.  Go ahead.

2  A.      So if an individual has a permanent denial,

3  they probably don't have a position requiring

4  unescorted access because they would know whether it

5  was permanent or if there was a time frame on it.

6  Q.      Okay.  So in Mr. Goforth's case, assuming

7  that he had a permanent denial, he could not apply to

8  get his UAA unless he had a job that required it?

9           MR. BERNIER:  Object to the form.

10          THE WITNESS:  That would be my

11 understanding because there would be no reason for an

12 application for unescorted access without a job

13 requiring it.

14 BY MR. JOHNSON:

15 Q.      Okay.  Thank you.  Let's look at Document 4,

16 please.

17 A.      I am getting a message that says the preview

18 didn't load and it may be protected, and I cannot

19 download this file.

20 Q.      Okay.

21          MR. BERNIER:  Meshelle, try refreshing.

22 This happened to a previous witness.  Just refresh

23 the whole window and see if that helps.

24          THE WITNESS:  And it does.  Is it the

25 employment -- or adverse employment action and

1  executive review board procedure?

2  BY MR. JOHNSON:

3  Q.     Yes.  And I'll represent that this was

4  previously identified as Exhibit 20 to Mr. Sanders'

5  deposition, so I'm not going to be readmitting it.

6         And is this the policies established by TVA

7  to give guidance for conducting executive review

8  boards?

9  A.     This is the procedure that provides that

10  guidance.

11  Q.     And this says, "effective date 10/20/2017" on

12  the first page there; does it not?

13  A.     It does say that.

14  Q.     Okay.  Look at Section 3.0 for me, please.

15  It's on Page 6 of 39.

16  A.     3.0?

17  Q.     Yes, ma'am.  It's called "Process."

18  A.     Yes.

19  Q.     So we're in the Section 3.0 called Process,

20  and then it says -- 3.1 says, "Roles and

21  Responsibilities"; correct?

22  A.     Yes.

23  Q.     And 3.1.1 says, "Executive Review Board";

24  correct?

25  A.     Correct.

1  Q.      And I want you to read Item B under that

2  Section 3.1.1 entitled, "Executive Review Board."

3  A.      Did you say, "B," as in bravo or "D," as in

4  delta?

5  Q.      "B," as in bravo.

6  A.      It states, "Ensure that the discipline is not

7  taken because an employee engaged in activities

8  protected by the employee protection regulations of

9  10 CFR 50.7.{C.1}"

10 Q.      All right.  And let's look at Subsection E,

11 echo, and just read the first line of that, please.

12 A.      "Review proposed adverse actions before the

13 actions are taken to determine whether the proposed

14 actions are consistent with employee protection

15 regulations."

16 Q.      And let's go down to 3.1.3 in the same --

17 3.1.3 on the same page, Page 7 of 39.

18 A.      Okay.  Do you want me to read something?

19 Q.      Yeah.  Let's read -- well, 3.1.3 is called

20 "TVA Nuclear Line Manager"; correct?

21 A.      Yes, it is.

22 Q.      And go ahead and read what it says under

23 alpha there.

24 A.      "The applicable line manager is responsible

25 for initiating this process for both TVA nuclear

1    employees and staff augmented contract personnel,

2    including fact-finding investigation of incidents."

3    Q.      Did you or anyone else from the ERB, to your

4    knowledge, ever contact Jeff McGuire about the

5    proposed ERB actions?

6    A.      I don't have any knowledge related to contact

7    with Jeff.

8    Q.      Do you know who Jeff McGuire is?

9    A.      No.  No, I do not.

10   Q.      Let's look at Page 8 of 39.

11   A.      Okay.

12   Q.      And we're at Section 3.1.5.

13   A.      3.1.5?

14   Q.      Yes, ma'am.  And that's called "Contractor or

15   Vendor Human Resources"; correct?

16   A.      Correct.

17   Q.      And it says -- or read subsection Charlie for

18   me.

19   A.      "The contractor/vendor HR representative is

20   responsible for identifying and informing the TVA

21   nuclear HR and the ERB of any protected activity of

22   which they are aware."

23   Q.      And so do you recall who the contractor HR

24   representative was for Mr. Goforth's termination?

25   A.      It was Rebecca.  I don't remember her last

1  name right off.

2  Q.      Does Rebecca Rogers sound correct?

3  A.      Yes, that's correct.

4  Q.      Did you have any conversations with Rebecca

5  Rogers prior to the termination of Mr. Goforth

6  regarding the subject of the ERB?

7  A.      I don't recall having anything specific to

8  the ERB.  I think it was more about -- well, not the

9  conduct of the ERB, but making sure the ERB paperwork

10  was filled out and the purpose of the ERB.

11  Q.      Okay.  Did you ever have any conversations

12  with her that you recall where you-all talked about

13  protected activity of Mr. Goforth?

14  A.      I don't recall any conversation with Rebecca

15  on protected activity with Mr. Goforth.

16  Q.      I'm going to ask you about some other folks

17  who were not HR folks, but while we're on the subject

18  of information about protected activity.  We've

19  already talked about John Reeves, and I think your

20  testimony was you don't recall any conversations with

21  Mr. Reeves about protected activity of Mr. Goforth.

22  Am I remembering that correctly?

23  A.      Yeah, I don't have any recall of

24  conversations with Reeves related to protected

25  activity or anything else.

1  Q.      And we've already talked about Johnny Slater,

2  and you don't recall any communications with

3  Mr. Slater about protected activity?

4  A.      I do not recall any conversations, other than

5  what you shared with me previously about Mr. Slater

6  and his involvement with the non-select.

7  Q.      Sure.  All right.  How about Tony White, any

8  conversations with Tony White about protected

9  activity?

10 A.      Not about protected activity.

11 Q.      About something -- did you have any

12 conversations with him about something else regarding

13 Mr. Goforth?

14 A.      It would have only been related to the ERB

15 process and DeWarren filling out the paperwork for

16 the ERB process.

17 Q.      Well, tell me what you can recall about such

18 conversations you had with Tony White.

19 A.      Tony is the maintenance director, and

20 DeWarren, the DZ -- I'm not sure what his title

21 was -- coordinator, that he supported maintenance.

22 So Tony is the director of maintenance.  Just from an

23 awareness of DeWarren having to put the ERB package

24 together associated with the manway covers.

25 Q.      Did Tony White mention to you that Goforth

1  had ongoing litigation with TVA?

2  A.     Not that I recall.

3  Q.     Did you ever have any conversations with

4  Jesse James about Mr. Goforth, that you can recall,

5  prior to Mr. Goforth's termination?

6  A.     No, other than I just may have confused my

7  time frame a little bit as to whether it was Jesse

8  James or if it was Tony White that was the director

9  of maintenance during this time.

10  Q.     Well, I can represent to you that that

11  transition from Jesse James to Tony White occurred in

12  about March of 2018, I think the record shows.  Would

13  that be consistent with your memory?

14  A.     Yeah, that sounds right.  So Jesse would have

15  been the director of maintenance, so the conversation

16  about the ERB process would have been Jesse versus

17  Tony.  I previously said I had talked with Tony about

18  the ERB process.  So it would have been with Jesse.

19  Jesse was the maintenance director.

20  Q.     Okay.  Well, what conversations, if any, can

21  you remember that you had with Jesse James about

22  Mr. Goforth?

23  A.     Only, again, that there would have been the

24  ERB process associated with whatever adverse

25  employment action was decided with Mr. Goforth

1  relative to the manways.

2  Q.      Do you recall Mr. James referencing any

3  litigation with TVA that Mr. Goforth was involved in?

4  A.      I do not.

5  Q.      Do you recall him talking about an evaluation

6  that Mr. Goforth had written about an incident that

7  occurred during tritium activities?

8  A.      I do not.

9  Q.      All right.  Let's talk about DeWarren

10  Washington.  Previously, we talked about the boxes

11  that Mr. Washington checked on his initial draft in

12  Item 14.  Can you tell me about conversations you

13  had, if any, with Mr. Washington about Mr. Goforth?

14  A.      The conversations I had with DeWarren were

15  about filling out the ERB paperwork and just helping

16  him through that process.

17  Q.      Can you tell me more specifically what the

18  conversations mentioned?

19  A.      It would have been around completeness of the

20  paperwork; any information or documentation

21  associated with the investigation that supported

22  their decision, their adverse employment decision.

23  Q.      And I think we already talked about that you

24  didn't ask him about why he checked those boxes the

25  way he checked them, but correct me if I'm wrong

1   about that.

2   A.      That's correct.  I didn't ask him about that.

3   I provided that feedback to Kim as part of the review

4   of the package.

5   Q.      Do you recall Mr. Washington specifically

6   saying that Mr. Goforth was involved in litigation

7   with TVA?

8   A.      I don't recall DeWarren sharing that

9   information with me.

10  Q.      Did you have any -- or who is Jon Hanner?

11  A.      I'm not sure.

12  Q.      If I told you that he was the DZ --

13  A.      HR.

14  Q.      -- HR person for Watts Bar, or maybe even for

15  Watts Bar and other facilities, does that sound

16  correct?

17  A.      It does.

18          MS. LINDGREN:  Object to form.

19  BY MR. JOHNSON:

20  Q.      Do you recall having any conversations with

21  Mr. Hanner about Mr. Goforth prior to Mr. Goforth's

22  termination?

23          MS. LINDGREN:  Object to form.

24          THE WITNESS:  I do not specifically

25  recall conversations with Jon, but he could have been

1   A.     We do ERBs for suspensions and terminations,

2   so it's highly likely the majority of them dealt with

3   terminations.

4   Q.     Okay.  On that subject, let's take a look at

5   Document 12.  And just let me know when you're with

6   me.

7   A.     I am with you.

8   Q.     Okay.  That looks on its face -- to make sure

9   we're on the same document -- to be a November 28,

10   2018, letter by the Nuclear Regulatory Commission to

11   Mr. Joseph W. Shea; correct?

12   A.     Correct.

13   Q.     It recites that Mr. Shea was the vice

14   president of nuclear regulatory affairs and support

15   services for TVA; correct?

16   A.     Correct.

17   Q.     You want to take a minute and familiarize

18   yourself just with the letter itself, the first two

19   pages.

20   A.     Okay.

21   Q.     And then, let me know if that is a document

22   you're familiar with.

23          MR. JOHNSON:  And while you're looking at

24   the document, and this is for counsel's reference

25   only, I'm not going to admit this document because

1  it's been previously admitted as <u>Exhibit 17</u>, and that

2  was to Mr. Sanders' deposition.

3              THE WITNESS:  I have reviewed the first

4  two pages.

5  BY MR. JOHNSON:

6  Q.      Okay.  Have you seen this document before,

7  other than in preparation for your deposition with

8  counsel?

9  A.      I don't recall seeing this before.

10  Q.      Okay.  Were you aware that at some point --

11  or let me ask it this way.  At any point since

12  November 28, 2018, has TVA implemented a process to

13  review all access denials by an ERB?

14  A.      Ask me that again.

15  Q.      Since November 28, 2018, the date of this

16  letter, has TVA initiated a process for all access

17  denials to be reviewed by an ERB?

18              MR. BERNIER:  Object to the form.  You

19  can answer, Meshelle.

20              THE WITNESS:  ERBs for access denials are

21  not required.  There can be a discretionary or we

22  call it a non-required ERB for access denials.  And

23  the reason ERB doesn't review access denials is

24  because that is an independent process.  So the

25  denial of access isn't necessarily viewed as an

1 adverse employment action that falls under ERB. That

2 might be an easier way to say it.

3 BY MR. JOHNSON:

4 Q.      And that's the way you have been

5 understanding what ERBs are supposed to do with

6 respect to access denials during the time that you

7 were at Watts Bar?

8 A.      I would have pulled out the procedure, and

9 it's been revised a couple of times since then, so

10 I'd have to look at the procedure and what the

11 requirements were at the time to make sure I answer

12 that question properly. So if we can go back to the

13 ERB procedure, I would feel more comfortable with

14 telling you what the requirements were related to

15 access denials.

16 Q.      But sitting here today you can't recall

17 whether TVA has, since November 28, 2018, required

18 ERB review of all access denials?

19 A.      Correct. There is not a requirement to

20 review all access denials.

21          MR. JOHNSON: Okay. Would y'all like to

22 take another break at this time? And if you could

23 leave Document 12 up, please, Ms. Augustin. We'll

24 come back to that. It's 11:13. I understand you

25 need to be done by 12:45. I think we'll stay well

1   under that, but let's, for everyone's benefit, since
2   we've been going two hours, let's take a -- y'all
3   want five minutes, ten minutes?  A ten-minute break.
4                  THE WITNESS:  I'm good with about five
5   minutes.
6                  MR. JOHNSON:  Okay.  Five-minute break
7   until 11:18.
8                  (Short break.)
9                  MR. JOHNSON:  All right.  Is everybody
10  back?  Are you ready to proceed then?
11  BY MR. JOHNSON:
12  Q.      All right.  We are done with Document 12,
13  except for this one last question.  Was an ERB
14  conducted to review the access denial of Mr. Goforth
15  before his access was denied?
16  A.      No.  There was no reason to do an ERB at that
17  time because it's not required by the procedure.
18  Q.      Do you recall having any conversations with
19  Paul Simmons about Mr. Goforth, other than at the ERB
20  meeting?
21  A.      I happened to be sitting in the OCC, the
22  outage control center, the morning that the issue of
23  the manways being left open came up, and I was
24  sitting next to Paul when that was reported out.  And
25  my conversation with him was about that's not a good

1   A.      Yes.

2   Q.      This seems to be an e-mail from you to Amanda

3   Elizabeth Poland of November 7, 2018; correct?

4   A.      Correct.

5   Q.      Can you tell me who Amanda Poland is?

6   A.      Amanda Poland, at the time, was my boss.

7   Q.      Okay.  And so describe her position for me.

8   A.      She was the director of, I'm going to say,

9   nuclear HR.  I don't recall exactly what the title

10  was.

11  Q.      So she was --

12  A.      But similar to what my responsibilities are

13  today is what she had previously in that role.

14  Q.      Did you succeed her when you got the job?

15  A.      Yeah.  There was a gap in time where the

16  position wasn't filled and two individuals, myself

17  and someone else, acted in that role.  And then in, I

18  believe, it was late -- late August or September of

19  last year is when I took the position full-time.

20  Q.      Okay.  So on November 7th Ms. Poland is

21  saying, is she not, "Contractors don't, but isn't

22  Goforth the one who has an open action against us for

23  not hiring him"?  That's what Ms. Poland is saying to

24  you; right?

25  A.      Yes.

1  Q.      And then you're responding to that with this

2  e-mail back to her; right?

3  A.      Correct.

4  Q.      So tell me about any conversations that you

5  may have had with Ms. Poland on the subject of this

6  e-mail prior to the termination of Mr. Goforth.

7  A.      So Amanda had been contacted through LinkedIn

8  by Mr. Goforth, and when she accepted the request, he

9  apparently had reached out to her relative to his

10 non-select action and had asked her via LinkedIn for

11 assistance.  And so Amanda had asked at some point

12 relative to that contact, you know, what the

13 information was or what the case was that was

14 impacting Mr. Goforth.  And I shared with her that it

15 was a non-select related to that preference.

16 Q.      So at the time that you sent this e-mail to

17 Ms. Augustin (sic), this was prior to the meeting of

18 the ERB on November 21st that we talked about

19 earlier; correct?

20 A.      Correct.

21 Q.      At any time prior to the termination of

22 Mr. Goforth, did you attempt to find out any more

23 about what this open litigation you-all are referring

24 to was about?

25 A.      No, I didn't, and --

1           MS. LINDGREN:  Object to the form.

2           THE WITNESS:  No, I did not, and the

3    reason is, I deal with a number of various cases in

4    different stages, and I don't keep basically a

5    running status as to where each one of those is.  So

6    if OGC reaches out to our HR generalist, or reaches

7    out to me for information, then it becomes a data

8    point.  But otherwise, they just kind of work through

9    the process in the background.

10   BY MR. JOHNSON:

11   Q.      Were you not concerned at this time that this

12   might be protected activity?

13           MS. LINDGREN:  Object to the form.

14           THE WITNESS:  I looked at this as a

15   separate issue, a non-select, not necessarily

16   protected activity.  I look at it as a different

17   element.

18   BY MR. JOHNSON:

19   Q.      And then if you look at the second page,

20   please, of Document 10.  Please read -- well, let's

21   establish what it is first.  It seems to be another

22   e-mail from you to Ms. Poland, but this one is dated

23   November 21st in the afternoon at 1:53 p.m.; correct?

24   A.      That is correct.

25   Q.      So this would have been sometime pretty

1    as Exhibit 68, and it is -- Document 10 is

2    Exhibit 68.

3                (Document was marked for identification

4    as Exhibit Number 68.)

5    BY MR. JOHNSON:

6    Q.      Let's look at Document 11.

7    A.      Okay.

8    Q.      And do you recognize the e-mail from you --

9    or from DeWarren Washington, because it was CC'd to

10   you and Mr. Sanders, of December 4th that begins

11   halfway down the page?

12   A.      Is the question do I recognize the e-mail?

13   Q.      Yeah.  Do you recall sending this e-mail or

14   receiving this e-mail?

15   A.      I don't necessarily recall receiving it, but

16   apparently I did because I'm on the CC.

17                MR. JOHNSON:  All right.  Let's call that

18   69.  Document 11 is 69.

19                (Document was marked for identification

20   as Exhibit Number 69.)

21   BY MR. JOHNSON:

22   Q.      This may be a subject that we've addressed

23   earlier in the deposition, I can't recall, but remind

24   me if we did.  Do you recall a complaint made by Greg

25   Whitehorn in the 2017/2018 range of time?

1   A.     Is there a topic related to Mr. Whitehorn?

2   Q.     Yes, a complaint about retaliation for

3   protected activity.

4   A.     I recall Mr. Whitehorn having a concern about

5   a performance review.  I don't recall if it was tied

6   to a complaint about protected activity.

7   Q.     What role, if any, did you play with regard

8   to that complaint that you just referenced?

9   A.     I worked through a process related to

10   Mr. Whitehorn's performance review and his

11   superintendent at the time relative to the accuracy

12   of the performance review, and then we ultimately had

13   a settlement with Mr. Whitehorn that drove changes to

14   his performance review.

15   Q.     Do you recall if his supervisor at the time

16   that wrote the performance review was Dusty Rhodes?

17   A.     Yes, that was the superintendent that we

18   worked with.

19   Q.     So did you work -- did you have

20   communications directly with Mr. Rhodes in attempting

21   to work this out with Mr. Whitehorn?

22   A.     Yes.

23   Q.     Did Mr. Rhodes -- well, let me ask this about

24   Mr. Whitehorn first.  Did Mr. Whitehorn ever provide

25   you with copies of an evaluation of cycle 14 tritium

1  program that was part of his complaint?

2  A.      I do not recall.

3  Q.      If you don't recall the document, do you

4  recall the subject matter?

5  A.      I don't recall a document or the subject

6  relative to Mr. Whitehorn's complaint.

7  Q.      Do you recall the complaint was about certain

8  CRs that were written about activity in the tritium

9  program?

10          MR. BERNIER:  Object to the form.  Jim, I

11  think we're a little far afield here from the case.

12  Are you talking about a different case entirely?  Are

13  you going to link them up?

14          MR. JOHNSON:  Well, I mean, I don't think

15  this is a time to make relevance objections, if

16  that's what you're doing.  But we believe it to be

17  relevant, so I would ask that the witness answer the

18  question.

19          MR. BERNIER:  Okay.  You can answer,

20  Meshelle.

21          THE WITNESS:  I don't remember any

22  condition reports related to tritium.  Again, the

23  recall I had had to do with his performance review

24  and his overall performance rating for that

25  performance review.

1  BY MR. JOHNSON:

2  Q.      Do you recall discussing, in the context of

3  your involvement to the settlement of the matter,

4  whether Mr. Rhodes mentioned Mr. Goforth's

5  evaluation?

6              MR. BERNIER:  Object to the form.  Jim,

7  what do you mean by discussing in the context of the

8  settlement of the matter?

9  BY MR. JOHNSON:

10 Q.      All right.  Do you recall Mr. Rhodes telling

11 you anything about an evaluation of cycle 14 of the

12 tritium program written by Mr. Goforth?

13 A.      I do not.

14 Q.      Do you recall complaints by any other TVA

15 employees, besides Mr. Whitehorn, that were for

16 protected activity within the tritium program in

17 2017/2018?

18             MR. BERNIER:  Object to the form.

19             THE WITNESS:  I would not necessarily get

20 any complaints like that.  I don't have any recall of

21 other complaints or concerns.  In fact, I don't have

22 any dealings from the perspective of the tritium work

23 that's done.  So based on that, I have no recall of

24 any other issues that came up associated with

25 tritium.

1  BY MR. JOHNSON:

2  Q.     Do you recall Mr. Whitehorn taking the

3  position in his complaint that Mr. Rhodes' evaluation

4  was retaliation for his protected activity?

5           MR. BERNIER:  Object to the form.

6           MS. LINDGREN:  Object to the form.

7           THE WITNESS:  I don't have any specific

8  recall to that.  Again, what I recall was focused on

9  overall performance review and the rating.

10          MR. JOHNSON:  I think I may be finished

11  with my questions.  Let me just check on a couple of

12  these exhibits with the court reporter.  Was

13  Document 7 admitted as one of the exhibits?

14          THE REPORTER:  No.

15          MR. JOHNSON:  Okay.  If anybody wants to

16  take a look at Document 7 again, we went over it, and

17  I would like for that to be admitted as Exhibit 70.

18          (Document was marked for identification

19  as Exhibit Number 70.)

20          MR. JOHNSON:  And we admitted Document 9

21  as an exhibit, did we not?  I'm asking the court

22  reporter.

23          THE REPORTER:  Yes.

24          MR. JOHNSON:  And we admitted Document 1,

25  did we not?

1                    REPORTER'S CERTIFICATE

2

3    STATE OF TENNESSEE

4    COUNTY OF HAMILTON

5           I, PAULA McGUIRK, RPR, LCR#789, CCR-GA, in

6    and for the State of Tennessee, do hereby certify

7    that the deposition of MESHELLE AUGUSTIN was reported

8    by me, and that the foregoing 90 pages of the

9    transcript is a true and accurate record to the best

10   of my knowledge, skills and ability.

11          I further certify that I am not related to

12   nor an employee of counsel or any of the parties to

13   the action, nor am I in any way financially

14   interested in the outcome of this case.

15          I further certify that I am duly licensed

16   by the Tennessee Board of Court Reporting, as

17   evidenced by the LCR number and expiration date

18   following my name below.

19          In witness whereof, I have hereunto set

20   my hand this 5th day of October, 2021.

21

22

23          PAULA McGUIRK, RPR, LCR, CCR-GA
            LCR#789 - Expires:  6/30/2022

24

25

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2             EASTERN DISTRICT OF TENNESSEE

3                  AT CHATTANOOGA

4   -------------------------------------------------
                                     )
5   ROBERT M. GOFORTH,               )
                                     )
6          Plaintiff,                )
                                     ) Case No.:1:20-cv-254
7      vs.                           )
                                     )
8   TENNESSEE VALLEY AUTHORITY       )
    and DAY & ZIMMERMANN NPS,        )
9   INC.,                            )
                                     )
10         Defendants.               )
    -------------------------------------------------
11                          Chattanooga, Tennessee
                            September 30, 2021
12

13          DEPOSITION OF REBECCA WHITEMAN
                (Formerly Rebecca Rogers)
14                 (Appearing remotely)
    -------------------------------------------------
15

    APPEARANCES:
16

                  FOR THE PLAINTIFF:
17

                  JAMES M. JOHNSON, ESQ.
18                Attorney at Law
                  620 Lindsay Street, Su 210
19                Chattanooga, TN 37403
                  (423) 648-4093
20                jj@jamesmjohnsonatty.com

21

22

23

24

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-37  Filed 11/15/21  Page 384 of 672  PageID #: 654
UA 0377

1   for a moment.  I'm not going to quiz you in-depth on it.

2   I'll ask you particular things.  But just to familiarize

3   yourself with it.  And let me know when you're ready.

4      A   Okay. (Reviewing document.)

5      Q   On its face, this document is dated January 5,

6   2017, correct?  Top left-hand corner.

7      A   Yes.  Yes.

8      Q   And does this look like a hire letter from

9   Day & Zimmermann for a particular job for Mr. Goforth?

10         MR. LANTIS:  Objection to form.

11      A   Yes.

12      Q   And in the first sentence of the letter it's

13   saying that the company is offering him the position of

14   task manager DOE tritium project at TVA Watts Bar Nuclear

15   Power station in Spring City, Tennessee.

16      So my question is, is that the job that he held at

17   the time that you were involved in his termination?

18         MR. LANTIS:  Objection to form.

19         You may answer.

20      A   To my knowledge, he was in that role.

21      Q   And have you ever worked on these hire letters of

22   employees before, management employees like this?

23      A   No.

24      Q   So if we go down the document it says:  "In the

25   performance of these duties, we are pleased to offer you

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-18   Filed 11/15/21   Page 385 of 672   PageID #: 655
JA 0378

1  a bi-weekly salary of $5,760, which is the equivalent of

2  $149,760."  Correct?  It says that?

3      A   Yes, it says that.

4      Q   And it says:  "Your salary is based on the

5  assumption you will be working a 40-hour workweek,

6  although you may sometimes work more or less."

7          So my question about that is, is a 40-hour

8  workweek a full-time job?

9                  MR. LANTIS:  Objection to form.

10                 You may answer.

11     Q   And I'm talking about at DZ in 2017, in your

12 experience, is a 40-hour workweek a full-time job?

13                 MR. LANTIS:  Objection to form.

14                 You may answer.

15     A   Yes, that would be considered a full-time

16 position.

17     Q   And we've talked before about outages.  In your

18 deposition testimony you mentioned outages.  So, when

19 there is an outage at Watts Bar, are most DZ employees

20 assigned to Watts Bar given an outage role that is

21 separate from their full-time role?

22     A   Sometimes.  Not all the time, is my understanding,

23 I don't know the ins and outs of exactly, you know,

24 what -- where they might move somebody.

25     Q   But that happens?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 125-1 Filed 11/15/21  Page 386 of 672  PageID #:
656
JA 0379

1  an outage then the time gets assigned to outage time?

2          MR. LANTIS:  Objection to form.

3          You may answer.

4          MR. MEALOR:  Objection.

5    A   I believe so.  Again, I'm not a hundred percent

6  sure how the ins and outs work on the time.  I don't know

7  it to be an issue.

8    Q   Okay.  Well, looking at the first page again,

9  which is marked 368 at the bottom right...

10   A   Okay.

11   Q   I understand from your testimony that your boss at

12  the time was Jon Hanner, correct?

13   A   That's correct.

14   Q   So, if you look partway down, on November 15th

15  Victoria Lopez was saying -- and I'm just reading for you

16  for the benefit of brevity, "Jon - is this billable to

17  the client or non-billable?"  It says that, right?

18   A   Yes.

19   Q   Do you know who Victoria Lopez is?

20   A   Victoria Lopez worked in the business services

21  organization.

22   Q   So what does the business services organization

23  do?  Or maybe more specifically, what does she do within

24  the business services organization?

25   A   My understanding is they help with administrative

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-15  Filed 11/15/21  Page 387 of 672  PageID #:
JA 0380
657

1  tasks on the HR side.  So, for this purpose, it looks
2  like she was helping out, trying to get this sorted
3  through.
4      Q   So she's an HR -- within HR?
5      A   Yes.
6      Q   And then there is an answer back to Ms. Lopez that
7  says, at the top of Document 2, "Billable per John
8  Reeves," right?
9      A   Yes.
10     Q   The first email --
11     A   Yes.
12     Q   So, the question there is "Do we bill this to the
13  client," I take it that that means -- the client would be
14  TVA, right?
15     A   Yes.
16     Q   "Do we bill this to the client" or do we bill it
17  to ourselves, I guess.  DZ, right?
18             MR. LANTIS:  Objection to form.
19             MR. MEALOR:  Objection.
20             MR. LANTIS:  Objection.
21     A   Yes.
22     Q   Okay.
23     A   To DZ.
24     Q   And do you -- if I state that Mr. Goforth was
25  suspended from work, with pay, on October 22nd until he

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 125-1   Filed 11/15/21   Page 388 of 672   PageID #:
JA 0381
658

1  was terminated on November the 29th, this email would've

2  been sent during that period of his suspension, right?

3      A    Yes, it appears that way.  I was not involved.

4      Q    Okay.  Let's take a look at Document 3.

5              THE REPORTER:  Was that an exhibit, sir?

6              MR. JOHNSON:  Oh, yeah.  I need to mark this

7  one.  This will be Exhibit 74, the November 15th email

8  chain that we were just discussing.

9              (Exhibit 74 marked for identification.)

10 BY MR. JOHNSON:

11     Q    Okay.

12     A    I've opened Document 3.

13     Q    All right.  Again, this is not -- well, let's see.

14 This is not something that I expect you to have seen

15 before.  But this seems to be a later iteration of the

16 some thing we discussed in Exhibit 74 that we just

17 reviewed.  So I'm going to ask you some questions

18 regarding this one.

19         At the bottom of this document which has been

20 previously marked as Exhibit 56, it says, in an email

21 to -- copies to your boss, Mr. Hanner -- are you with me,

22 there at the bottom of Exhibit 56?

23     A    Yes.

24     Q    Okay.  And this email went to your boss,

25 Mr. Hanner, right?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-1   Filed 11/15/21   Page 389 of 672   PageID #:
659
JA-0382

1    A   Yes.

2    Q   Okay.  And it says:  "The job that Mr. Goforth is

3  on works for 10s.  That job worked three days last week.

4  Then I put him in the for holiday that we got.  I was not

5  aware at all that Mr. Goforth was terminated on the 21st.

6  When I asked Mr. Washington today about Mr. Goforth's

7  time, he told me he needs to be paid for last week."

8        It says that, correct?

9    A   Yes, it says that.

10    Q   So, open Document 3A now, please.

11    A   Okay.  I've opened it.

12    Q   And the top -- well, Document 3A has been

13  previously marked as Exhibit 57.  And at the top it

14  appears to be an email from your boss, Jon Hanner, dated

15  November 26 to DeWarren Washington, Carla Fisher,

16  Stephanie Chesser, and others, correct?

17    A   Yeah.

18    Q   And what your boss, Mr. Hanner, is saying is, is

19  he not, "To clarify, this means three days at eight hours

20  per day billable as DeWarren directs."  It says that,

21  does it not?

22    A   Yes.

23    Q   And then if we look down at the next email, it's

24  an email from Mr. Washington to Mr. Hanner, dated the

25  same day as the email that you just -- that we just

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-53   Filed 11/15/21   Page 390 of 672   PageID #:
660
JA 0383

1  looked at.  And in that email, Mr. Washington is saying

2  to Mr. Hanner, "H should be paid what his work group

3  worked," correct?

4          MR. LANTIS:  Objection to form.

5      A   Yes.

6      Q   All right.  And then if you turn to the next page,

7  there's an email halfway down from Carla Fisher to

8  Stephanie Chesser and copied to your boss and others,

9  that says, "He works tritium."  It says that, does it

10  not?

11     A   Yes.

12     Q   And so Ms. Fisher, who you previously identified,

13  is saying:  "He works tritium.  Miki confirms they did

14  work, so I will charge him to that for three days and two

15  holidays."  It says that, right?

16          MR. LANTIS:  Objection to form.

17          You can answer, Becca.

18     A   Yes, it says that.

19     Q   So from reading this, is it fair to conclude that

20  when Mr. Goforth was on suspension he was paid time for

21  his -- the time that his work group, tritium, worked,

22  correct?

23          MR. LANTIS:  Objection to form.

24          MR. MEALOR:  Object.

25     A   Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-6   Filed 11/15/21   Page 391 of 672   PageID #:
661
UA 0384

1  terminated for falsification of documents; is that

2  correct?

3      A   That's correct.

4      Q   Let's open Document Number 5.

5      A   Okay.  It's open.

6      Q   This document appears on its face to be an email

7  from you to Kenneth Blackwell, with copy to John Reeves

8  dated, October 31, 2018.  Am I correct?

9      A   That is correct.

10     Q   And the subject matter is "Protected Activity,"

11 right?

12     A   That is correct.

13     Q   So, just tell me what you were trying to do with

14 this email when you sent it.

15     A   So, as part of our process for the ERB process, we

16 check with our ECP designated person, who was Kenneth

17 Blackwell here, to ensure that the employee hasn't

18 engaged in any protected activity on the DZ side.

19     Q   So tell us for the record what ECP stands for.

20 You just mentioned ECP.  If I help you out a little bit,

21 can you tell me --

22     A   Yeah, you're going to have to.

23     Q   You're having a little brain freeze in that.  If I

24 tell you it's Employee Concerns Program, does that sound

25 right?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-3  Filed 11/15/21  Page 392 of 672  PageID #:
662
JA 0385

1    A    Yeah, that's correct.  Thank you.

2    Q    And so what was Kenneth Blackwell's role within --

3    if any, within employee concerns?

4    A    He was our representative for DZ at the TVA sites.

5    Q    At all of the TVA's sites or just Watts Bar?

6    A    He does all of them, to my knowledge.

7    Q    So did he reside, in 2017-'18, geographically, up

8    at Lancaster, or was he somewhere down in TVA world?

9             MR. LANTIS:  Objection to form.

10   A    To my knowledge, he was somewhere in TVA,

11   Tennessee.

12   Q    So, is it your understanding of the ERB process,

13   which you just mentioned, that DZ is, with respect to

14   employees like Mr. Goforth, supposed to conduct a search

15   for protected activity by the employee?

16   A    Yes.

17   Q    So other than contacting Mr. Blackwell about

18   concerns that Mr. Goforth may have expressed to ECP, what

19   other attempts to determine if Mr. Goforth engaged in

20   protected activity did you make?

21   A    We followed the ERB process that had been set

22   forth by TVA.

23   Q    Did you talk to Mr. Goforth about whether he had

24   engaged in protected activity?

25   A    No.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-4  Filed 11/15/21   Page 393 of 672   PageID #:
663
JA 0386

```
 1      Q   Did you talk to John Reeves about whether
 2   Mr. Goforth had engaged in protected activity?
 3      A   No.  Aside from this email being sent.
 4      Q   Do you know what role Mr. Reeves played in the
 5   termination of Mr. Goforth?
 6      A   Yes.
 7      Q   What was that role?
 8      A   John Reeves made the decision to terminate
 9   Mr. Goforth.
10      Q   Did John Reeves ever tell you what he based that
11   decision on?
12      A   Yes.
13      Q   Did he tell you that he interviewed Mr. Goforth?
14      A   Yes.
15      Q   Did he tell you that Mr. Goforth told him during
16   the interview that he was being targeted for protected
17   activity?
18            MR. LANTIS:  Objection to form.
19            You may answer.
20      A   He had mentioned that Mr. Goforth had raised a
21   concern but it was not part of this concern.
22      Q   Okay.  Well, what did he tell you about the
23   concern that Mr. Goforth raised?
24      A   He didn't tell me any details about it.  And
25   that's why we do these ECP protected activity checks.
```

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-15   Filed 11/15/21   Page 394 of 672   PageID #:
664
JA 0387

1    Q   Did he tell you that there were other employees

2   who engaged in the same types of activity that he was

3   fired for that were not disciplined?

4            MR. LANTIS:  Objection to form.

5            MR. MEALOR:  Object to form.

6    A   No.

7    Q   So as follow-up to what Mr. Reeves said to you, as

8   you've just testified, did you do anything to discover

9   what protected activity Mr. Goforth may've engaged in,

10  other than sending this email to Mr. Blackwell?

11   A   Yes.  As I had mentioned before, we go through the

12  ERB process that's set forth by TVA.

13           And I think it's helpful to add that, you know,

14  safety is Day & Zimmermann's number one core value, and

15  we really care about the safety of our employees.  So I

16  think the great thing about the ERB process that we go

17  through, and filling out the paperwork and engaging in

18  that review board, is that it puts that layer of checks

19  in place to ensure that any proposed actions that

20  management is taking doesn't negatively impact our

21  employees.  And it just makes them feel comfortable to

22  raise a concern without fear of retaliation.

23   Q   So, I take it from your testimony then that any

24  further information, other than from Mr. Blackwell, on

25  protected activity by Mr. Goforth would be reflected in

1   the ERB documents?

2           MR. LANTIS:  Objection to form.

3           You may answer.

4           MR. MEALOR:  Object to form.

5   A   Yes.  We would check that they've had contact with

6   the ECP representative.  We don't know what the protected

7   activity was.

8   Q   Other than Mr. Goforth and Mr. Reeves, which

9   you've already testified about, did you speak -- do you

10  recall speaking to anyone else about protected activity

11  by Mr. Goforth?

12  A   Yes.

13  Q   Who would that be?

14  A   Jon Hanner.

15  Q   All right.  Tell me about the discussions you had

16  about protected activity by Mr. Goforth with Jon Hanner.

17  A   So, to the follow-up to this email they had, the

18  only contact that DZ had had, from Ken's perspective, was

19  a casual contact, to my knowledge, which there was no

20  details on.  So we chose to put that on the ERB

21  paperwork, where we check yes, they've contacted the ECP

22  department.

23      I wouldn't consider that protected activity

24  necessarily, but they did contact.  So my question to Jon

25  Hanner was just ensuring that even though it was a casual

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-7  Filed 11/15/21  Page 396 of 672  PageID #:
JA 0389
666

1    contact with our ECP representative, that it was in fact

2    considered a contact to ECP, and so I wanted to ensure

3    that when we were filling the paperwork out to be

4    presented to the review board that we checked that box.

5    That would make sense.

6        Q   So the only thing you discussed with Mr. Hanner

7    was -- with respect to protected activity by Mr. Goforth,

8    was this ECP documentation that you've just referred to?

9        A   Yes.  The email that Ken had sent back after this.

10                 MR. JOHNSON:  All right.  Let me just say for

11   the record that Document 5 that Ms. Rogers was looking at

12   has been previously identified as Exhibit 32.  So we

13   don't need to re-introduce it.

14   BY MR. JOHNSON:

15       Q   Okay.  I think we're at the point where you can

16   open up Document 6.

17       A   Okay.  I'm opening Document 6.

18       Q   So, Document 6 appears to be what you had -- what

19   you previously testified to just a moment ago about

20   discussing the ECP information from Mr. Blackwell with

21   Mr. Hanner, correct?

22       A   Yes.

23       Q   So, on -- it appears that you conducted that

24   conversation, set up by this email, at a meeting on

25   November 2nd.  So my question is, did you have that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 55   Filed 11/15/21   Page 397 of 672   PageID #:
667
JA 0390

1  meeting on November 2, 2018 with Jon Hanner?

2      A    Yes.

3      Q    And did John Reeves participate, as indicated on

4  this meeting getting set up?

5      A    I believe so.

6      Q    Do you recall anything that John Reeves said

7  during this phone conference of November 2nd?

8      A    I don't remember all of the conversation, but I do

9  recall that he was on the call with us.

10     Q    Did he at this time say, to your recollection,

11 that Mr. Goforth had told him that he was being targeted

12 for protected activity, and he said that during his --

13 that is, that he said that during his interview with him?

14             MR. LANTIS:  Objection.

15     Q    Do you recall whether Mr. Reeves said that during

16 this meeting?

17             MR. LANTIS:  Objection to form.  You may

18 answer.

19             MR. MEALOR:  Objection.

20     A    I don't recall exactly what he said in regards to

21 Mr. Goforth feeling targeted.  I do recall that he had

22 mentioned that he brought something up about him -- about

23 Mr. Goforth being involved in protected activity.

24         We -- excuse me.  John Reeves had already made his

25 decision, and we were reviewing to ensure that we were

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 398 of 672   PageID #:
668
JA 0391

1   putting everything properly on the paperwork to reflect.

2   And I assured John Reeves that, you know, I had to go

3   through my own checklist with DZ in which this came up.

4   So that's why we had that conversation.

5       Q   So when you say that Mr. Reeves had already made

6   his decision, you mean the decision to terminate

7   Mr. Goforth?

8       A   That is correct.

9       Q   So did Jon Hanner suggest to you any follow-up

10  that should be done regarding Mr. Reeves mentioning, as

11  you've just testified to, protected activity by

12  Mr. Goforth?

13      A   No.

14      Q   And did you take -- and I think this is just

15  repeating testimony you've already made, but just to be

16  sure now that we've looked at this.  Did you do anything

17  other than conduct -- contact Mr. Blackwell about

18  protected activity by Mr. Goforth, and filling out the

19  ERB documents as you've previously testified to?

20      A   No, nothing additional.

21      Q   Looking at the second page of Document Number 6 --

22  which let's go ahead and mark this as Exhibit 76.

23              MR. LANTIS:  Jim, you're marking this entire

24  document, Document 6, as Exhibit 76?

25              MR. JOHNSON:  Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 155-1   Filed 11/15/21   Page 399 of 672   PageID #: 669
UA 0392

1          MR. LANTIS:  Okay.  I just want to be clear

2  for the record, this is a compendium of documents.  That

3  it's not one continuous document, rather it's --

4          MR. JOHNSON:  Right.

5          MR. LANTIS:  -- multiple documents, one of

6  which looks like it was previously marked.

7          MR. JOHNSON:  Yeah.  Within it is previously

8  marked Exhibit 35.

9          MR. LANTIS:  There's just three separate

10  documents in this one document.

11          MR. JOHNSON:  Right.

12          Off the record for a moment.

13          (Off-the-record discussion was had.)

14          MR. LANTIS:  Why don't we mark that as three

15  separate documents?  I just -- there are three documents,

16  and they're -- I mean, it's not one exhibit.  I think

17  that's going to create confusion, especially when one of

18  the documents inside has already been marked as its own

19  standalone document.  I think that we should break this

20  into three.

21          MR. MEALOR:  I concur.

22          MR. JOHNSON:  All right.  You tell her how

23  you want to break it down.  It doesn't matter to me.

24          MR. LANTIS:  Well, I just think we should

25  break it down into the specific documents.  Right?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-13  Filed 11/15/21  Page 400 of 672  PageID #:
670
JA 0393

1          So the first page is a calendar invite.
2  That's a document.
3          DZ --
4          MR. JOHNSON:  So that's Exhibit 76.
5          MR. LANTIS:  Okay.  DZ 906 is a document --
6  it's a portion of a document, and it's been marked
7  previously as Exhibit 35.  So let's just look at that and
8  call it Exhibit 35.
9          And then you've got the last two pages of
10  this document, which is DZ 405 and 406, and that should
11  be its own document as well.  And maybe you want to mark
12  that one as 77.  I don't have a preference.  Maybe you're
13  not going to even use those last two pages.  But I just
14  think that's --
15          MR. JOHNSON:  Okay.
16          MR. LANTIS:  -- three completely separate
17  documents, and the record should reflect that.
18          MR. JOHNSON:  All right.  We'll so mark them.
19          So, Sheila, are you clear, the first page of
20  this Document 6 is Exhibit...
21          THE REPORTER:  76.
22          MR. JOHNSON:  76.  And then Exhibit 35 has
23  already been admitted, the next.  And then the last two
24  pages are going to be Exhibit 77.
25          (Exhibits 76 and 77 were marked for

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-7   Filed 11/15/21   Page 401 of 672   PageID #: 671
JA 0394

1              identification.)

2    BY MR. JOHNSON:

3        Q    So, for your purposes Ms. Whiteman, let's look at

4    the second page of what you're looking at, which says

5    Exhibit 35 at the bottom, previously marked Exhibit 35.

6        A    Okay.

7        Q    So you recall seeing this, I take it?  Because

8    this is an email from Mr. Blackwell to you of October

9    31st.  Correct?

10       A    Yes.

11       Q    And it is in response to your email that was in

12   Document 5 that we just went through previously.  And it

13   was previously marked as Exhibit 32.  It was in response

14   to the email you had sent them on October 31st that we

15   just went over.  And he's getting back to you the same

16   day and sending you this email, correct?

17       A    Yes.

18       Q    And in it it says that the concerned individual,

19   CI, his name is Robert Goforth, correct?

20       A    Yes.

21       Q    And that he contacted ECP on August 30, 2018,

22   correct?

23       A    Yes.

24       Q    And it says CI's concern, does it not?  "CI is

25   augmented to TVA..."  It says that, right?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-15 Filed 11/15/21  Page 402 of 672  PageID #:
JA 0395
672

1    A   Yes.

2    Q   "... and states he believes he is being set up for

3 failure," correct?

4    A   Yes.

5    Q   And then it says, in the notes, that "the

6 concerned individual stated that the DZ site manager

7 doesn't like him, may be trying to set him up to fail.

8 States he didn't want to file a concern and is handling

9 himself."  That's correct?  What I just read is correct,

10 right?

11    A   Yes.

12    Q   So, what follow-up, if any, did you do with anyone

13 regarding the information that was contained on here,

14 besides talking to Mr. Blackwell and Mr. Reeves about it

15 as you've just testified?

16    A   I shared it with Jon Hanner.

17    Q   Anything else?

18    A   I'm sorry?

19    Q   Anything else you did as follow-up to this?

20    A   I, as I mentioned before, stated it -- or put it

21 on the ERB paperwork as a contact to our ECP department,

22 even though it was, as it says, "not a concern, he's

23 handling himself."

24    Q   So you did no follow-up with anyone about the

25 validity of Mr. Goforth's expressed statement that he's

Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-5   Filed 11/15/21   Page 403 of 672   PageID #: 673
JA 0396

1   being set up to fail?

2          MR. LANTIS:  Objection to form.

3          You may answer.

4   A    No.

5   Q    And now we'll look at what's been marked as

6   Exhibit 77, which appears on its face to be an email from

7   Kenneth Blackwell to Mr. Reeves and Mr. Hanner.

8        Have you seen this email before?  It says DZ page

9   405, in the bottom right-hand corner.  Should be the

10  third page of your document?

11  A    Let me look.  (Reviewing document.)  I don't

12  recall what this is about.

13  Q    Okay.  Look at the bottom of that document.

14  There's an email from Jeff McGuire to Ruth Fordham that's

15  a part of this email chain.  Are you with me, at the

16  bottom of that page?

17  A    Yes.

18  Q    Read that email through the end, which goes on to

19  the next page.

20  A    (Reviewing document.)  Okay.

21  Q    So did Mr. Hanner or Mr. Reeves share this email

22  of Mr. McGuire's that we're looking at, with you?

23  A    I believe so, but I don't recall.

24  Q    Okay.  I want to direct your attention

25  particularly to the language where it says, at the top of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-57   Filed 11/15/21   Page 404 of 672   PageID #: 674
JA 0397

1  DZ page 406, the last page of your document, it says,

2  Mr. McGuire is stating in the email, "Look at the prior

3  steps.  Robert thought he was verifying the manways were

4  ready to be.  DZ is saying the intent of the signoff was

5  for the supervisor to visually verify the manways were

6  installed.  To a degree I can see both sides.  However,

7  the step is poorly written at best.  It is a note, not a

8  step.  The actions are out of order as the cleanness

9  inspection should be before the installation.  The only

10  action for the supervisor was to observe the cleanliness,

11  which he did.  And no place does it say the supervisor

12  has to visually observe the manways are installed."

13      Looking at that language, do you recall seeing

14  this and incorporating some of this language in the ERB

15  documents?

16  A  I don't recall putting all of this in there.  I do

17  recall that part of the work order was to ensure that the

18  manways were reinstalled -- excuse me, the manway covers

19  were reinstalled.

20  Q  Do you recall at any time arriving at the

21  conclusion that the crux of the dispute was whether

22  Mr. Goforth was signing off a note or whether he was

23  signing a work step?

24  A  I recall it being a work step in a procedure.

25  Q  Do you recall that Mr. Goforth's position was that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-53   Filed 11/15/21   Page 405 of 672   PageID #:
675
JA 0398

1  he was only signing off, as it says here in Mr. McGuire's

2  email, was only signing off on a note, not a work step?

3  Do you recall understanding that at the time of doing the

4  ERB documents?

5          MR. LANTIS:  Objection to form.

6          MR. MEALOR:  Object.

7  A    No, I recall it being a work order.

8  Q    Well, we know it was a work order.  The question

9  was whether you understood that it was Mr. Goforth's

10  position that he was only signing off on a note, not a

11  work step?

12          MR. MEALOR:  Object to form.

13  A    To my knowledge, I believe it was a work step.

14  Q    Well, I know that's your knowledge.  My question

15  is, are you -- were you aware that Mr. Goforth's position

16  was that it was not a work step, that it was a note he

17  was signing off on?  I'm asking you did you understand

18  that to be his position, not whether you thought it was

19  right.

20  A    No.

21  Q    All right.

22          MR. LANTIS:  Jim, could we take a short break

23  at some point in time when you get to a natural stopping

24  point?

25          MR. JOHNSON:  Yeah.  We can take it now if

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50-5   Filed 11/15/21   Page 406 of 672   PageID #:
676
JA 0399

1   you want.

2              MR. LANTIS:  Just five minutes or something.

3              MR. JOHNSON:  Yes.

4              MR. LANTIS:  Okay.  Thanks.

5              (Recess from 10:21 to 10:28 a.m.)

6   BY MR. JOHNSON:

7      Q   Ms. Whiteman, open Document 7, please.  Just let

8   me know when you have it up.

9      A   Okay.  It's pulled up.

10     Q   Document 7 has been previously marked as Exhibit

11  40.  And it appears to be an email from DeWarren

12  Washington to you, dated November the 5th, entitled

13  Goforth, and with attachment Goforth Fact-Finding PDF,

14  correct?

15     A   No.

16     Q   Okay.  Tell me what it is.

17     A   This is -- this says -- it's from November 20th,

18  saying Goforth Files.

19     Q   You have that -- are you sure you're in Document

20  7?

21             MR. LANTIS:  Yes.  That's what Document 7 is,

22  Jim.

23             MR. JOHNSON:  I'm sorry.  Let's see.  Let's

24  try Document 6 then.  I must've misnumbered them somehow.

25             MR. LANTIS:  Document 6?  Isn't that what we

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-4  Filed 11/15/21  Page 407 of 672  PageID #: 677
JA 0400

1  just looked at?

2          THE WITNESS:  Yes.

3          MR. MEALOR:  I think you said 40.  This was

4  your original Document 40?  I can see the number at the

5  very top corner of Document 7, but it was entered as

6  Exhibit 38.

7          MR. JOHNSON:  All right.  How about take a

8  look at Document 8.  See if I got it misnumbered.

9          THE REPORTER:  Could we go off the record so

10  I can assist over here?

11          MR. MEALOR:  Yeah.

12          (Off-the-record from 10:30 to 10:35.)

13  BY MR. JOHNSON:

14  Q   We're looking at what's previously been marked as

15  Exhibit No. 40.  And is that an email that you're

16  familiar with?

17  A   Yes.

18  Q   Okay.  So my first question about this email is,

19  did you provide Mr. Washington with the documents in

20  blank form for him to start filling out for the ERB?

21  A   Yes.

22  Q   And so this email is an email of November 5th from

23  Mr. Washington to you, attaching his having filled out

24  the contractor fact-finding notes.  Am I correct?

25  A   Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-5   Filed 11/15/21   Page 408 of 672   PageID #: 678
JA 0401

1   Q   And so this is the fact-finding notes on

2   Mr. Goforth.  And it states "No previous disciplinary

3   actions," about a third of the way down, under Contractor

4   History.  Am I right?

5   A   Yes.

6   Q   Do you know who filled that out?  Did you make any

7   check about whether he had previous discipline?

8       Let me just ask it as one question.  Did you fill

9   that out or tell him how to fill that one out, with no

10  previous discipline?

11  A   Yes.  I advised him that there was no previous

12  history.

13  Q   And he was seeking, it looks like, a little

14  further down, Recommended Level of Disciplinary Action,

15  he was seeking a termination, or at least he -- he

16  checked on here "Termination for Cause"?  Or did you --

17              MR. LANTIS:  Object to form.

18  Q   Did he check "Termination For Cause"?

19  A   Yes.

20  Q   Did you advise him on how to fill that one out?

21  A   Yes.

22  Q   Tell me about a conversation where termination was

23  discussed between you and Mr. Washington.  Just tell me

24  what y'all talked about.

25  A   I shared with DeWarren that John Reeves made the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 409 of 672   PageID #:
679
JA 0402

1  decision to terminate Mr. Goforth based off of the
2  information that he had received.  And I challenged
3  Mr. Reeves to ensure that, you know, the termination --
4  that we, you know, were making sure that everything was
5  shared with him, with all the detail that he needed.
6        And Mr. Reeves was very passionate in terminating
7  him for cause for falsification of records, and so I
8  worked with DeWarren and helped him fill this paperwork
9  out.
10   Q   Did DeWarren give you any pushback at all on
11  termination being what was being sought?
12   A   No.
13   Q   What comments, if any, did he make about your
14  telling him that Mr. Reeves wanted it to be a
15  termination?
16            MR. LANTIS:  Objection to form.
17            You may answer.
18   A   I don't recall DeWarren making any comments.
19   Q   Looking down at the bottom, the last question
20  there, "What was the contractor's rationale for the
21  issue?"  And just read me what it says there as the
22  rationale for the issue.
23   A   "Employee stated he signed for cleanliness and
24  acknowledgement of the manway covers being ready to
25  reinstall."

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 155   Filed 11/15/21   Page 410 of 672   PageID #: 680
JA 0403

1     Q   Okay.  Did you write that?

2     A   DeWarren wrote that.

3     Q   Okay.  Look at the next page, please.

4     It states there, does it not, a "No" block being

5 checked to the question "Was the contractor on clear

6 notice of any rules/expectations that were violated prior

7 to the event?"

8     A   Correct.

9     Q   Did you fill that out or did DeWarren fill that

10 out, where it says "No"?

11     A   DeWarren filled it out.

12     Q   Did you question DeWarren about that, putting "No"

13 there?

14     A   Not that I recall.

15     Q   And so I take it that where it says "Employee

16 stated he signed for cleanliness and acknowledgement of

17 the manway covers being ready to reinstall," that's --

18 was that written by DeWarren?  Because it looks like

19 almost exactly the same language as under the

20 contractor's rationale that we just discussed.

21     A   I believe so.  I believe DeWarren filled out this

22 form.

23     Q   Okay.

24     A   I may not recall the details, but that's typically

25 how we complete these.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-54  Filed 11/15/21  Page 411 of 672  PageID #: 681
JA 0404

1    Q    And then under -- if you go a little bit further

2    down it says -- you see the question where it says "Was

3    the action confirmed to be willful misconduct

4    (intentional/deliberate)"?

5    A    Yes.

6    Q    And it's checked "No."  Do you know who checked

7    the "No" there?

8    A    Yes.  I believe it was DeWarren.

9    Q    Did you raise any question to DeWarren at the time

10   that you received this, on November 5th, as to his

11   finding that the action was confirmed not to be willful

12   misconduct, intentional/deliberate?

13          MR. LANTIS:  Objection to form.

14   A    No.

15   Q    Do you remember seeing that being checked at the

16   time as a "No" answer?

17   A    No, I don't recall.  I probably saw it.

18   Q    But it didn't raise a question in your mind as to

19   whether a termination for falsification of documents

20   might be inappropriate, given this answer "No"?

21          MR. LANTIS:  Objection to form.

22   A    No, because in his position, he would be required

23   to fulfill his job duties properly.  So, no.

24   Q    Let's take a look at Document Number 8.

25   A    Okay.  I have it pulled up.

1    Q    This appears on its face to be Mr. Washington

2    emailing you on November 6th of 2018, saying "Becca, I

3    think this is everything you will need for the ERB."  Is

4    that correct?

5    A    Yes.

6    Q    And so are these the forms you sent him, and then

7    he's now sending them back to you, saying that he thinks

8    this is what you'll need for the ERB?

9    A    Yes.  It appears that way.

10   Q    Okay, and we're going to start looking at the

11   bottom right-hand page numbers now, to make it easy to

12   navigate in the documents.

13        So let's take a look at the page that's marked 758

14   at the bottom right-hand corner.

15   A    Okay.

16   Q    And this is a document entitled, at the top,

17   Proposed Adverse Action Review Form for the ERB, correct?

18   A    Yes.

19   Q    And it's a five-page document, page 1, 2, 3, 4,

20   and 5 of 5?

21   A    Yes.

22   Q    And on the first page, that is, page 1 of 5, it

23   says that Mr. Goforth's title was task manager, correct?

24   A    Yes.

25   Q    And his role in his hire letter that we went over

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-5   Filed 11/15/21   Page 413 of 672   PageID #: 683
JA 0406

1  earlier in your testimony said that his job title was

2  task manager for the tritium program, correct?

3    A   Yes.

4    Q   Were you aware at the time that this was filled

5  out that Mr. Goforth was assigned to the tritium program?

6            MR. LANTIS:  Objection to form.

7            MR. MEALOR:  Object to form.

8            MR. LANTIS:  You may answer.

9    A   Yes.

10   Q   Take a look at page 2 of 5, which is the next

11 page.

12   A   Okay.

13   Q   And so in question 1 there it says, "To your

14 knowledge, has this individual engaged in any potentially

15 protected activity within the past 12 months?"  Are you

16 with me?

17   A   Yes.

18   Q   Okay.  And there's six or seven blocks that are

19 yes or no questions after that, correct?

20   A   Yes.

21   Q   And so my question -- first question is, did you

22 fill out any of those blocks under question 1?

23   A   No.

24   Q   So I take it then that since Mr. Washington sent

25 this to you, your understanding was that Mr. Washington

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-1   Filed 11/15/21   Page 414 of 672   PageID #: 684
JA 0407

1  had filled in these blanks?

2      A    Yes.

3              THE REPORTER:  I'm sorry.  Did someone

4  object?

5              MR. MEALOR:  I did.

6              THE REPORTER:  Thank you.

7      Q    It says, as the -- I believe it's the fourth item

8  down, that Mr. Goforth contacted the legal department,

9  correct?

10     A    Yes.

11     Q    So did you ask Mr. Washington at the time what he

12 meant by Mr. Goforth contacted the legal department?

13     A    Yes.  I asked DeWarren why he checked "Yes."

14     Q    What did he say?

15     A    I believe he did it in error and then corrected it

16 later.

17     Q    Well, my question was, what did he say when you

18 asked him why he checked that?

19             MR. LANTIS:  Objection to form.

20             You may answer.

21     A    That he did it in error.

22     Q    He said, when you questioned him about this, when

23 you received it on November 6th, he said at that time

24 that he did that in error?

25     A    Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-5  Filed 11/15/21  Page 415 of 672  PageID #: 685
JA 0408

1    Q  Was there any further discussion about him --

2 between you and him, about -- at this time, on contacting

3 the legal department?

4    A  No.  He was fairly new at filling these out.  And

5 I shared with him that we hadn't contacted any of those.

6 So the only one that he would've checked in this -- on

7 this one would be "Contacted the Employee Concerns

8 Program," and that was it.

9    Q  So you assured him that none of these things that

10 he checked Yes had in fact occurred, except for the

11 employee concerns program?

12    A  Correct.  Except for the employee concerns

13 program.  Because we did contact them.

14    Q  Did you at any time -- and I think you've already

15 answered this, but I want to make sure it's specific to

16 these things -- ask Mr. Goforth whether he had done any

17 of these things that are checked Yes here?

18    A  No.

19    Q  Did you specifically check with the legal

20 department as to whether he had -- Mr. Goforth had made

21 any contact there?

22          MR. LANTIS:  I'm going to place a limited

23 objection.

24          If you inquired about whether Mr. Goforth had

25 ever contacted the legal department for purposes of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 416 of 672   PageID #: 686
JA 0409

1    filling out this form, you may answer that question, but
2    I want to instruct the witness not to discuss any
3    privileged communication that she had with legal counsel
4    about Mr. Goforth.
5              Subject to that limitation, Becca, you may
6    answer the question.
7    Q   What your lawyer is instructing you, and it's
8    appropriate, is that I don't want you to tell me anything
9    the legal department may have said.  I just want to know
10   whether you contacted the legal department about this
11   question.
12   A   No.
13   Q   And I take it that would apply to both the TVA
14   legal department and the DZ legal department, that you
15   did not check with either one of those?
16   A   That is correct.  I did not check with either of
17   them.
18   Q   And "Contacted the Employee Concerns Program," I
19   take it that would be what we've already gone over, as
20   the communication regarding Mr. Goforth having contacted
21   employee concerns as provided to you by Mr. Blackwell?
22   A   That's correct.
23   Q   And with whom, if anyone, did you check to
24   determine your advice to Mr. Washington that Mr. Goforth
25   had not participated in an investigation other than the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-10   Filed 11/15/21   Page 417 of 672   PageID #:
687
JA 0410

1  one currently at issue, the last item there?  To whom did

2  you check about that, if anyone?

3      A   I didn't check with anyone.  I checked our HR

4  platform where we keep our investigations.

5      Q   Did you check with anyone at TVA regarding this

6  question about investigations?

7      A   No.

8      Q   Now, it says, right beneath there where Yes is --

9  where -- let me start over so I'm not confusing you.

10         It says, right beneath the blocks that we've just

11  been talking about, "Employee has ongoing litigation

12  regarding employment with TVA."  So is that your language

13  or is that Mr. Washington's?

14     A   That would be DeWarren's language.

15     Q   Did you and DeWarren talk about the reason he

16  wrote that?

17     A   Not that I recall.  But we would, in normal

18  practice, go over this form together.

19     Q   All right.  And so now let's look at page 761, at

20  the bottom.

21     A   Okay.

22     Q   Again, the same questions are there, under

23  Protected Activity Summary, where it's marked Yes for

24  Contacted legal, contacted an external regulatory agency,

25  and contacted employee concerns program.  So, those look

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-4   Filed 11/15/21   Page 418 of 672   PageID #: 688
JA 0411

1    like pretty much -- very similar to the other questions.

2              So did you fill those out, or did DeWarren?

3        A    DeWarren.

4        Q    I take it your previous testimony about these

5    three things that you've just given would be the same for

6    these blocks?

7        A    That is correct.

8        Q    Now, look at page 765, at the bottom right,

9    please.

10       A    Okay.

11       Q    And the top question there, where it's checked

12   "No," "Was the contractor on clear notice of rules and

13   expectations?"  That's --

14             MR. LANTIS:  Jim, sorry to interrupt, but at

15   least the document on the Box site, page 765 is omitted.

16             MR. MEALOR:  The pages are transposed.

17             MR. LANTIS:  Sorry.  So it's after 766, I

18   guess.

19             MR. MEALOR:  Yes.

20             MR. JOHNSON:  I'm sorry they're out of order.

21   Are we all on the same page then, 765?

22             MR. LANTIS:  Yeah.

23             MR. JOHNSON:  Okay.

24             MR. LANTIS:  Becca, are you good?

25             THE WITNESS:  I'm good.  Thank you.

1          MR. LANTIS:  Sure.

2    BY MR. JOHNSON:

3      Q    So, this is the same question that we went over in

4    the contractor notes that Mr. Washington had provided you

5    the day before, on November 5th, that we've already gone

6    over.  So, that's unchanged in this November 6th draft of

7    the ERB documents.  Am I correct?

8      A    Yes.

9      Q    Let's take a look at Document 9 now.

10     A    Okay.

11     Q    Let's focus first on the first email in time,

12   which is from John Reeves to you, dated November 12th,

13   halfway down the page.  Are you with me?

14     A    Yes.

15          MR. JOHNSON:  And this, by the way, has

16   previously been identified as Exhibit 37.  So it will not

17   be reintroduced.

18     Q    So, let me just read, for brevity's sake here,

19   that email to you from John Reeves.  And he also sent it

20   to Jon Hanner and copied it to DeWarren Washington.

21          But it says, "DeWarren and I just spoke by phone.

22   He does have an open question from TVA asking if this

23   type of action (termination and no rehire for 90 days) is

24   consistent with our company's past disciplinary actions.

25   I believe we agreed in our November 2nd meeting that we

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 420 of 672   PageID #: 690
JA 0413

1  were good to go.  Agree?"

2          That's what it says there, right?

3      A    Yes.

4      Q    So do you recall a November 2nd meeting -- and I

5  would ask you to, for purpose of refreshing your memory,

6  that the -- we've already gone over a meeting of November

7  2nd with Mr. Reeves and Mr. Hanner and you.  Do you

8  recall attending that meeting?

9      A    Yes.

10     Q    Okay.  So, do you recall any discussion of the

11 company's past disciplinary actions at the November 2nd

12 meeting?

13     A    Yes.

14     Q    Could you tell us what you remember?

15     A    I remember us talking about any type of similar

16 infraction that we've had in the past where we had a

17 falsification of records and it resulted in

18 termination --

19     Q    Do you recall --

20     A    -- that we shared with --

21     Q    I'm sorry?

22     A    That we shared with John Reeves.

23     Q    Do you recall anything about that prior

24 termination?  Where it was?  Who was involved?

25     A    I don't remember all of the details, no.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 421 of 672   PageID #: 691
JA-0414

1    Q    At any time in the November 2nd meeting, did

2    Mr. Reeves mention that Mr. Goforth gave him examples of

3    other employees who were more seriously disciplined than

4    he was?

5               MR. MEALOR:  Object to form.

6    A    No.

7    Q    Do you recall him mentioning in particular that

8    employees working on the ice condensers during the outage

9    were not disciplined, despite their misconduct for the

10   same type of thing as him --

11              MR. LANTIS:  Objection to form.

12              You may answer.

13              THE REPORTER:  (To Mr. Johnson) I'm sorry.

14   The end of your question?

15   Q    Do you recall any discussion -- let me just

16   shorten it for you.  Do you recall any discussion at this

17   November 2nd meeting about workers working on the ice

18   condensers?

19   A    No.

20   Q    Okay.  Let's take a look at Document 10.  Just to

21   make sure we're together on this, this is a document

22   previously marked Exhibit 44.

23        Do you see that?

24   A    Yes.

25   Q    And it seems on its face to be an email from

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-15   Filed 11/15/21   Page 422 of 672   PageID #:
692
JA-0415

1    Mr. Washington to you, dated November 12, 2018, correct?

2        A    Yes.

3        Q    And it says, "Becca, please see the attached

4    files.  Also, see the attached comments from TVA HR,"

5    correct?

6        A    Yes.

7        Q    So once again, this seems to be an updated version

8    from Mr. Washington, as of November 12th, of the

9    documents that he had previously sent you on November

10   6th?

11       A    Yes.

12       Q    And let's start -- looking at the bottom

13   right-hand corners again, to make it easy to navigate

14   through the document, let's look at DZ page 815, the

15   bottom right-hand corner.

16       A    Okay.

17       Q    Are you with me?

18       A    Yes.

19       Q    And it still says on these fact -- contractor

20   fact-finding notes, it still says at the top that

21   Goforth's job title was task manager, right?

22       A    Yeah.

23       Q    So it still says "No previous disciplinary

24   actions," right?

25       A    Correct.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-16   Filed 11/15/21   Page 423 of 672   PageID #: 693
JA 0416

1    Q   And let's look at the second page of the

2   contractor fact-finding notes, DZ page 816.

3    A   Okay.

4    Q   It still says "No" to the question "Was the action

5   confirmed to be willful misconduct

6   (intentional/deliberate)?"  It still says that, right?

7    A   Right.

8    Q   Let's look at DZ page 824.

9    A   Okay.

10   Q   It still says there, answer "Yes" to "Contacted

11  legal department, contacted NRC DOL, or other external

12  regulatory agency?"  It still says "Yes" to "Participated

13  in an investigation?"  Correct?

14   A   Correct.

15   Q   So, as of six days after your conversation of

16  November 6th that you previously testified to, all of

17  those blocks are still the same, right?

18           MR. LANTIS:  Objection to form.

19           You may answer.

20   A   Right.

21   Q   Let's look at page 825 on that one.

22   A   Okay.

23   Q   In question 8 it says, "Have all witnesses and

24  relevant parties, including the individual in question,

25  been interviewed and are their statements documented and

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-17  Filed 11/15/21  Page 424 of 672  PageID #:
694
JA 0417

1  included in the ERB package?"

2          So, my question about that is, did you conduct any

3  interviews of any witnesses about this event that the

4  Executive Review Board was meeting about?

5      A    No.

6      Q    And you knew at the time that if the ERB would be

7  following the recommendation by DZ in these documents

8  that Mr. Goforth would be fired?

9              MR. MEALOR:  Objection to form.

10             MR. LANTIS:  Objection to form.

11     A    Can you rephrase the question?

12     Q    Okay.  You knew at the time that you were looking

13 at this and these questions were being answered that

14 there was a likelihood Mr. Goforth was going to be fired

15 if the ERB agreed with the recommendation of termination?

16             MR. LANTIS:  Objection to form.

17             MR. MEALOR:  Object to form.

18     A    Yes.

19     Q    Let's look at page 826.

20     A    Okay.

21     Q    All these questions on page 826 where there are

22 blocks, they're all still marked "Yes," about contacting

23 legal and external regulatory agency and ECP, right?

24     A    Yes.

25     Q    Okay.  Let's go to page 828, please.

1     A    Sure.

2     Q    Okay.  So the first time you ever saw this

3     would've been November the 12th, at the earliest, right?

4     A    I don't recall, but it would appear, the way the

5     document is sent.

6     Q    Yeah.  All I'm saying is it's attached to --

7     A    Yeah.

8     Q    -- DeWarren's email to you of November 12th.  So

9     you wouldn't have looked at it any earlier than November

10    12.  That's the question.  Right?

11    A    Correct.

12    Q    So, one of the things that Ms. Augustin is saying

13    here in her email on page 828 is under the heading

14    Fact-Finding.  And then it says, does it not, "Question

15    regarding expectations is checked 'No.'  Does that mean

16    he didn't know or understand the expectations for the

17    work to be performed?"

18         Do you recall having a discussion with

19    Mr. Washington about his contractor fact-finding notes as

20    a result of receiving this information, from

21    Ms. Augustin?

22    A    I do believe -- I don't recall specifically

23    talking about that one.  However, as part of our normal

24    practice that would be something that we would have gone

25    over.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-19   Filed 11/15/21   Page 426 of 672   PageID #: 696
JA 0419

1    Q   Okay.  Do you recall having a discussion about the

2 last item listed there on page 828 and continuing on 829?

3 And why don't you just read that for us, beginning with

4 the word "Probably" to the end where it says "Thanks,

5 Meshelle"?

6    A   "Probably needs some additional work before the

7 ERB is scheduled.  For my review, I'm not clear on the

8 basis for action.  Falsification of records or because he

9 said he was signing off that the manways were ready to be

10 installed versus what the work order says (even though

11 there's no placekeeping on the step that the manways were

12 installed)."

13    Q   Do you recall having a discussion with

14 Mr. Washington about that after you received these

15 comments?

16    A   I don't recall having a conversation with him

17 about that.  But again, it would be part of our normal

18 practice to review this and ensure we're aligned on the

19 paperwork.

20    Q   But the ultimate result of this was the

21 termination was for falsification of records, correct?

22            MR. LANTIS:  Objection to form.

23            You may answer.

24            MR. MEALOR:  Object to form.

25    A   Yes.

1    Q   Do you recall at any time, looking at this comment

2  from Meshelle Augustin, whether you had a discussion with

3  anyone about whether Mr. Goforth's belief, as stated in

4  these documents, that he was not signing off on a note,

5  was perhaps credible?  Any discussion about that with

6  anyone?

7              MR. LANTIS:  Objection to form.

8              You may answer.

9    A   Yes.  I, as I'd stated previously, had challenged

10  John Reeves on the decision to terminate him for the

11  falsification of records, in which Mr. Reeves was very

12  passionate in his answer, to ensure that the work order

13  with Mr. Goforth, circle, slash, confirming that he did

14  in fact reinstall the manways cover.  And in addition to

15  that, he had different statements and documentation that

16  he had shared where Mr. Goforth agreed that it was his

17  responsibility as part of his job and part of the work

18  order to in fact ensure that the manway covers were

19  reinstalled.  And so that's the reason Mr. Reeves made

20  the recommendation for termination.

21    Q   Did Mr. Reeves ever inform you that in his

22  interview, Mr. Goforth's position was that he was

23  acknowledging a note, not signing off on a work step?

24    A   No, because Mr. Goforth did state that he was in

25  fact responsible for ensuring that the manway covers were

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-4   Filed 11/15/21   Page 428 of 672   PageID #:
698
JA-0421

1  reinstalled.

2   Q   Have you seen statements by Freddie Gibson and

3  Derek Pair about Mr. Goforth's position on the manway

4  covers being off?

5   A   Yes.

6   Q   Is that what Mr. Reeves was referring to as

7  Mr. Goforth's admission, that you've just testified

8  about?

9           MR. MEALOR:  Object to form.

10  A   Yes.  To my knowledge.

11  Q   Let's take a look at Document 11.

12  A   It appears I'm not able to open this document.  It

13  says it may be protected.

14          MR. LANTIS:  Becca, just refresh your browser

15  and it'll let you in.

16          THE WITNESS:  Okay.

17  Q   Let me know if you're in the document.

18  A   Okay.  I have it up.

19  Q   Does this document show that it's marked Exhibit

20  45?

21  A   Yes.

22  Q   And it seems on its face that it's a document from

23  DeWarren Washington to you, with a copy to Jon Hanner,

24  Jason Howard, and John Reeves, correct?

25  A   Yes.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50   Filed 11/15/21   Page 429 of 672   PageID #:
699
UA 0422

1   the day that they met, that's consistent with your memory

2   of events?

3     A   Yes.

4     Q   So let's look at page 873. Wait a minute. Let me

5   withdraw that question, because I think we need to take a

6   prior step to looking at that.

7       It says, in the email from Mr. Sanders to

8   Mr. Washington, on page 864, the first page of the

9   document that we're looking at, it says -- with respect

10   to the SCWE screening form that we've been talking about,

11   it says, "Question 4 has to be answered. NA is not

12   reasonable." Correct?

13     A   Yes.

14     Q   Now let's look at page 873.

15       And so that question 4 on page 873 says, does it

16   not, "Consider if the individual being evaluated is an

17   outlier either in a positive manner or negative manner in

18   the number of CRs/PCRs/safety issues identified, etc.

19   And if so, could the fact that there is an adverse

20   employment action being taken against them create a

21   perceived chilled work environment?"

22       And so that's the question that Mr. Washington had

23   said "NA" to, right?

24           MR. LANTIS: Objection to form.

25     A   Right.

Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL Document 25-1 Filed 11/15/21 Page 430 of 672 PageID #: 700
JA 0423

1    Q  And so at this time you-all had 24 hours,

2  approximately, before the ERB meeting to fashion a

3  response to that?

4    A  Yes.

5    Q  So what efforts, if any, did you make to

6  determine, after getting this, that Mr. Goforth was an

7  outlier in either a positive or negative manner in

8  protected activity?

9    A  I don't recall.

10    Q  Okay.  Then going back to the first page, 864.

11    A  Okay.

12    Q  It says, halfway down, "ERB proposed adverse

13  action review needs all blanks filled in."  Are you with

14  me?

15    A  Yes.

16    Q  And it says, "Is his title really task manager?"

17        Do you recall having a discussion with

18  Mr. Washington about Mr. Goforth's title?

19    A  I don't recall the specifics of our conversation.

20  But again, we would've reviewed this as normal practice.

21    Q  Did his job title get changed after Mr. Sanders

22  questioned this on the forms -- on the proposed adverse

23  action form?  Do you recall?

24    A  I don't recall.

25    Q  Okay.  Then it says -- in Mr. Sanders' comment he

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 95-17  Filed 11/15/21  Page 431 of 672  PageID #:
701
JA 0424

1  says that "Question 4 would be his work group, at a

2  minimum."  That's what Mr. Sanders says, right, there on

3  page 864?

4     A   Yes.

5     Q   So if you look at page 876, at question 4, that's

6  another "NA" that Mr. Washington had put, correct?

7     A   Correct.

8     Q   And we've already identified that his work group

9  for his task manager position was tritium program.

10  Correct?

11          MR. LANTIS:  Objection to form.

12          You may answer.

13     A   Correct.

14     Q   And going back to page 864, he's also

15  questioning -- that is, Mr. Sanders, that questions 6 and

16  9 are not answered on the proposed adverse action review.

17  He's saying that, right?

18     A   Yeah.  Looks like he has a question mark next to

19  those numbers.

20     Q   Sure.  And that's fair.

21          So let's look at page 877.

22     A   Okay.

23     Q   And question 6 was "Identify the rules or policies

24  violated, and attach copies of the rules/policies."

25          So that would be -- the rule violated you've

1  the day before the ERB on November the 21st, right?

2     A    Correct.

3     Q    So, he is attaching the ERB documents, according

4  to his email here, correct?

5     A    Correct.

6     Q    And he's saying Wednesday at 12:30.  So -- well,

7  we'll just -- he's saying Wednesday at 12:30, right?

8              MR. LANTIS:  Objection.

9              You can answer.

10    A    Right.

11    Q    All right.  So, did you attend the ERB?

12    A    Yes, I believe I did.

13    Q    And did you attend by telephone?

14    A    Yes.

15    Q    Was there a video provided, or was it just by

16 phone?

17    A    I believe it was just by phone.

18    Q    Do you know whether you attended the entire

19 meeting?

20    A    Typically with ERB reviews, they dismiss certain

21 individuals at the end before they complete the final

22 review.

23    Q    Tell me everything you can remember about what was

24 said at that meeting.  I know it was a long time ago, and

25 I'm not asking for, you know, exact quotes of what was

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 150-1 Filed 11/15/21  Page 433 of 672  PageID #: 703
JA 0426

1  said.  Just give me your sense, from beginning to end,

2  about what was said, if you can remember.  Nobody's

3  asking you to speculate.  Our usual practice, you know,

4  your lawyer doesn't want that, I don't want that.

5       We're just saying, according to your memory as we

6  sit here today, tell us what you recall about what was

7  said.

8  A   I recall our operations management team -- I don't

9  recall if it was John Reeves or DeWarren Washington,

10 explaining the concern of what happened and the reason

11 for termination.  But I recall them going through that

12 and just going through the forms.  I don't recall any

13 specifics from that review board.

14 Q   All right.  So, did you have in front of you

15 during that meeting the document that we're looking at

16 now that's been marked Exhibit 49?  Is that what you were

17 looking at during the meeting?

18 A   Let me just review it really quickly.  (Reviewing

19 document.)

20 Q   And you might start with the email from

21 Mr. Sanders to you.

22      I'm sorry.  Go ahead.

23 A   I was looking through the document.  So yes, this

24 would've been what we would have to review.

25 Q   So this is what you were looking at and presumably

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 434 of 672   PageID #: 704
JA 0427

1  everyone else was looking at as you went through it
2  during the meeting?
3          MR. LANTIS:  Objection to form.
4      A   Yeah.  Correct.
5      Q   Okay.  So let's look at the first page of this
6  document that was sent by Mr. Sanders to everyone.  And
7  it's page 935 at the bottom right.
8      A   Okay.
9      Q   So let's go back to question 4, which is the one
10 that you testified previously to, that the day before had
11 been marked NA.  And take a look at question 4 and the
12 response to it that's now in place of the NA.
13     A   Okay.
14     Q   So, was any protected activity that Mr. Goforth
15 may have been involved with, been discussed, other than
16 what it says here about CRs?
17         MR. MEALOR:  Object to form.
18     A   I don't -- again, I don't recall, like, the
19 specifics from that review board specifically.  However,
20 the -- the purpose of the ERB (as stated), so I'm sure it
21 would've been discussed.
22     Q   Do you recall Mr. Reeves or Mr. Washington -- I
23 don't think you could remember which one attended --
24 saying that in the interview by Mr. Reeves, Mr. Goforth
25 said that he was being targeted for protected activity?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-13  Filed 11/15/21  Page 435 of 672  PageID #:
JA 0428
705

1          MR. LANTIS:  Objection to form.

2      Q   Did that come up at the meeting?

3      A   I don't recall.

4      Q   All right.  Let's look at question 6, which in

5  your prior testimony was not answered, as pointed out by

6  Mr. Sanders.  And let's look at that.  And let me know

7  when you've read all of number 6.

8      A   (Reviewing document.)  Okay.

9      Q   And as you recall from your prior testimony, this

10  is the question that Mr. Sanders said at a minimum would

11  be his work group as persons impacted by the ERB

12  decision, right?

13      A   Yes.

14      Q   Okay.  So, for brevity, let me just read what the

15  answer is now, in place of the previously blank answer.

16  "The major impact would be within the maintenance

17  services department.  Due to working relationships, other

18  potential organizations would be the maintenance

19  departments would be mildly affected."  Is that, is that

20  the answer that was provided to the ERB?

21      A   Yes.

22      Q   Okay.  So anywhere in there does it mention

23  Mr. Goforth's tritium work group?

24      A   Not that I see.

25      Q   Okay.  Do you recall any discussion at the meeting

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-4  Filed 11/15/21  Page 436 of 672  PageID #:
706
JA 0429

1  that Mr. Goforth was a full-time task manager for the

2  tritium program?

3      A   I specifically don't recall.

4      Q   Okay.  Let's look at page 937.

5      A   Okay.

6      Q   Look at that first sentence there and let me know

7  if you can tell me what NSCMP, in the first line, stands

8  for.

9               MR. LANTIS:  I'm sorry.  What page, Jim?

10              MR. JOHNSON:  We're on 937.

11     A   I don't know what that stands for.

12     Q   Okay.  Was there any discussion about that person

13 having been contacted, at the meeting, that you recall?

14     A   Not that I recall.

15     Q   Okay.  And then under item 1 there, it's now

16 saying that the individual is being terminated for

17 falsification of records.  That's now been filled in,

18 right?  Item 1(a).

19     A   Yes.  Yeah.

20     Q   And then item 1(b) as represented to the ERB at

21 its meeting, "Management's legitimate reason for taking

22 the proposed action (in other words, tell the workforce

23 about management's reasons  - the antidote to a chilling

24 effect is the truth)."

25           And so what the answer there now is -- and I'm

1  reading for brevity here, "The investigation

2  substantiated that the individual falsified signed

3  documentation without performing field verification."

4  Correct?  That's that answer?

5     A   Correct.

6     Q   Do you recall any discussion of that particular

7  item at the meeting?

8     A   I don't recall talking about that particular item,

9  but I do recall them going over, like I said in the

10  beginning, the information as to, you know, why John

11  Reeves believed that he had falsified documentation.

12     Q   Do you know if you provided this information in

13  1(b)?  "The investigation substantiated that the

14  individual falsified signed documentation without

15  performing field verification," is that your language?

16     A   I don't believe I filled that out.

17     Q   Well, was it your understanding that the reason

18  that the document Mr. Goforth signed was false was that

19  he did not do a field verification before signing?

20     A   Correct.  That is correct.

21     Q   And is that what Mr. Reeves explained to you as

22  the reason the document was falsified?

23            MR. LANTIS:  Objection to form.

24            You may answer.

25     A   Mr. Reeves believed that he had falsified the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-1   Filed 11/15/21   Page 438 of 672   PageID #:
708
JA 0431

1   documentation because the work order step was not

2   completed correctly.

3       Q    And did he say that under the work order step he

4   should've gone and done field verification, actually gone

5   and looked?

6       A    Yes.

7       Q    Okay.  Look at page 938.

8           I want to direct your attention to subdivision (d)

9   towards the top of the page.

10      A    Okay.

11      Q    Are you with me?

12      A    Yes.

13      Q    Okay.  It says, "The status of the individual's

14  safety or other concern and management's commitment to

15  investigate and resolve the concern."  That's what is on

16  the boilerplate of the SCWE mitigation plan, right?

17      A    Correct.

18      Q    And so then the answer in there is "The concerns

19  of the individual have been evaluated and addressed.

20  Management is committed to promptly addressing any future

21  concerns raised by the individuals."

22          Let me -- before you answer the question -- well,

23  I haven't posed a question yet, but let's -- I'm going to

24  give you a little bit of the information.  Mr. Washington

25  previously testified that he took this language for this

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 439 of 672   PageID #:
709
UA-0432

1   answer directly from the documents sent by Mr. Sanders.

2   He cut and pasted it in there.

3          Would you have any knowledge of that?

4                MR. MEALOR:  Object to form.

5      A   I mean, I don't -- I think that that would be

6   possible, sure --

7      Q   Okay.

8      A   -- that he did that.

9      Q   And so in your mind, were the concerns of

10  Mr. Goforth evaluated and addressed --

11               MR. LANTIS:  Objection to form.

12     Q   -- as of the ERB meeting?

13               MR. LANTIS:  Objection to form.

14     A   Yes.

15     Q   And question number 3, this is the question that

16  was previously blank that you've already testified to.

17  It says, "Consider if the individual being evaluated is

18  an outlier either in a positive manner or a negative

19  manner in the number of CRs/PCRs/safety issues

20  identified, and if so could the fact that there is an

21  adverse employment action being taken against them create

22  a perceived chilled work environment."

23         And I apologize to the court reporter for having

24  read that so fast.

25         And so the answer to that that has now been filled

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 250-13  Filed 11/15/21  Page 440 of 672  PageID #:
710
JA 0433

1  in is "The individual has written one CR within the year

2  and it is not believed that this action will result in

3  creating a perceived chilled work environment."  That's

4  now the answer that's been provided, right?

5      A    Correct.

6      Q    Okay.  So, was no other protected activity

7  discussed other than this one CR --

8              MR. LANTIS:  Objection to form.

9      Q    -- at the meeting?  To your knowledge.

10              MR. LANTIS:  Objection to form.

11              MR. MEALOR:  Same.

12      A    I don't recall all of -- any of the protected

13  activity that was discussed.  But there was this one, the

14  one that was written that was sent back from Kenneth

15  Blackwell, was the one that we would be referring to,

16  that we believed was just a casual contact, was not a

17  protected -- I mean, it was a concern, but he said he was

18  going -- he wanted to handle it himself, he didn't want

19  it to be an actual concern.  We treated it a little

20  bit -- as if it was.  And our decision was made without

21  the -- it had nothing to do with any protected activity.

22  It was strictly due to the falsification of records.

23      Q    Okay.  Were you aware that Mr. Goforth had written

24  an evaluation about some safety incidents occurring

25  within the tritium program prior to his termination?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-14   Filed 11/15/21   Page 441 of 672   PageID #: 711
JA0434

1    A    No, I was not.

2    Q    Did anyone mention that Mr. Goforth had written

3  this evaluation -- an evaluation about nuclear safety

4  prior to his termination?  Did anybody bring that up at

5  the meeting?

6    A    No.  I didn't know about that, and I don't recall

7  anyone bringing that up at the time.

8    Q    Did anyone bring up that a CR had been written by

9  an ECP investigator that incorporated Mr. Goforth's

10  evaluation?

11    A    No.  Not that I recall.

12    Q    Did anyone bring up at the meeting the fact that

13  Mr. Goforth had pending litigation against TVA regarding

14  a promotion?

15    A    No.  Not that I recall.

16    Q    Were you aware that there was pending litigation

17  with TVA regarding a promotion that Mr. Goforth did not

18  get?

19    A    No.

20    Q    All right.  Well, we're going -- continuing

21  through this document that you've identified was the

22  document that you and others were looking at during the

23  meeting, the ERB meeting.  And so let's take a look at

24  page 941.

25    A    Okay.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-13   Filed 11/15/21   Page 442 of 672   PageID #: 712
JA 0435

1    Q   On page 941, where it says employee title, that

2  has been changed from what it previously said, as you've

3  testified to, from task manager to boilermaker maker

4  correct?

5    A   Correct.

6    Q   Was there any discussion about why that was

7  changed, that you had with either Mr. Sanders or

8  Mr. Washington?

9    A   I don't recall.

10   Q   And taking a look at page 942 in the draft sent by

11 Mr. Sanders that everyone had at the meeting, the blocks

12 in question 1 have now been altered, correct?

13            MR. LANTIS:  Objection to form.

14   Q   From the prior draft.  And so it now says "No" for

15 contact legal department, right?

16   A   Correct.

17   Q   It now says "No" for contacting NRC DOL or any

18 other external regulatory agency.  It says "No" now,

19 right?

20   A   Correct.

21   Q   It still says "Yes" for contacted ECP.  And now it

22 says "No" for participated in an investigation, right?

23   A   Correct.

24   Q   Do you recall any discussion with Mr. -- well,

25 I'll withdraw that question.

**Wilson Reporting Agency  (423) 267-6000**
**www.wilsonreporting.com**
Case 1:20-cv-00254-TRM-SKL   Document 350-15   Filed 11/15/21   Page 443 of 672   PageID #:
**JA 0436**
713

1       And if you look right underneath there, do you

2 recall that previously Mr. Washington's draft up to this

3 point had said that Mr. Goforth was engaged in litigation

4 with TVA?  Do you recall that?  We can look back at it if

5 you want.  Do you recall it said that?

6    A   Yes, I recall it said that.

7    Q   And now it no longer says that, right?

8    A   That's correct.

9    Q   Let's look at page 943.

10    A   Okay.

11    Q   Question 8 says, does it not, "Have all witnesses

12 and relevant parties, including the individual in

13 question, been interviewed and are their statements

14 documented and included in the ERB package?"  It says

15 that, right?

16    A   Yes.

17    Q   Were you present, by phone or otherwise, at the

18 interview of Mr. Reeves with Mr. Goforth?

19    A   No.

20    Q   Was there -- did you ever listen to a tape or -- I

21 shouldn't say tape anymore.  That shows my age.

22       Did you ever listen to a recording of that

23 interview?

24    A   No.  I didn't know there was a recording.

25    Q   Did Mr. Reeves ever say to you that there was a --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-17 Filed 11/15/21  Page 444 of 672  PageID #: 714
JA 0437

1  well, I guess he didn't if you didn't know, so let me not

2  ask that.

3       Did Mr. Reeves or Mr. Washington mention at the

4  ERB that there was a tape -- or, I'm sorry, a recording

5  of the interview?

6     A   Not that I recall, no.

7     Q   So it goes without saying then that no tape or

8  portions of the tape were played at the ERB meeting?

9     A   No.

10    Q   Was there a transcript of the interview ever made

11 of the recording, a written transcript?

12    A   No.  Not to my knowledge.

13    Q   So, question 11 is about the individual's prior

14 performance history, correct?

15    A   Correct.

16    Q   Do you know who Jeff McGuire is?

17    A   No.

18    Q   So was there any mention of Mr. McGuire in the ERB

19 meeting?

20    A   No.  I don't know who Mr. McGuire is.

21    Q   And so I guess it goes without saying that there

22 was no statement from Mr. McGuire about the individual's

23 prior performance history?

24    A   No.

25    Q   And Mr. McGuire did not attend the ERB?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 445 of 672   PageID #:
UA 0438
715

1          MR. LANTIS:  Objection.

2          You can answer, Becca.

3     A    No.

4     Q    So, question 13 is about "Is the proposed action

5 reasonably related to the seriousness of the offense and

6 actions taken with other individuals who have submitted

7 similar offenses?"  That's at the bottom of page 943,

8 correct?

9     A    Yes.

10    Q    Did Mr. Reeves or Mr. Washington or anyone else at

11 the meeting state that Mr. Goforth had identified in his

12 interview people who he felt were treated differently

13 than he was being treated?

14    A    No.  Not that I recall.

15    Q    And now looking, finally, at pages 946 and 947.

16 Let me know when you're there.

17    A    I'm on page 946.

18    Q    Okay.  And that's the fact-finding notes from the

19 contractor that was done by Mr. Washington, correct?

20    A    Correct.

21    Q    And it still says -- well, let's see.  If you look

22 at page 2, which is -- of the contractor fact-finding

23 notes, which is page 947, the question there, that's the

24 first one that has an answer filled in is "Was the

25 contractor on clear notice of any rules and/or

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-13   Filed 11/15/21   Page 446 of 672   PageID #:
JA 0439
716

1  expectations that were violated prior to the event?"
2  That has now been changed from a "No" to a "Yes,"
3  correct?  We've gone over -- well, let me just leave the
4  question there.  See if you recall.
5              MR. LANTIS:  I'm sorry, Jim, what's the
6  question?
7      Q   Okay.  The question is, to the question on the
8  form of "Was the contractor on clear notice of any rules
9  an/or expectations that were violated prior to this
10 event," previously in these drafts of the fact-finding
11 notes of the contractor that question was marked "No."
12 You've already testified to that when we looked at it,
13 right?
14     A   Correct.
15     Q   And now it says "Yes"?
16     A   That is correct.
17     Q   Do you recall any discussions with Mr. Sanders or
18 Mr. Washington about why that was changed on the
19 contractor fact-finding notes?
20     A   I don't recall specifically.  But I mentioned
21 before, DeWarren was fairly new to this.  So, it was
22 probably just in error and we made sure that it was
23 correct.
24     Q   It still says, does it not, further down on that
25 page, 947, "Was the actin confirmed to be willful

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 50  Filed 11/15/21   Page 447 of 672   PageID #:
JA 0440
717

1  misconduct (intentional/deliberate)," it still says "No"

2  for that one, right?

3     A    That is correct.

4     Q    Let's look at Document 16 now.

5          Are you with me?

6     A    Yeah.  I have it pulled up now.

7     Q    Does it say Exhibit 52 at the bottom?

8     A    Yes.

9     Q    All right.  This document was previously

10  identified as Exhibit 52.

11          So, take a look through this.  Just scroll through

12  it.  Because my question to you is going to be is this

13  the ERB documents as finally signed by the members of the

14  ERB?

15     A    (Reviewing document.)  Yes, it appears these

16  documents have been signed.

17     Q    I'm not going to laboriously take you through that

18  to compare it to the draft that Mr. Sanders sent right

19  before the meeting.  We'll let the document speak for

20  itself on that now that you've identified it.  Okay?

21     A    Okay.

22     Q    All right.  So, finally, let's look at Document

23  17.

24               MR. LANTIS:  Jim, there's no Document 17 in

25  the Box.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 135-4   Filed 11/15/21   Page 448 of 672   PageID #:
JA0441
718

1          MR. MEALOR:  Thank you.

2          MR. JOHNSON:  There's not?  Okay.  Well,

3    let's look at -- Paul, can you pull up Exhibit 54 from

4    the plaintiff's exhibits and send it to the witness,

5    please?

6          MR. LANTIS:  We'll work on that.

7          MR. JOHNSON:  And this is probably my last

8    question, if everyone can hang on.

9          MR. LANTIS:  Okay.  I've got it pulled up.

10          Becca, do you have it?

11          THE WITNESS:  Yeah.  I've received it and I

12    have it pulled up.

13    BY MR. JOHNSON:

14     Q    Referring to what's previously been identified as

15    Exhibit 54, this is the fact-finding notes of contractor

16    only.  And it has, on page 2, the signature of

17    Mr. Washington, correct?

18     A    That's correct.

19     Q    And what's the date by that signature?

20     A    11/20/2018.

21     Q    Do you recall whether this signed version of the

22    fact-finding notes was present at the ERB meeting?

23     A    I don't recall if it was signed or not, but the

24    fact-finding form would've been part of the ERB review.

25          MR. JOHNSON:  Okay.  Let's take a five-minute

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-5   Filed 11/15/21   Page 449 of 672   PageID #:
JA 0442
719

1                     REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4              I, Sheila D. Wilson, Licensed Court Reporter
     #268 and Notary Public, in and for the State of
5    Tennessee, do hereby certify that the deposition of
     REBECCA WHITEMAN was reported by me, and that the
6    foregoing 98 pages of the transcript is a true and
     accurate record to the best of my knowledge, skills, and
7    ability.
              I further certify that I am not related to
8    nor an employee of counsel or any of the parties to the
     action, nor am I in any way financially interested in the
9    outcome of this case.
              I further certify that I am duly licensed by
10   the Tennessee Board of Court Reporting, as evidenced by
     the LCR number and expiration date following my name
11   below.
              In witness whereof, I have hereunto set my
12   hand this 25th day of October 2021.

13

14

15

16

17   _____

18   Sheila D. Wilson, LCR #268
     Expiration date: 6/30/2022.
19   Notary Public Commission
     Expires: 1/25/2023.
20

21

22

23

24

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1 Filed 11/15/21  Page 450 of 672  PageID #: 720
UA 0443

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE

 2             EASTERN DISTRICT OF TENNESSEE

 3                 AT CHATTANOOGA

 4  -------------------------------------------------
                                    )
 5  ROBERT M. GOFORTH,              )
                                    )
 6        Plaintiff,                )
                                    ) Case No.:1:20-cv-254
 7     vs.                          )
                                    )
 8  TENNESSEE VALLEY AUTHORITY      )
    and DAY & ZIMMERMANN NPS,       )
 9  INC.,                           )
                                    )
10        Defendants.               )
    -------------------------------------------------
11                        Chattanooga, Tennessee
                          September 10, 2021
12

13          DEPOSITION OF FREDDIE GIBSON
                (Appearing remotely)
14
    -------------------------------------------------
15
    APPEARANCES:
16
                FOR THE PLAINTIFF:
17
                JAMES M. JOHNSON, ESQ.
18              Attorney at Law
                620 Lindsay Street, Su 210
19              Chattanooga, TN 37403
                (423) 648-4093
20              jj@jamesmjohnsonatty.com

21

22

23

24

25
```

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-12 Filed 11/15/21  Page 451 of 672  PageID #: 721
JA 1444

1    Q   And I'll try to do the same for you.  When you're

2    giving me an answer, I'll try to wait and make sure

3    you've finished giving your answer before I begin my next

4    question.  So, I'll try to obey the same rules.  Okay?

5    A   Yes, sir.

6    Q   And when you give your answers, please do so

7    clearly and in a high enough voice to where the court

8    reporter can pick it up, because she can't record answers

9    that involve saying things like "uh-huh" or "huh-uh" or,

10   you know, shaking the head, nodding the head.  She can

11   only hear what you speak out loud.  Understand that?

12   A   I do.

13   Q   Terrific.  All right.  Let's talk a little bit

14   about your experience in working at Day & Zimmermann.

15   How long have you been with Day & Zimmermann?

16   A   I have been with Day & Zimmermann roughly 11

17   years.  I think they got the contract in 2010 January.

18   Q   All right.  Thank you.  And how much of that

19   experience has been at Watts Bar?

20   A   I would say 95 percent.

21   Q   And is that 95 percent the most recent of your

22   experience?  That, in other words, five percent, would

23   that have been back at the beginning of the 11 years, or

24   is the 95 percent at Watts Bar, is that recent?

25              MR. LANTIS:  Objection to form.  You may

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 135-1   Filed 11/15/21   Page 452 of 672   PageID #: 722
JA 0445

1  answer.

2   Q   Is the Watts Bar experience your -- you're

3  currently working at Watts Bar, correct?

4   A   That is correct.  Watts Bar.

5   Q   All right.  And the times you've been away from

6  Watts Bar, when did they fit into this 11 years?  At the

7  beginning?  In the middle?

8   A   2016, 2017, possibly -- I'm trying to remember,

9  sir -- they sent me down to Browns Ferry Nuclear Plant as

10  the night shift site manager.  Then I was also sent to

11  Sequoyah as the night shift site manager as well for an

12  outage, sir.

13   Q   So you were doing the same type of work there that

14  you do at Watts Bar, but it was just at different plants?

15   A   Yes, sir.  Somewhat.  That is correct.

16   Q   So I take it, then, that you have a lot of

17  experiencing with performing work orders at these plants?

18   A   Yes, sir.

19   Q   And do you have a lot of -- is a lot of that work

20  order experience on BOP work orders?

21   A   A lot of it would be, yes.

22   Q   And with regard to BOP work orders that you have a

23  lot of experience with, would that be in actually doing

24  the work on the work orders?

25   A   Not in the position I was in at Browns Ferry and

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-4   Filed 11/15/21   Page 453 of 672   PageID #:
JA 0446
723

1  Sequoyah.

2    Q   All right.

3    A   Some here at Watts Bar, though.

4    Q   Okay.  So some of your experience was actually

5  doing the work.  And so I take it then the rest of your

6  experience was sort of managing or supervising the work?

7    A   That would be correct.  Yes, sir.

8    Q   And in managing or supervising the work, did you

9  sign off on work having been performed by those that you

10  were supervising?

11    A   I have before.

12    Q   And have you done work before on the work order

13  that's in controversy in this case, which I think you

14  know is a moisture separator work order?  Have you done

15  work on moisture separator work orders?

16    A   When you say I have worked on them, do you mean --

17    Q   Well, either worked on them -- excuse me for

18  interrupting --

19    A   -- reviewed them?

20        MR. LANTIS:  Let him clarify the question, if

21  you wouldn't mind.

22    Q   Go ahead.

23    A   Do you mean reviewing work orders?  I'm a

24  non-manual, so I'm not allowed to work on the equipment

25  itself.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 50-4 Filed 11/15/21  Page 454 of 672  PageID #:
JA-0447
724

1    Q   Yes, I mean reviewing work orders.

2    A   Yes, sir, I have reviewed.

3    Q   And you've reviewed moisture separator work

4 orders?

5    A   I have looked at various work orders, yes, sir.

6    Q   Let's talk for a moment then about your knowledge

7 of Mr. Goforth's work.  How long have you known

8 Mr. Goforth?

9    A   I would say as soon as Unit 2 went online and he

10 came over.  Maybe a little bit before that.  So, let's

11 see, eight, nine years.

12    Q   And how -- what was the nature of your work with

13 him?  What was he doing in relation to what you were

14 doing?

15    A   He was working outages as a boilermaker

16 supervisor.  I also knew him when he worked over on Unit

17 2.

18    Q   So, since the Unit 2 work was finished -- well,

19 tell us when the Unit 2 work was finished.

20    A   I'm unsure exactly of the date, sir.

21    Q   All right.  But that would've been -- I think you

22 referred to it earlier as 2016 or so?

23    A   General time frame, yes, sir.

24    Q   And since then you have been at the same site as

25 him?  Watts Bar?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 251-18   Filed 11/15/21   Page 455 of 672   PageID #: 725
JA 0448

1    A    Yes, we've been at the same plant.

2    Q    And he was working outages during that time?

3    A    Also working over with TVA augmented and working

4    outages when they came around.  Yes, sir.

5    Q    So was he working, to your knowledge, in TVA

6    augmented all of the time except for the time when he

7    came over to do the outages?

8    A    From my understanding, yes, sir.

9    Q    And when you were working with him during the

10   outages, how frequently did you have occasion to see him

11   at work in that environment?

12   A    Only at meetings mostly.  I was on back shift most

13   of the time.

14   Q    When you say "back shift," which shift are you

15   referring to?

16   A    Night shift.

17   Q    And so when you say you would see him at turnover,

18   so I take it he was doing day shift and you were doing

19   night shift, so you would just see him when turnovers

20   occur?

21   A    During outages, yes, sir.

22   Q    And during these outages did you have occasion to

23   know what his professional work was --

24            MR. LANTIS:  Object --

25   Q    -- in the outages?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-4   Filed 11/15/21   Page 456 of 672   PageID #:
726
JA 0449

1   work?

2       A    When I got to work.  I believe that's what it was,
3   sir.

4       Q    And so in response to that information, were you
5   called upon to do anything?

6       A    We looked into the work order.  We went to see
7   what was off.  And due to some of the employees already
8   being laid off due to the end of the outage, Mr. Goforth
9   was the lead, so we all decided to call him and get his
10  expertise.

11      Q    Did you actually go to the site of the manway
12  cover being off and observe that it was off?

13      A    Yes, sir.

14      Q    Did you climb up the scaffolding and look at it at
15  that time?

16      A    I did.

17      Q    And what did you see when you got up there?

18      A    Saw that there was a wide opening; manway was
19  sitting over to the right, I believe it was, and there
20  was some of the orange netting over there as well.

21      Q    What is the orange netting used for?

22      A    Used for MFE control, sir.  It's over the opening
23  to prevent any foreign material getting into the system.
24  Or it could also be on the scaffold, to prevent items
25  from falling off the scaffold.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-5   Filed 11/15/21   Page 457 of 672   PageID #: 727
JA 0450

1    Q   And so this particular one that you saw, was that

2    the one that would be the FME cover?

3    A   Not sure of that, sir.

4    Q   Can you tell me what the practice is for

5    boilermakers who have opened a manway cover is with

6    respect to using the cover?

7    A   Yes, sir.  Once the manway cover is recovered

8    initially and it is secured so it can't go anywhere, they

9    place the FME cover over the opening, whether it's either

10   zip-tied at the top or wired down so it can't go anywhere

11   while no one's working on that opening, sir.

12   Q   And so the purpose of that, I take it, and correct

13   if I'm wrong, is just to make sure that no foreign

14   material gets into the opening?

15   A   Yes, sir.

16   Q   Is that a strict boilermaker procedure for the

17   boilermakers who are working on removing and installing

18   these manway covers?

19            MR. LANTIS:  Objection to form.  You may

20   answer.

21   A   Yes, sir.

22   Q   So what conclusion, if any, can you draw about the

23   likelihood that boilermakers working on the manway would

24   have left it without putting an FME cover over it?

25            MR. LANTIS:  Objection to form.  You may

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-5   Filed 11/15/21   Page 458 of 672   PageID #: 728
JA 0451

1    answer.

2        A    It would be unlike most any craft to leave the FME

3    cover off.

4        Q    Mr. Goforth, I think you are aware, was of the

5    opinion that the manway was likely removed by someone

6    other than the boilermakers after it had been installed.

7    Given what you've just said, can you comment for us,

8    please, on that position that he took; that is, the

9    likelihood you think he could be right?

10               MR. LANTIS:  Objection to form.  You may

11    answer.

12               MR. BERNIER:  Objection to form.

13        A    Do you care to repeat the question?  Are you

14    asking me if I believe someone else removed the manway?

15        Q    No, sir.  That's not exactly what I'm asking,

16    because I don't think anybody knows the answer to that

17    question.

18        What I'm asking is, given the procedures that the

19    boilermakers followed, that you just testified to, would

20    you think that there is at least some likelihood that

21    someone other than the boilermakers removed that manway

22    cover after it was installed?

23               MR. LANTIS:  Objection to form.  You mean

24    installed during the outage?

25               MR. JOHNSON:  Yes.  After it was reinstalled

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-2   Filed 11/15/21   Page 459 of 672   PageID #:
729
UA 0452

1  during this outage.

2          MR. LANTIS:  So you're presupposing it was

3  reinstalled?

4  BY MR. JOHNSON:

5     Q   The question is, what do you think the likelihood

6  is that the manway cover was reinstalled and then removed

7  by other than boilermakers after it was reinstalled?

8     A   I would be speculating, sir.  That would be a

9  violation, without a work order, making sure the

10  individuals are all in clearance.  So it would be, I

11  think, unlikely that somebody would just go up and take

12  it off.  But that is just my opinion.

13    Q   And you think it's -- also, I think in your prior

14  testimony, that it's unlikely that the boilermakers

15  would've left an FME cover off, who are working on the --

16  either the taking off of the manway or the installing of

17  the manway cover?

18    A   I agree to that, yes, sir.  I do not believe our

19  team would leave a manway FME cover off for no reason.

20    Q   So is it just fair to say it's kind of a mystery

21  how that manway cover was found off?

22          MR. LANTIS:  Objection to form.  You may

23  answer.

24    A   Yes, sir.  It is uncertain.

25    Q   So let's get back to where we were.  You had

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-53 Filed 11/15/21  Page 460 of 672  PageID #:
730
JA 0453

1  arrived at work and learned that the manway cover was

2  off.  You went to the scene, climbed the scaffolding.

3  You just described what you saw.  What did you do next?

4      A    Went back to the war room, and we spoke of what we

5  seen and then came up with a plan on what we're going to

6  have to do to get the unit moving forward so we can get

7  back online.

8      Q    All right.  So that, I think, is a good point to

9  kind of pause.  And I would like for you to help me sort

10 of set the scene of what goes on during the outage and

11 who the major characters are.  Sort of

12 scene-and-characters questions.

13          So what was your job at this point in the outage?

14     A    My job was still the site superintendent.  That

15 would be to continue with our schedule, having insulators

16 reinstalling insulation, carpenters removing scaffolds,

17 and, in this case, getting another work order put

18 together or a modification to the work order so we could

19 get work steps and data sheets to get the manway back on

20 so that the operations group could pull vacuum and move

21 the unit.

22     Q    So I take it that you were the sort of senior on

23 the ground DZ person for this part of the outage, as

24 you've just described it, during the night?

25     A    Yes, sir.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-4   Filed 11/15/21   Page 461 of 672   PageID #: 731
JA 0454

1  communicate through emails, phone calls, or in person,

2  depending on what time it is for our meeting turnover, to

3  our liaison in the OCC.

4  Q  And let's go below you a little bit.  So, where

5  would Mr. Goforth -- well, let me ask it this way.  On

6  this particular work order that we're involved with where

7  you found the manway cover off, who was the DZ night

8  shift person responsible for performance of that work

9  order?

10  A  Benjamin Newell.

11  Q  And who was the daytime counterpart for

12  Mr. Newell?

13  A  Mr. Goforth, sir.

14  Q  Give me a brief picture of what the setup is in

15  the war room.  And maybe I can start you off with asking

16  you:  Is there a large whiteboard in the war room?

17  A  Yes, sir.  There are multiple whiteboards in the

18  war room.

19  Q  What are those whiteboards used for?

20  A  Tracking various jobs.  So, we would have one that

21  tracked safety.  We'd have one that tracked number of

22  scaffolds built, remaining scaffolds built; how much

23  insulation has been removed; how many locations need to

24  be reinstalled.  We would have fragnets on the

25  whiteboards that show where we're at in progress of

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-15  Filed 11/15/21  Page 462 of 672  PageID #:
732
JA 0455

1  new data sheet, go up after we have verified everything

2  is correct and get the manway reinstalled, signed off,

3  work order completed and back to operations.

4      Q   And so was Mr. Goforth to be a part of that plan

5  on getting this manway cover reinstalled?

6      A   Yes, sir.  He is our lead for BOP.

7      Q   And so did you communicate this to Mr. Goforth?

8      A   Yes, sir.  Mr. Goforth, like I said -- even though

9  I had Benjamin Newell on night shift, Mr. Goforth had

10  experience and he was like what we would call the lead.

11  Yes, sir.

12     Q   So, how did you communicate that to him, the plan

13  to him?

14     A   In the war room we just went over the plan, which

15  was, like I said, to modify the work order, and then we

16  would work the work order, sir.  It would have the work

17  steps and data sheet.

18     Q   So did you have to call him in since it was at

19  night?

20     A   It was early morning.  But yes, sir, we did call

21  him in.  He came in on his own time, sir.

22     Q   And at this meeting where you went over the plan

23  with him in the war room, can you tell me, the best as

24  you can recall, what you said and what he said?

25     A   I can't answer that, sir.  That's been a long time

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-5  Filed 11/15/21  Page 463 of 672  PageID #:
733
JA 0456

1              You can answer.

2     A   I think this form right here that we filled out,

3  the prompt investigation that we're referring to, was the

4  initial what we discussed in the war room, went up to

5  investigate what was left off, come back to the war room,

6  discussed it, and then started doing our plan to get it

7  back on.  So that would be the initial, sir.

8     Q   Yeah.  And that would be the prompt investigation

9  report that you just identified, that we've marked as

10  Exhibit 62, Document 2?  That's the report of the prompt

11  investigation as you just described it?

12     A   Yes, sir.

13     Q   Your answer was yes?

14     A   Yes, sir.

15     Q   Okay.  So, let's look down at the key learnings.

16  Are you with me?

17     A   Yes, sir.

18     Q   And so it says, does it not, as number 1, "The

19  completed data sheets versus the actual field conditions

20  were not validate by the immediate supervisor."  Correct?

21     A   Yes, sir.

22     Q   So, for the boilermakers who were doing the actual

23  field work, who would've been their immediate supervisor

24  on the night shift?

25     A   Mr. Benjamin Newell.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-17   Filed 11/15/21   Page 464 of 672   PageID #:
JA 0457
734

1     Q   Okay.  How about down from Mr. Newell, do you know

2  who his general foreman was and his foreman was?

3     A   I apologize.  I can't remember, sir.

4     Q   All right.  Well, would the general foreman or the

5  foreman be an immediate supervisor as well?

6     A   Yes.  The general foreman would be the next in

7  line, yes, sir.

8     Q   Okay.  And then down from the general foreman

9  there would be a foreman who was also an immediate

10  supervisor?

11     A   Yes.  The foreman would be the next one down, sir.

12     Q   Okay.  So, when you wrote this, you were saying

13  that the validation was not done by, in this case,

14  whoever that foreman was and that general foreman was

15  and, I believe you said, Mr. Newell?

16           MR. LANTIS:  Objection to form.  You may

17  answer.

18           MR. BERNIER:  Objection to form.

19     Q   That would be the immediate supervisor you're

20  referring to?

21           MR. LANTIS:  Same objection.

22           You can answer, Freddie.

23     A   Yes, sir.

24     Q   Okay.  So, looking at number 2, "The workers

25  involved in this scope of work did not validate they were

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-4   Filed 11/15/21   Page 465 of 672   PageID #:
735
JA 0458

1  on the correct manway cover when completing the data

2  sheet."  That's what key learning number 2 says?

3    A  Yes, sir.

4    Q  So, do you know who the boilermakers were that

5  were involved in this scope of the work?

6    A  No, sir.

7    Q  And whose job is it to tell those boilermakers

8  that this is the manway cover you're supposed -- to

9  actually be there with them and tell them this is the

10 manway cover you're supposed to be doing, whose job would

11 that be?

12   A  From the foreman, then from the general foreman.

13   Q  Thank you.  Let's look at number 2 now, the prompt

14 investigation report that you stated that you were the

15 author of as well.

16   A  Okay.

17   Q  All right.  So, event description, again it's

18 pretty much the same as was on the human performance

19 alert that we just went over.  The event description

20 there is that while ops was attempting to establish

21 Unit 1 condenser vacuum they discovered the manway cover

22 we've been talking about was not installed, right?

23   A  Yes, sir.

24   Q  And you're saying the standard for the evolution

25 or condition there is "Validation of cross-under manways

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 350-5  Filed 11/15/21  Page 466 of 672  PageID #:
736
JA 0459

1    should've been performed."  Correct?

2        A    Yes, sir.

3        Q    And based on your human performance alert, that

4    should've been done by the boilermakers and the foreman,

5    general foreman, and possible night shift supervisor?

6    Correct me if I'm wrong about any of those.

7                MR. LANTIS:  Objection to form.

8                MR. BERNIER:  Objection to form.

9                MR. LANTIS:  You can answer.

10       A    The individuals that placed the manway cover on

11   and signed off the data sheets, yes, sir.  Should've been

12   that crew all the way up through the foreman, general

13   foreman, supervisor.

14       Q    All right.  Thank you.

15           We're going to take a look at a document now,

16   because we referred to that CR in that document.  Let's

17   take a look at Document 10.

18       A    Okay.

19       Q    Wait a minute.  I'm sorry.  I'm on the wrong --

20   that's the wrong document.  It's Document 5.  I'm sorry.

21       A    Okay.

22       Q    All right.  Does that document appear to be a CR?

23       A    Yes, sir.

24       Q    And if you -- what's the CR number there at the

25   top, sort of top left?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 135-1 Filed 11/15/21  Page 467 of 672  PageID #: 737
JA 0460

1      A    1457849.

2      Q    You don't have to look back at the document we

3   just went over, on the human performance report.  Will

4   you take my word for it that that's the same number that

5   is on that document?  Or do we need to look back at that?

6      A    I believe it's the same number, sir.

7      Q    And who does it say that the author of that -- of

8   the CR is?

9      A    You're referring to the owner, sir?

10     Q    Yes, sir.

11     A    Washington, DeWarren.

12     Q    And would the owner be the person that submitted

13  the CR, and his name?

14     A    Yes, sir.  At the very bottom of a CR, you hit

15  submit once you're complete.

16          MR. JOHNSON:  Okay.  Well, let's mark this

17  one as Exhibit 63.

18          MR. LANTIS:  Jim, do you know whose

19  production this is out of, this document?  It's not ours.

20          MR. JOHNSON:  I don't see the production

21  number -- the page number on it, so I can't answer you

22  that for sure.  It's the CR that DeWarren did, but I

23  can't tell you which production it came from.

24          (Exhibit 63 was marked for identification.)

25  BY MR. JOHNSON:

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-45   Filed 11/15/21   Page 468 of 672   PageID #: 738
JA 0461

1    Q   Let's look down at the cause and evaluation that's

2  on this CR.  Please read over the key learnings and

3  takeaways that you see written there.

4    A   Key learning number one --

5    Q   Yeah.  You don't have to read it.  You don't have

6  to read those.

7    A   Oh.

8    Q   But just let me know when you've looked at the key

9  learnings and the takeaways.

10   A   (Reviewing document.)  Yes, sir.

11   Q   I know this may be difficult for you to have to

12 switch back and forth to documents and you can't get them

13 both up on the screen at the same time.  But if I

14 represent to you that the key learnings and takeaways are

15 identical to what you put in your human performance

16 alert, which was Document 1, does that look fair -- like

17 a fair statement?  Or do you want to look back at

18 Document 1 to make sure?

19   A   They look to be the same, sir.

20   Q   So this looks like kind of a cut and paste that

21 Mr. Washington did from your human performance alert?

22   A   I'm unsure if he cut and paste, sir.

23   Q   But it's the same words?

24   A   Same words, yes, sir.

25   Q   If you look down at the bottom of that, it says

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 350-52   Filed 11/15/21   Page 469 of 672   PageID #: 739
JA 0462

1  the resolution of this is to "Conduct a briefing to

2  reinforce expectations regarding validating work."  Am I

3  reading that correctly, under Resolution?

4      A    Yes, sir.

5      Q    And do you know whether that briefing occurred

6  and, if it did, when it occurred?

7      A    No, sir.  I do not recall.

8      Q    Do you recall when Mr. Goforth was terminated and

9  how you found out about that?

10     A    Do not remember the exact day, sir, or exactly the

11  way I heard it, but I did hear that he was going to be

12  terminated, yes, sir.

13     Q    All right.  So you heard about that he was going

14  to be terminated before he actually was?

15     A    Usually it is after an ERB is completed.  So it

16  would've been after that sometime, sir.

17     Q    So the termination cannot be done until the ERB

18  meets and approves it?

19             MR. LANTIS:  Objection to form.

20             You can answer, Freddie.

21     A    I'm not sure exactly how that works, sir.

22     Q    Fair enough.

23     A    I've never been on an ERB and never had to

24  terminate anyone.

25     Q    So in your experience, when someone is terminated

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-53   Filed 11/15/21   Page 470 of 672   PageID #:
JA 0463
740

1  from either DZ or TVA, does there have to be an ERB

2  performed before it can be done?

3          MR. LANTIS:  Objection to form.

4          You can answer.

5    A   I have never seen anyone terminated, sir, so I do

6  not recall how that would actually work.  But

7  procedurally, we usually do an ERB if it's going to

8  affect an individual.

9    Q   I see.  And so is Mr. Goforth's termination the

10 only one that you know about from your time at

11 Day & Zimmermann?

12   A   Yes, sir.  As far as I can remember.

13   Q   Getting back to this "conduct briefing to

14 reinforce expectations regarding validating work," do you

15 remember a morning meeting where Mr. Washington announced

16 to those attending the morning meeting that a person had

17 been terminated?

18   A   I apologize, sir, I do not.  It's been a long

19 time, sir.

20   Q   Well, you may not have even been there.  It was

21 just a question to see.  So, I understand.

22          MR. LANTIS:  Jim, are you going to put that

23 last -- that CR into the record?

24          MR. JOHNSON:  Did we not do that already?  I

25 think we did.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-1   Filed 11/15/21   Page 471 of 672   PageID #: 741
JA 0464

1  that's something you didn't have anything to do with when

2  you were referring to the manway cover being off?

3           MR. LANTIS:  Objection to form.

4    Q   When you were looking at the manway cover being

5  off?

6           MR. LANTIS:  Objection to form.

7           You can answer.

8    A   I did not go look at the cleanliness, no, sir.

9    Q   So that wasn't something you were concerned with

10  when you were doing a prompt investigation into why the

11  manway cover was off, because it was just irrelevant as

12  to whether anybody verified cleanliness, correct?

13           MR. LANTIS:  Objection to form.

14           You may answer.

15    A   I was more concerned that did the FME cover get

16  pulled in when they tried to pull vacuum and why the

17  manway was off.

18    Q   Okay.  And I take it that you are familiar with --

19  based on all your experience that you've recited with

20  work orders, with all the policies and procedures

21  regarding the writing and the performance of work orders

22  at Watts Bar?

23    A   Yes.  Familiar with them, yes, sir.

24    Q   All right.  And so I'm going to tell you that

25  Mr. Goforth's position, as established in this suit so

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-15 Filed 11/15/21  Page 472 of 672  PageID #:
742
JA 0465

1    far, is that when he signed this document he was

2    acknowledging a note of how he and other supervisors were

3    supposed to notify craft of their responsibilities.  And

4    he signed it acknowledging the note, that that's how this

5    was to be done going forward.  Based on your knowledge of

6    policies and procedures, do you find that an acceptable

7    understanding of what this says under "Note" here?

8          MR. BERNIER:  Objection to form.

9    A   So the first note, (as read) "Craft will notify

10   supervisor to observe pipe cleanliness, manway

11   cleanliness and accountability for all cleanliness

12   inspections prior to installing the manway covers.

13      "Responsible craft shall reinstall the manway

14   covers in accordance with MMTP-104..."

15      Repeat your question, sir.

16    Q   Mr. Goforth's position has been that when he

17   signed this he was acknowledging the note that -- a note

18   that told him how the craft was to do the work, so that

19   he could appropriately instruct his subordinates in how

20   to do the work and document it, and that that's what he

21   was signing.  He was acknowledging that that was -- that

22   it was a note that that's what he was supposed to do

23   under the policies and procedures.  Does that seem like

24   an acceptable interpretation of the policies and

25   procedures as you know them?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-5  Filed 11/15/21  Page 473 of 672  PageID #: 743
JA 0466

1          MR. LANTIS:  I'm going to object on --

2          MR. BERNIER:  Objection to form.

3          MR. LANTIS:  -- the characterization of

4    Mr. Goforth's position.

5          Subject to that objection, Freddie, you can

6    answer the question.

7    A    The one that says "Verify cleanliness.  Document

8    TI-27..." if that's the way he seen that -- poorly

9    written -- with the other two notes in there, that could

10   be possible, yes, sir.

11   Q    All right then.  Let me show you another document.

12   It's Document 12.

13   A    Okay.

14   Q    Are you with me?

15   A    Yes, sir.

16         MR. JOHNSON:  And this is for counsel's

17   information.  You can disregard it, Mr. Gibson.  But this

18   was previously entered as Exhibit 54, so I'm not going to

19   reintroduce it now.

20   Q    Mr. Gibson, please take a look at this document,

21   the two pages of it, and let me know when you're ready to

22   talk about it.  And I can tell you, I'm only going to ask

23   you questions about the second page of it that says page

24   2 of 2.  Well, let me change.  I'm going to ask you

25   primarily about page 2 of 2.  I may have a question or

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-57   Filed 11/15/21   Page 474 of 672   PageID #:
744
JA 0467

1  two on page 1 also.

2  A  (Reviewing document.)  Okay, sir.

3  Q  So, looking at the first page -- let me ask you

4  this first.  I take it this is a document you've never

5  seen that before; is that correct?

6  A  I don't think I've ever seen this, no, sir.

7  Q  All right.  So, on the first page, at the very top

8  it says Factfinding Notes ( Contractor Only).  Correct?

9  A  Yes, sir.

10  Q  And then it says -- under Name it says Robert

11  Goforth, and under Manager it says DeWarren Washington.

12  Correct?

13  A  Yes, sir.

14  Q  And it says, under Contractor History, no previous

15  disciplines and no documented nondisciplinary actions,

16  correct?

17  A  Was that on the same page?

18  Q  Yeah.  It's just under Contractor History there at

19  the top of the front page.

20  A  Understood.  Yes, sir.

21  Q  All right.  So, then we go down to the second

22  page, and let me direct you to about halfway down, where

23  there's a question that says "Was the action confirmed to

24  be willful misconduct, intentional or deliberate?"

25  Right?  Are you with me?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95 Filed 11/15/21  Page 475 of 672  PageID #:
JA 0468
745

1     A    I am with you, sir.

2     Q    Okay.  And then down from there it says "Was a CR

3    written to document this offense?"  Correct?

4     A    Correct.

5     Q    And it says "Yes."  And then it lists the CR under

6    that, which is 1457849, correct?

7     A    Yes, sir.

8     Q    And is that the same CR number as the CR we just

9    went over that Mr. Washington wrote?

10    A    Looks to be the same, yes, sir.

11    Q    And is that the same CR that Mr. Washington took

12   your language from your human performance alert and put

13   into the CR?

14             MR. BERNIER:  Objection to form.

15             MR. LANTIS:  Objection to form as well.

16    Q    I'll repeat the question.  Is that --

17             MR. JOHNSON:  And I understand the objections

18   apply.  You don't need to object again.

19    Q    Is that the same CR in which you testified earlier

20   that Mr. Washington incorporated your human performance

21   alert into the CR?

22    A    That looks to be the CR, yes, sir.

23    Q    All right.  Now, so we're talking about what was

24   in that CR, meaning the manway cover being found off,

25   correct?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-5  Filed 11/15/21  Page 476 of 672  PageID #:
746
JA 0469

1    A    Yes, sir.

2    Q    Okay.  And so it says there, above that, where it

3  says "Was the action confirmed to be willful misconduct,

4  intentional/deliberate?"  It says that, right?

5    A    It does.

6    Q    And then down at the bottom it says that this

7  document was prepared by DeWarren Washington on November

8  8th, correct?

9    A    Yes, sir.

10    Q    And then it's signed by DeWarren Washington on

11  November 20th; is that correct?

12    A    Yes, sir.

13    Q    And so above where his signature is, where it says

14  "Was the action confirmed to be willful misconduct,

15  intentional/deliberate?" it's marked "No"; is that

16  correct?

17    A    It is marked "No."  Yes, sir.

18    Q    So based on your prompt investigation and your

19  human performance alert and everything you know about

20  this manway cover being off, was Mr. Goforth's conduct in

21  signing the work order that we just went over willful,

22  intentional or deliberate misconduct?

23         MR. LANTIS:  Objection to form.

24         MR. BERNIER:  Objection to form.

25    Q    Well, let me put it this way, would you agree with

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-17   Filed 11/15/21   Page 477 of 672   PageID #:
JA 0470
747

1    Mr. Washington on this form that the action of

2    Mr. Goforth in placing his signature on the work order

3    was not willful misconduct, intentional/deliberate?

4    Would you agree with that statement?

5              MR. LANTIS:  Objection to form.

6              MR. BERNIER:  Object to the form.

7        A    I would agree.

8        Q    All right.  It also says, "Does the offense create

9    notoriety upon or negatively impact the agency's

10   reputation?"  Do you see where it says that?

11       A    I do.

12       Q    And would you understand the agency, since it says

13   "agency," to be TVA?

14       A    I'm uncertain, sir.

15       Q    Okay.  Well, TVA is an agency of the United States

16   government, is it not?

17             MR. LANTIS:  Objection to form.

18       Q    To your knowledge.  I mean, if you don't know, you

19   know, tell me.

20       A    I didn't know if it's referring to DZ or if it's

21   referring to TVA, but...

22       Q    Okay.  Well, let's assume either one or both.

23   Would you agree that Mr. Goforth signing of that document

24   did not creat notoriety or negatively impact the agency's

25   reputation?  Would you agree that it says "No" to that,

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-47   Filed 11/15/21   Page 478 of 672   PageID #:
748
JA 0471

1 as signed by Mr. Washington?

2         MR. LANTIS:  You're asking if he agrees that

3 the box is checked "No," not -- it's unclear what your

4 question is.

5   Q  Well, we'll take it one step at a time.  Would you

6 agree that the box says -- that's signed by

7 Mr. Washington, says "No"?

8   A  Yes, the box is marked "No."

9   Q  Okay.  And do you agree that knowing what you know

10 about Mr. Goforth signing that document, as you've

11 testified to, and what happened with the manway cover

12 being off, would you agree that that's a correct

13 statement when it says "No"?

14         MR. BERNIER:  Objection to form.

15   A  Yes, sir.

16         MR. JOHNSON:  Let's mark this one -- oh, this

17 one is previously marked as 54, so we don't have to mark

18 it.

19 BY MR. JOHNSON:

20   Q  Excuse me for a moment here, Mr. Gibson.  I'm

21 trying to locate another document.

22      Take a look at Document Number 4, please, sir.

23 Let me know when you're with me.

24   A  So far it's not letting me download it.  It says

25 "This document didn't load.  The document may be

1  protected."

2           MR. LANTIS:  Hey, Freddie, if you'll just

3  refresh that browser window that you're in, it should let

4  you download the document.

5           THE WITNESS:  Okay.  Hitting refresh now,

6  sir.

7           Thank you.  All right.

8  BY MR. JOHNSON:

9    Q   Okay.  You want to look it over for a minute

10 before I talk about it?  We're just going to talk about

11 this briefly.

12          THE REPORTER:  Is this a prior marked

13 exhibit?

14          MR. JOHNSON:  It's a prior marked.

15          THE REPORTER:  What's the number?

16          MR. JOHNSON:  It's 55.

17          THE REPORTER:  On prior marked exhibits,

18 Mr. Johnson, if you'll call out the number, the actual

19 exhibit number, then I can link that up.

20          MR. JOHNSON:  Terrific.  So you've got

21 Exhibit 55 in the record now?

22          THE REPORTER:  Yes.

23 BY MR. JOHNSON:

24    Q   Let me know, Mr. Gibson, when you're ready to talk

25 about that document.

1    A    I am on the second page.

2    Q    All right.  And there's an earlier email that is

3  from Ms. Edwards that is shown there, correctly --

4  correct?

5    A    That is correct.

6    Q    And does that email appear to you to quote the CR

7  1457849 and which also has your key learnings and

8  takeaways that you had put in your human performance

9  alert?

10    A    It looks that way.  Yes, sir.

11    Q    Okay.  So let's go back to the first page and look

12  at what Mr. Goforth styles there as his professional

13  opinions on actions to take.

14        The first one says "Work orders need to have child

15  work orders for each manway removed, just like Sequoyah

16  does on theirs.  The current work order was deficient and

17  did not list the individual manway installations like it

18  did for the removals."

19        Is that what it says there under number 1?

20    A    That is what you read, yes, sir.

21    Q    And based on all of the experience that you

22  recited with work orders, and this particular work order

23  at issue, does that sound like -- well, let me ask it

24  this way.  You can disregard my question up to then.

25        I think earlier you commented that the work order,

1    where Mr. Goforth signed it, was I think your words were

2    "poorly written"; was that correct?

3              MR. BERNIER:  Objection to form.

4       A    Where the work note was at?

5       Q    Yes.  When we went over the Section 3.13, where it

6    said "Note" and where Mr. Goforth signed as supervisor, I

7    think your comment about that part of the work order was

8    that it was poorly written; is that correct?

9              MR. BERNIER:  Same objection.

10      A    That is correct.

11      Q    Would what Mr. Goforth is proposing here in number

12   1, would that improve the quality of the work order to

13   make it less likely that a manway cover would not be

14   reinstalled?

15             MR. BERNIER:  Objection to form.

16      A    It could help, yes, sir.

17      Q    All right.  Are you aware that in fact in the 2020

18   reiteration of this work order that that's exactly what

19   was done to this work step?

20      A    I do not, sir.

21      Q    All right.  Let me show you then what's been

22   previously marked as Exhibit 28.  It is your Document

23   Number 8.  Let me know when you're you with me on

24   Document 28.

25      A    On Document Number 8?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-15   Filed 11/15/21   Page 482 of 672   PageID #:
752
JA 0475

1    Q   I'm sorry.  Yes, Document Number 8.

2    A   Yes.  I'm looking at Document 8, and it says

3   Attachment A on top.

4    Q   And then beneath that it says "Section 3.13,

5   Manway Cover Reinstallation," correct?

6    A   Correct.

7    Q   And is that the same section that we were

8   referring to earlier that said "Note" and then that

9   Mr. Goforth signed?

10              MR. LANTIS:  Objection to form.  You can

11   answer.

12    Q   We can look back at the work order.

13    A   It looks the same, except for the "verified

14   cleanliness."  Looks like the procedure changed.  It says

15   "MMTP-112" instead of "TI-27."

16    Q   Oh, good point.  Good catch.  Okay.  Other than

17   that, does it appear to be the same section, except now

18   it's got a whole bunch of sign-offs for each cross-under?

19    A   It does.  It says "critical stepdown."  And it

20   also says "highly skilled supervisor."

21    Q   Okay.  And then if you look at all three of the

22   pages of this, it includes ten signature lines for craft

23   supervisor for all ten of the manway covers, does it not?

24    A   That looks to be correct, yes, sir.

25    Q   And it says that the craft supervisor is to sign

Case 1:20-cv-00254-TRM-SKL   Document 95-14   Filed 11/15/21   Page 483 of 672   PageID #: 753
JA 0476

1  it.  So would that be the level we talked about earlier,

2  like the foreman or the general foreman or the supervisor

3  for the shift, the shift supervisor?

4     A   It looks like all these signatures are

5  supervisors, not general foremans or foremans.

6     Q   Okay.  And now there are ten signatures, one for

7  each manway cover, instead of just the one signature

8  between the note that was on the one Mr. Goforth signed,

9  right?

10     A   Yes, sir.  There's more work steps and more

11  detail.

12     Q   Okay.  So looking back then at the document that

13  we were previously in, Mr. Goforth's email to Sherrie

14  Lynne about his professional opinions on what to improve

15  the work order, does that look like that in fact the work

16  order was changed to implement Mr. Goforth's suggestion?

17            MR. BERNIER:  Objection to form.

18            MR. LANTIS:  I'll join the objection.

19     A   I think it had said a child work order.  Is that

20  what it said?  Not modify the original work order, but it

21  said child work order.

22     Q   Well, other than the child work order -- instead

23  of the child order, it does list each individual manway

24  installation like it did for the removals.  It does -- it

25  did require the ten sign-offs for the installations like

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-14   Filed 11/15/21   Page 484 of 672   PageID #: 754

JA 0477

1    it did for the removals, correct?

2              MR. LANTIS:  Objection to form.

3       A    Yes, sir.  It improved that section.

4       Q    Okay.  And you may not know the answers to these

5    now, but I'll ask just to see if you do.  If you look at

6    number 4, it says "Each cross-under needs to be

7    individually marked and etched on both the installation

8    cover and the manway itself that clearly identify the

9    manway."

10              My understanding is that now the way this is done

11   is, for performing this work order, is that there are

12   little cards that are hung on strings down from the

13   manway cover when it's taken off that lists the -- like

14   1A2C, you know, the name of that manway, and it's hung

15   down on the card to the floor level.  Are you familiar

16   with that?  Have you seen that done since?

17      A    I have not seen that hanging to the floor, no,

18   sir.

19      Q    Okay.

20      A    From my understanding, they were supposed to put

21   another piece of metal over the metal that's up there

22   with the nomenclature on it.

23      Q    Okay.  And have they done that?

24      A    I haven't went and verified, sir.

25      Q    Take a look at your --

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-14   Filed 11/15/21   Page 485 of 672   PageID #: 755
JA 0478

1           MR. BERNIER:  Hey, Jim.  If you're about to

2    move into another section, would now be an okay time for

3    a break?

4           MR. JOHNSON:  Yeah.  We can break now, but I

5    think this is probably pretty much my -- I think I've got

6    maybe -- I've got one more document, and then I think I'm

7    going to be asking Mr. Goforth if we're ready to wrap up.

8    We can take a break now, or we can take a break...

9           MR. BERNIER:  If that's where you are, we can

10   continue.

11          MR. JOHNSON:  Okay.  We'll just finish this

12   one document and then we'll take a break, and we may be

13   done.

14   BY MR. JOHNSON:

15   Q   All right.  Take a look at your Document Number 3,

16   please.

17   A   Okay.

18   Q   This purports on its face to be, does it not, an

19   email from you of October 21st, 2018 to DeWarren

20   Washington, correct?

21   A   Yes, sir.

22   Q   And it is about the manway cover conversation.

23   That's the subject, correct?

24   A   Yes, sir.

25          MR. JOHNSON:  All right.  Let's mark this one

Case 1:20-cv-00254-TRM-SKL   Document 250-19   Filed 11/15/21   Page 486 of 672   PageID #:
756
JA 0479

1 as Exhibit 64.

2                    (Exhibit 64 was marked for identification.)

3 BY MR. JOHNSON:

4     Q    Do you recall having done this email, Mr. Gibson?

5     A    I do.

6     Q    And would you read the first sentence of it,

7 please?

8     A    "On 10/19/2018, we had Mr. Robert Goforth come

9 into the plant and discuss the issue with the manway that

10 was not installed but was signed off in the work order

11 and also on the data sheet."

12     Q    All right.  So I just want to take you back to

13 that day and ask you, please, to identify who was present

14 when Mr. Goforth came to the plant to discuss the issue

15 as you state here.

16     A    On the very last sentence it identifies who was

17 there.

18     Q    Okay.  And do you remember, sitting here today,

19 that those folks were there?

20     A    All except for Mr. Jeff Wilson.  I don't recall

21 that.

22     Q    Okay.  And so tell me, the best as you can

23 remember, who said what, beginning at the beginning of

24 that conversation.

25     A    Other than what I've written, sir, I really don't

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 150-4   Filed 11/15/21   Page 487 of 672   PageID #:
757
JA 0480

1  remember everything that transpired right there.  That

2  was a long time, air.

3     Q   Okay.  Fine.  So who, if anyone, asked you to send

4  this email?

5     A   I think it was Mr. Derek Pair had got ahold of me

6  and said that Mr. Washington wants us to make sure we get

7  a written statement in on what had happened.

8     Q   And would this be your statement in response to

9  that request by Mr. Pair?

10    A   Yes, sir.

11    Q   And so your -- go ahead and read what you're

12 saying there, where it says "Mr. Goforth said..."

13    A   "Mr. Goforth said that the overall responsibility

14 was on him and Mr. Benjamin Newell, who are the

15 supervisors on days and nights shift for the balance of

16 plant work.  We tried to contact the individuals who

17 signed the paperwork, but neither answered their phones."

18    Q   Okay.  Let's talk about that last little piece

19 first.  Were you ever made -- able to make contact with

20 either of the individuals who signed the paperwork but

21 didn't answer their phone that day?

22    A   I'm sorry, sir, you broke up.  I couldn't hear

23 you.

24    Q   Okay.  My question was, if you look at the second

25 part of that statement there, "We tried to contact the

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 95-1 Filed 11/15/21   Page 488 of 672  PageID #:
JA-0481
758

1    individuals who signed the paperwork, but neither

2    unanswered their phones."  Were you ever able to reach

3    either of those individuals who signed the paperwork but

4    you couldn't get them that day?  Were you ever able to

5    reach them?  And I mean you.

6        A   I don't recall, sir.  I know I didn't get ahold of

7    the two craft individuals.  I can't remember if I got

8    ahold of Mr. Newell or not.

9        Q   All right.  Do you know if anyone else ever got

10   hold of those individuals?

11       A   I do not, sir.

12       Q   Okay.  And on your statement about Mr. Goforth

13   took overall responsibility for himself and Mr. Newell,

14   did you take that to mean that Mr. Goforth had

15   fraudulently and with intent to deceive signed that work

16   order where he did that we've talked about?

17              MR. BERNIER:  Objection to form.

18       A   Could you repeat the question?

19       Q   Let me -- I'll withdraw the question that way.

20   Let me ask this way.  What did you understand him to mean

21   when he said that the overall responsibility was on him

22   and Mr. Newell?

23       A   I expected it to come from any of the supervisors,

24   sir.  They owned the work.

25       Q   Right.  And so you -- you're a military veteran,

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-4  Filed 11/15/21  Page 489 of 672  PageID #: 759
JA-0482

1  are you not, sir?

2      A    Yes, sir.

3      Q    What service did you serve in?

4      A    Army.

5      Q    And you're aware -- were you aware that

6  Mr. Goforth is a Navy veteran?

7      A    I did.

8      Q    And tell me if I'm characterizing this

9  incorrectly.  But is this kind of the concept from

10 military service that if it happens on your watch, it's

11 your overall responsibility?

12             MR. BERNIER:  Objection to form.

13     A    In the military, yes, sir, we are responsible for

14 the personnel that are assigned under us.

15     Q    And did you take it that that's what --

16 essentially what Mr. Goforth was saying, and as you wrote

17 here, for him and Mr. Newell?

18             MR. LANTIS:  Objection to form.

19     Q    Essentially --

20             MR. BERNIER:  Objection to form.

21     Q    Essentially the same thing as in the military?

22     A    I did take it that way, sir, that he was referring

23 to he, as the leader over the BOP, and he takes

24 responsibility for his people.

25     Q    And I take it, based on your prior testimony, that

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 55-4  Filed 11/15/21  Page 490 of 672  PageID #:
JA 0483
760

1    that did not mean that he had fraudulently signed that

2    document that we talked about earlier?  You did not take

3    him to have said that?

4                MR. LANTIS:  Objection to form.

5                MR. BERNIER:  Objection to form.

6        A    No, sir.

7                MR. JOHNSON:  I think that may be all the

8    questions I have for you, Mr. Gibson.  We'll take a

9    little break here as requested by Mr. Bernier and then

10   we'll reconvene.

11               Is 10 minutes adequate, Mr. Bernier?

12               MR. BERNIER:  It is to me, yes.

13               MR. JOHNSON:  Everybody okay with 10 minutes?

14               MR. LANTIS:  Yes.

15               MR. JOHNSON:  Okay.  It's 10:29.  So, say

16   10:35 we'll reconvene.

17                      (Recess.)

18   BY MR. JOHNSON:

19       Q    Mr. Gibson, thank you for your patience.  I have

20   just a few more questions for you.  And the first one is,

21   do you know who John Reeves is?

22       A    Yes, sir.

23       Q    Who is John Reeves, professionally at

24   Day & Zimmermann?

25       A    Mr. Reeves is a VP with DZ.  He's one of our main

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-1   Filed 11/15/21   Page 491 of 672   PageID #:
761
JA 0484

1  leadership personnel.

2      Q   And do you know what his position was back at the

3  time that Mr. Goforth was terminated?

4      A   I think the title was director of operations over

5  the three sites.

6      Q   The three sites being what?

7      A   Browns Ferry, Watts Bar, Sequoyah Nuclear Plants.

8      Q   Did John Reeves ever contact you regarding the

9  manway cover being off at any time from it being found

10  off until Mr. Goforth was terminated?

11      A   Say the question again, sir.  I apologize.  I

12  coughed.

13      Q   Did John Reeves ever contact you regarding the

14  manway cover being off at any time from the time it was

15  found off until Mr. Goforth was terminated?

16      A   I do not recall.  Unless you're referring to when

17  he came on-site.

18      Q   Well, when did he --

19      A   I don't remember a phone call.

20      Q   Do you -- when did he come on-site that you're

21  referring to?

22      A   Not sure exactly the date, but as one of our

23  leaders he came to the site to help with looking over

24  what had happened with the manway.

25      Q   Okay.  Did he talk to you during -- when he came,

1  about the manway being off?

2      A    I'm sure he did, yes, sir.

3      Q    Do you recall any of that conversation?

4      A    I do not, sir.  I apologize.  I do not.

5      Q    Do you know how long -- well, during the time that

6  you're aware of that he was at Day & Zimmermann, would he

7  ever be in a position where he was actually performing

8  work orders at Watts Bar?

9              MR. LANTIS:  Objection to form.

10             You may answer.

11     A    No, sir.  He would not be implementing work.

12     Q    Would he be an on-site supervisor for people who

13  were implementing work?

14             MR. LANTIS:  Objection to form.

15             You may answer.

16     A    He would not be a supervisor directing any work or

17  over any of our supervisors.  He would be over our

18  manager.  And he would be over all of us, but he would be

19  over Mr. Washington.

20     Q    Correct.  But he would not be one of the

21  supervisors or managers whose job it was to make sure

22  work orders were being done on the floor?

23     A    That would be a fair statement, yes, sir.

24     Q    Were you aware, prior to the time that Mr. Goforth

25  was being terminated, that he had an ongoing case going

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 25-4  Filed 11/15/21  Page 493 of 672  PageID #: 763
JA 0486

1  on with TVA at the -- either the Office of Special

2  Counsel or the MSPB?

3      A    No, sir.

4      Q    Were you aware that he was involved in any --

5  let's call it litigation with TVA regarding his work

6  before he was fired?

7      A    No, sir.

8      Q    Were you aware that Mr. Goforth had written an

9  evaluation of the performance of workers in the cycle 14

10  tritium program?

11      A    No, sir.

12      Q    Were you aware of an event where there was a video

13  of a tritium rod assembly being dropped?  Were you aware

14  of any videos regarding anything about TPBARS in cycle 14

15  of the tritium program?

16      A    No, sir.  The only thing we heard was a CR was out

17  there about -- we thought it was something bent possibly.

18  But that's been so long ago, sir, not sure.

19      Q    And who did you discuss this thing being bent

20  with, if anyone?

21              MR. LANTIS:  Objection to form.

22              You may answer.

23      Q    Do you recall discussing that event you just

24  described with anyone?

25      A    Nothing directly with anyone, no, sir.  Usually

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 494 of 672   PageID #: 764
JA 0487

1   when a CR comes out it's for information so that people

2   don't make any of the same type mistakes.

3       Q   Did you get that CR?

4       A   I didn't personally get the CR, no, sir.

5       Q   Did you discuss the CR with anyone who did get the

6   CR?

7       A   Not that I recollect, no, sir.

8       Q   Do you know if Mr. Washington got the CR?

9       A   I do not.

10      Q   Other than Mr. Washington, who we've already

11  talked about, did you discuss the manway issue being off

12  with any of the following people?  And I'll list people

13  by name, okay?  Did you discuss it with Tony White?

14      A   I do not think so, no, sir.

15      Q   Do you remember Tony White making any comments

16  about Mr. Goforth?

17      A   No, sir.

18      Q   How about Paul Simmons, do you recall him making

19  any comments about Mr. Goforth?

20      A   No, sir.

21      Q   What about Jeff Miller, do you recall him making

22  any comments about Mr. Goforth?

23      A   No, sir.

24      Q   Jason Howard?

25      A   No, sir.

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-4  Filed 11/15/21  Page 495 of 672  PageID #:
765
JA 0488

1    Q   Jesse James?

2    A   No, sir.

3    Q   Rebecca Rodgers?

4    A   No, sir.

5    Q   All right.  This is my last little few questions

6 here, and it's going to be about these human performance

7 alerts like the one you did that was your Document Number

8 1.

9       How frequently are these human performance

10 alerts -- and I'll be talking about 2017-2018 period,

11 while you were there.  How frequently were these human

12 performance alerts circulated?

13    A   Usually when there was a substantial event,

14 whether it's an injury or an accident, plant damage, or

15 something of the nature like the manway not being

16 reinstalled, sir.

17    Q   Okay.  But I mean were these frequent -- let me

18 put it this way, how many of them do you think you did --

19 you have done, just estimate ballpark, during your time

20 at DZ?

21    A   I'm not certain, sir.  Quite a few.

22    Q   Okay.  And by "quite a few," you mean like more

23 than 10?

24    A   Sounds about right, sir.

25    Q   Okay.  And have you ever known anyone to be fired

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 250-4   Filed 11/15/21   Page 496 of 672   PageID #:
766
JA 0489

1  that you -- I think earlier you said you don't know

2  anyone who's been fired. But just to be clear about it,

3  anyone ever fired, to your knowledge, that was the

4  subject of a -- whose activities were the subject of a

5  human performance alert?

6     A   Not that I can recollect, no, sir.

7          MR. JOHNSON: Mr. Gibson, thank you very much

8  for your time. I know you've been up all night. We

9  appreciate your being here. And I'm finished with my

10  questions.

11          Other counsel may wish to ask you some

12  questions.

13          MR. BERNIER: I have a few follow-up here.

14          Paul, I didn't know if now is a good time for

15  me to go, if you wanted to do something here.

16          MR. LANTIS: No, go ahead. Okay.

17              EXAMINATION

18  BY MR. BERNIER:

19     Q   Mr. Gibson, we haven't met yet, but my name is

20  Mike Bernier. I'm an attorney with TVA. Thank you for

21  your time this morning, especially after a long night. I

22  really appreciate it.

23     A   Yes, sir. Thank you.

24     Q   I'll try to be as quick as possible.

25          I want to turn back to the manway incident. It's

Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL Document 250-7 Filed 11/15/21 Page 497 of 672 PageID #:
767
JA 0490

1    A   To my best ability, I thought that they were doing

2   an ERB, Executive Review Board, sir, but not a hundred

3   percent sure.  It's been a while.  Apologize.

4    Q   So, were you aware of whether John Reeves was

5   doing any type of investigation or evaluating

6   individuals' conduct related to that incident?

7    A   Not a hundred percent sure, sir, but I know he did

8   ask questions, you know.  Because he would be like the

9   rest of us, trying to figure out what happened.

10   Q   What he was doing, was that separate from what you

11  initially did when coming to your prompt investigation

12  report?

13   A   No, not really.  I thought he was doing the same

14  thing, sir, just going back over the steps, how did we

15  get here, you know.  And to do that, we really needed to

16  talk to the two individuals and the supervisor that was

17  on nights.

18   Q   Okay.  So you are aware that he was looking into

19  the issue as well, right?

20   A   Yes, sir.  Pretty much all of us were, yes, sir.

21   Q   Okay.  I want to turn back to the work order.  And

22  if you still have the documents in front of you, this is

23  Document 7.  And it was our previous Exhibit 27.  Let me

24  know when you have that pulled up in front of you.

25   A   What was the document number again, sir?

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 25-4 Filed 11/15/21  Page 498 of 672  PageID #:
768
JA 0491

1    Q    Document Number 7.

2    A    Okay.

3    Q    If you could go to the last page.  It's the one

4    that says Attachment A and then 3.13, Manway Cover

5    Reinstallation up top.

6    A    Yes, sir.

7    Q    Okay.  You were asked a good bit about this

8    earlier, but I want to focus on Mr. Goforth's signature.

9    What did Mr. Goforth's signature signify to you on this

10   document?

11   A    (Reviewing document.) "Manway cover

12   reinstallation," then the note, "craft..." That the

13   cleanliness was verified.  I guess when I first looked at

14   it, sir, it would be "Verify cleanliness.  Document on

15   TI-27," and that the other prerequisites were met.  But

16   it is poorly written as a note.

17   Q    I understand what you're saying there.  But to

18   clarify what you're saying, does his signature signify to

19   you that the steps on the notes have been completed?

20        MR. JOHNSON:  Object to form of the question.

21   He's already testified what it signified to him.

22   A    Yes, sir.  Only because of the 3.13, where it says

23   "Manway cover reinstallation."  But the "Note" does cause

24   some uncertainties.

25        MR. BERNIER:  Okay.  I have no further

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 254-1   Filed 11/15/21   Page 499 of 672   PageID #: 769
JA 0492

1          REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4          I, Sheila D. Wilson, Licensed Court Reporter #268
     and Notary Public, in and for the State of Tennessee, do
5    hereby certify that the deposition of FREDDIE GIBSON was
     reported by me, and that the foregoing 82 pages of the
6    transcript is a true and accurate record to the best of
     my knowledge, skills, and ability.
7          I further certify that I am not related to nor an
     employee of counsel or any of the parties to the action,
8    nor am I in any way financially interested in the outcome
     of this case.
9          I further certify that I am duly licensed by the
     Tennessee Board of Court Reporting, as evidenced by the
10   LCR number and expiration date following my name below.
           In witness whereof, I have hereunto set my hand
11   this 26th day of September 2021.

12

13

14

15

16   _____
     Sheila D. Wilson, LCR #268
17   Expiration date: 6/30/2022.
     Notary Public Commission
18   Expires: 1/25/2023.

19

20

21

22

23

24

25

Wilson Reporting Agency  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-4   Filed 11/15/21   Page 500 of 672   PageID #:
770
UA-0493

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TENNESSEE
 2                     AT CHATTANOOGA
         _____
 3
     ROBERT M. GOFORTH,
 4
                Plaintiff,
 5
     vs.                           Case No: 1:20-cv-254
 6
     TENNESSEE VALLEY AUTHORITY
 7   and DAY & ZIMMERMANN NPS,
     INC.
 8
                Defendants.
 9
     _____
10
                   Chattanooga, Tennessee
11                    August 19, 2021

12           DEPOSITION OF DeWARREN WASHINGTON
     _____
13
     APPEARANCES:
14
                FOR THE PLAINTIFF:
15
                JAMES M. JOHNSON, ESQ.
16              Attorney at Law
                620 Lindsay Street, Suite 210
17              Chattanooga, TN 37403
                (423)648-4093
18              jj@jamesmjohnsonatty.com

19                   -and-

20              JUSTIN S. GILBERT, ESQ.
                Gilbert Law, PLC
21              100 W. MLK Blvd., Suite 500
                Chattanooga, TN 37402
22              (423)756-8203
                justin@schoolandworklaw.com
23

24

25
```

1  answer.

2  BY MR. JOHNSON:

3  Q.      I'm sorry.  What is your current job at

4  Day & Zimmerman?

5  A.      Site manager for Day & Zimmerman at Watts Bar

6  Nuclear Power Plant.

7  Q.      And was that the job that you held at the

8  time Mr. Goforth was terminated?

9  A.      Yes, sir, I was just hired in in that

10  position.

11  Q.      When were you hired into that position?

12  A.      Just before that particular outage, which was

13  late that spring.  I don't know the exact date, but

14  it was that spring before that fall outage.

15  Q.      So that would have been the late spring of

16  2018?

17  A.      Yes, sir.

18  Q.      And prior to that, where were you working?

19  A.      I went to start my own business, but prior to

20  that I was a construction supervisor when I hired in

21  with TVA in 2012.

22  Q.      Okay.  Let me -- you're going a little bit

23  fast for me.  If I can stop you on what you just said

24  about the -- you went into private business before

25  you got hired in the spring of 2018?

1    concerns.

2          So with regard to the Cusick CR that you're

3    looking at now, does the information I just gave you

4    refresh your memory any better as to whether you've

5    seen that before?

6    A.     No, sir.

7    Q.     Have you seen it in your preparation for this

8    deposition today?

9                THE WITNESS:  Do I answer that, Paul?

10               MR. LANTIS:  Actually, no, I'm going to

11   instruct him not to answer on attorney/client

12   privilege.  The documents that were shown by counsel

13   to a witness in preparation for a deposition are work

14   product and attorney/client privilege.

15               MR. JOHNSON:  Well, I don't think their

16   identification is privileged or work product.  I

17   think what any legal advice was is privileged, but I

18   don't think just identifying what he looked at, I

19   think I can ask him -- if I had just point blank

20   asked him, Did you look at any documents in

21   preparation for your deposition, I don't think you

22   would have objected because I would have then said,

23   Well, what documents did you look at, and I've never

24   known that to be objected to.  All we're doing is

25   identifying the documents.  I'm not going to ask him

1  Q.      And that would be within the maintenance

2  department that you --

3  A.      No, sir.

4  Q.      -- were in?

5  A.      Big picture maintenance, yes, but specific

6  department, no.

7  Q.      Okay.  Well, does the big picture maintenance

8  get the same notice of CRs that the department under

9  it gets?

10  A.      No, sir, I wouldn't have seen the CR and I

11  didn't see the CR.

12  Q.      Okay.  And I think the CR may have

13  actually -- if you look at the date on it, it's

14  November 2017.  So that may have been during that

15  interlude when you were in your own business.

16  A.      Yes, sir.

17  Q.      Would that be true?  So that's one reason why

18  you may not have gotten notice of it.

19          So let me, then, get to this point.  Did

20  after you came back on board -- in the spring of 2018

21  I think you said; correct?

22  A.      Roughly, yes, sir.

23  Q.      And at that time you came back as the site

24  manager?

25  A.      Before the site manager I came back to -- as

1  too much, so I need to be corrected about that every

2  now and then.

3        All right.  So your reporting structure was

4  up to who once you became the site manager?

5  A.        Jason Howard was our ops manager, and

6  Mr. John Reeves, who was our director at the time.

7  Q.        Okay.  And so who then reported to you?

8  A.        Mr. Freddie Gibson, which is our general

9  superintendent; our planning manager at the time, I

10  think, was Mr. Robin Keys; our project controls

11  manager, Mr. Matt Summers, and everybody who would

12  directly report to those individuals.

13  Q.        And that would go right on down through the

14  line to the lowest on the ladder there at Watts Bar

15  site?

16  A.        Yes, sir, for Day & Zimmermann.

17  Q.        For Day & Zimmerman?

18  A.        Yes, sir.

19  Q.        Okay.  Did you hear anything from Tony White

20  about their being a CR for events that occurred in

21  the tritium program?

22  A.        No, sir.

23  Q.        Did you hear anything from anybody else about

24  a CR that had been written for the tritium program?

25  A.        No, sir.

1  Q.      So at the time you became the site manager,

2  were you aware of ongoing litigation by Mr. Goforth

3  with TVA?

4  A.      No, sir.

5  Q.      At any time subsequent to your being the --

6  getting the site manager position, did you learn

7  about -- up to the time Mr. Goforth was fired --

8  litigation that he was having against TVA?

9  A.      No, sir.

10 Q.      So did you ever talk to a lawyer for TVA by

11 the name of Johnny Slater, and I don't want to know

12 what Johnny Slater might have said, but did you ever

13 talk to a lawyer from TVA named Johnny Slater?

14 A.      No, sir.

15 Q.      Did anyone make you aware that Mr. Goforth

16 had a pending mediation to resolve his litigation

17 with TVA?

18 A.      No, sir.

19 Q.      Did there come a time, within the time

20 reference we're talking about as you became site

21 manager for DZ at Watts Bar, when you were working

22 or, at least, inquiring with Mr. Goforth, and having

23 some back and forth with him about the budget for the

24 upcoming cycle 15 tritium program?

25 A.      The budget for it regarding?

1  A.      Specifically, no.  I mean, typically what

2  occurred, he would have notified me during that time

3  of what the need was.

4  Q.      Okay.  Well, during any of those discussions

5  with him about the personnel needs for the upcoming

6  cycle, do you recall telling him that you hoped that

7  cycle 15 goes better than the last cycle?

8  A.      No, sir, I don't.

9  Q.      Do you recall telling him that you wouldn't

10  want to have another bad report about the upcoming

11  cycle as had just happened with the last cycle?

12  A.      No, sir, I do not.

13  Q.      Do you recall telling him that you hoped

14  there wouldn't be another complaint about the way the

15  cycle went?

16  A.      No, sir, I did not.

17  Q.      You don't remember having any conversations

18  along the lines I've just posed to you in the last

19  couple of questions?

20  A.      No, sir, I did not make those statements.

21  Q.      Is it possible you made them and you just

22  don't remember because it wasn't that important at

23  the time?

24  A.      No, sir.

25              MR. LANTIS:  Objection to form, but you

1    may answer.

2              MR. MEALOR:  Objection.

3              THE WITNESS:  No, sir, I did not make

4    those statements.  I wasn't aware of any of those

5    instances that he referenced in those statements

6    regarding the performance or anything in cycle 14.

7    BY MR. JOHNSON:

8    Q.      Do you recall Mr. Goforth having a discussion

9    with you in which he told you that his boss,

10   Mr. McGuire, had directed him to write an evaluation

11   of the cycle 14 activities by the Day & Zimmermann

12   and TVA workers?

13   A.      No, sir.

14   Q.      Did he tell you that he had to write the

15   evaluation, and it was just intended to make the team

16   better?

17   A.      No, sir.

18   Q.      Do you recall whether several TVA and DZ

19   employees in 2018 filed complaints that they thought

20   they were being retaliated against, and specifically

21   naming Jesse James?

22   A.      In 2000 when?

23   Q.      '18.

24   A.      I heard some rumblings of some rumors, but I

25   didn't know anything specific.

1  Q.      Were there any names associated with the

2  rumblings that you heard?

3  A.      No, sir, I did not know of any names.

4  Q.      Just tell me about the rumblings.  What

5  rumbles did you hear?

6  A.      Well, just treatment and how he talked to

7  people sometimes.  That was basically it.  Just

8  professionalism-type issues.

9  Q.      With Jesse James?

10  A.      Yes.

11  Q.      Do you know why Mr. Jesse James was replaced

12  by Mr. White?

13  A.      No, sir, I do not.

14  Q.      Did you hear rumblings that that happened

15  because of these difficulties he was having?

16  A.      No, sir.

17          MR. LANTIS:  Objection to form.  You may

18  answer.

19          THE WITNESS:  No, sir, I do not.

20  BY MR. JOHNSON:

21  Q.      And whatever rumblings you heard, was there

22  any indication that Mr. Goforth's evaluation of cycle

23  14 had generated these complaints?

24  A.      No, sir.

25  Q.      On the CR that you still have in front of you

1  that's previously marked as Exhibit 10, who was the

2  department -- or was it directed at the MMG group at

3  TVA?

4  A.      Yes, sir, that's what it states.  Initiating

5  department, D code, mechanical maintenance; owner

6  group, D code, mechanical maintenance.

7  Q.      Does it identify a leader of that group?

8  A.      Specifically a name?

9  Q.      Yes, sir.

10  A.      No, sir, the owner's name is blank.

11  Q.      Oh, that's the owner's name of the CR?

12  A.      That's correct.

13  Q.      Okay.  What I was looking for is who is the

14  CR directed at, possibly for corrective action?

15  A.      If you reference on Page 2, initial actions

16  taken, a TVA tritium production senior program

17  manager met with the maintenance -- WBN maintenance

18  director to discuss the problems encountered.

19  Q.      Okay.  Did you ever hear anything from the

20  maintenance director, once you came on board, that

21  referred to having to do corrective action with

22  regard to that CR?

23  A.      No, sir.

24  Q.      So would you have any knowledge of whether

25  any corrective action was taken?

1  A.      No, sir.

2  Q.      Okay.  Well, let's not let Exhibit 10 get

3  away from us or the court reporter will get angry.

4  Although, she will be nice about it.

5        So just to summarize a little bit -- well, I

6  might just show you one other document.

7            MR. JOHNSON:  Anyone remember offhand

8  what exhibit number the Goforth's evaluation is?

9            MR. LANTIS:  It would be a low number

10 because you showed it in McGuire's dep.

11           MR. JOHNSON:  Yeah.

12           MS. LINDGREN:  I think it's Exhibit 5.

13           MR. JOHNSON:  5.  Okay.

14 BY MR. JOHNSON:

15 Q.      I'm going to show you what's previously been

16 identified as Exhibit 5, and ask you if that's a

17 document you recognize?

18 A.      First time I've seen this.

19 Q.      Okay.  You don't need to look at it further

20 if you're confident in your answer.

21 A.      Okay.

22 Q.      And I may be repeating myself, forgive me if

23 I am, but did you ever hear anyone speak of a

24 document authored by Mr. Goforth called "Cycle 14

25 Tritium Project"?

1    A.       No, sir.

2    Q.       Okay.  Let's get up to the point where the

3    manway cover was found off.

4                MR. LANTIS:  Before we start, Jim, can I

5    just get another bottle of water real quick?

6                MR. JOHNSON:  Sure.

7                (Short pause.)

8    BY MR. JOHNSON:

9    Q.       All right.  So if I represent to you that the

10   manway cover was found off during the night of

11   October 18th to 19th, would that sound correct?

12   A.       That sounds correct, yes, sir.

13   Q.       Okay.  And would it also sound correct that

14   Mr. Goforth was suspended as a result of that manway

15   being off on October 22nd?

16   A.       Yes, sir.

17   Q.       And October 22nd was a Monday; correct?

18   A.       Yes, sir, that's correct.

19   Q.       Okay.  Do you recall informing Mr. Goforth

20   that he had been suspended on that morning of October

21   the 22nd?

22   A.       Yes, sir, I do.

23   Q.       And where did you find Mr. Goforth to give

24   him this information?

25   A.       Mr. Goforth was out in the commons area right

1  outside our OCC in the main office building on-site.

2  Q.      Okay.  Tell us what the "OCC" is.

3  A.      It's our Outage Control Center.  It's where

4  all applicable departments onsite reside to manage

5  our outages.

6  Q.      Is that called the war room?

7  A.      It's called the OCC, Outage Control Center.

8  Q.      Okay.  So you found him in the OCC?

9  A.      No, sir, he was outside of the OCC.

10  Q.      I see.  So outside -- the OCC is one room?

11  A.      Yes, sir, one room.

12  Q.      And so he was in a hallway?

13  A.      No, he was outside in the commons area.  It's

14  an area where some picnic tables are and all that.

15  Q.      Oh, an outdoor area?

16  A.      Yes.  I came outside and I saw him through

17  the glass door, and I went outside to talk to him.

18  Q.      Okay.  Do you remember who you were with

19  within the minutes or up to a half an hour or so

20  before you saw Mr. Goforth and went and informed him

21  of this?

22  A.      Yes, sir, I do.

23  Q.      Who were you with?

24  A.      I was with our site VP at the time, Mr. Paul

25  Simmons, Mr. Tony White, who was our maintenance

1    director, and a host of other people.  The outage

2    folks that were inside the OCC, was in there talking

3    to them about some outage issues, and I saw

4    Mr. Goforth and went outside to notify him of his

5    suspension.

6    Q.      Okay.  Well, when you were with Mr. Simmons

7    and Mr. White, did the -- any two of you or the three

8    of you have a direct discussion together?

9    A.      No, sir, I talked to them independently,

10   actually.  Notified both of them that I was going to

11   be suspending Mr. Goforth pending further

12   investigation.

13   Q.      All right.  So let's take them one at a time.

14   Okay?

15   A.      Mm-hmm.

16   Q.      Let's take Mr. Simmons first.  So you're in

17   the OCC?

18   A.      Yes, sir.

19   Q.      And you go up to Mr. Simmons and you say

20   what?

21   A.      No, actually, I did not go up to Mr. Simmons

22   at first.  I came in to talk about some other issues

23   regarding outage, so Mr. Simmons sitting in the back

24   corner, and then went up to him to notify him of our

25   decision to suspend Mr. Goforth pending further

1  Q.      All right.  And he did write you a statement
2  that you received, I think, that -- was it that
3  Monday?
4  A.      Yes, sir.
5  Q.      Was that before the suspension or after the
6  suspension?
7  A.      Around about the same -- I got the statement
8  that morning, I think, and then the afternoon is when
9  the suspension took place.
10 Q.      Who made the decision to suspend?
11 A.      I made the decision to suspend.
12 Q.      Did you confer with anyone before you made
13 the decision to suspend?
14 A.      I spoke with Mr. Reeves and Mr. Howard about
15 it.
16 Q.      All right.  At what point was the
17 determination made that someone was going to further
18 investigate this?
19 A.      That afternoon, once we started digging back
20 through the work order and looking at how things were
21 signed, Mr. Reeves came down and we went through it
22 together as well.  So he wanted to interview
23 Mr. Goforth, and that's what occurred.
24 Q.      Okay.  So this is all occurring on Monday,
25 the 22nd, that Mr. Reeves came down?

1    A.      On Sunday.  I think he came down that Sunday,

2    if I'm not mistaken.

3    Q.      That Sunday being the day before Mr. Goforth

4    was suspended --

5    A.      Yes, sir.

6    Q.      -- or the following Sunday?

7    A.      No, the Sunday before.  That weekend before.

8    Q.      Okay.  So actually, before Mr. Goforth was

9    suspended, a decision was made for Mr. Reeves to

10   investigate what happened?

11   A.      No, sir, that's not what I stated.

12   Q.      Okay.  Just clear it up for me, then, because

13   I thought that's what I heard.

14   A.      No, sir.

15   Q.      Go ahead.

16   A.      I said -- the question was when

17   Mr. Goforth -- the decision was to suspend

18   Mr. Goforth.  I said first I made that decision.

19   Second, when Mr. Reeves got involved, he got involved

20   that Sunday when he came down.  The decision was

21   already made to suspend him.  He came --

22   Q.      I see.

23   A.      Yes.  I was -- I was -- I wanted to make sure

24   I conferred with him to make sure we had everything

25   that we needed to do from a suspension standpoint,

1  and that's when I made a notification that following

2  Monday.

3  Q.      Okay.  So my question was, then, when was it

4  decided that Mr. Reeves would investigate the

5  incident?

6  A.      That Monday as well.  He wanted to get

7  further information as to what, you know, occurred;

8  you know, what was -- you know, behaviors, things of

9  that nature.

10 Q.      And that was on Monday, the 22nd, the same

11 day as the suspension?

12 A.      Yes, sir.

13 Q.      All right.  So at that point did you

14 participate or have any further discussions with

15 Mr. Reeves in the course of his investigation?

16 A.      Yes, I did.

17 Q.      Can you tell me what those were?

18 A.      I basically supplied any information or

19 documentation that he needed.  It wasn't just him

20 doing the investigation.  I was helping him.  I was

21 supplying documents or previous documents, work order

22 documentation, things of that nature as well.

23 Q.      Okay.  And I'm talking about up to the time

24 that he made the termination decision, let's confine

25 it to.  The Monday you decide -- y'all decide that he

1    was going to be the investigator, and then there came

2    a time when he decided to recommend termination.  So

3    I'm talking about that time period.

4    A.      Okay.

5    Q.      And that's when you were providing such input

6    as he requested in terms of help of what he needed?

7    A.      That's correct.

8    Q.      Okay.  So when did he make that decision that

9    he was going to recommend termination?

10   A.      It was later on that week.  I don't know the

11   specific date, but it was after the interview that he

12   conducted with Mr. Goforth.

13   Q.      Okay.  So if I tell you he interviewed

14   Mr. Goforth on October the 25th, which would have

15   been a Thursday, so it was very shortly after that?

16   A.      Mm-hmm, shortly.

17   Q.      Okay.  So that being on a Thursday, do you

18   recall whether he made the decision to terminate,

19   say, on Friday or --

20   A.      Roughly.  Like I said, it was in that time

21   frame.

22   Q.      Okay.  So it was pretty -- pretty quick --

23   A.      Yes, sir.

24   Q.      -- after the interview?

25           Okay.  Did he ever ask you to produce any of

1    doing this on the 5th you just, you know, put a date

2    in there since it was just a draft; right?

3    A.       Yes, sir.

4    Q.       But the intention for this draft was that

5    eventually this would be part of the ERB documents?

6    A.       That's correct.

7    Q.       Okay.  And so on the second page there, let's

8    read the first question after "If you answer yes to

9    any of the questions below, please provide an

10   explanation."

11   A.       Mm-hmm.

12   Q.       What was the first question?

13   A.       "Was the action confirmed to be willful

14   misconduct, intentional/deliberate."

15   Q.       And you indicated "no" for that answer in

16   this draft?

17   A.       Yes, sir, I did.

18   Q.       Okay.  All right.  Thank you.

19              MR. JOHNSON:  Let's mark that one as the

20   next exhibit, which is number 40.

21              (Document was marked for identification

22   as Exhibit Number 40.)

23   BY MR. JOHNSON:

24   Q.       As of this time, had Mr. Reeves informed you

25   of what the grounds for the termination would be?

1  A.      Yes, sir.

2  Q.      And was the grounds that he informed you of

3  falsifying a document?

4  A.      Yes, sir.

5  Q.      Okay.  All right.  Let's look at this one,

6  which I'll inform counsel is Page Number 753 to 768.

7  And let me know if that is your e-mail to Rebecca

8  Rogers, copied to others, and that's the attachment

9  to your e-mail.

10       And I can tell you that these are documents

11  provided to us by Day & Zimmermann, and they're

12  consecutively page numbered.  There's not anything

13  missing in the pages.

14            MR. LANTIS:  Yeah, DeWarren, just so you

15  know, when he's saying consecutive page numbers,

16  these are a little stamp that we put on the documents

17  as an identifier, so that's how you know what he's

18  saying is accurate.  If you see any gaps in there,

19  though, let us know.

20            MR. JOHNSON:  May I see your copy,

21  please, sir?  Here, this is the same thing.  This is

22  just another copy.  This was supposed to be mine.

23  I've got to remember whose pile is whose.  It's

24  identical.

25            THE WITNESS:  Yes, sir.

1  the ERB decision is he's terminated?

2          MR. LANTIS:  Objection to form.  You may

3  answer.

4          THE WITNESS:  Yes.  Yes.

5  BY MR. JOHNSON:

6  Q.      Is it your understanding that DZ could not

7  fire Mr. Goforth without getting the approval of TVA?

8          MR. LANTIS:  Objection to form.

9          THE WITNESS:  No, sir.

10 BY MR. JOHNSON:

11 Q.      Okay.  What was your understanding?

12 A.      My understanding of the ERB process is to

13 ensure -- the ERB board is to ensure that there is

14 no -- the termination is not directly linked to any

15 ongoing concerns or investigations or litigation.

16 Q.      And who did you get that view from?

17 A.      That's what the ERB procedure says.  If you

18 read the ERB procedure, that's what it states, and

19 the procedure is noted at the bottom of all those

20 documents as well.

21          MR. JOHNSON:  All right.  Let's mark this

22 one as 56, which is your Document 3.

23          (Document was marked for identification

24 as Exhibit Number 56.)

25 //

1     REPORTER'S CERTIFICATE

2

3 STATE OF TENNESSEE

4 COUNTY OF HAMILTON

5    I, PAULA McGUIRK, RPR, LCR#789, CCR-GA, in

6 and for the State of Tennessee, do hereby certify

7 that the deposition of DeWARREN WASHINGTON was

8 reported by me, and that the foregoing 160 pages of

9 the transcript is a true and accurate record to the

10 best of my knowledge, skills and ability.

11    I further certify that I am not related to

12 nor an employee of counsel or any of the parties to

13 the action, nor am I in any way financially

14 interested in the outcome of this case.

15     I further certify that I am duly licensed

16 by the Tennessee Board of Court Reporting, as

17 evidenced by the LCR number and expiration date

18 following my name below.

19     In witness whereof, I have hereunto set

20 my hand this 20th day of September, 2021.

21

22

23   PAULA McGUIRK, RPR, LCR, CCR-GA
    LCR#789 - Expires:  6/30/2022

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF TENNESSEE

 3                       AT CHATTANOOGA
     ----------------------------------------------------
 4   ROBERT M. GOFORTH,                   :

 5           Plaintiff,                   :
                                          :
 6   vs.                                  :   NO:  1:20-CV-254
                                          :
 7   TENNESSEE VALLEY AUTHORITY           :
     and DAY & ZIMMERMANN NPS, INC.,      :
 8                                        :
             Defendants.                  :
 9   ----------------------------------------------------
                               Chattanooga, Tennessee
10                             August 18, 2021

11              DEPOSITION OF JOHN REEVES
     ----------------------------------------------------
12   APPEARANCES:

13              FOR THE PLAINTIFF:

14              JAMES M. JOHNSON, ESQ.
                Attorney at Law
15              620 Lindsay Street, Suite 210
                Chattanooga, Tennessee  37403
16              (423) 648-4093
                jj@jamesmjohnsonatty.com
17

18              FOR DEFENDANT TENNESSEE VALLEY AUTHORITY:

19              MICHAEL V. BERNIER, ESQ. (Remotely)
                STEPHEN T. MEALOR, ESQ.
20              Tennessee Valley Authority
                Office of the General Counsel
21              400 West Summit Hill Drive
                Knoxville, Tennessee  37902
22              (865) 632-3045
                mvbernier@tva.gov
23              stmealor@tva.gov

24

25
```

Case 1:20-cv-00254-TRM-SKL   Document 35-16   Filed 11/15/21   Page 523 of 672   PageID #: 793
JA 0516

1    Q    I see.  So you would go to plants where there

2  were Westinghouse facilities and do work there?

3    A    Yes.

4    Q    Okay.  All right.  What was your position at TVA

5  at the time that you did the investigation of

6  Mr. Goforth?

7    A    I was the senior director for operations.

8    Q    And tell us what that -- the job duties of that

9  position.

10   A    My responsibility were all the

11 Day & Zimmermann operations related to the TVA nuclear

12 account.

13   Q    So that was all of the TVA plants?

14   A    Yes.  All the new -- oh, I'm sorry.

15   Q    Yeah.  All the new plants.

16   A    Yes.

17   Q    And so that would be Sequoyah, Watts Bar, and

18 Browns Ferry?

19   A    That is correct.

20   Q    Okay.  How did you find out that this manway

21 cover was not on, on -- that ended up in the

22 investigation of Mr. Goforth?

23   A    My team contacted me.

24   Q    Specifically who on your team?

25   A    Originated from the site manager.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-15   Filed 11/15/21   Page 524 of 672   PageID #: 794
JA-0517

1    Q    Who was?

2    A    DeWarren Washington.

3    Q    And so did you have a direct conversation with

4    DeWarren?

5    A    Yes.

6    Q    Can you tell me about that conversation?  What

7    did DeWarren tell you, and what did you tell him?

8    A    The plant was struggling to pull a vacuum.  They

9    found the source of the issue to be a manway cover and

10   crossunder piping that was left off that should have

11   been installed.

12   Q    So that's what he told you?  And then what was

13   your response?

14   A    Appreciated the heads up, and I would start my

15   process.

16   Q    Why would DeWarren be calling you in particular?

17   Did you have a role that said:  Hey, if something like

18   this happens, I should be called?  I'm the one to call?

19   A    That was my policy, is I wanted to hear any time

20   we had significant issues.

21   Q    So you think Warren -- DeWarren contacted you

22   directly before he went to other management, or would

23   you have no knowledge of that?

24   A    I don't have direct knowledge of that.

25   Q    Okay.  Well, what indirect knowledge do you have

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-18   Filed 11/15/21   Page 525 of 672   PageID #: 795
JA-0518

1    of how he -- how he wound up with you?  I'm just trying
2    to determine how he wound up with you.  What was the
3    events?
4      A    I appreciate the question.  There's a level of
5    management between me and the site managers.  And my
6    policy is use of the chain of command -- but I wanted
7    to hear about significant issues.
8      Q    Okay.  So who would have been the in-between
9    person?
10     A    My operations manager.
11     Q    Who was?
12     A    Jason Howard.
13     Q    I see.  So your understanding is, DeWarren went
14   to Jason.
15          Was he on site at Watts Bar?
16                  MR. LANTIS:  Jason or DeWarren?
17   BY MR. JOHNSON:
18     Q    Jason.
19     A    I don't recall if Jason was at site when
20   DeWarren called me.
21     Q    Well, quite apart from whether he was on site at
22   that time, was his job on site?  Was that his job to be
23   on site at Watts Bar?
24     A    It was our practice that the ops manager and
25   myself would make frequent visits during outages.  So

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35   Filed 11/15/21   Page 526 of 672   PageID #:
JA-0519
796

1  that would have been his, his duty assignment as part

2  of many duties.

3     Q    Okay.  All right.  So I think we've established

4  how DeWarren got to you and what DeWarren said when he

5  called.

6        So as a result of DeWarren calling, what did you

7  do?

8     A    I notified my, my supervisor, my boss.

9     Q    Who is?

10     A    Bill Hickman.

11     Q    Okay.  And what was the conversation with

12  Mr. Hickman like?

13     A    I don't recall specifically, but my practice is

14  to contact him -- and again, a significant issue --

15  alert him to the issue.  So my normal practice is

16  create a text or make a phone call and say as a heads

17  up, here's the issue, here's where we are, here's my

18  plan.

19     Q    All right.  And your plan was what, at that

20  time?

21     A    To get to site and uncover what, what had

22  happened.

23     Q    Did DeWarren tell you anything other than the

24  manway was discovered off about facts surrounding -- or

25  perceived facts by him surrounding the manway being

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 527 of 672   PageID #: 797
JA 0520

1    A    And it is an expectation.

2    Q    All right.  So before you arrived at the site,

3  your memory is that you talked to Mr. Washington and

4  Mr. Hickman.  And, you know, you may, based on

5  practice, have talked to who you mentioned.

6    A    Yeah.  And -- yes.  That's correct.

7    Q    Okay.  Thank you.  So there came a time when you

8  conducted a telephone interview with Mr. Goforth.  Is

9  that correct?

10    A    Yes.

11    Q    And if I give you a sequence of times, tell me

12  whether this sounds right to you.  That the manway

13  cover was found off the night of October 19th -- 18th

14  to 19th -- which is a Thursday and Friday; that

15  Mr. Goforth was suspended on that Monday, the 22nd of

16  October, and the interview by you, the telephonic

17  interview with Mr. Goforth was Thursday, the 25th of

18  October.  Does that sound correct?

19    A    I know the interview was on the 25th.  I know

20  the 18th and 19th is when the manway cover was

21  discovered on the scaffold by the client.  The

22  suspension is at a level that I'm not --

23    Q    I understand.

24    A    -- involved in, but that's, that's the best of

25  my recollection of, of the timeline -- those, those two

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-12   Filed 11/15/21   Page 528 of 672   PageID #:
798
JA 0521

1  should have, you shouldn't have.  I just want to know

2  whether you checked with them.

3     A     And I'm -- my pause is to make sure I'm, I'm

4  remembering correctly and --

5     Q     Sure.

6     A     -- all the folks that I -- I've spoke with

7  outside of my organization.

8           I did talk to TVA maintenance.  I don't recall

9  talking to any of the engineers.  Is that, is that

10 helpful?

11          The person responsible for the inspection is the

12 engineer.  I don't recall talking to the engineer.

13    Q     Okay.  And so the only person that you talked to

14 that you've identified so far is who?  Because you've

15 just identified somebody, but not by name.

16                MR. LANTIS:  Objection to form.  You may

17 answer.

18                THE WITNESS:  It was one of the people

19 in maintenance, which would have reported up through

20 the maintenance director -- which at the time was

21 either Mr. White or Mr. James.  And I apologize, I, I

22 don't recall the name of the individual.

23 BY MR. JOHNSON:

24    Q     Okay.  And what was that -- do you recall what

25 the conversation was?

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-17   Filed 11/15/21   Page 529 of 672   PageID #: 799
JA 0522

1    A    Yes.  What, what, what was the objective of what

2    we were doing with Day & Zimmermann, just confirming

3    our, our objectives.

4    Q    Okay.  So you didn't get into the issue of how

5    the manway cover got off or on.  You were just trying

6    to understand the objectives of the, the work?

7    A    Making sure I understood the work -- that is

8    correct -- and it was prep -- prepping for my interview

9    for Mr. Goforth.

10   Q    All right.

11        (Playing audio.)

12   BY MR. JOHNSON:

13   Q    So does that kind of represent what you

14   learned --

15   A    Correct.

16   Q    -- when you talked to --

17   A    Part of my learning.  I just -- I, I didn't want

18   to misrepresent that I spoke to a FAC engineer.  I

19   don't recall speaking to a FAC engineer that was

20   responsible for that piping.

21   Q    Uh-huh.

22   A    But I did do -- I did have discussions with

23   multiple TVA individuals in the OCC once we discovered

24   the event.

25   Q    Okay.  And Mr. Goforth's input into this up to

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 530 of 672   PageID #: 800
UA 0523

1   this point -- I'm just asking you again.  So far it has

2   been accurate and, and truthful.

3       A    Yes.  What I was looking for was to make sure he

4   had good knowledge of the work that was being done and

5   had experience, and I -- that's, that's correct.  That

6   was the line of my questioning.

7            I think it's important to say I -- I don't want

8   to be misconstrued in, in your question.  I, I had a

9   lot of concerns with what was in the work order and

10  things that, that he said, so I'm not saying that --

11  your, your questioning was, was I satisfied that he was

12  being truthful.  I was not satisfied that he was being

13  truthful.

14      Q    Up to this point with the words that came out of

15  his mouth, was he being truthful?

16      A    Yes, sir.

17           (Playing audio.)

18              MR. LANTIS:  Just listen to it, John.

19              THE WITNESS:  Okay.

20  BY MR. JOHNSON:

21      Q    Okay.  Let's take a look at that signature log.

22           Have you identified the signature log, page --

23      A    32.

24      Q    It says 32 at the top, but that's Mr. Goforth's

25  writing -- but that will help counsel to identify it.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 531 of 672   PageID #:
JA 0524
801

1    A    Correct.

2    Q    I think it's Section -- Category One Violation,

3   Subsection K.  Can you identify that --

4    A    Does it have Craft Employee Orientation

5   Information & Work Safety Rules?  What we call our work

6   safety rules.

7    Q    Right.

8                    MR. LANTIS:  Document 46, for the

9   record.

10                    THE WITNESS:  And the falsification of

11  records, such as Social Security number, name, quality

12  control documents or other is the reason for

13  termination.

14  BY MR. JOHNSON:

15   Q    Okay.  And we'll call this Exhibit 33?

16                    THE COURT REPORTER:  33.

17          (Exhibit 33 was marked for identification).

18  BY MR. JOHNSON:

19   Q    And so that was the reason for the termination,

20  the violation of this subsection?

21   A    Best of my knowledge, that's correct.

22   Q    Falsification of records.

23   A    That's correct.  There is an HR document that

24  states that.  But to the best of my knowledge, best of

25  my recollection, that is dead on.

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 532 of 672   PageID #: 802
JA 0525

1    Q    Okay.  So, I mean, obviously the falsification

2    wasn't about Social Security number --

3    A    Or others.

4    Q    -- name, quality control documents or others.

5    A    It was part of that, that statement, or others.

6    Q    Or others?

7    A    Correct.

8    Q    Got it.

9         Because this wasn't a quality control document

10   as evidenced by it was NQR or --

11   A    That's a very long answered question with

12   quality control.

13   Q    Okay.  Well, let's leave it -- I'm sorry.  I

14   don't mean to interrupt you --

15   A    The system was not in nuclear safety, so that --

16   we established that earlier.

17   Q    Yeah.

18   A    There's a BOP or Balance of Plan operation.  And

19   that crossunder piping is not nuclear safety related.

20   Q    Okay.

21   A    Does that help?

22   Q    It helps.  But I think the main thing is, you're

23   just saying you're really relying on the or other part.

24   A    Yes.  That, that -- that paragraph as written is

25   what the -- what we determined to be his violation.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 533 of 672   PageID #:
803
JA 0526

1     When I say we, I -- I'm, I'm responsible for

2  that, Jim.  I made that decision.

3          MR. JOHNSON:  All right.  Let's continue

4  the tape.

5          MR. LANTIS:  3924.

6       (Playing audio.)

7          MR. JOHNSON:  Let's stop it there.

8          MR. LANTIS:  4110.

9  BY MR. JOHNSON:

10   Q    Okay.  That's twice that we've heard that

11  Mr. Goforth said he was engaged in protected activity,

12  correct?

13   A    Correct.

14   Q    And the first time he said he was engaged in

15  protected activity included litigation, did he not?

16   A    I believe that's what he said, from my

17  recollection.

18   Q    Okay.  Can you tell me what follow-up if any you

19  did to determine whether he had been engaged in

20  protected activity?

21   A    That email, because it just says it exactly what

22  I did.  I spoke to our employee concerns program

23  manager.

24   Q    Okay.  And that was the full extent of, of all

25  that you did to --

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1  Filed 11/15/21  Page 534 of 672  PageID #:
804
JA 0527

1      A      Nobody from TVA had anything to do with my

2    decision to terminate Robert Goforth.  No, sir.  That

3    was my decision.

4      Q      Did you -- did you make your decision before

5    TVAs ERB?

6      A      Yes.

7      Q      I believe I already know the answer to this

8    question from that answer, but I'm going to ask it

9    nonetheless.  Was TVAs ERB process part of your

10   decision-making process?

11     A      My decision was made.  TVAs process was to

12   comply with the confirmatory order they had with the

13   NRC.

14     Q      Did anyone at TVA influence your decision to

15   terminate Mr. Goforth in any way?

16     A      Absolutely not.

17     Q      Did anyone at TVA indicate what TVA wanted you

18   to do with respect to discipline for Mr. Goforth?

19     A      Absolutely not.  That would be co-employment.

20     Q      Did Mr. Goforth's work on TVAs tritium project

21   play any part in your decision to terminate

22   Mr. Goforth?

23     A      No.

24     Q      Were you aware of any report Mr. Goforth made

25   about the tritium project when you made the decision to

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 535 of 672   PageID #: 805
JA-0528

1    terminate him?

2      A      No.

3      Q      Were you aware -- were you aware of any concerns

4    Mr. Goforth raised regarding TVAs tritium project when

5    you made that decision to terminate him?

6      A      No.

7                        MR. BERNIER:  Thank you for your time.

8    I have no more questions.  I really appreciate it,

9    Mr. Reeves.

10                       THE WITNESS:  Yes, sir.

11                       MR. LANTIS:  I don't have anything.

12                       RE-EXAMINATION

13   BY MR. JOHNSON:

14     Q      In followup to the questions that you just

15   responded, on the recording that we listened to -- and

16   we've been over this before, but that Mr. Goforth told

17   you he engaged in protected activity that involved

18   litigation, correct?

19     A      Correct.

20     Q      Okay.  Did you inquire in that so far as to

21   learn that the litigation involved protected activity

22   for his evaluation that he had written and his -- the

23   Cusick CR that he had participated in?  Did you, did

24   you follow in -- follow his statement enough to know

25   whether it involved the litigation involved with that?

WILSON REPORTING AGENCY   (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 135-4   Filed 11/15/21   Page 536 of 672   PageID #:
806
JA 0529

1   A    I followed our process to make sure that any

2   safety concerns that were raised were evaluated by the

3   TVA, and our process with Ken and Brad that we looked

4   at earlier.

5        So that, that note that you saw from -- with Ken

6   Blackwell is what I did to follow-up within our system.

7   Brad is his supervisor.  And then with TVA, I depend on

8   the ERB that, as I stated earlier, that's a, that's

9   a -- I don't have participation in that process by

10  design.

11  Q    So when he told you that he was involved in

12  litigation and that that was protected activity, that

13  turned out to be the sum total of what you knew about

14  that protected -- about that protected activity, that

15  particular protected activity that he was alleging.

16  A    I'm not sure I understand your question.

17  Q    When he told you that he was involved in

18  protected activity --

19  A    Uh-huh.

20  Q    -- which involved litigation, that turned out to

21  be all you ever knew before the termination about that

22  litigation.

23  A    The first time I heard about tritium was when we

24  were -- you and I met at the NRC.  I knew nothing about

25  the tritium.

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-1   Filed 11/15/21   Page 537 of 672   PageID #: 807
JA 0530

1          I'm sorry.  That -- that's the fact.  So that's

2    the fact.  Sorry that you're disappointed in that

3    answer.

4      Q    So you didn't -- I -- I'm not trying --

5      A    It just seemed frustrated, Jim.

6                   MR. LANTIS:  Yeah.

7    BY MR. JOHNSON:

8      Q    Yeah.  Because it's a simple yes or no question,

9    and you're answering --

10     A    Okay.  Keep it simple and concise.

11     Q    If you would just say --

12     A    Keep it simple and concise, and I'll be happy to

13   answer the question.

14     Q    I'll try it one more time, and see if you can

15   answer yes or no to it, because I'm --

16         Okay.  All I'm asking you is, was -- at the time

17   you made the termination decision, the sum total of

18   what you knew about him being in litigation was that he

19   told you he was engaged in protected activity involving

20   litigation.

21                   MR. BERNIER:  Objection to form.

22                   MR. JOHNSON:  Yes or no.

23                   MR. LANTIS:  You can answer.

24                   THE WITNESS:  Okay.  So -- so --

25   BY MR. JOHNSON:

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-15  Filed 11/15/21  Page 538 of 672  PageID #:
JA 0531
808

1    Q    Can you answer it yes or no?

2    A    I'm going to answer truthfully.  So that was the

3 first time I had heard about him raising a legal

4 concern when he made that statement.

5    Q    Okay.

6    A    Does that answer your question?

7    Q    Well, and was that all you knew was that

8 statement up to the time you made a termination

9 decision?

10    A    I knew nothing about tritium when he made that

11 statement.  I knew nothing about tritium when I

12 terminated him.

13    Q    Did you know anything about litigation when you

14 terminated him other than that he was in litigation?

15 That's the question.

16    A    There was a statement made to me about work that

17 he did falsifying documents for Watts Bar too -- that

18 there was some concerns.  That's, that's what someone

19 said -- and there was no validation to that.  So

20 that's -- I don't believe there was any litigation

21 involved there.

22              MR. JOHNSON:  That's all the questions I

23 have.

24              MR. LANTIS:  Okay.  Mike, anything in

25 follow-up?

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL   Document 35-5   Filed 11/15/21   Page 539 of 672   PageID #: 809
UA 0532

1              REPORTER'S CERTIFICATE

2     STATE OF TENNESSEE  )

3     COUNTY OF HAMILTON  )

4              I, Beth Ann Pell, Licensed Court

5     Reporter #267, do hereby certify that I reported in

6     machine shorthand the deposition of JOHN REEVES, called

7     as a witness in the above-styled cause; that the said

8     witness was duly sworn by me; that the foregoing pages,

9     numbered from 1 to 167 inclusive, were typed under my

10    personal supervision and constitutes a true record of

11    said deposition.

12             I further certify that I am not an

13    attorney or counsel of any of the parties, nor a

14    relative or employee of any attorney or counsel

15    connected with the action, nor financially interested

16    in the outcome of the action.

17             Witness my hand in the City of

18    Chattanooga, County of Hamilton, State of Tennessee,

19    this 20th day of September, 2021.

20

21    _____

22             Beth Ann Pell, LCR# 267
              Licensed Court Reporter
23             Expiration Date: 06/30/2022

24

25

WILSON REPORTING AGENCY  (423) 267-6000
www.wilsonreporting.com
Case 1:20-cv-00254-TRM-SKL  Document 35-1 Filed 11/15/21  Page 540 of 672  PageID #: 810
UA 0533

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TENNESSEE
 2                    AT CHATTANOOGA
    _____
 3
    ROBERT M. GOFORTH,
 4
             Plaintiff,
 5
    vs.                           Case No: 1:20-cv-254
 6
    TENNESSEE VALLEY AUTHORITY
 7  and DAY & ZIMMERMANN NPS,
    INC.
 8
             Defendants.
 9
    _____
10
                 Chattanooga, Tennessee
11                September 16, 2021

12          DEPOSITION OF GREGORY R. WHITEHORN
    _____
13
    APPEARANCES:
14
             FOR THE PLAINTIFF:
15
             JAMES M. JOHNSON, ESQ.
16           Attorney at Law
             620 Lindsay Street, Suite 210
17           Chattanooga, TN 37403
             (423)648-4093
18           jj@jamesmjohnsonatty.com

19               -and-

20           JUSTIN S. GILBERT, ESQ.
             Gilbert Law, PLC
21           100 W. MLK Blvd., Suite 500
             Chattanooga, TN 37402
22           (423)756-8203
             justin@schoolandworklaw.com
23

24

25
```

1    questions.  That is, she can't pick up facial

2    expressions or "uh-huh" or "unh-huh" or shakes of the

3    head or nods of the head.  She can only pick up what

4    you're actually saying.  So please try to answer all

5    my questions out loud.  Understood?

6    A.        Yes, sir.  Yes, sir.

7    Q.        All right.  Terrific.  Well, we'll get

8    started then.  Tell us, please, about your military

9    experience, if any.

10   A.        I do not have any military experience, sir.

11   Q.        All right.  How about your work experience

12   then?  And let's confine it to things that are

13   relevant to what you were doing in 2017 and '18.  So

14   tell me about how much experience you have in the

15   nuclear power industry.

16   A.        The nuclear power, I've been in nuclear power

17   since 2000.  So it's going on 22 years of experience

18   in nuclear.  I have -- roughly ten of those years

19   were spent in the union trades as a boilermaker in

20   various levels of positions, from a worker all the

21   way up to a general foreman superintendent.

22            In 2010 I hired on with TVA as a

23   modifications task manager, and I have held that

24   position from then until now, present.  The titles

25   have changed.  My title is now a maintenance services

1  supervisor, but the job description and job that I do

2  has not changed.

3  Q.      And tell me again, please, the year that you

4  began at TVA.

5  A.      As a contractor, 2000.

6  Q.      And that's the managed task job that you just

7  described was in 2000?

8  A.      Yes, sir, that's correct.

9  Q.      And in your work at TVA -- well, first of

10  all, let me ask you this:  How much of that work at

11  TVA has been at Watts Bar?

12  A.      Prior to 2010 -- I guess I'm going to try to

13  do this as a percentage because I've worked in

14  various other nuclear power plants, coal fires, oil

15  refinery, but at Watts Bar I would say my experience

16  through those years would be somewhere in the 18 to

17  20 percent.

18  Q.      And what are you doing at the present time?

19  A.      At the present time, so again, 2010 till

20  present, all of my work has been at Watts Bar.  And

21  my title from the start was modifications task

22  manager; my title now is a maintenance services

23  supervisor, and I've overseen various projects

24  throughout those years.

25  Q.      So which of those two jobs at Watts Bar you

1   I apologize.  I don't have these notes written down

2   to tell you exact dates and times.  It's somewhere in

3   that '17-'18 time frame that this happened.

4          There was a transition from maintenance

5   services task-managed, to the maintenance department

6   MMG.  TVA and any contractors then would be

7   augmented, working directly for TVA.

8   Q.      Okay.  And as you say, were you replaced then

9   by a DZ worker who was augmented to TVA?

10  A.      Yes, sir, that's correct.

11  Q.      Who would that have been?

12  A.      That would be Mr. Robert Goforth.  He was

13  requested by Jeff McGuire, who is the tritium program

14  manager.  He owns the project for TVA and at Watts

15  Bar.  There are some other peers in corporate who

16  work with him.  There's Carla Borrelli and his

17  bosses, which I'm not sure who those are at this

18  time, or were at that time.

19         But Mr. McGuire requested Mr. Goforth to take

20  the role that I once held because he needed that

21  position.  He needed someone to fill that role, and

22  my chain of command was no longer going to allow me

23  to be involved in that.  So he hired Mr. Goforth, and

24  through requests to me and discussions with my boss

25  and other management, it was agreed that I would help

1   train Mr. Goforth in the duties that I performed, and
2   how I oversaw the work, and how I reported to
3   Mr. McGuire and so on and so forth.
4   Q.      So in your experience with Mr. Goforth in
5   making that transition, how did he perform?
6   A.      He did very well.  I had no concerns or
7   issues with his performance.
8   Q.      Did you previously know Mr. Goforth before --
9   A.      I did.
10  Q.      -- he took that position?
11  A.      I'm sorry.  Yes, sir, I did.
12  Q.      And how long had you known him?
13  A.      I've known Mr. Goforth personally from
14  working as a boilermaker in my previous TVA career,
15  2002-'3 time frame.  I can't remember the exact year.
16  I was still an apprentice at the time.
17  Q.      So you worked for a time with Mr. Goforth as
18  a boilermaker at Watts Bar or other TVA facilities
19  during the period you're telling us about that you
20  were a boilermaker?
21  A.      Yes, sir.  It was not only at Watts Bar and
22  other TVA facilities, but we actually first met, if
23  memory serves me, at a Georgia power plant.
24  Q.      And then did there come a time when you
25  worked further with him once you made it into the

1 task management ranks there at Watts Bar?

2 A.      Yes, sir.  He was filling the role when I

3 was -- my last campaign that I oversaw as a task

4 manager, he was filling the role of a field engineer,

5 and I was training him in that role because the

6 previous people that we had had doing that type work

7 had either retired or moved on to other positions.

8 So I was teaching him the role of a field engineer

9 and what that consisted of, and he did very well.

10 Q.      So during all this time that you've known him

11 over all the years when you were boilermakers and

12 then when you made it into the task management rank,

13 did you have an opportunity on a regular basis to

14 learn his reputation for work ethic?

15 A.      Yes, sir, I did.  Not only in the capacity of

16 the task manager over tritium, but Mr. Goforth also

17 worked under me as a BOP task -- or excuse me -- a

18 BOP supervisor and as a BOP oversight.  I also know

19 of his work that was on Unit 2 from talking with

20 other peers of mine, and everybody spoke very, very

21 highly of his work, and he was very knowledgeable of

22 his work.

23 Q.      And when I say "reputation," I mean,

24 reputation within the Watts Bar work community there.

25 And I understand that --

1  A.      Yes, sir, everything that I just stated.

2  Q.      How about his reputation for professional

3  competence both as a boilermaker and then later as a

4  task manager, are you familiar with that --

5              MR. LANTIS:  Form.

6              MR. BERNIER:  I'm going to object to the

7  form.

8  BY MR. JOHNSON:

9  Q.      -- are you familiar with that in the Watts

10 Bar community, his reputation for that?

11 A.      Yes, sir.  His reputation for everything that

12 you stated was well.  Mr. Goforth had no bad

13 reputation, whether it be for work ethic, whether it

14 be through his morals or anything.  He had a good

15 reputation.  He did a good job.

16 BY MR. JOHNSON:

17 Q.      All right.  Well, let me ask this,

18 professional reputation within the Watts Bar

19 community; a question about a couple of other

20 qualities.  Without repeating the entire question,

21 I'll just give you the quality.

22          How about his reputation for reliability,

23 would you know that in the Watts Bar community?

24              MR. BERNIER:  Object to the form.

25              MR. LANTIS:  Objection to form.

1              MR. JOHNSON:  From time to time --

2              MR. BERNIER:  You can answer.

3    BY MR. JOHNSON:

4    Q.      Let me explain a little bit, Mr. Whitehorn.

5    There may be objections from time to time, like you

6    just heard from the attorneys, and that's attorney

7    business and attorney jobs that have nothing to do

8    with your responsibility to answer questions.  It's

9    just done for the record.  And so when you hear an

10   objection, unless an attorney instructs you not to

11   answer the question, you can just ignore the

12   objection and proceed with your answer.

13           Is that helpful to you to understand that

14   going forward?

15   A.      Yes, sir.

16   Q.      Okay.  So my question prior to the objection,

17   just to refresh your memory, was I'm going to give

18   you a couple of other qualities, and without

19   repeating the entire questions that I've asked you

20   about his reputation for work ethic and professional

21   competence, what I'm asking you is to each of these

22   qualities if you know Mr. Goforth's reputation in the

23   Watts Bar community.

24           Do we understand each other?

25   A.      Yes, sir.

1  Q.      How about reliability then?

2  A.      He was very reliable.  When given a task he

3  went out, got it done, and a lot of times he even

4  went above and beyond things that were asked of him

5  to get work done because he -- he was outstanding.

6  That's my opinion on that.  That is my opinion as a

7  manager who he worked for.  He did an outstanding

8  job, and I would have loved to have a crew of 50 of

9  him.

10  Q.      How about his trustworthiness?

11          MR. LANTIS:  Objection to form.

12  BY MR. JOHNSON:

13  Q.      Same question as to trustworthiness.

14  A.      His trustworthiness was without question, and

15  I never heard anyone question it in my presence.

16  Q.      How about honesty?

17          MR. LANTIS:  Objection to form.

18          MR. BERNIER:  Objection to form.

19          THE WITNESS:  My opinion of his honesty

20  was he was an honest individual, and I never heard

21  anyone say anything otherwise.

22  BY MR. JOHNSON:

23  Q.      Okay.  And I understand you said my opinion

24  was, but specifically, to refresh your memory, the

25  question was about whether you knew his reputation

1    for honesty in the Watts Bar community.

2              MR. LANTIS:  Objection to form, to the

3    extent that's a question.

4              MR. JOHNSON:  That's a question.

5              THE WITNESS:  I guess I'm trying -- and

6    this is the time, I guess, where I get to speak kind

7    of, you know, freely because of this setting.  I'm

8    not quite -- I think I answered it.  You know, I

9    mean, I -- let me try answering it and see if this is

10   what you're wanting.

11             He was an honest person.  Everyone that I

12   spoke with -- so I'm just, you know -- honest,

13   trustworthy, hard working, all of those great core

14   values that you look for in a worker, a supervisor,

15   he had, and his reputation amongst my peers that I

16   spoke with was the same.  Did I answer it, sir?  I

17   hope I did.

18   BY MR. JOHNSON:

19   Q.    Yes, sir.  Thank you.

20             MR. BERNIER:  And Greg, if you don't

21   understand a question at any point, feel free to ask

22   him to explain or rephrase or just tell him you don't

23   understand.  That's totally fine.

24             THE WITNESS:  I understand, sir.

25             MR. JOHNSON:  Yeah, and I would second

1  foreman, general foreman, superintendent, task

2  manager.  I've overseen every aspect of it, including

3  the initial loading of Unit 2 ice condenser.

4  Q.      All right.  Let's start -- well -- and let me

5  ask you, since we were talking about your supervisory

6  role during the 2017 outage, let me ask you if when

7  the -- or do you recall that a manway cover was found

8  off on approximately October the 19th, 2017 during

9  the outage?

10 A.      Yes, sir, I do.

11 Q.      And what system was that manway cover on?

12 A.      Memory serves me, I believe those are main

13 steam, which is system two, I think.

14 Q.      Would that be the moisture separators that

15 you referred to earlier when you were describing

16 balance of plant work?

17 A.      Yes, sir, it is in that system.

18 Q.      And were you initially given a role in -- to

19 investigate that manway cover being found off?

20 A.      Yes, sir.  As the task manager over it, I

21 received a text message from my boss with a picture

22 of the manway cover off, and basically said that

23 operations found this manway cover off whenever they

24 were attempting to pull vacuum.  We need to dig into

25 this.  Greg, I want you to pair up with DZ and make

1    sure that they're doing a good investigation and

2    talking with the individuals who performed the actual

3    installation, or said they did the installation of

4    the manway.  And I'm paraphrasing, by the way.  This

5    is not verbatim, whatever that text message said, but

6    that is what I remember from it.

7            Now, with that -- that was on my off day, and

8    I actually got woke up by that text message.  You

9    know, I leave it on just in case somebody needs me,

10   there's an emergency or for whatever reason, so I can

11   be reached.  The text message woke me up and I looked

12   at it.  And again, that was my off day so --

13   Q.     So who --

14   A.     -- I do --

15   Q.     I'm sorry.  You can finish your answer.

16   A.     I was just going to say my peer that was

17   there, Jeff Wilson, was also on that text message

18   thread.  It was a group text, and he would be working

19   on that in my stead.

20   Q.     I see.  Well, who was your text message from?

21   A.     My boss, John Rhodes.  And for clarification,

22   I know we're jumping back and forth, John Rhodes is

23   his given name.  Dusty is a nickname that was given

24   to him in his youth.  So if you hear me say John

25   Rhodes or you hear someone say Dusty Rhodes, they are

1   the same person.

2   Q.      Understood.  Thank you.  So was it your

3   understanding -- or what was your understanding from

4   receiving that text message as to the role you would

5   play investigating the manway cover being off going

6   forward?

7   A.      Well, based off of the text message that I

8   got, I made an assumption that when I came back

9   tomorrow I would be picking up on wherever that

10  investigation was at.  I would, you know, obviously

11  come in, touch base with my peer, see what

12  information he had gleaned, and then go to DZ, see

13  where they were at.  And, you know, basically, as it

14  was stated, kind of pair up with them.

15          Not necessarily lead the investigation

16  because it is a DZ work activity, but follow with

17  them and assure that they are crossing all the Ts and

18  dotting all the Is.

19  Q.      So subsequent to you having that

20  understanding from getting that text message from

21  Mr. Rhodes, did any events occur to change your

22  understanding of what your role was?

23  A.      When I got --

24              MR. BERNIER:  Object to the form.

25              MR. JOHNSON:  Yeah, that's the objection

1  I told you can -- that's for the record for the
2  attorneys.  You can pretend they didn't happen and go
3  forward with your answer.
4              MR. BERNIER:  Well, if I could clarify on
5  that.  Greg, if you hear me or another lawyer start
6  talking, please let us get our objection out just so
7  it clears up the record.  Don't pretend like it's not
8  happening.
9              THE WITNESS:  Understand.
10             MR. BERNIER:  Thank you.
11 BY MR. JOHNSON:
12 Q.      So do you recall the question, or would you
13 like me to repeat it for you?
14 A.      Yeah, I was going to ask you, sir, if you
15 don't mind to repeat it, please.  I apologize.
16             MR. JOHNSON:  Sure.  And I will assure
17 counsel that his objection is preserved so he doesn't
18 have to object again when I restate it.
19 BY MR. JOHNSON:
20 Q.      The question was, what events, if any,
21 occurred to alter your understanding that you've just
22 expressed of what you were to do as you understood
23 from the text from Mr. Rhodes?
24 A.      So when I came to work the next day I got
25 with, again, my peer, Jeff Wilson, and discussed with

1    him, you know, okay, where are we at?  You know,

2    what's our status?  And he basically informed me that

3    the investigation was over.  It was done.  DZ had it,

4    and I didn't need to do anything further.  And, you

5    know, I can't remember if he specifically said that

6    was due to a discussion with Dusty Rhodes who was on

7    back shift, by the way, for clarification, or that

8    was, you know -- I can only surmise that that's how

9    he got that information, through Dusty, in a

10   discussion with him because they always did a

11   turnover, whether it be start or end of his shift.

12   And they basically had told me it's good.  You don't

13   need to do anything.

14   Q.      And it was Mr. Miller who told you what you

15   just described to us?

16   A.      Mr. Wilson, Jeff Wilson.

17   Q.      Oh, Mr. Wilson.  I'm sorry.  Yeah, Jeff

18   Wilson.  Yeah.  Okay.

19   A.      That is correct, sir.

20   Q.      Okay.  And so the reason you think that that

21   came from Mr. Wilson and not Mr. Rhodes, if I'm

22   understanding you correctly, is that Wilson was on

23   day and Rhodes was on night, and you were on day?

24   A.      Yes, sir, that is correct.  And Mr. Wilson

25   was assigned the duty/responsibility of filling the

1  maintenance services manager role on day shift, which

2  is the title my boss carries.  So basically my boss

3  is on night shift, Mr. Wilson's his counterpart on

4  day shift, and that is why they were turning over to

5  each other.

6  Q.      All right.  Okay.  Let's take a look at our

7  first document then.  Would you please open your

8  Document Number 1?

9  A.      Yes, sir.

10         MR. JOHNSON:  And for counsel and the

11  court reporter, this document has previously been

12  marked as Exhibit 27, and so I will not be asking

13  that it be admitted again.

14  BY MR. JOHNSON:

15  Q.      So take a look at the document for us,

16  please, sir.

17  A.      I'm looking at the first page of the

18  document, sir, and I do see Exhibit 27 on it.

19  Q.      Okay.  And it says -- well, let me just ask

20  you this:  Does this appear to be, on the face of it,

21  the work order that was for the moisture separator

22  where the manway cover was found off?

23  A.      Yes, sir, it does appear to be that one.

24  Q.      And on all of my subsequent questioning

25  regarding this Exhibit 27, I'm going to ask you to

1   please ignore the highlighting and the little

2   handwritten numbers, or any other -- and the little

3   handwritten numbers that are in circles on there --

4   because those were done subsequently, and were not

5   part of the document that I'm questioning you on.

6   Understood?

7   A.      Yes, sir, understand.

8   Q.      All right.  So going through this document,

9   let me ask you -- well, before we go through it, you

10  talked about your experience with work orders.  Is

11  this a routine work order that you are familiar with

12  from your work at -- as BOP supervisor?

13  A.      As the BOP task manager, yes, sir, I am.

14  This is a very routine work order.  No different than

15  any others.

16  Q.      And as a boilermaker, did you perform the

17  work and sign off on the work on a work order that

18  was for this same work?

19  A.      So to clarify, I don't know that I have

20  signed off for this particular manway.  I have worked

21  on what we refer to as a "football" manway, and

22  that's just because of its shape.  It's shaped like a

23  football.  And if you hear me use that term, that is

24  synonymous with the cross-under manways.

25          So I have worked on them in the past.  I have

1 physically performed the work on them. I have

2 documented work in work orders as a worker, as a

3 foreman, as a general foreman, superintendent, and I

4 have reviewed work orders and signed some in as a

5 task manager. So I have worked in every level in the

6 organization in the documentation of work orders.

7 Q. All right. Well, let me ask you then to turn

8 to the very last page of this document and when you

9 get there, let me know.

10 A. I am on the last -- I'm sorry -- oh, I'm

11 sorry. There's a lot more than that. Okay. The

12 very last page. The attachment alpha is the header,

13 and it looks like it starts with 3.13, I think.

14 Q. Yes. 3.13, which is titled "manway cover

15 reinstallation"; am I correct?

16 A. Yes, sir, you are correct.

17 Q. All right. Take a minute and familiarize

18 yourself with this Section 3.13 down to, and

19 including, where Mr. Goforth's signature appears.

20 A. Okay.

21 Q. All right. Let me ask you if you saw this

22 when you were asked to do the investigation, or if

23 you were to participate in the investigation?

24 A. Yes, sir, I did.

25 Q. All right. And is this a section of this

1   work order that you're familiar with, this

2   Section 3.13 from your past work?

3   A.      Yes, sir, it is.

4   Q.      And please then --

5              MR. BERNIER:  Hey, Jim, what do you mean

6   by "past work" there?  Do you mean work in the

7   investigation or other past work?

8              MR. JOHNSON:  I mean, other past work.

9              THE WITNESS:  Okay.  I apologize

10  because -- thank you, Mike, for that clarification,

11  because I was actually answering that from the

12  investigation standpoint.

13             From my past work, I don't know that I

14  have ever worked this specific step -- or this page.

15  I don't know that I have actually documented or

16  anything, but, again, loads and loads of very, very

17  similar type things.

18  BY MR. JOHNSON:

19  Q.      All right.  And we're going to put this aside

20  just for a moment and look at Document Number 2, and

21  then we'll come back to it.  Okay?

22  A.      Yes, sir.

23  Q.      Would you open Document 2?

24  A.      All right.  I have Doc 2 open.  This is a

25  procedure, NPG work management planning procedure.

1   The title is NPG-SPP-07.6.

2   Q.      All right.  You seem to be in the right

3   document.  And do you see that it's marked

4   Exhibit 30?

5   A.      I do, sir.

6               MR. JOHNSON:  And so, counsel, because

7   it's marked Exhibit 30, I will not be reintroducing

8   this document either.

9   BY MR. JOHNSON:

10  Q.      So take a look through the pages that are

11  included -- well, let me ask you this before you look

12  further into the document.  Is this document one of

13  the nuclear program standard programs and processes,

14  as it says there on the left side of the title page?

15  A.      Yes, sir, it is.  This is a nuclear

16  procedure.

17  Q.      And is it a nuclear procedure that you are

18  familiar with?

19  A.      Not verbatim, but, yes, sir, in content I

20  have read it and I do know the basic content.  I

21  couldn't give you word for word or exact sections,

22  but I do know what it is and what is inside it.

23  Q.      All right.  Is this basically a guide of how

24  to prepare work orders for those who are preparing

25  work orders?

1          MR. LANTIS:  Objection to form.

2          THE WITNESS:  Yes, sir, it is.

3   BY MR. JOHNSON:

4   Q.      And is it also a guide for those who are

5   supervising work orders to use to make sure that they

6   can perform their job?

7          MR. BERNIER:  Objection to form.

8          THE WITNESS:  Jim, I don't know that I

9   quite understand that question.

10  BY MR. JOHNSON:

11  Q.      All right.  Well, let me see if I can then

12  make this easier for you.  Is this something that

13  people who are supervising workers doing their jobs

14  would look to to make sure that they are describing

15  to the workers what they're supposed to do in looking

16  at a work order?

17          MR. LANTIS:  Objection to form.

18          MR. BERNIER:  Objection to form.

19          THE WITNESS:  I actually understood that

20  one, and I would say yes.

21  BY MR. JOHNSON:

22  Q.      All right.  So I want you to, please, then --

23  and this is an excerpt, these are excerpts from the

24  document -- go through and look at those.  I'm not

25  saying read every word, since you say you're familiar

1   with it, but just to refresh your memory about the
2   things that it says.  Just take a few minutes to look
3   through it and let me know when you're done.
4   A.      Okay.  You want me to look back through all
5   71 pages?
6   Q.      Well, there aren't 71 pages.  It's just an
7   excerpt.  There's only three, four, five, six
8   or seven pages.
9   A.      Oh, okay.  I understand.  I'm sorry.  Yes, I
10  will look at them.  I thought this was the whole
11  document.  I apologize.  What questions would you
12  like to ask, sir?
13  Q.      All right.  I just want to then return to
14  Document Number 1, and go back to that last page of
15  Document Number 1 where we left off before we went
16  and looked at these procedures.
17  A.      Yes, sir, I am back to Doc 1 and I'm on the
18  last page that we were previously looking at.
19  Q.      Okay.  So you're looking at Section 3.13
20  again, down to where you see Mr. Goforth's signature?
21  A.      That's correct.
22  Q.      Now, Mr. Goforth's position in this case has
23  been that his signature represented that he was
24  acknowledging what a note said by signing it.
25          So my question is, based on your -- all of

1  your work experience, as you've described, and just

2  looking at Document Number 2, NPG work management

3  planning and procedure, is Mr. Goforth's

4  representation of what his signature is reasonable to

5  you?

6          MR. BERNIER:  Objection to form.

7          MR. LANTIS:  Objection to form, based on

8  the representation, and objection to form as to the

9  balance of the question.

10          MR. BERNIER:  Jim, will you not testify

11  and ask him questions, please.

12          MR. JOHNSON:  I am asking a question.

13  BY MR. JOHNSON:

14  Q.      My question was, is Mr. Goforth's position

15  that he is acknowledging a note by his signature

16  there a reasonable one, in your opinion, based on

17  your experience and the planning and procedures that

18  you just read?

19          MR. LANTIS:  And I think you're

20  misstating his representation based on his deposition

21  testimony, and that was one of the bases of my

22  objection.

23          MR. JOHNSON:  Mike, you are allowed to

24  object -- or, I'm sorry, Paul -- to form of the

25  question, and the Judge has an order entered saying

1  you can object to form of the question.  It
2  specifically forbids giving information to a witness
3  outside of objecting to form.  So I'd ask you to
4  refrain from doing that in the future, which you just
5  did.
6          MR. LANTIS:  Jim, I'm not giving any
7  information.  I'm objecting to what you're saying.
8          MR. JOHNSON:  I understand that that's
9  what you're saying.  I'm just cautioning, again, that
10 all I expect to hear, based on the Judge's order, is
11 objection to form or an instruction not to answer on
12 the basis of privilege.  Other than that, anything
13 else is out of bounds under the Court's order.
14         MR. LANTIS:  I'll proceed as appropriate,
15 Jim.  I disagree with what you're saying.  That's
16 fine.
17         MR. JOHNSON:  You don't need to explain
18 the basis of your objection, in other words.  But I
19 understand your position.  I think we understand each
20 other.
21 BY MR. JOHNSON:
22 Q.      So do you remember the question,
23 Mr. Whitehorn?
24         MR. BERNIER:  Jim, real quick.  The rules
25 do not require us to only say objection to form.

1   They do provide for a short statement of the basis of

2   the objection.  I'm not going to give any information

3   to the witness that would inform his answer, but I do

4   think it would be inappropriate for you to testify

5   for him or regarding what anyone else said, and then

6   just ask him if he agrees with that.  Ask a question

7   rather than giving testimony, please.

8           MR. JOHNSON:  I am allowed to ask leading

9   questions to a witness who is an employee of an

10  adverse party, and I will ask leading questions as I

11  deem appropriate.  That's all I'm doing.

12          MR. LANTIS:  That goes beyond a leading

13  question, though.

14          MR. JOHNSON:  Well, we disagree about

15  that, and I understand your objections to form, and

16  so let's proceed.

17  BY MR. JOHNSON:

18  Q.      Now, do you remember the question?  Would you

19  like me to ask it once again?

20  A.      Would you please repeat it, sir?

21  Q.      Sure.  The question is, based on your

22  experience with these work orders, as you described

23  it in your testimony, and based on your reading that

24  you just performed of Exhibit 30 excerpts, NPG work

25  management planning and procedure, do you find -- and

1  this is a question -- do you find Mr. Goth's

2  position -- or Mr. Goforth's position that he

3  signed -- his signature there represents that he's

4  acknowledging a note, to be a reasonable position?

5          MR. LANTIS:  Same objection.

6          THE WITNESS:  Yes, sir, I do.  I do find

7  it reasonable based off of the procedure.  This is

8  not a work step based off of several different

9  excerpts from the procedure.  A work step can have no

10  more than one actionable statement in it.  This has

11  multiple action statements embedded in it.  This is

12  just so terribly written, that it's just terrible.

13          The fact that it has a note in big, bold

14  black, that is the exact definition of what a note is

15  supposed to be.  It's supposed to start and it's

16  supposed to end, you know.  A note must end with

17  something.  Whether it be a box, whether it be the

18  changing to a new work step or another note, whatever

19  it may be, it must end.  Again, the most important

20  thing here is there can only be one actionable

21  statement.  You can't have a signature that is

22  validating multiple upon multiple items.

23          So with that, yes, I can see where

24  Mr. Goforth signed this as it being a note.

25  //

1  BY MR. JOHNSON:

2  Q.      All right.  So I'm going to go back to your

3  previous testimony regarding your initially being

4  assigned to investigate or participate in the

5  investigation of the manway being off.  So I'm

6  referring you back to that prior testimony, and here

7  is my question:

8          Had you been permitted to continue in the

9  investigation, what is the likelihood, if any, that

10 you would have found that signature on 3.13 to be

11 falsely signing a document?

12         MR. LANTIS:  Objection to form.

13         MR. BERNIER:  Objection to form.

14         THE WITNESS:  I would not have found it

15 falsely anything.  I would -- if I had continued my

16 investigation and been asked what my findings were,

17 which was never done, I would have concluded that

18 this was not a work step.  This was procedurally a

19 note.

20         I do understand where my management, TVA,

21 and DZ may have been coming from on this with what

22 they intended and/or wanted it to be, but that

23 doesn't change the fact of what it is by procedure.

24 By procedure, by the law, it is a note and it was

25 signed as such.  I can see that.  So there was no

1 falsification or intent to give false information to
2 someone for the purposes of hiding a truth.  It was a
3 note, and signed as such.
4 BY MR. JOHNSON:
5 Q.      Do you know who John Reeves is?
6 A.      I do know him, sir.
7 Q.      And what, at this time, was your
8 understanding of Mr. Reeves' position?
9 A.      At that time I do not remember his exact
10 title, but as the hierarchy of DZ was, there were
11 three site managers.  One at Watts Bar, one at
12 Sequoyah, one at Browns Ferry.  Above those
13 individuals there was a man named Jason Howard, and
14 above him was Mr. Reeves.  And again, I don't know
15 what their actual titles with DZ were.
16 Q.      And do you know who was assigned to do the
17 investigation of Mr. Goforth when you were taken off
18 of it?
19 A.      I did not know who the, quote, unquote,
20 assigned person was, but I did see Mr. Reeves there
21 on site and I did hear from other people, peers and
22 individuals, that Mr. Reeves was on-site performing
23 some form of investigation on the missing manway
24 cover.
25 Q.      Did Mr. Reeves ever ask you about the missing

1   manway cover?

2   A.      No, sir, he did not.

3   Q.      And again, you were the supervising TVA

4   manager over the balance of plant work that this work

5   order was included in; correct?

6   A.      That is correct, sir.

7   Q.      I'm going to shift gears here on you,

8   Mr. Whitehorn.  So give me a moment to make sure

9   we're done with these Documents 1 and 2 that we just

10  looked at.  Okay?

11  A.      Yes, sir.

12  Q.      I hate to have you diving in and out of

13  documents, so that's why I want to make sure we're

14  done with these.

15          Do you know whether Mr. Reeves has ever

16  done -- ever directly supervised, as you did,

17  performance of any of these routine work orders?

18              MR. LANTIS:  Objection to form.

19  BY MR. JOHNSON:

20  Q.      At Watts Bar?

21  A.      To my knowledge Mr. Reeves has never worked

22  at Watts Bar in a working role, or even an oversight

23  role, up to a superintendent.  I guess I think that

24  would answer your question.

25  Q.      Thank you.  All right.  We're going to move

1  on then, please, sir.  So open Document Number 3, if

2  you will.

3  A.     Yes, sir.  Okay, sir, I'm looking at a

4  document titled "fact-finding notes, contractor

5  only."

6  Q.     Okay.  You're on the right document then.

7  And I take it that this is a document you've never

8  seen before?

9  A.     Yes, sir, I've never seen this document.

10  Q.     And is it marked Exhibit 54 at the bottom of

11  the first page?

12  A.     Yes, sir, it is marked Exhibit 54.

13         MR. JOHNSON:  So I will not be admitting

14  this as a separate exhibit since it's previously been

15  admitted as Exhibit 54, and that's for counsel's

16  purposes I'm saying that.

17  BY MR. JOHNSON:

18  Q.     So this is a document you're not familiar

19  with, but let me walk you through it a bit.  It says

20  that the contractor information is about Robert

21  Goforth there at the top; is that correct?

22  A.     I do see Robert Goforth's name written under

23  name.

24  Q.     All right.  And the manager's DeWarren

25  Washington?

1    A.       I do see that.

2    Q.       All right.  And let's go to the second -- oh,

3    let's see.  So at the bottom of the document in the

4    bottom -- second to bottom block, you see where it

5    says "recommended level of disciplinary action"?

6    A.       Yes, sir, I do.

7    Q.       And it says termination for cause?

8    A.       I do see that.  It is marked or X'd at

9    termination for cause.

10   Q.       Okay.  And then let's go to the second page.

11   A.       I'm on the second page.

12   Q.       And then you see that this document is

13   prepared by, at the bottom, DeWarren Washington, site

14   manager?

15   A.       I see that name in the signature, yes, sir.

16   Q.       And the date, November 8, 2018; is that

17   correct?  Date prepared by.

18   A.       Prepared by, the date is 11-8, that is

19   correct.  Signature date is a few days later.

20   Q.       All right.  And so you see the signature

21   date, November 20th, as you just referred to.  And is

22   that a signature there for DeWarren Washington?

23   A.       Yes, sir, it is.

24   Q.       Does it appear to be a signature for DeWarren

25   Washington?

1    A.      It does appear to be a signature of DeWarren

2    Washington.

3    Q.      All right.  Let's go up to just above that

4    where there are some boxes checked.

5    A.      Okay.

6    Q.      And one of the boxes that's checked, it was

7    for the question, "Was the action confirmed to be

8    willful misconduct, intentional, deliberate," and

9    there's -- it's marked no.  Do you see that?

10   A.      I'm looking for it, sir.  Oh, so was the

11   contractor -- no.

12   Q.      You're looking up four lines up from where

13   the prepared by and the signatures are where it

14   says --

15   A.      Oh, yes, sir, I found it.  "Was the action

16   confirmed to be willful misconduct, intentional,

17   deliberate"?  It says no.

18   Q.      So with respect -- would you agree that

19   Mr. Goforth's conduct -- I think as you testified to

20   earlier -- was not any kind of willful, intentional

21   or deliberate attempt to falsify?

22              MR. LANTIS:  Objection.

23              MR. BERNIER:  Objection to form.

24              THE WITNESS:  Yes, I would agree with

25   that statement.  It was not willful, or with any

1  intent to mislead or falsify something.

2  BY MR. JOHNSON:

3  Q.     Do you see where it says, "Does the offense

4  create notoriety upon or negatively impact the

5  agency's reputation"?

6  A.     I do.

7  Q.     Do you see where it's marked no?

8  A.     I see it.

9  Q.     And based on everything that you've told us

10  up to now in your testimony, would you agree with

11  that statement as made by Mr. Washington?

12               MR. LANTIS:  Objection.

13               MR. BERNIER:  Objection to form.

14  BY MR. JOHNSON:

15  Q.     And maybe I should clarify there first.  Let

16  me represent to you that the "agency" would refer to

17  TVA being an agency, and so let me repeat the

18  question.

19         Would you agree that the offense creates

20  no -- does not create notoriety upon or negatively

21  impact the agency's reputation?

22               MR. BERNIER:  Same objection.

23               THE WITNESS:  So I'm going to clarify

24  what I believe you to be saying.  You are asking me

25  the offense, being the manway cover/signing of the

1  alleged step note, whatever, does it bring a negative

2  impact or notoriety to TVA's reputation?

3  BY MR. JOHNSON:

4  Q.    Correct.

5  A.    I would say no, and I agree with the

6  statement no.

7  Q.    While we're thinking about that statement,

8  would -- do you know how the manway cover being off

9  was remediated?

10  A.    It was corrected immediately upon

11  notification.  Mr. Goforth -- again, I was off so,

12  you know, I found this information out after the

13  fact, but Mr. Goforth came in.  I believe a

14  maintenance work order was written to go reinstall

15  the manway, and he had some workers who were on-site.

16  I'm not sure who those workers were.  You know, I

17  wasn't there.  But he got some workers, knowledgeable

18  boilermakers.  They went out there, they put the

19  cover on, documented everything correctly, and closed

20  out the issue.

21  Q.    So did that having to put that manway cover

22  back on delay the ability -- or delay the return to

23  service and generation of electricity of Watts Bar

24  Unit 1?

25  A.    No, it did not.

1          MR. BERNIER:  Objection to form.

2    BY MR. JOHNSON:

3    Q.     Okay.  Shifting gears now, we're going to go

4    ahead and go to Document Number 4.

5    A.     Yes, sir.  I'm opening Document 4.

6          MR. BERNIER:  Jim, since you're

7    transitioning, would now be a good time to take a

8    short break?

9          MR. JOHNSON:  Certainly.  How long a

10   break would you like?

11         MR. BERNIER:  Five minutes will work for

12   me.  I just want to get a cup of coffee.

13         MR. JOHNSON:  Is a five-minute break

14   adequate for you, Mr. Whitehorn?  Would you prefer a

15   longer period of time for a break?

16         THE WITNESS:  Five minutes is fine with

17   me.  I'm going to go to the restroom, grab a bottle

18   of water, and I'm going to come right back.  Five

19   minutes should be sufficient.

20         MR. JOHNSON:  All right.  Five-minute

21   break.  Thank you, sir.

22         THE WITNESS:  Thank you.

23         (Short break.)

24         MR. JOHNSON:  Okay.  Are we ready to go

25   back on the record?

1          MR. LANTIS:  That's fine with me.

2          THE WITNESS:  I'm ready, sir.

3    BY MR. JOHNSON:

4    Q.      All right.  Would you please get Document 4

5    up on your computer, Mr. Whitehorn?

6    A.      Yes, sir.  I currently have Document 4 open.

7    This is a CR summary report.

8          MR. JOHNSON:  And before we get into

9    that, I wanted to let counsel know that Mr. Goforth

10   had joined us during this testimony, and he is in the

11   room.  He is not in the room right now, and I'm going

12   to proceed without him.  But he pointed out that a

13   couple of times I said "2017" outage when referring

14   to what was actually the "2018" outage.  So I wanted

15   to ask you, Mr. Whitehorn, something about that to

16   clear that up for the record.

17   BY MR. JOHNSON:

18   Q.      When we've been discussing this manway cover

19   incident, that was during the 2018 outage, and your

20   testimony is regarding the 2018 outage at Watts Bar

21   Unit 1; am I correct?

22   A.      Yes, sir, you're correct.

23   Q.      And I'm not sure exactly when I referred to

24   it as the 2017 outage, but when we talked about your

25   being the TVA -- and I can't remember what the word

1  is -- superintendent or supervisor over BOP work

2  orders, that was for the 2018 outage as well;

3  correct?

4  A.      That is correct, sir.  I was the TVA

5  oversight/task manager.

6  Q.      Thank you.  All right.  So let's dive into

7  this Document Number 4.  And let me ask you first if

8  you have seen this document before?  And, please,

9  just -- I think if you take a look at the first page,

10 you'll be able to answer that question.

11 A.      Yes, sir, I am familiar with it.

12 Q.      All right.  And so let's go through it.  Tell

13 me from looking at the first page what this CR is

14 about.

15 A.      So the CR is basically summarizing the

16 performance of DZ and Unit 1R15 outage, and it

17 basically lines that out in the first paragraph of

18 the condition details.

19 Q.      I see.  And then do you see where it says,

20 "re-work quality issues"?

21 A.      Yes, sir.

22 Q.      And are among those re-work and quality

23 issues the ice condenser bay doors?

24 A.      Yes, sir, they are.

25 Q.      And are among those quality issues the BOP

1    manway not being installed?

2    A.      Yes, sir.

3    Q.      That we talked about earlier; correct?

4    A.      Yes, sir, it is.

5    Q.      Let me ask you, since we've already talked

6    about it, the manway cover being left off, and the

7    question that I have -- we've already talked about

8    any delays in the plant coming online.  But the

9    question that I have is, when they tried to establish

10   a vacuum, is there any suction action into the

11   system, as a result of the manway cover being off,

12   sufficient to suck any kind of foreign material into

13   that piping?

14              MR. LANTIS:  Objection to form.

15              THE WITNESS:  No, sir, there is not.

16   BY MR. JOHNSON:

17   Q.      All right.  Explain to me why that would be,

18   based on your experience.

19   A.      It's very easy.  The picture that was sent to

20   me, I mean, this -- I like facts.  Things that can be

21   proven.  You look at the picture that was sent to

22   me -- and I'm sure it's out there somewhere within

23   this investigation, DZ should have it -- the picture

24   of the manway off that was taken, clearly shows the

25   FME cover nicely folded up and laying on the deck,

1   approximately three/four feet, maybe five, away from
2   the opening of the hole, and it's still sitting there
3   nice and pretty and folded.
4           So if it could suck something in, that would
5   be in the system.  It cannot.  You can't pull a
6   vacuum until you have a sealed-up system.  Then you
7   pull vacuum, which puts a negative pressure on it.
8   You cannot get -- the vacuum pumps that we have are
9   not going to suck anything into the system.
10  Q.      Had you been questioned by Mr. Reeves, or any
11  other investigator about this, you would have been
12  able to say as much if asked?
13  A.      Absolutely.
14              MR. BERNIER:  Objection to form.
15  BY MR. JOHNSON:
16  Q.      You have experience as a boilermaker, as
17  you've testified, regarding putting these manway
18  covers on, and so I'm asking you to draw on that
19  boilermaker experience.
20          Estimate for me, if you will, please, the
21  likelihood that -- well, let me ask it this way
22  first.  Are boilermakers given any instructions with
23  respect to FME covers on manways that are opened?
24              MR. BERNIER:  Objection to form.
25              THE WITNESS:  Yes, sir, they are.  And

1    it's trained -- I can speak from not only my training

2    as a boilermaker as well as work experience, and then

3    even into my supervision years, you always, when a

4    system is opened and after you are complete working

5    on it, before you leave the job site, whether it be

6    for a break, whether it be for lunch, or whether it

7    be for the end of your shift, or just you're complete

8    with your work and you need to leave, you always

9    reinstall your FME cover.

10          I mean, that's a standard -- that's not

11   just boilermakers.  That's all craft.  That is a

12   standard core value in nuclear power work, and even

13   beyond nuclear power.  I've never been to an oil

14   refinery or a coal fire plant that didn't have the

15   same process.

16   BY MR. JOHNSON:

17   Q.     So based on what you have just told me,

18   estimate for me the likelihood that it would have

19   been boilermakers working on taking off or putting on

20   that manway cover who would have left the FME cover

21   laying on the scaffolding, three or four feet from

22   the manway as you've just described?

23          MR. LANTIS:  Objection to form.

24          MR. BERNIER:  Objection to form.

25          THE WITNESS:  The way I can answer that,

1  Jim, is that it would be out of character of any

2  craftsman at Watts Bar to leave the manway cover off.

3  I don't know that a manway cover being off could give

4  me enough information to say it was a boilermaker.

5  But I can say that a manway cover being off is

6  against the way all FME workers are taught, and

7  everyone who works on a system that has FME, has to

8  be an FME worker.  They have to have that training.

9  So that's against all craft that are out here to

10  leave an FME cover off like that.

11  BY MR. JOHNSON:

12  Q.     All right.  If I represent to you -- and you

13  can take this as a hypothetical question if you

14  wish -- if the manway certification by boilermakers

15  that the manway cover was put back on were made

16  approximately ten days before the manway was found

17  open with the FME cover off, what opportunities can

18  you explain why others may have -- then the

19  boilermakers assigned to this work order, would have

20  removed that manway?

21           MR. LANTIS:  Objection to form.

22           MR. BERNIER:  Objection to form.

23  BY MR. JOHNSON:

24  Q.     Or that anyone else would have -- estimate

25  for me whether anyone else would have removed that

1   manway cover after it was installed during that
2   approximately ten-day period?
3                  MR. LANTIS:  Objection to form.
4                  MR. BERNIER:  Objection to form.
5   BY MR. JOHNSON:
6   Q.     Based on your experience with the way this
7   work is performed?
8                  MR. LANTIS:  Objection to form.
9                  THE WITNESS:  Jim, I'm trying to think of
10  how to answer your question.
11  BY MR. JOHNSON:
12  Q.     Well, let me help you a little bit then
13  before you answer.  The purpose of taking these
14  manway covers off, is it not, is so that FAC
15  inspections can be performed inside the manways; is
16  that correct?
17  A.     That is correct, sir.
18  Q.     And tell us what FAC stands for.  And if you
19  can't, just tell us what --
20  A.     You actually -- I kind of pride myself on
21  knowing all our acronyms, but you got me there.  I
22  know the last one, I believe, is corrosion, but I
23  can't -- it's basically a group that goes in and
24  through various methods test corrosion on the plant.
25  And in this particular case they're going in to test

1   wall thickness, turning vanes, making sure everything

2   is set for another 18-month run.

3   Q.      So it's the boilermakers under this work

4   order who take the manway covers off; correct?

5   A.      That is correct, sir.

6   Q.      And it's the boilermakers under this

7   particular work order that put the manway covers back

8   on after the FAC inspections; correct?

9   A.      That is correct, sir.

10  Q.      And so during that time period all of these

11  FAC inspections are done, is that correct, between

12  the taking off and the putting back on?

13  A.      That is correct.

14  Q.      So in your -- so in your experience -- and

15  let me go back to my prior question -- given that

16  these FAC inspections are necessary, what is the

17  likelihood that someone other than boilermakers could

18  have taken that manway cover off after it was

19  reinstalled by --

20              MR. BERNIER:  Objection to form.

21              MR. LANTIS:  Objection to form.

22  BY MR. JOHNSON:

23  Q.      Let me ask it this way.  Has that ever

24  happened before?

25  A.      It has happened, yes.  It has happened and

1    I'm not sure of what process was used to do it, but

2    it has happened at Watts Bar where FME was dropped in

3    to the piping from turbine deck in their scope of

4    work, and they had to go in and go into a cross-under

5    manway to retrieve the FME.

6         So -- and that was basically kind of the

7    direction that I was going to answer your question,

8    and the only way I can answer is, that it's not

9    unplausible.  I can't really give you a likelihood on

10   it, but I can say that it is not unplausible.

11   Q.    All right.  Thank you, sir.

12        So looking again on Page 1 of Document 4 --

13   which now that it's identified, let's have this

14   admitted as the next exhibit -- which would be

15   Exhibit 71?

16              THE REPORTER:  Yes.

17              MR. JOHNSON:  Okay.

18              MR. LANTIS:  I just want to make a quick

19   point of clarification.  We keep using the phrase

20   "admitted," and while I understand -- I think I

21   understand that you're just saying let's mark that as

22   an exhibit.  I just don't want there to be any

23   confusion that we're in some way stipulating to the

24   admissibility of any document that's been used at one

25   of these depositions at trial.

1          It just kind of dawns on me that we're

2   using the term "admit," and that is a very trial-ish

3   word, and I just want to make clear that we certainly

4   haven't agreed or waived our ability to challenge the

5   admissibility of any documents entered during a

6   deposition at trial.

7          MR. JOHNSON:  And I would agree with that

8   statement, and to the extent I use the word "admit,"

9   let's just understand that to mean "marked," and I'll

10  try to say marked.

11         MR. LANTIS:  It's just something that's

12  been on my mind.  I just wanted to say it while I was

13  thinking about it.

14         MR. JOHNSON:  That's a fair point.  All

15  right.  So this is going to be marked as Exhibit 71;

16  that is, Document 4 is going to be marked as

17  Exhibit 71.

18         (Document was marked for identification

19  as Exhibit Number 71.)

20  BY MR. JOHNSON:

21  Q.     So looking back to the first page of what's

22  now been marked as Exhibit 71, we've talked about

23  that the ice condenser bay doors being swapped when

24  reinstalled, and we've talked about the cross-under

25  manway.  Are there other re-work quality issues

1    listed there, in addition to the ice condenser and

2    the BOP manway?

3    A.       Yes, sir.  Re-work, yes, sir.

4    Q.       You want to take a look for a moment and just

5    familiarize yourself with what those are before I ask

6    any questions about it, and let me know when you're

7    ready?

8    A.       Okay.

9    Q.       All right.  From looking at all of these, can

10   you identify whether any of these, or which, if any

11   of these, would be, from a nuclear safety

12   perspective, a safety issue?

13                MR. BERNIER:  Objection to form.

14                MR. LANTIS:  Yeah, I'll object as well.

15                THE WITNESS:  The form of the question,

16   Jim, is a little hard for me to answer.  I mean --

17   because I guess the reason, my thought here is,

18   you're asking me if any of these are nuclear safety

19   concerns, and without -- if none of them had been

20   fixed, then they all would be.  You know, they would

21   all affect something.  Maybe not necessarily nuclear

22   safety.  You know, we do have a safety-related system

23   here, the ice condenser, so that obviously would be

24   nuclear safety.  You've got some of the secondary

25   site.  You'd have a RAD monitor.

1            I mean, you know, again, could they be

2    nuclear safety?  Without being fixed, they all kind

3    of carry that title.  So I guess that's where my

4    struggle is with the answer.  I don't know if I've

5    answered your question or -- at least that's my --

6    BY MR. JOHNSON:

7    Q.      Yeah, I think that answers and it narrows the

8    focus a little bit.  So let me follow up on your

9    narrowing of the focus.

10            As between the ice condenser and the BOP

11    manway cover, which, if either of those, is a -- I

12    think you said nuclear safety-related item?

13                MR. BERNIER:  Objection to form.

14                THE WITNESS:  The ice condenser is a

15    safety-related system.  It is a passive system that

16    is used in the safe shutdown of the plant in the

17    event of a main steam line break LOCA.  And so, yes,

18    it is a safety-related system.

19    BY MR. JOHNSON:

20    Q.      What about the BOP work on the cross-under

21    manways, is that a safety-related system?

22    A.      No, sir, it is not.

23    Q.      What would be a safety-related consequence of

24    Bay 5 and 6 doors being swapped when reinstalled?

25    What could be a safety-related consequence of that

1  item?

2          MR. BERNIER:  Objection to form.

3          MR. LANTIS:  Objection to form.

4          THE WITNESS:  So --

5  BY MR. JOHNSON:

6  Q.       Maybe what you need to do here, and let me

7  interrupt you and rephrase that question.

8          Tell us what ice condensers are and what

9  they're supposed to do for the safety of the plant.

10 A.       Okay.  So an ice condenser is, again, a

11 passive system, meaning that it is not used for

12 anything unless called into service.  How it would be

13 called into service is if we have a main steam line

14 break LOCA.  And a LOCA is an acronym for loss of

15 containment -- I've got to write this down so I can

16 get it right.  Hold on just a second.

17         MR. BERNIER:  Greg, you don't need to

18 pull stuff up and look into anything.  Just based on

19 what you know.

20         THE WITNESS:  I'm just trying to

21 remember.  A LOCA is a term used for a loss of

22 containment integrity where we align the rupture, and

23 the steam would just burst out of the main steam

24 line, okay, and that would be on the primary side.

25 Primary being the radioactive side.

1          What would then happen is the steam would

2   bust out, come out, and it would -- through the

3   pressure it would push open the lower end of the

4   doors of the ice condenser, the steam would then go

5   up into the ice bed.  The ice is designed to cool the

6   steam and condense it back into water.  Of course,

7   it's not going to stop it because of the pressure.

8   Again, it's part of an entire system to help us to

9   get everything under control when this happens.

10          But the steam will continue on up.  It

11  will pop open the intermediate deck doors.  It also

12  has vent -- passthrough vent curtains.  It'll pop

13  open the top deck blankets, and it works its way

14  through and circulates.  The idea here is to allow

15  you to get RHR, which is residual heat removal, and

16  other systems that are designed to bring this under

17  control back in service.

18  BY MR. JOHNSON:

19  Q.     I see.  When you say "loss of containment,"

20  what are you talking about being contained that's

21  lost?

22  A.     Steam.  Steam inside your main steam lines.

23  Q.     And if that steam is lost, is there a

24  consequence to that?

25  A.     Yes, sir.

1    Q.      What would that be?

2    A.      So if the system did not work and it was

3    impeded or a function was lost in it, pressure could

4    build up in containment such that it could rupture

5    containment and you would then have a radioactive

6    issue with the public.  A plume would happen.  It

7    would burst out, it would come out, and there would

8    be an emergency situation where the public would have

9    to be evacuated and so on.  I apologize.  My

10   terminology's not really good right now.

11   Q.      And so for that system to work correctly, the

12   ice condenser, to prevent that consequence from

13   occurring, the bay doors have to be on the right

14   opening?

15   A.      That is correct.

16   Q.      All right.  Going further into this document,

17   take a look at the second page of it, please, sir.

18   A.      Second page of the document.  Okay.

19   Q.      And who is -- does it say is the originator

20   of this CR?

21   A.      John Rhodes.

22   Q.      And that's your boss; correct?

23   A.      That is correct.

24   Q.      At the time of this CR he was your boss;

25   correct?

1            MR. BERNIER:  Objection to form.

2            MR. LANTIS:  Objection to form.

3            THE WITNESS:  As the owner, he would have

4    had to have agreed with the findings.  He may not

5    have been the one to do the common cause, and he may

6    not have been the one to make the determinations, but

7    as the owner, he would have had to agree with those

8    findings since his name is on it.

9    BY MR. JOHNSON:

10   Q.     All right.  To your knowledge, was an

11   investigation made into the ice condenser bay doors

12   being swapped conducted by Mr. Reeves?

13           MR. LANTIS:  Objection to form.

14           MR. BERNIER:  Objection to form.

15           THE WITNESS:  To my knowledge, no, sir, I

16   do not know of one.

17   BY MR. JOHNSON:

18   Q.     To your knowledge, did Mr. Washington

19   initiate any investigation into the ice condenser bay

20   doors being put in the wrong places?

21           MR. LANTIS:  Objection to form.

22           THE WITNESS:  To my knowledge, no, sir,

23   he did not.

24   BY MR. JOHNSON:

25   Q.     If he had ordered an investigation, would

1        THE WITNESS:  It worked.  Well, I say it

2    worked.  It is and it isn't.  It's spinning.

3        MR. JOHNSON:  It's a long document, so it

4    may take it a while to fully download.

5        THE WITNESS:  Okay.  That makes sense, I

6    guess.

7        MR. JOHNSON:  Just let me know when it

8    appears to be complete.

9        THE WITNESS:  It is still spinning.

10        MR. BERNIER:  Can we go off the record

11    here, Jim?

12        MR. JOHNSON:  Sure.

13        (Off-the-record discussion was held.)

14        THE WITNESS:  Okay.  Yes, sir, I have it

15    here now.

16        MR. JOHNSON:  Terrific.

17    BY MR. JOHNSON:

18    Q.    Okay.  Referring to Document 5 then, please,

19    sir, look at the first page and tell me what you see

20    it saying there.

21        And maybe I can just help you out with this

22    and lead a little bit.  This appears to be a routine

23    work order.  Number ending in digits 5968?

24    A.    That is correct, sir.  This is the ice

25    condenser servicing work order for Unit 1R15.

1  Q.      I see.  And so this would be during the 2018

2  outage, fall 2018 outage in Unit 1?

3  A.      That would be correct.

4  Q.      And this would be --

5  A.      And how I know that -- I'm sorry, I just want

6  to clarify for the record.  How I know that is the

7  outage ID is 115 fox trot.  The 1 denotes the unit,

8  the 15 denotes the outage, and fox trot let's me know

9  that it was in the frozen scope.  So that's how I

10 know what this -- where this work order, what it's

11 from, because I do not remember work order numbers

12 off the top of my head.

13              MR. JOHNSON:  I see.  All right.  Your

14 having identified it, I want to mark this exhibit as

15 Number 72.

16              (Document was marked for identification

17 as Exhibit Number 72.)

18 BY MR. JOHNSON:

19 Q.      All right.  So let's move to the page --

20 there are Bates number -- what we call Bates numbered

21 pages in lawyer world at the bottom of this, and the

22 Bates number on this one is TVA-Goforth 3408 on the

23 page that you were just looking at.

24 A.      That's correct, sir.

25 Q.      Do you see that?

1        All right.  Now, what I want you to do is, go

2   to Page 3409, the next page.

3   A.     Yes.

4   Q.     Then I want you to look at 3409 and 10, and

5   let me know when you've had a chance to look at

6   those.

7   A.     Okay.

8   Q.     All right.  Taking a look at these pages,

9   3409 and 3410, it appears to me that these are on

10  documents entitled "actual work performed"; is that

11  correct?

12  A.     That is correct, sir.

13  Q.     And based on your experience with these work

14  orders as you testified to, what do the actual work

15  performed pages indicate?

16  A.     The actual --

17  Q.     And I'm talking as a general matter in work

18  orders, what are actual work performed pages for, and

19  what do they indicate?

20  A.     So actual work performed pages are used for

21  the supervisor or the workers, whoever it is that is

22  tasked with doing that, to go in and write down the

23  activities that were performed on their respective

24  shift.

25  Q.     Okay.  And --

1  A.      It's kind of a journal of the work that's

2  being done.

3  Q.      And this -- on these work orders appears to

4  have entries made -- well, yeah, so let me clarify

5  what you just said first before I get into that

6  question.

7          Who is it that is supposed to make these

8  entries on here?

9                  MR. BERNIER:  Objection to form.

10                 THE WITNESS:  It should be the workers or

11 the supervisor, or the foreman.  That can be general

12 foreman, foreman, or worker, should be the one to do

13 the data entry.

14 BY MR. JOHNSON:

15 Q.      All right.  And so this appears to be showing

16 data entry for all days and nights from October the

17 5th of '18 to October the 9th of '18.  Would that be

18 correct --

19 A.      Yes, sir.

20 Q.      -- on these pages?

21         And does it all seem to be the same person

22 who is making these entries?

23                 MR. LANTIS:  Objection to form.

24                 THE WITNESS:  The handwriting appears to

25 be the same throughout the document -- throughout

1  this page.

2  BY MR. JOHNSON:

3  Q.      All right.  And are there initials

4  identifying the person?

5  A.      It looks like RTJ.

6  Q.      All right.  And would you know who that is?

7  A.      That should be Robert Terrence Johnson.

8  Q.      And is Robert Terrence Johnson a craft worker

9  or is he a non-manual person as assigned to the ice

10  condensers?

11  A.      He is a non-manual person assigned to the ice

12  condensers as a field engineer.

13  Q.      So are non-manuals allowed to conduct actual

14  work?

15          MR. BERNIER:  Objection to form.

16          THE WITNESS:  The words that you said,

17  are they "allowed to conduct actual work," the answer

18  to that is, no, they are not allowed to conduct

19  actual work.

20  BY MR. JOHNSON:

21  Q.      And so if this form is supposed to be filled

22  in by only people who actually did the work, how do

23  we account, if at all, for why Robert Johnson, as a

24  non-manual worker, would be filling all these in?

25          MR. BERNIER:  Objection to form.

1          MR. LANTIS:  Same objection.

2          THE WITNESS:  That's a good question,

3  sir, and one that I don't have an answer for because

4  it should have been the workers who filled this out.

5  I don't know why a field engineer would be writing

6  days and nights on it.  That is definitely not

7  appropriate.

8  BY MR. JOHNSON:

9  Q.     Would any one person be working to perform

10  work on continuous days and nights for, let's see,

11  one -- well, from October the 5th to October the 9th,

12  however many days that is?

13  A.     No, sir.  That would be -- one, it's

14  physically and theoretically impossible, but that

15  would be a huge violation of the fatigue rule as

16  well.

17          MR. BERNIER:  Also, I want to object to

18  the form of that question.

19  BY MR. JOHNSON:

20  Q.     All right.  Now, I'll direct your attention

21  to the Bates numbered page at the bottom from 3424 to

22  3430.

23  A.     3430?

24  Q.     3424 to 3430.

25  A.     I understand.  3424.  I'm getting to it.

1  Okay, I'm on 3424, and you want me to just look

2  through these pages?

3  Q.      Yeah, just look through those for a minute,

4  keeping in mind your testimony about -- well, first

5  let me just ask you to identify.  Do these all appear

6  to be more actual work performed pages?

7  A.      Yes, sir, they do.

8  Q.      All right.  And keeping in mind what you just

9  testified to on the other actual work performed

10  documents we just went through, go ahead and take a

11  look through all of these pages and let me know when

12  you're done.

13  A.      What was the final page, sir?

14  Q.      3430.

15  A.      3424 to 3430.  I understand.  Okay, sir, I've

16  looked at them.

17  Q.      All right.  Aside from one entry made by

18  someone with the initials "CPH" on Page 3424, do all

19  of the rest of these entries seem to have been made

20  by whom you've identified as Robert Johnson on all

21  these pages?

22  A.      Yes, sir, it does.

23  Q.      So would the same testimony that you gave

24  regarding the two actual work performed pages that we

25  just went over before this apply to these pages as

1  well?

2          MR. LANTIS:  Objection to form.

3          THE WITNESS:  Yes, sir, it does.

4  BY MR. JOHNSON:

5  Q.    Okay.  I'm now -- well, let me ask you this

6  before we get off of -- that's the last of the actual

7  work performed documents that we're going to go over

8  on this work order, so my question for you now is,

9  had an investigation been performed on this work

10  order, as was performed on the work order that

11  Mr. Goforth was terminated as a result of, would the

12  things that you have testified about these work

13  performed pages likely been noted in investigations?

14          MR. BERNIER:  Objection to form.

15          MR. LANTIS:  Form.

16          THE WITNESS:  That is definitely a high

17  probability that that would have been something that

18  was brought up and found, due to the fact when you

19  would look at -- your investigation is going to draw

20  you to what documentation is out there.  You're going

21  to look at all the facts.

22          And it would have definitely been a

23  questioning statement to have asked why is this

24  individual, who is on day shift and is non-manual,

25  making entry logs for every single shift and he's a

1  non-manual.  So it definitely would have been

2  something I would have probably questioned had I done

3  the investigation.

4  BY MR. JOHNSON:

5  Q.     All right.  But it's my understanding that no

6  investigation was ordered or initiated by

7  Mr. Washington on this work order?

8             MR. LANTIS:  Objection to form.

9             MR. BERNIER:  Objection to form.

10            THE WITNESS:  To my knowledge, there was

11  no investigation ordered.

12  BY MR. JOHNSON:

13  Q.     And to your knowledge, was the only

14  investigation of those items found on the CR that we

15  went through into the work order that Mr. Goforth was

16  terminated as a result of?

17            MR. LANTIS:  Objection to form.

18            MR. BERNIER:  Objection to form.

19            THE WITNESS:  I'm thinking, Jim.  So to

20  answer your question, I was not aware of any

21  investigation that went beyond the questioning of a

22  supervisor, or possibly a worker, as to what

23  transpired.  No statements, to my knowledge, were

24  taken, no records were pulled.  All the different

25  things that can be done for an investigation, there

1    was nothing else done, nor was Mr. Reeves, again to

2    my knowledge, on site performing any investigations.

3    BY MR. JOHNSON:

4    Q.       And I take it, except as to the manway cover

5    being off as related to Mr. Goforth?

6    A.       That is correct, sir, with the exception of

7    Mr. Goforth and the manway.

8    Q.       And TVA has indicated in responses to our

9    discovery that no one was disciplined from Day &

10   Zimmermann for actions during this 2018 outage in

11   Unit 1, other than Mr. Goforth.  Would that be

12   consistent with your knowledge?

13                 MR. LANTIS:  Objection to form.

14                 MR. BERNIER:  Objection to form.

15                 THE WITNESS:  So to my knowledge, I do

16   not know of any other disciplinary actions that were

17   taken against any individuals.  And how I base that

18   statement is, visually I did not see anyone missing a

19   day or leave the job or anything of that nature.

20                 And the reason I say that is, I would not

21   be privy to a coaching session, a write-up, anything

22   of that nature.  But as far as someone being

23   disciplined to the extent of days off or termination,

24   there was none of that.

25   //

1  BY MR. JOHNSON:

2  Q.      Except as to Mr. Goforth?

3  A.      That is correct, except for Mr. Goforth.

4  Q.      Okay.  Let's move on then.  I want you to

5  turn, please, sir, to Bates stamp Page 3599.

6          MR. LANTIS:  Sorry, Jim.  Could you say

7  that page one more time?

8          MR. JOHNSON:  3599.  It's also Page 121,

9  I think, of that document.

10         THE WITNESS:  Sorry, Jim.  I've got a

11 laptop here with a little screen.  It's taking me a

12 little while to get to it.

13 BY MR. JOHNSON:

14 Q.      You're fine.  Just let me know when you're

15 there.

16 A.      Okay.  Page 121, and it is Bate stamp 3599.

17 Okay, I'm on it.

18 Q.      Okay.  So I'm going to be asking you --

19 A.      I apologize, Jim.  Give me just a second.  I

20 need to rotate the view because it's sideways on me.

21 Q.      Yeah, sorry about that.  I think everybody

22 has to do it.  I know I did.

23 A.      Okay.  I have rotated it, and I am looking at

24 Attachment 10, again Page 121 to 149, and this is

25 Page 1 of 3.  Go ahead, sir.

1   Q.      All right.  So I'm going to be asking you

2   about that page and the subsequent page, page 3600.

3   A.      Okay.

4   Q.      Those two pages.  So you want to take a look

5   at those for a minute and let me know when you're

6   ready to talk about them.

7               MR. LANTIS:  I'm sorry.  Are we still on

8   Exhibit 5?

9               MR. JOHNSON:  Yes.

10              MR. LANTIS:  My pages are not the same as

11  what y'all are looking at, I guess.

12              MR. JOHNSON:  Well, are you using the

13  Bates stamp page numbers?

14              MR. LANTIS:  Well, I'm going to try that

15  now.  Because you said 121.  It's not 121 for me.

16              MR. JOHNSON:  Well, it's Page 121 of the

17  actual document, but the Bates stamp number is 3599

18  at the bottom, or it may be on the left-hand side

19  based on what your view is.

20              MR. LANTIS:  For me, in my documents,

21  it's Page 192 of the document, but I think I

22  downloaded from the Box site.  So I just want to make

23  sure we're all reading from the same page.

24              MR. JOHNSON:  Okay, but you're on --

25              MR. BERNIER:  Paul, I think you're on

1  Page 192 of the PDF.  There's an internal page number

2  on the work order.

3              MR. LANTIS:  I see it.  I understand.

4              MR. JOHNSON:  So are you with us, Paul?

5              MR. LANTIS:  I am.  Thanks.

6  BY MR. JOHNSON:

7  Q.     All right.  So just let me know when you're

8  finished looking at theses pages, 3599 and 3600,

9  please, sir.

10  A.     I'm good.

11  Q.     All right.  It appears to me that under a

12  column that's entitled "Section step 6.17.2(2), there

13  are not any signatures.  There's some dates, but no

14  signatures.  Are you with me?

15  A.     Yes, sir.

16  Q.     And then if you look at the next page there

17  are also dates, but no signatures.  Are you with me?

18  A.     Yes, sir.

19  Q.     And it appears to be saying that there are 24

20  possible entries for signing and dating, and that

21  that seems to correspond with bay numbers 1 through

22  24.  Would that be correct?

23  A.     Yes, sir.

24  Q.     So this would include the bay numbers 5 and 6

25  that were referenced in the CR as being in the wrong

1   place?

2              MR. BERNIER:  Objection to form.

3              MR. LANTIS:  Objection to form.

4              THE WITNESS:  It would, but it's not the

5   signature for the doors, but it is a missing

6   signature for basket clevis pin and cotter key

7   installation.

8   BY MR. JOHNSON:

9   Q.      Okay.  Well, tell us what that means then,

10  basket clevis pin, cotter key installation?

11  A.      So the ice condenser is comprised of 1,944

12  baskets that are 12 inches in diameter and 48-feet

13  long.  At the bottom of those baskets they have a

14  clevis pin that is run through a mechanical joint

15  which locks the basket into place to prevent it from

16  becoming a projectile in the event that the main

17  steam line breaks and we get a rush of

18  super-pressured steam into containment.  The pins are

19  what keeps them, again, from becoming a missile and

20  possibly breaching containment.

21  Q.      So if those pins are not properly installed,

22  what could be the consequence of that?

23              MR. LANTIS:  Objection to form.

24              THE WITNESS:  Are we talking about in an

25  accident event?

1  BY MR. JOHNSON:

2  Q.      I'm talking about under normal circumstances,

3  and then under an accident event.  Why don't you just

4  take them one at a time.

5           MR. LANTIS:  Objection to form.

6           THE WITNESS:  Under normal circumstances,

7  if the pins were not in, the ice condenser is

8  declared inoperable and we would not be able to move

9  from Mode 5, which is a classification of power

10 ascension.  When coming out of an outage, we could

11 not move into Mode 4.  And in laymen's terms for

12 anyone who doesn't understand that, it means we can't

13 turn -- we cannot turn our reactor on.

14 BY MR. JOHNSON:

15 Q.      All right.  I think you've explained that

16 under normal circumstances.  Explain it under, what

17 did you say, containment circumstances, or accident

18 circumstances?

19 A.      Yes, sir.  Accident circumstances, meaning

20 that the ice condenser is now being called into

21 service to do its designed function.  The

22 potential -- and I have to say potential because an

23 ice condenser has never been called into service and

24 it's all hypothesis and calculations.  But the

25 hypothesis is that without these pins the potential

1    for a basket to become a projectile, or a "missile"

2    as we refer to them just because it's cylindrical and

3    it looks like a missile, that's just kind of our

4    terminology, it could come out and breach

5    containment, and then we would then have a

6    radioactive release to the public.

7    Q.      All right.  So this is definitely a nuclear

8    safety -- well, a signoff here that's of nuclear

9    safety consequence?

10                   MR. LANTIS:  Objection to form.

11                   MR. BERNIER:  Objection to form.

12                   THE WITNESS:  I would have to say yes.

13   BY MR. JOHNSON:

14   Q.      Looking also at the column that's marked

15   6.18.4 where it says inter deck doors, frames, beams,

16   curtains installed, it appears that RTJ, who you

17   identified as Mr. Johnson, has signed off on all of

18   those.  Would I be correct about that?

19   A.      Based off of the writing before and the

20   initials, yes, sir, I would agree with your statement

21   that it looks like RTJ, Robert Terrence Johnson, is

22   the one who did the signing for those.

23   Q.      And if you look at the second page, he did

24   the signing for that column on all 24 ice bays; did

25   he not?

1    A.      Yes, sir, that's correct.

2    Q.      And so who is supposed to be making the

3    certifications here -- well, I shouldn't call them

4    certifications without knowing.  What are you doing

5    when you sign in this particular column?  What are

6    you signing for?

7                MR. BERNIER:  Objection to form.

8                THE WITNESS:  You're signing that you

9    installed the doors, frames, beams and curtains.

10   BY MR. JOHNSON:

11   Q.      Oh, so this is the one that actually says the

12   doors, such as doors 5 and 6, that were found to be

13   in the wrong place were installed?

14   A.      That is correct, sir.

15   Q.      And is that supposed to be signed off by a

16   craft non-manual?

17               MR. BERNIER:  Objection to form.

18               THE WITNESS:  No, sir.

19   BY MR. JOHNSON:

20   Q.      Okay.  So a supervisor can sign off on that?

21   Or let me put it this way.  A field engineer who had

22   the position of Mr. Johnson can sign off on that?

23               MR. BERNIER:  Objection to form.

24   BY MR. JOHNSON:

25   Q.      All right.  Let me ask it this way.  What

1   conditions --

2           MR. BERNIER:  Jim, let him answer the

3   question that he was about to answer.

4   BY MR. JOHNSON:

5   Q.      Okay.  If you remember the question and can

6   answer it, please do.

7   A.      Yes, sir.  The question was, is can a field

8   engineer sign for this step, and I'm going to have to

9   say no.

10  Q.      And why would that be?

11  A.      This needs to be who it was that did the

12  actual installation, and that's kind of for multiple

13  reasons.  One, so we know who did it, so that we can

14  go back if we need to ask a question, such as, Bay 5

15  and 6.  It'd be nice to know who it was to be able

16  to, you know, talk to those individuals and find out,

17  you know, what their thought process was, how did

18  they, you know -- to get learnings, you know.  That's

19  one piece.

20          But the bigger piece of it too is, this is a

21  safety-related system.  We have to be able to make

22  sure the people who are doing things are qualified,

23  and make sure that they're within the fatigue rule,

24  and this individual was not.

25  Q.      All right.  And so that next column it says,

1  "Torque wrench ID number."  Is that the torque wrench

2  that would have been used by the manual craft

3  installer to install those doors?

4  A.      That would be a true statement.

5  Q.      Okay.  And so the last column is about

6  foreign material equipment removed, and that also,

7  for all 24 bays, if I'm correct, and please check,

8  was signed off by field engineer Johnson.  Am I

9  correct?

10  A.      Yes, sir, you are correct.

11  Q.      So comment for me what the purpose of that

12  step is.

13  A.      That step would be to make sure that all,

14  again, foreign material -- foreign material being

15  anything that is not meant to be there -- and in the

16  ice condenser, if it's not part of the system or ice,

17  it's not supposed to be in there.  So that's

18  validating that it is out, as well as all the

19  equipment that was brought in to do the servicing.

20  Q.      And so please tell us, if you can, whether or

21  not it would be appropriate for the field engineer to

22  sign off on that.

23              MR. BERNIER:  Objection to form.

24              MR. LANTIS:  Objection to form.

25              THE WITNESS:  I'm going to have to say

1  that, no, that's not an appropriate thing for a field

2  engineer to sign off for.

3  BY MR. JOHNSON:

4  Q.      All right.  So my last question with regard

5  to these signoffs, similar to the ones on the work

6  performed, what is the likelihood that an

7  investigation into the ice condenser doors being put

8  on incorrectly would have turned up these problems

9  that you've just identified if an investigation had

10  occurred, as it did in the case of Mr. Goforth?

11              MR. BERNIER:  Objection to form.

12              MR. LANTIS:  Objection to form.

13              THE WITNESS:  I feel confident in this

14  answer to say that had I done an investigation, and

15  anyone with knowledge had done an investigation, it's

16  a hundred percent likelihood that it would have been

17  identified.

18              And what I mean by "would have been

19  identified" is first off, anyone doing an

20  investigation is going to go straight to Page 5 and

21  6, just as they did with the manway incident, and

22  they would look and see who was it that installed it

23  because we need to talk to those individuals.  We

24  need to find out, you know, what happened.  How did

25  this error trap?  How did this, whatever it was, come

1   about.

2          And the first thing I would have noticed

3   is I've got RTJ for every single one of them, and I

4   would be wanting to know why. You know, that doesn't

5   tell me who did this work. I can't identify

6   anything.

7          And then had I had the time to look this

8   document over, and I was doing my investigation, I

9   would have looked at the other signatures and I would

10   have immediately seen that we have no signatures for

11   basket clevis pins and cotter keys being installed.

12   So, yes, high likelihood with anyone else. Very

13   high. A hundred percent with myself. There you go.

14   BY MR. JOHNSON:

15   Q.    Okay. Let's take a look, please, sir, at

16   Page 3601 and, again, I'm talking about the Bates

17   stamp number at the bottom of the page, or it may be

18   on the left based on your orientation.

19   A.    Give me just a second because it's not -- oh,

20   there it is. Okay. What was the number again, sir?

21   Q.    3601.

22   A.    Okay. Okay, I'm on 3601. That should be

23   Attachment 10, Page 3 of 3, and as it relates to the

24   MI-61.06, it's Page 123 of 149. Go ahead, sir.

25          MR. JOHNSON: Paul and Mike, are you with

1  us?

2          MR. LANTIS:  I'm there.  Go ahead.

3          MR. JOHNSON:  And Stephen, you with us?

4  Okay.

5  BY MR. JOHNSON:

6  Q.     All right.  This says, does it not,

7  Attachment 10, Page 3 of 3, bay restoration, and then

8  it's signed apparently by someone named Scott Terry

9  as field engineer/supervisor's signature.

10         What, if anything, can you tell us about the

11  meaning of that signature at this point in this work

12  order?

13  A.     So that signature to me, being the last page

14  on Page 3 of 3 for an attachment, and underneath

15  remarks -- obviously the remarks being, all right, if

16  you had anything you needed to jot down, mark down as

17  a note for us to know in the future, whatever.

18  Obviously there's nothing there so there was nothing

19  of note, and he is signing this stating that

20  everything in this document was complete.

21  Q.     So in your opinion, based on your experience

22  and your knowledge of this work order, should this

23  person have noted the missing signatures that we saw

24  on the clevis pin column before signing this?

25         MR. LANTIS:  Objection to form.

1          MR. BERNIER:  Objection to form.

2          THE WITNESS:  Doing his job, yes, he

3    should have noted that there were missing signatures.

4    BY MR. JOHNSON:

5    Q.      Anything else that that signature signifies

6    to you there in relation to your testimony about all

7    the pages we went over?

8    A.      Nothing more than what I just stated.  He is

9    validating -- he's validating at least the data's

10   there.  That much he is doing.  Whether or not you're

11   validating the actual field conditions, I don't know

12   that I would go that far, but I would say that you're

13   at least validating the data is there.

14   Q.      So I take it that what you're saying is, that

15   this field engineer/supervisor, Scott Terry, did not

16   necessarily need to go and check to see physically

17   that those doors were on as represented by these

18   documents?

19          MR. LANTIS:  Objection to form.

20          MR. BERNIER:  Objection to form.

21          THE WITNESS:  Yes, that's what I said.

22   Yes.  I don't know that I could stretch out that he

23   was supposed to go validate all of this work was

24   done, but -- because you can't.  I mean, it kind of

25   goes back to the same issue that we have at hand here

1  with the manway.  You can't validate that 24 bays

2  were torqued.  When they're done -- you know, it's

3  supposed to be done on multiple shifts, you can't --

4  you know, I mean, and you can't physically see all of

5  those bolts get torqued.

6           So, again, I would not say that this

7  signature is denoting field work.  I would say this

8  signature is supposed to be validating the document

9  is complete, and if there are any remarks that came

10  from the field or information provided to him he

11  would put it in there.  And then he signs that it is

12  complete.  That's what I believe that that signature

13  step is stating, and I have procedure to back me up

14  for that.

15  BY MR. JOHNSON:

16  Q.      All right.  So you mentioned a comparison of

17  this situation being analogous to Mr. Goforth.  So

18  let's amplify that a little bit, if we may.  Let me

19  ask you, with Mr. Goforth's signing where he signed,

20  as you've already testified to to Section 3.1.13, I

21  think it was, where his signature was where he was

22  disciplined for, would the expectation there be the

23  same as for Mr. Terry here, that he wouldn't have

24  actually gone and looked at every one of these manway

25  covers physically to make sure that they were there?

1          MR. LANTIS:  Objection to form.

2          MR. BERNIER:  Objection to form.

3          THE WITNESS:  I'm going to clarify my

4   statement, and that's that I can't say that I agree

5   with that because the signature, based off procedure

6   and what it is, was not doing any validation.  That

7   step or that note, whatever you want to call it, was

8   providing information to the supervisor that the

9   location of the field work was going to be documented

10  on the MMTP-104 data sheets, that it was going to be

11  documented on the TI-27 data sheets for cleanliness,

12  and all of that information would be documented

13  there.  That's what I believe procedurally it was

14  doing.

15          The difference between that scenario and

16  this one, that one was just getting information and

17  acknowledging the information.  This one was signing

18  that the document was completed.  Now, the

19  correlation between those two is the statement that

20  was made is that this was -- that Mr. Goforth signed

21  a validation that work was performed, when there is

22  no way possible that you could have done that because

23  the MMTP-104 data sheet is not just the manways on.

24  It is documenting validation that you've cleaned your

25  seating surface, your bolts are lubed and chased,

1 your gasket's new. All of these different attributes

2 that are being looked at in ten different locations

3 over multiple days. It can't be done.

4 And in this particular case they were

5 actually done on night shift, the opposite shift. In

6 previous outages, they've been done on multiple

7 shifts. You cannot validate work that you didn't

8 watch and you didn't see. This is the problem with

9 this.

10 And those were some of the learnings that

11 came from this that we had to change this. This was

12 not okay. There was an error trap that was put here

13 and here's what happened. But that's what it is, is

14 an error trap. And all we have here, at most, is a

15 human performance issue that should have required

16 some coaching to not only Mr. Goforth, but the entire

17 department for us all to learn, as well as the

18 planning department because that step note, whatever,

19 should never have been written that way, ever.

20 BY MR. JOHNSON:

21 Q.      So where you have a work order that has a

22 problem like you've just identified for the work

23 order section that Mr. Goforth was terminated for,

24 what is the correct way procedurally to deal with a

25 note or a work order that's badly written and giving

1   seemingly conflicting -- subject to conflicting

2   interpretations?

3         How do you -- what procedurally is done to

4   rectify that?

5   A.      So I have to ask a clarifying question.  Are

6   we talking about -- because it kind of depends upon

7   when the identification of it happened.  You know, if

8   we're going to -- for us to be like for like here, we

9   would say identification of this was after the fact.

10  So is that what -- you want me to answer that, or are

11  we talking about like if I found it in use or --

12  Q.      Yeah, the identification after the fact on a

13  more long-term basis.  Is there a procedural way to

14  deal with badly written -- seemingly badly written

15  work orders that can be interpreted different ways,

16  and, if so, what is that procedure?

17  A.      If memory serves me, I believe the work order

18  planning, the one that you showed me in one of your

19  documents, talks about statements that are not --

20  that are misleading, that are not -- you know, that

21  are not correct when found and -- the short answer to

22  your question is, is you will go in, you will revise

23  it, you will fix it and make it in line with the

24  procedure, you will make it clear and concise to the

25  reader and the performer.  And then also the CAT

1    process would have you -- "CAT" being corrective

2    action program -- would have you go back to all the

3    parties involved and coach them.

4         So the planner, you would go to the planner

5    and you would coach the planner and say, hey, you

6    know, you planned this, but you didn't meet these

7    criterias to meet a work step or a note, or whatever

8    your intent was.  You didn't meet it.  Here's what

9    was identified.  And here's how you fix it in the

10   future.

11        So now you fixed it with the individual; now

12   we fixed it with the work document, and the last

13   piece is to provide the learnings.  We don't -- in

14   human performance events like this, we don't just

15   coach the one person who did it, or who was caught in

16   the error trap.  We coach everyone.  And there was

17   some coaching provided to everyone, but then there

18   was more done to one person.

19   Q.    All right.  The last page that I will have

20   you look at, sir, in this document that's identified

21   as Exhibit 72, is Bates number 3638.

22   A.    I'm almost there.  All right.  I've got to

23   change my rotation again.  3638, I'm looking at --

24   yeah, 3638.  Attachment H or hotel?

25   Q.    Correct.

A.      It's the housekeeping log.

Q.      So tell me what the purpose of the

housekeeping log is.

A.      The housekeeping log is a daily signature of

the supervisor, and that supervisor can be

multiple --

                (Interruption in proceedings.)

                THE WITNESS:  If you don't mind,

someone's trying to open this door.  Can I tell them

I'm in here?

                MR. JOHNSON:  Yes, sir.

                MR. LANTIS:  Jim, while he's doing that,

after this question or the next couple of questions,

I need to take probably a ten-minute break.

                MR. JOHNSON:  Yeah, that'll be fine.  I

am approaching the end.  I don't think we'll be more

than another 15 minutes or so.

                MR. LANTIS:  Yeah, I'm going to need to

take a break before then.  And the reason why is my

Mom's here, and I've got to get her in an Uber to the

airport because she's got to leave and she doesn't

have Uber.  So I can't wait 15 minutes.  I literally

need a break in about two-minutes.

                MR. JOHNSON:  Okay.  We'll just have him

answer this question and we'll be off of this

1  document except for I've got one more question after

2  this, and then I'll be off of this document and we'll

3  have about 15 minutes left.  So, yeah, we can take a

4  break.

5          MR. LANTIS:  Okay, great.

6          THE WITNESS:  That record to answer your

7  question what is it, it is for a foreman, general

8  foreman or a supervisor, one of those levels,

9  whoever's assigned the task, to sign off that they

10  have performed housekeeping at the end of their shift

11  and the area's being kept clean and safe.

12  BY MR. JOHNSON:

13  Q.      All right.  And so from looking at this

14  document, can you identify what shift Mr. Johnson,

15  the field engineer, was on through -- well, from

16  September 19th of '18 till October 9th of '18?

17  A.      First shift or day shift.

18  Q.      All right.  And would September 19th of '18

19  to October 9th of '18 be just about the entire outage

20  as related to the ice condensers?

21  A.      Yes, I would think it would be.

22  Q.      All right.  And so Mr. Johnson, according to

23  your testimony, was on day shift and, yet, I think as

24  you previously testified, he was making work

25  performance signatures for night shift also; correct?

1                    MR. LANTIS:  Objection to form.

2                    THE WITNESS:  That is what is in the

3    document.  Did you hear my answer, ma'am?  I

4    apologize.  I overspoke.

5                    THE REPORTER:  Yes, I did hear your

6    answer.  Thank you.

7                    THE WITNESS:  Okay.

8                    MR. JOHNSON:  What was the answer you

9    got?

10                   (The answer was read back by the

11   reporter.)

12                   MR. JOHNSON:  I have one more question

13   and we're completely off of this.  I don't think it

14   will take long.  But if you need to go, I can hold it

15   until after.

16                   MR. LANTIS:  I mean, if it's literally

17   one more question and not one question followed by

18   seven follow-ups then, yeah, I'm okay.

19                   MR. JOHNSON:  Okay.

20   BY MR. JOHNSON:

21   Q.     So with regard to this signature log, and

22   also Mr. Terry signing the Attachment 10 bay

23   restoration as field engineer/supervisor that you've

24   testified to, again my question is, would those

25   likely have been things that would have been

1  discovered in a reasonable investigation of the ice

2  bay doors being on the wrong doors?

3           MR. LANTIS:  Objection to form.

4           THE WITNESS:  Yes, sir.

5  BY MR. JOHNSON:

6  Q.    And the answer was "yes, sir," I think.  Am I

7  correct?

8  A.    It was.

9           MR. JOHNSON:  Okay.  All right.  Let's

10  take a break.  How much time do you need, Paul?

11  Well, he's gone.

12           MR. BERNIER:  He said ten earlier.

13           MR. JOHNSON:  Okay.  Ten minutes.  So

14  that's exactly noon.  And then I'll be, as I say, I

15  think only about 15 minutes from wrapping up.

16           MR. BERNIER:  Okay.

17           MR. JOHNSON:  So we're off the record

18  until noon.  Are you on Eastern time, sir?

19           THE WITNESS:  Yes, sir.  That's fine.

20           MR. JOHNSON:  Off the record till noon.

21           THE WITNESS:  Okay.

22           MR. JOHNSON:  Thank you.

23          (Short break.)

24           MR. JOHNSON:  Are we ready to begin?

25           MR. LANTIS:  Yeah.

1          MR. BERNIER:  Yes.

2          MR. JOHNSON:  Let's go back on the record

3    then.

4    BY MR. JOHNSON:

5    Q.      Mr. Whitehorn, I think we're done with the

6    documents, and so just need to ask you some more

7    questions.  And the first one of those is, during the

8    period after Mr. Goforth took over for you as the TVA

9    augmentee over -- in the tritium program, that is

10   around 2017 and into 2018, did you make any

11   complaints of your own about being retaliated against

12   for protected activity?

13   A.      Yes, sir, I did.

14   Q.      And can you tell me what you said was your

15   protected activity you were being retaliated for?

16   A.      My involvement with the tritium consolidation

17   project, specifically the bending of a thimble tube

18   while on a irradiated TPBAR hub pull of TPBARs.

19   Additionally, with performing the investigation and

20   being a part of that, and also testifying to ECP.

21   And the final piece of that, is basically my entire

22   involvement in that.  My help with Mr. Goforth in his

23   writing of his assessment, the self-assessment, if

24   you will, of the campaign.  All those different

25   variables.

1  Q.      Okay.  And who were you making that complaint

2  against as being a person or entity retaliating

3  against you?

4  A.      Because anything beyond this would be

5  conjecture and I didn't make conjecture, I did it

6  against my boss, John Rhodes, because he's the one

7  that gave me the poor performance review.

8  Q.      So was the poor performance review which you

9  were saying was an adverse employment action against

10 you that you were being retaliated for?

11 A.      Yes, sir, that is correct.  And that is in

12 accordance with the procedure that governs adverse

13 actions.

14 Q.      And was your complaint resolved?

15 A.      It was.

16 Q.      And how was it resolved?

17 A.      Through an agreement with me and TVA.

18 Q.      Okay.  And as a result of that agreement, was

19 your performance evaluation changed?

20         MR. BERNIER:  I'm going to object there,

21 Jim.  You know, first I think this is off the beaten

22 path, but also we're talking about a settlement

23 agreement at this point.

24         MR. JOHNSON:  Okay.  I didn't know that.

25 Is that like an NDA on that?

1          MR. BERNIER:  There is a confidentiality

2    provision.

3          MR. JOHNSON:  Okay.  All right.  Well, I

4    think most confidentiality provisions have an

5    exception for testimony in a legal proceeding, but I

6    don't think -- I won't push on that because I think

7    he's already said what his protected activity was.

8    That was it was resolved and what the adverse action

9    was.  So I'm willing to move on from there.

10          MR. BERNIER:  Okay.

11   BY MR. JOHNSON:

12   Q.      So breaking down what you just told me about

13   your protected activity, when you say a bent thimble,

14   are you referring to -- and I can tell you the

15   June 22nd drop of a TPBAR assembly that bent a

16   thimble, June 22, 2017?

17          MR. BERNIER:  Objection to form.

18          THE WITNESS:  Without having dates in

19   front of me, that sounds to be an accurate statement,

20   but I don't have it in front of me.  So that sounds

21   like the right time frame.

22   BY MR. JOHNSON:

23   Q.      All right.  Well, maybe this will help.  Was

24   there a video made of that event?

25   A.      There was.

1  Q.      And tell me how widely, if at all, that video

2  was circulated within Watts Bar?

3              MR. LANTIS:  Objection to form.

4              THE WITNESS:  I'll be honest with you,

5  Jim, here's why I can't answer that.  Because I do

6  not know who all Jeff McGuire sent it to.  He may

7  have sent it to a lot of people.  He may not have

8  sent it to very many people.  I can't answer that.

9  McGuire could.

10             But I do know that at least myself and

11 Steve Cook had seen the video.  Those are the only

12 two that I know for certain that I can say saw that

13 video.  Outside of that, it could have been sent to a

14 lot of people.

15 BY MR. JOHNSON:

16 Q.      Well, was either the video or the event

17 itself -- well, let me take the video out of it

18 because you said you don't know.  Was the event

19 itself used for training purposes at least within the

20 TVA MMG and the Watts Bar -- or, I mean, the DZ

21 augmented employees --

22             MR. LANTIS:  Objection to form.

23             MR. BERNIER:  Objection to form.

24 BY MR. JOHNSON:

25 Q.      -- who worked on tritium?

1   A.      You said was it used as training.  I mean,

2   the only way I could say that -- yes, it's OE now.

3   It's operating experience.  And every time a campaign

4   is done, you go over your operating experience and

5   make sure that you learn from your mistakes and you

6   don't make them again.

7   Q.      And so did you actually see the evaluation

8   that Mr. Goforth wrote about the cycle 14 that

9   included this incident?

10  A.      Yes, sir.

11  Q.      And who else do you know that saw that

12  evaluation, if anyone?

13              MR. BERNIER:  Objection to form.

14              THE WITNESS:  So the only -- to answer

15  your question, the only person that I know for

16  certain that saw it would be Steve Cook.  Outside of

17  that, I know McGuire.  Obviously McGuire saw it.  Who

18  all saw it outside of that, I mean, I heard, you

19  know, rumblings.  Because you're asking me a very

20  specific question.  Who did I know saw it?

21              I never saw Jesse James read it.  I never

22  saw anyone above that.  I don't know if Paul Simmons

23  might have gotten a copy of this.  I do also know

24  that ECP had a copy of it.  I do not remember that

25  gentleman's name.  He was a corporate ECP

1    investigator, and he had a copy of it.  And that's

2    the only people that I know for certain had a copy.

3    BY MR. JOHNSON:

4    Q.      Would the ECP investigator be Howard Cusick?

5    A.      That would be him.

6    Q.      Do you know whether Mr. Cusick wrote a CPR --

7    I'm sorry -- a CR that incorporated the gaps found in

8    the evaluation?

9    A.      Yes, sir, he did.

10   Q.      And so tell me -- well, let me do it this

11   way.  Let me just give you some names, and I want you

12   to tell me whether or not you had any discussions

13   with any of these people about either the Cusick CR

14   or the evaluation that Mr. Goforth wrote.

15           So the first name I'm going to give you is

16   Tony White.

17   A.      No, sir.

18   Q.      Dusty Rhodes?

19   A.      I believe we may have had some dialogue about

20   it throughout the course of the process that you

21   previously mentioned.

22   Q.      In your prior testimony you mentioned there

23   was talk going around.  So that's the kind of thing

24   I'm talking about is, did you -- with any of these

25   people, did you hear them talk about either the

1  evaluation or the Cusick CR?

2        So with that in mind, let me give you Tony

3  White again.  Same answer, or does that change your

4  answer any?

5              MR. LANTIS:  Objection to form.

6              MR. BERNIER:  Objection to form.

7              THE WITNESS:  So did I hear people talk

8  of it?  Yes, I did hear someone make reference that

9  there was a conversation about this report.

10 BY MR. JOHNSON:

11 Q.      And --

12 A.      Go ahead.

13 Q.      And who did you hear that from?

14 A.      Jeff McGuire.

15 Q.      And who did Jeff McGuire say that he had had

16 a discussion about it with?

17 A.      Tony White.

18 Q.      Okay.  How about DeWarren Washington?

19              MR. BERNIER:  Jim, what's the question

20 about DeWarren here?

21              MR. JOHNSON:  Yeah, the question is, did

22 he ever discuss this with DeWarren Washington; that

23 is.  The evaluation or the Cusick CR.  Let's limit it

24 to that.

25 //

1    BY MR. JOHNSON:

2    Q.        Did you ever discuss or have any conversation

3    with DeWarren Washington about either the evaluation

4    or the Cusick CR?

5    A.        No, sir.

6    Q.        Did you ever hear of anyone else having a

7    discussion of the -- about the -- or conversation

8    about the evaluation or the Cusick CR with

9    Mr. Washington?

10                   MR. BERNIER:  Objection to form.

11                   THE WITNESS:  I did hear that there were

12    management -- maybe not an official meeting -- I

13    heard that there were discussions that were held over

14    it and talked about it.  This particular -- with

15    Mr. Washington, none of it would have been official.

16    It would have just been them providing him with

17    information of what they heard.  And I did hear that

18    he was involved in some of those conversations, but

19    to the validity of it, I have no idea.

20    BY MR. JOHNSON:

21    Q.        So who did you hear from that these

22    conversations had occurred?  How did they come to

23    your attention?  From whom?

24                   MR. BERNIER:  Objection to form.

25                   THE WITNESS:  Jim, I'm going to tell you,

1    I don't remember.  I apologize.  I don't remember

2    that.

3    BY MR. JOHNSON:

4    Q.      All right.  Do you know who Meshelle Augustin

5    is?

6    A.      I do.

7    Q.      And who do you recall her being at the time

8    of your complaint?

9    A.      She was the HR manager.

10   Q.      For who?

11   A.      TVA.

12   Q.      And what information, if any, did you give to

13   Ms. Augustin about your protected activity?

14   A.      I gave her everything.

15           MR. BERNIER:  Objection to form.

16   BY MR. JOHNSON:

17   Q.      I'm sorry?

18   A.      I gave her everything.  "Everything" being I

19   sat down with her.  I requested a meeting with her.

20   After the notification was made to me by my boss

21   through the end-of-year performance review that I was

22   going to be given a below satisfactory rating, I

23   requested a meeting with her through e-mail,

24   formally.  I believe the title I put on it was, "This

25   is a formal request for a meeting."  I made it

1    official so that she knew what it was about.

2         We then had a subsequent meeting sometime

3    after that, I don't remember, but I had time to put

4    together everything for her that she needed to see,

5    and part of that was the evaluation.

6    Q.    Did you give her the actual evaluation that

7    Mr. Goforth had performed?

8    A.    I can't remember if I e-mailed all of it to

9    her or not.  I want to think I did, but I can't say

10   for certain that I did.  I do know I had it all in my

11   hand when I came in.  I had my files.  And I came in,

12   and I had everything there to discuss.

13        I want to say that just so this doesn't

14   sound -- you know, because we're really picking a

15   piece out of something that probably makes me sound

16   bad -- but, you know, there was a whole huge

17   backstory to this -- this issue with me at hand.

18   And, you know, when we're grabbing these little

19   pieces I sound like a disgruntled employee or

20   something who got a bad evaluation, but that was

21   actually nowhere near the case.  I had exemplary

22   evaluations all the way up to that nine days before

23   the end of the fiscal -- yeah, the fiscal year.  I

24   had an exemplary report from John Rhodes.  So that is

25   why this all led to this.

1          So there's a lot more to it than that, but

2    all that information, in file form and written form,

3    so that I could get a timeline so that I could

4    explain my side of this, was with me and discussed

5    with her in that meeting.

6          She took notes on her iPad, and I remember

7    that specifically just because she was the first

8    person I saw actually using a writing pen, if you

9    will.  Not an actual pen, but the new pens on an

10   iPad.  That just stood out in my mind.

11          I can't remember if I sent her everything; if

12   she asked me if I had it in an e-mail form.  It does

13   seem like she may have asked that, but I can't

14   remember specifically.  But I know I went through

15   everything and I talked about it because it was

16   specific to why I felt like I was being retaliated

17   against.

18   Q.    So you said you couldn't remember whether you

19   e-mailed her a copy of the evaluation, but you said

20   you brought the evaluation in a file with you.

21          Did you give her the evaluation as a hard

22   copy at that meeting?

23   A.    I did not let her have any of my files

24   because I had not made copies of any of it.  It was

25   just we talked about it, we looked at it, and

1    discussed it.

2    Q.       What specific recall, if any, do you have

3    whether you specifically mentioned Mr. Goforth's

4    evaluation in your conversation with Ms. Augustin

5    that day?

6                   MR. LANTIS:  Objection to form.

7                   MR. BERNIER:  Objection to form.

8                   THE WITNESS:  It would have just been in

9    the timeline of events that happened.  We would have

10   talked about it and I would have just said that this

11   was a document that was written discussing the

12   deficiencies noted in the campaign.  Specifically,

13   the nuclear safety concern that we've already

14   discussed with the bent thimble tube.

15                   And I would have just walked through the

16   timeline with it.  She would have known that --

17   actually, you know what, I'm also positive I said

18   that this was written by Mr. Goforth and I helped him

19   to write it, and I told her how I was involved with

20   it.

21   BY MR. JOHNSON:

22   Q.       Among the documents that you brought with you

23   to that meeting, was the Cusick CR that we've talked

24   about part of the documents that you brought with

25   you?

1  A.      I don't remember, sir.

2              MR. BERNIER:  Objection to form.

3              THE WITNESS:  I don't remember if I had

4  that with me at the time.

5  BY MR. JOHNSON:

6  Q.      Do you recall whether you mentioned the

7  Cusick CR to Ms. Augustin as part of your

8  conversation with her?

9  A.      I don't recall.  And the only reason why I

10  say that, it probably would not have stood out to me

11  as something for us to talk about because I was more

12  engaged in the timeline of what had transpired.

13  Q.      Do you know of your own personal knowledge of

14  any other employees who filed complaints of

15  retaliation for protected activity at approximately

16  the time that you filed your complaint?

17              MR. BERNIER:  Objection to form.

18              THE WITNESS:  Are you referring to the

19  chilled work environment at Watts Bar?

20  BY MR. JOHNSON:

21  Q.      No, sir.  What I'm asking is, your testimony

22  has been that you made a complaint in the 2017/2018

23  time range about retaliation for protected activity.

24          My question is, do you know others who made

25  complaints that they suffered adverse employment

1  action for protected activity during that same time

2  frame?

3  A.      Yes, sir, I do know.

4              MR. BERNIER:  Objection to form.

5              THE WITNESS:  A peer of mine in my

6  department, Shane Benoit, also --

7              THE REPORTER:  Say that name again, sir.

8              THE WITNESS:  Shane Benoit.

9  BY MR. JOHNSON:

10  Q.      Tell me if I'm spelling it right because I

11  don't know.  I've not heard of this person, but I'm

12  from New Orleans and it sounds like it's a

13  B-E-N-O-I-T name.  Is that --

14  A.      He is from New Orleans.

15  BY MR. JOHNSON:

16  Q.      Okay.

17  A.      Do you want me to look that up to confirm?

18  Q.      No, sir, that's good enough.  Do you know

19  whether or not that complaint was ever resolved?

20  A.      It was resolved.

21              MR. BERNIER:  Objection to form.

22  BY MR. JOHNSON:

23  Q.      And when was your complaint resolved?

24  A.      I don't remember the date, sir.

25  Q.      Would it have been in 2018?

1    A.       Without having it in front of me, I

2    apologize, I don't remember when it was done.  It

3    went on for a fair amount of time, and I don't

4    remember the exact on when the date was.

5    Q.       Well, we know it would have to have been

6    after June of 2017 when the -- well, let's see.  We

7    know it would have had to have been after

8    October 17th of 2017 because that's when Mr. Goforth

9    issued the evaluation.  Does that sound right?

10   A.       Yes, sir.

11   Q.       And do you recall approximately how much time

12   it took for the issue to be resolved from the time

13   you made your complaint?

14   A.       If memory serves it was nine months to a

15   year, something like that.

16   Q.       Okay.  Thank you.  And anyone else besides

17   Shane Benoit that you can recall that are responsive

18   to the question that I asked you about others who

19   filed complaints for protected activity, retaliation,

20   at about the time of yours?

21   A.       He's the only one that I can think of.

22   Q.       Do you know if Mr. Shane Benoit's complaint

23   involved this protected activity being involved with

24   either Mr. Goforth's evaluation or the Cusick CR?

25               MR. BERNIER:  Objection to form.

1  A.       Freddie Gibson.  Yes, sir, that's correct.

2  Q.       Okay.  Any other information, or have you

3  told me all information you would know that -- or

4  that you know about, that Mr. Washington may have

5  known about this litigation of Mr. Goforth's?

6              MR. BERNIER:  Objection to form.

7              THE WITNESS:  Yes, sir, that would be

8  correct.  All that I can remember.

9  BY MR. JOHNSON:

10 Q.       I have one last question for you,

11 Mr. Whitehorn, and that is this.  As we sit here

12 today, are you concerned about retaliation from

13 anyone in TVA management for your testimony today?

14             MR. BERNIER:  Object to form.

15             THE WITNESS:  I can't -- with someone who

16 has been through this and seen what I've seen, I

17 can't sit here and answer that and say no with a

18 hundred percent.  Yes, there is a side of me that is

19 always worried about standing up and telling the

20 truth, and when you see wrongdoing, telling what

21 you've seen and what you feel.  And I'm going to try

22 to move forward with this and sleep at night knowing

23 that, you know, the people that I've talked with here

24 seem to be good people, I think they're honest

25 people.  I've been told that, you know, it's not

1  going to be discussed, nobody else is going to be

2  talking about it, and I'm going to hope that that's

3  true and move on.

4           But, yes, there is a part of me that's

5  always worried about this because it ties directly

6  back to the things that I've already spoke about

7  and -- so, anyway, yeah.

8  BY MR. JOHNSON:

9  Q.      And let me just expand that question one

10 time.  Sorry.  I lied to you about the last question.

11 I just need to expand on that a little bit.

12          Are you worried about retaliation of any sort

13 from anyone at Day & Zimmermann as a result of your

14 testimony today?

15 A.      No, sir.  I don't work for Day & Zimmermann,

16 so I don't have any fear of that.

17          MR. JOHNSON:  Mr. Whitehorn, that's all

18 my questions for you for today.  I appreciate your

19 attending, and counsel for the other parties may have

20 some questions for you at this time.

21          THE WITNESS:  Okay.  Thank you, Jim.

22          MR. LANTIS:  Mr. Whitehorn, I do have a

23 number of questions for you.  I'm going to ask,

24 though, that we take about a five- to seven-minute

25 break to allow me to sort of -- I want to be

1  ready, sir.

2                    EXAMINATION

3  BY MR. JOHNSON:

4  Q.     All right.  I'm looking, Mr. Whitehorn, now

5  at the ice condenser work order, which is Exhibit --

6  it's the ice condenser work order, and I'm looking at

7  Page 3523, which was a page that Mr. Lantis examined

8  Mr. Whitehorn on.  It says at the top, "Servicing ice

9  condenser."  Is everybody with me?

10        So if you look, please, sir, at the work

11  steps in this -- on this page, all of those work

12  steps are in capital letters; are they not?

13  A.     Yes, sir, they are.

14  Q.     All of those work steps are in bold print;

15  are they not?

16  A.     Yes, sir, they are.

17  Q.     All of those work steps begin with an action

18  verb; do they not?

19  A.     Yes, sir, they do.

20  Q.     So this would be seemingly, with respect to

21  all of those qualities regarding actual work steps, a

22  properly written work order?

23  A.     That's correct.

24  Q.     Can you distinguish between this properly

25  written order and the poorly written work order, as

1   you've described it, that Mr. Goforth signed that he

2   was terminated for with respect to those items

3   indicating work steps?

4               MR. BERNIER:  Objection to form.

5               THE WITNESS:  Yeah, I --

6   BY MR. JOHNSON:

7   Q.      Well, let me -- I can make it easier for you.

8           Did the work -- did the elements under the

9   word note begin with capitalized, bold-printed action

10  verbs?

11  A.      What document was that, sir?

12  Q.      That was Document 5.  I'm sorry.  That was

13  Document 1, which is also Exhibit 27.  And you'll

14  need to go to the last page of it.  When you get to

15  the last page of the work order where Mr. Goforth put

16  his signature, you can let me know.

17  A.      Okay, I'm there, sir.  Please restate your

18  question.  I just wanted to have it here in front of

19  me.  Go ahead.

20  Q.      Sure.  Are there any sentences that begin

21  with -- under the word "note" with an action verb

22  that is capitalized and in bold print?

23  A.      No, sir.

24  Q.      And is capitalizing in bold print and

25  beginning with an action verb a requirement of the

1    work management planning procedures that you looked

2    at earlier in your testimony as Document Number 2?

3               MR. LANTIS:  Objection to form.

4               THE WITNESS:  Yes, sir.

5    BY MR. JOHNSON:

6    Q.        What was the answer, please?

7    A.        Yes, sir, it is.

8    Q.        All right.  Thank you.  Now, also in your

9    testimony by Mr. Lantis you were saying that one

10   problem with the work order that we were looking at

11   that Mr. Goforth signed is that it didn't require ten

12   signatures for each manway cover, as did the removal

13   of the manways and the FAC inspection.

14             You did so testify; is that correct?

15   A.        Yes, sir, I did.

16   Q.        And do you know whether or not, based on your

17   experience there in managing these work orders, that

18   this work order that's Document 1 was amended after

19   Mr. Goforth's termination to require ten signatures,

20   one for each manway cover reinstallation?

21   A.        That is correct, sir.

22   Q.        And in response to Mr. Goforth's question --

23   or I'm sorry -- Mr. Lantis' question regarding about

24   when you made your complaint about being retaliated

25   against for protected activity, do you recall saying

1  earlier in your testimony that it was between

2  October 2017, when Mr. Goforth wrote his evaluation,

3  and the nine months to one year that it took before

4  your situation was resolved?

5  A.      That sounds correct.

6  Q.      We talked some and -- or you-all talked some

7  when you were visited with by Mr. Lantis about texts

8  between you and Mr. Goforth.

9          Were there a lot of exchanges of texts

10  between yourself and TVA management employees as a

11  matter of routine work?

12  A.      Yes, sir.

13  Q.      And so, for example, would you have texted

14  with Tony White?

15  A.      Probably not on that, but when he was in his

16  previous role as my boss, we'd text quite often.

17  Q.      All right.  And you were in your previous

18  role where he was your boss from March of 2018 until

19  you got your new job after Mr. Goforth was

20  terminated?

21  A.      No, sir.  Mr. White was the MODS manager in

22  2010, and stayed for approximately three years in

23  that role.  And then he left for about a year when he

24  went to cert class.  And then Jeff -- it may have

25  been a little longer than a year -- Jeff Swanson came

1  in, was my boss for a while.

2      And then Tony ended up taking back that role

3  as my boss after Jeff Swanson.  And then served in

4  that role for another year, some time frame around

5  that, and then he went on to move to QA and

6  progressed his way to where he is now as the

7  maintenance director.

8  Q.     Okay.  So what period of time are we talking

9  about when you were frequently texting with him, as

10  you testified, when he was your boss?

11  A.     When he was my boss, that would have been for

12  the first three years of my employment, and then

13  whenever he was my boss the second time, which was a

14  year or two years after that, once Mr. Swanson left.

15  Any person -- so maybe this is easier.  Any person

16  who's my boss, we were texting.  That's the favorite

17  way of communication is texting.

18  Q.     Is that the favored way of a communication

19  amongst TVA management employees generally within

20  maintenance?

21          MR. BERNIER:  Objection to form.

22          THE WITNESS:  Yes, sir.  That and

23  e-mails.

24  BY MR. JOHNSON:

25  Q.     All right.  And is -- how about did you have

1  a frequency of texting with Mr. Washington --

2  Mr. Washington?

3  A.      When he was my boss, yes, sir.

4  Q.      Okay. And what period of time would that

5  have been?

6  A.      I believe he was the manager in the '16 to

7  '17 time frame.

8  Q.      Okay. And how about in 2018 during the

9  outage, were you texting with Mr. Washington, if you

10  can recall?

11  A.      I mean, I'm sure I did. I'm sure I had some

12  form of texting to him, asking him something or

13  telling him something or, you know, again, just

14  general work-related things.

15  Q.      Was texting a frequent means of communication

16  between or among -- between or among DZ and TVA

17  employees?

18           MR. LANTIS: Objection to form.

19           MR. BERNIER: Objection to form.

20           THE WITNESS: Yes.

21  BY MR. JOHNSON:

22  Q.      And we're talking about during the period

23  2017 and 2018?

24  A.      Yes, sir.

25  Q.      Let's look again back -- I think we were on

1  Page 3523.  Let's advance up to Page 3635 in the ice

2  condenser work order.

3  A.      3635.  All right, Jim, I'm looking at -- it

4  looks like a component status sheet.  What's clearly

5  marked here is at the bottom of it is TVA Form Number

6  40739.

7  Q.      Correct.  You're at the right page.  It says,

8  "Responsible organization MODS requested by Scott

9  Terry," at the top right of the document.

10  A.      That is correct, sir.

11  Q.      All right.  You were asked a lot of questions

12  by Mr. Lantis, and then a few questions also on the

13  topic by Mr. Bernier, about the appropriateness of

14  signing by Mr. Johnson.  I want you to take a look at

15  where Mr. Johnson's initials appear on this document.

16        But before we do that, tell me what this

17  document is.  What are people saying by putting their

18  initials on this document?

19  A.      So a component status sheet is a way that we

20  track the configuration of the plant.  When you go

21  out to manipulate a valve -- in this particular case,

22  like the very first one's a manualized flow line

23  valve, you would document the as found condition.  If

24  it's in a closed position, an open position, whatever

25  it is, because that's the way the plant wants it to

1    be and where it needs to be.

2         But for some other reason, whether it be

3    procedural or work order based, what have you, we

4    need to go out there and change that configuration

5    for a period of time.  How we track that is by one of

6    these, a component status sheet.  So as you can see

7    on Line 1 they did an as found of closed.  They

8    changed it to an open position, and then returned it

9    at the completion of the work to a closed position.

10   That's what this document does.

11   Q.      Okay.  And is this the person who is signing

12   off for that where the initials are, that's supposed

13   to be the person who's actually performing that

14   operation of opening or closing?

15   A.      I would think so, but, you know, I -- I can't

16   think of a procedure right off base that tells me --

17   I mean, I'd have to go back and look and see if the

18   maintenance instruction tells that.  But, again, I

19   would think that the person doing the job should be

20   the one doing the signing.

21   Q.      All right.  We'll, let's look at the

22   signoffs.  It looks to me like there are two signoffs

23   in all of those signoff blocks.  There's RTJ, and

24   then there are other people's initials.  And so it

25   looks to me, and I'm not a handwriting expert, but it

1  appears to me that the handwriting on both sets of
2  initials in each of those blocks is done by one
3  person, and seemingly Mr. Johnson.

4        Is that the way it looks to you?
5  A.      So I'm going to say the same thing that you
6  did.  That I am not a handwriting expert, nor do I
7  claim to be, but, yes, sir, based off of looking at
8  it, it does look like the same person did write
9  everything.  And I'm making that determination more
10 solely based off of the J that's down here on the JD.
11 It's an identical match for the J that is on the end
12 of Mr. RTJ's initials.
13 Q.      All right.  What rules, if any, are there at
14 TVA on work orders of this nature for signing someone
15 else's initials?  Is that appropriate without
16 indicating that that's what you're doing?  Like
17 attributing --
18             MR. BERNIER:  Objection to form.
19 BY MR. JOHNSON:
20 Q.      -- that you have permission -- you know,
21 indicating in person there that you have authority?
22 A.      So as you stated, the only way that I know
23 that that can be done is if you are granted
24 permission by the individual, whether it be through
25 telephone, e-mail, text message, something of that

1   nature.  You can then sign it, as we refer to, per

2   Telecom or per whatever, you write out there.

3       And normally what you would see is an

4   asterisk, and then there would be an asterisk down at

5   the bottom to say what that is, you know, what that

6   asterisk is.  And then, Hey, per Telecom, I'm signing

7   this person's initials, and then you would put it.

8       I do not know of any allowance to -- well,

9   with the exception of recreating a work order that

10   was lost, you might find something like that if you

11   were going back in and you knew who did the

12   installations just so that you could track the person

13   who did it, but not in this respect.  I don't know of

14   any allowance to allow that.

15   Q.    So is that something that we just discussed

16   likely to have been noticed in an investigation

17   conducted in the same manner as an investigation

18   conducted by -- in Mr. Goforth's case?

19           MR. LANTIS:  Objection to form.

20           MR. BERNIER:  Objection to form.

21           THE WITNESS:  It is very plausible.

22           MR. JOHNSON:  That's all the questions I

23   have.

24           MR. BERNIER:  Nothing further here.

25           MR. LANTIS:  Nothing further.

1                    REPORTER'S CERTIFICATE

2

3    STATE OF TENNESSEE

4    COUNTY OF HAMILTON

5            I, PAULA McGUIRK, RPR, LCR#789, CCR-GA, in

6    and for the State of Tennessee, do hereby certify

7    that the deposition of GREGORY R. WHITEHORN was

8    reported by me, and that the foregoing 214 pages of

9    the transcript is a true and accurate record to the

10   best of my knowledge, skills and ability.

11           I further certify that I am not related to

12   nor an employee of counsel or any of the parties to

13   the action, nor am I in any way financially

14   interested in the outcome of this case.

15            I further certify that I am duly licensed

16   by the Tennessee Board of Court Reporting, as

17   evidenced by the LCR number and expiration date

18   following my name below.

19            In witness whereof, I have hereunto set

20   my hand this 13th day of October, 2021.

21

22

23           PAULA McGUIRK, RPR, LCR, CCR-GA
             LCR#789 - Expires:  6/30/2022

24

25

# Resume

Robert M. Goforth



Personal Cell
Work Cell
rmgoforth0@tva.gov
bob_bo43@yahoo.com

## PROFESSIONAL QUALIFICATIONS:

Over 20+yrs of experience providing leadership, supervision and management in nuclear and fossil fuel industries. Employed as a augmented TVA Task Manager, Mechanical Superintendent, Scheduler, Construction Coordinator, Field Engineer, and Work Package Planner with a reputation of providing quality craftsmanship, while maintaining a nuclear safety culture along with schedule adherence. Responsible for managing or supervising multi-craft disciplines ranging from 10 to 200 personnel. Out of the 20+ years of Power Utility Experience, over 10 years has been in the ever changing Nuclear Industry.

Personal: The experience gained in past projects working with some of the best personnel in the industry who took the time over the years to be teachers, has taught me to have an extremely wide range of project management, supervision, effective communication, well rounded skills that allows me to effectively deliver a safe work environment while meeting and obtaining assigned schedule workload goals. The experience gained allowed me to become well rounded in all aspects of new construction and/or operating units.

## EXPERIENCE:

### Nov 2016 to Nov 2018 Augmented TVA/ Watts Bar -Tritium Consolidation and Shipping Task MGR.

Assigned as the on-sight representative Task Manager for Tritium Consolidation and Shipping representing the TVA Tritium Program Managers and the DOE Tritium Sustainment Group. Responsibilities include all scheduling, coordination of Refuel Floor during Tritium activities and oversight that all procedural requirements are met during consolidation of Tritium Producing Burnable Absorbing Rods to include all scheduling of individual shipments that would be considered as a need to know basis.

### Nov 2015 to Nov 2016 Day & Zimmermann TVA/Watts Bar- Field Engineer

Assigned as the only Mechanical Field Engineer/Design for the Tritium Consolidation Cycle 13. The Main duties is to prepare all permits, prepare schedule and to set forth TVA procedures that are to be followed during all evolutions associated with TVA MODS/Maintenance projects.

### 2013 to Nov.2015 Work Management Inc. TVA/Watts Bar U#2- Senior Completions Coordinator

Assigned as the Senior Mechanical Coordinator/Scheduler/Supervisor for the Construction Completions group for the Unit#2 project. Was charged with coordinating all mechanical scheduled work events which were left unfinished during the construction phase and are turned over systems. Was also a 3yr member of the 5 person Review Group where new work orders are either approved or disapproved. Also acted and was qualified as a mechanical field engineer/planner/QRV/IQR/VT-2 certified and assist all disciplines in their individual fields. Was a team member that assisted the Unit#2 project to be able to load

Δ π EXHIBIT 5
Deponent Goforth
WWW.DEPOBOOKPRODUCTS.COM

fuel.

**2012 to 2013-** SUN-TECH/WATTS BAR Unit#2-- Turbine Building Superintendent
Turbine Building Mechanical Superintendent:
Was assigned as the Turbine Building Mechanical Superintendent responsible for the boilermakers, millwrights, iron workers, and vendors assigned to perform work in the Turbine Bldg. As part of my responsibilities, I was assigned as the FME coordinator for unit#2 and also the Lead Housekeeping Supt. responsible for the Turbine Building. Some of the other achievements included:

- Nominated for Contract Employee of the year for 2012.
- Assigned to take over all BOP projects for the last several outages on unit#1 by the MODS manager
- Completed assigned turbine building scope ahead of schedule
- Completed 70+ work orders assigned to me including a 98.5% acceptance rate for work package closure.
- All jobs assigned started on time or ahead of schedule and completed on time IAW the schedule.

**2010 to 2012- Day & Zimmermann Watts Bar #2 Mechanical Supt. Turbine Bldg.**
Assigned to the Turbine Building, supervising boilermakers, iron workers, millwrights and vendors. Accomplishments included:

- Helped coordinate the milestone of filling up the Main Condenser, a round the clock 3 week event
- Completed all assigned work ahead of schedule which was documented and noted with TVA Management.
- De-mobilizing Superintendents from D & Z was asked to stay and continue to be a part of the project.

**2009 to 2010- Bechtel Corporation, Lively Grove power plant, Lively Grove Illinois-**
Assigned as the Heat Stress Superintendent for both new Units 1 & 2. Supervised (4) Boilermaker crews where all heat stress applications were completed from start to finish. There were no individual accomplishments but many team accomplishments.

**2007 to 2009- Alberici Constructors, Ameren Energy Coffeen Illinois**
Project General Superintendent on the new construction scrubber project supervising over 200 multi-craft personnel. Also assigned as the procurement manager for the new scrubber project and outage superintendent during the scheduled outages for Alberici. Was the main oversight for fabrication of all duct work (most pieces weighed in excess of 20 ton, acted as critical lift coordinator, and was the supervisor on all tie-ins to the operating plant. The following is a partial list of achievements:

- Completed several critical lifts over 200 tons involving multiple cranes at once.
- Completed all 3 outages on time and ahead of schedule and under budget
- Completed the fabrication of all 80 pieces of duct work ahead of schedule with the smallest piece weighing 70,000lbs up to the largest piece weighing 200+ tons.
- Received 2 letters of Appreciation from Alberici Constructors and Ameren Energy for leadership.

**From 2000 to 2007-**
Worked either as a certified high pressure welder, foreman or General Foreman for local boilermaker union 454 at Watts Bar Nuclear Plant and Sequoyah on steam generator replacement, BOP, Refuel Floor, ICE and many scheduled outages. Worked at surrounding Southern Company power plants on either new construction projects or scheduled outages.

**Military:**
U.S Navy 1984 to 1993 AO2/E5
Received many awards including 2nd Honorable Discharge after ending my obligated service.
Awards & Medals include: Presidential Unit Citation, Armed forces expeditionary Medal (operation
Earnest Will & Operation Desert Shield/ Desert Storm), Weapons Expert Medal, Battle "E" service Medal,
Navy Expeditionary Medal, Continuous Sea Service Medal, National Defense medal (USS Constellation
Note: Can provide copy of DD-214 upon request.

**Education/Training:**
- Continuing Education in Construction Management
- OSHA 500 instructor
- American Welding Society (CWI) Certified Welding Inspector-2005
- Apprenticeship Graduate 1994- United Steel Workers- Millwright/Wheland Foundry
- Scaffold user instructor
- Aerial Lift instructor
- Steel erection & Rigging fundamentals instructor
- Fall Protection competent person
- Hazmat recognition, signs & systems
- Too many 4 to 8 Hr courses to list

**TVA Certifications & Training:**

- Certified Independent Qualified Reviewer (IQR)
- VT LEVEL II
- Certified Quality Related Verifier (QRV)
- Certified Confine Space Supervisor
- Certified Primary Authorized Employee (PAE)
- Work Order Navigation
- Employee Rights and Protection
- Certified Rigging Supervisor
- Certified High Torque Supervisor
- Certified Pressure Welder
- FME-Foreign Material Exclusion Supervisor
- Too many more to list but can provide copy

**Computer Skills:**
- Proficient in Microsoft (Word, Excel, Power Point)
- Highly proficient in MAXIMO/ obtained Maximo rights
- Can type 45+wpm
- Scheduling/ P6 & Prima Vera

# References Available upon request.

 

COPY
2/10/11

**Day&Zimmermann NPS®**
*We do what we say.*

02/08/2011

Robert Goforth
8839 Hwy 58 South
Decatur TN 37322
**Union Hall # 454 BM**

Dear Robert Goforth,

On behalf of Day & Zimmermann NPS, I am pleased to offer you the position of **Mechanical Supervisor** at **TVA - Watts Bar Unit 1 Nuclear Power Stat in Spring City TN.** Your start date at this location will be on **02/28/2011** based on your acceptance of this agreement. We can make no commitment on the duration of this assignment since that depends on the needs of our client however, at this time we believe it will run through the spring 2011. Successful completion of all necessary screening measures per clients Fitness for Duty Program for access to this facility is required and is an explicit condition of employment.

**Special Comments:**

As a field hourly employee of Day & Zimmermann NPS, you will not be eligible for Day & Zimmermann benefits including holiday or vacation pay. In addition, while assigned to this job site, your union benefits will be paid per the BM National Funds Alumni Agreement.

In performance of these duties, we are pleased to offer you an hourly wage of $46.00/ hour. If the scheduled project workweek exceeds 40 hours per week, you will be reimbursed for any hours over 40 on a time and one-half basis, if the overtime is approved in advance.

Due to the proximity of your permanent residence you will not receive TLA or travel expenses.

I understand and fully agree that my employment with Day & Zimmermann NPS is contingent upon successful completion of my background investigation and any training required. I also understand that my employment is conditional upon client approval of qualifications and staffing needs.

We understand that you are under no obligation to any current employer either to stay in their employment or refrain from accepting employment with a competitor. We recognize that you may be under obligation of confidentiality both with your current employer and your employer's customers and we fully expect and encourage you to honor those obligations.

Your employment is not governed by any written or oral contract and is considered an "at will" arrangement. This means that you are free, as is the company, to terminate the employment relationship at any time. As you may know, we are required to comply with the provisions of the immigration Reform and Control Act of 1986. When you report to work, **please bring your social security card and a valid driver's license.** If you do not have these documents you must contact me prior to employment to obtain a limited list of other acceptable documents.

The provisions above, together with your DZNPS Employee Orientation and work rules package, constitute the Terms and Conditions for this assignment. Terms are subject to revisions by customer.



Δ π EXHIBIT 6
Deponent Goforth
Date 11/15/21 Rhodes
WWW.DEPOBOOKPRODUCTS.COM

JA 0648

DZ0000024

**Day&Zimmermann NPS**

*We do what we say.*

Your signature below indicates acceptance of this agreement.

Date: 2-9-11      Employee Signature: _Robert DiFelto_

Please retain (1) copy for your records. Sign and return by post, email or fax the second copy to Day & Zimmermann NPS. This agreement will become effective when Day & Zimmermann NPS receives a signed copy from the applicant.

Thank You,

Jack Davis
Vice President, Staffing and Recruiting
Day & Zimmermann NPS
1827 Freedom Road Suite 101
Lancaster, PA 17601
717.391.3127 office
717.391.3212 fax



**Day&Zimmermann NPS**

We do what we say!

This is to certify that I have received, read and understand the <u>DZNPS Employee Orientation Book, Project Work Rules and Jobsite Safety Rules</u>.

ROBERT M. GOFORTH
Name (please print)

85837
Employee Number

Robert Goforth    2/28/11
Signature           Date

**NOTE:** Ensure that both the Employee and File Copies are signed.

FILE COPY

Letters of Policy / Programs
Attachment C
December 2010
Revision 8
Page 28 of 29

△ π EXHIBIT 7
Deponent Goforth
Date_____ Rptr._____
WWW.DEPOBOOKPRODUCTS.COM



# Day&Zimmermann NPS

*We do what we say.®*

Letters of Policy & Program

This is to certify that I have received, read and understand the following:

- A. DZNPS Policy on Harassment
- B. Responsibility and Respect
- C. Equal Employment Opportunity / Affirmative Action
- D. Handicap Self-Identification Statement
- E. Invitation to all Handicapped Individuals, Disabled Veterans of the Vietnam Era
- F. Employee Concerns Policy
- G. Safety Conscious Work Environment
- H. Code of Ethics

*Robert M. Goforth*

Name (Please Print)

*Robt S. Goforth*

Signature

2-28-11

Date

Δ π EXHIBIT 8

Deponent Goforth

Date _____ Rptr. _____

WWW.DEPOBOOKPRODUCTS.COM

Employee File Copy

# Craft Employee Orientation Information & Work and Safety Rules



Δ π EXHIBIT 10
Deponent _Golon L_
Date_____ Rptr._____
WWW.DEPOBOOKPRODUCTS.COM

Approved by Walter Sanders, President, DZNPS
Effective: July 13, 2015

Case 1:20-cv-00254-TRM-SKL   Document 35-10   Filed 11/15/21   Page 659 of 672   PageID #: 929

DZ0000086

# TABLE OF CONTENTS

Section One: Employee Orientation..................................................................4
    Welcome!..............................................................................................4
    Expectations..........................................................................................4
    An Important Note About Safety & Security.................................................5
Section Two: Employment Information...........................................................6
    Equal Employment Opportunity & Affirmative Action...................................6
    Non-Discrimination and Anti-Harrassment Policy........................................6
    Whistleblower Policy (with Special Note for Those Working on Nuclear Sites Pursuant to
    § 211 of the Energy Reorganization Act of 1974)........................................8
    Employment of Relatives..........................................................................9
    Genetic Information Non-Discrimination Policy..........................................10
    Personal Electronic Communication Equipment..........................................10
    Reasonable Accommodations to Religious Practices.....................................11
    Reasonable Accommodations to Disabilities...............................................11
    Policy on Personal Information Security.....................................................12
    Your Pay.............................................................................................13
    Policy Against "Off the Clock" Work.........................................................13
    Family Medical Leave Policy....................................................................14
    Bereavement Leave...............................................................................19
    Military Leave......................................................................................19
Section Three: Work & Safety Rules..............................................................22
    Work Rules..........................................................................................22
    Parking Facilities and Access to Project.....................................................22
    Hours of Work......................................................................................23
    Starting and Quitting............................................................................23
    Attendance & Lateness..........................................................................23
    Equipment, Tools & Personal Property......................................................24
    Termination Clearance..........................................................................25
    Quality...............................................................................................25
    Housekeeping......................................................................................25
    Safety & Health Rules...........................................................................25
    Smoking.............................................................................................26
    Security..............................................................................................26
    Drug & Alcohol Rules (i.e. "Fitness for Duty" Rule)....................................26
    Safety Rules.........................................................................................27
    In General...........................................................................................27
    Hard Hats...........................................................................................28
    Clothing.............................................................................................28
    Personal Protective Equipment................................................................28
    Personal Activity..................................................................................29
    Tools and Equipment............................................................................29
    Welding, Burning and Cutting................................................................29
    Housekeeping......................................................................................30
    Special Activities..................................................................................30

Case 1:20-cv-00254-TRM-SKL   Document 155   Filed 11/15/21   Page 660 of 672   PageID #:
930

UA 0653

DZ0000087

Penalties for Violations of Work & Safety Rules.............................................30
Category One Violations............................................................................30
Category Two Violations............................................................................31
Category Three Violations..........................................................................32

Case 1:20-cv-00254-TRM-SKL   Document 25-65   Filed 11/15/21   Page 661 of 672   PageID #:
931

UA 0654

DZ0000088

**Reporting Instances of Harassment**: The Company strongly encourages the prompt reporting of all incidents of discriminatory harassment. If an employee believes he or she is being harassed or has observed harassment, the employee should notify promptly his or her direct supervisor or any supervisor or manager, including a site supervisor. Alternatively, employees may report their concerns directly to human resources or employees may report their concerns to the Ethics and Employee Advocate Helpline at https://dayzim.alertline.com or by calling 1.877.319.0270.

**Investigation**: When an employee reports harassment as specified above, the Company will undertake a prompt investigation appropriate to the circumstances. The steps to be taken during the investigation cannot be fixed in advance, but will vary depending upon the nature of the allegations. Confidentiality will be maintained throughout the investigative process to the extent practicable and consistent with the Company's need to undertake a full investigation.

**Resolving the Matter**: Upon completion of an investigation, appropriate remedial action will be taken if necessary and if supported by the facts. Remedial action may include verbal or written counseling, referral to formal counseling, disciplinary suspension or probation, or discharge from the Company.

**Nonretaliation**: An individual who reports incidents that the employee, in good faith, believes to be violations of this policy, or who is involved in the investigation of harassment, will not be subject to reprisal or retaliation. Retaliation is a serious violation of this policy and should be reported immediately. The report and investigation of allegations of retaliation will follow the procedures set forth in this policy. Any person found to have retaliated against an individual for reporting discriminatory harassment or participating in an investigation of allegations of such conduct will be subject to appropriate disciplinary action.

**Communication**: This policy is part of the Company's overall commitment to open communication. The Company encourages any employee with workplace concerns of any nature (including, but not limited to, any alleged discrimination) to bring those concerns to the attention of the direct manager.

## WHISTLEBLOWER POLICY

A whistleblower is an employee who reports an activity that he/she reasonably believes to be illegal. The whistleblower is not responsible for investigating the activity or for determining fault or corrective measures; appropriate management officials are charged with these responsibilities. If an employee has knowledge of or a concern of illegal activity, the employee should report it to his/her direct supervisor or a manager, or to human resources. An employee, however, who intentionally files a false report of wrongdoing will be subject to appropriate disciplinary action. The Company's whistleblower policy is interpreted consistently with its policies on Equal Employment Opportunity and Non-Discrimination and Harassment. An investigation into any reported incident of illegal activity will follow the procedures set forth in the Company's Equal Employment Opportunity and Non-Discrimination and Harassment policy. Any person found to have retaliated against an individual for reporting an alleged illegal activity or for participating in an investigation of allegations of such conduct will be subject to appropriate disciplinary action.

*Special Note for Those Working on Nuclear Sites Pursuant to § 211 of the Energy Reorganization Act of 1974*: Whether an active or former employee, Employees have the right and responsibility to raise nuclear safety or quality concerns without fear of reprisal. DZNPS commits that no employee will suffer retaliation for raising safety or quality concerns in good faith. Employees with any concerns about safety or quality, or about retaliation of any kind, should immediately notify their site manager, or they should contact the DZNPS Employee Concerns Helpline at 877-248-2191, or they can contact the Employee Concerns representative at the plant at which they work. Employees also can direct their concerns to the Nuclear Regulatory Commission ("NRC").

## EMPLOYMENT OF RELATIVES

**Purpose**: The purpose of this policy is to establish uniform practices regarding the employment of relatives at DZNPS. This policy applies to all employees of DZNPS.

**Definition of Relative**: This policy applies to individuals who are related by blood, marriage or adoption, including the following relationships: spouse, domestic partner or civil union partner, child, step-children, parent, step-parent, legal guardian, grandparent, grandchild, brother, sister, half-brother, half-sister, aunt, uncle, niece, nephew, parent-in-law, daughter-in-law, son-in-law, brother-in-law and sister-in-law.

**Employment of Relatives:** Relatives of currently employed employees generally are considered for employment on the basis of their qualifications. However, when the hiring or employment of a worker's relative would result in a "prohibited relationship", DZNPS will not accept such employment. Following constitutes a prohibited relationship: where the employment of a relative of a currently employed worker creates either (1) a supervisor/subordinate relationship between the relative and an employee; or (2) an actual conflict of interest or the appearance of a conflict of interest.

**Marriage or Domestic Partnership between Current Employees**: Employees who marry, become related, or enter into a domestic partnership, can continue in their current position as long as a prohibited relationship (discussed above) is not created. Current employees who are married or are related, or are involved in a domestic partnership, can continue in their employment so long as a prohibited relationship (discussed above) is not created.

**Duty to Disclose Relationship:** Employees are expected to disclose to their supervisors whether they have a relative applying for a position with DZNPS or whether they currently work with a relative. To that end, DZNPS Anti-Harassment Policy states in pertinent part: "Consensual romantic and/or sexual relationships between an employee with supervisory authority and any subordinate, including one not directly under the supervisor, will compromise DZNPS' ability to enforce its policy against sexual harassment. Consequently, if such relationships arise, they will be considered carefully by DZNPS and appropriate action may be taken. Such action may include a change in responsibilities of the individuals involved in such relationships or transfer of location within DZNPS. Any supervisory employee involved in such relationship is required to report the relationship."

Case 1:20-cv-00254-TRM-SKL   Document 25-6   Filed 11/15/21   Page 663 of 672   PageID #: 933

DZ0000094

# Craft Employee Orientation Information & Work and Safety Rules



Case 1:20-cv-00254-TRM-SKL Document 35-16 Filed 11/15/21 Page 664 of 672 PageID #: 934

JA-0657

DZ0000086

# TABLE OF CONTENTS

**Section One: Employee Orientation**................................................4
   Welcome!........................................................................4
   Expectations..................................................................4
   An Important Note About Safety & Security..........................5
**Section Two: Employment Information**...........................................6
   Equal Employment Opportunity & Affirmative Action............6
   Non-Discrimination and Anti-Harrassment Policy.................6
   Whistleblower Policy (with Special Note for Those Working on Nuclear Sites Pursuant to § 211 of the Energy Reorganization Act of 1974)...............8
   Employment of Relatives..................................................9
   Genetic Information Non-Discrimination Policy.....................10
   Personal Electronic Communication Equipment....................10
   Reasonable Accommodations to Religious Practices..............11
   Reasonable Accommodations to Disabilities.........................11
   Policy on Personal Information Security..............................12
   Your Pay.......................................................................13
   Policy Against "Off the Clock" Work..................................13
   Family Medical Leave Policy.............................................14
   Bereavement Leave.........................................................19
   Military Leave................................................................19
**Section Three: Work & Safety Rules**............................................22
   Work Rules....................................................................22
   Parking Facilities and Access to Project.............................22
   Hours of Work...............................................................23
   Starting and Quitting......................................................23
   Attendance & Lateness....................................................23
   Equipment, Tools & Personal Property................................24
   Termination Clearance....................................................25
   Quality.........................................................................25
   Housekeeping................................................................25
   Safety & Health Rules.....................................................25
   Smoking.......................................................................26
   Security........................................................................26
   Drug & Alcohol Rules (i.e. "Fitness for Duty" Rule)..............26
   Safety Rules..................................................................27
   In General.....................................................................27
   Hard Hats......................................................................28
   Clothing........................................................................28
   Personal Protective Equipment..........................................28
   Personal Activity...........................................................29
   Tools and Equipment......................................................29
   Welding, Burning and Cutting...........................................29
   Housekeeping................................................................30
   Special Activities...........................................................30

Case 1:20-cv-00254-TRM-SKL   Document 55-6   Filed 11/15/21   Page 665 of 672   PageID #: 935

UA-0658

DZ0000087

Penalties for Violations of Work & Safety Rules...............................................30
Category One Violations............................................................................30
Category Two Violations............................................................................31
Category Three Violations..........................................................................32

3

fuel-gas cylinders by at least 20 feet or by a 5-foot high non-combustible barrier.

## 8. Housekeeping

a. Good housekeeping is everyone's responsibility. Keep your work area and tools orderly.

b. Maintain clear aisles and access to all work areas, never place equipment or tools on stairs or plant equipment, and keep clear access to exits and to safety equipment.

c. Promptly report and eliminate all slipping hazards, which are a major cause of injuries. Snow and ice, water, oil and grease, fly ash and coal dust can create hazards requiring personnel warning and prompt correction.

d. Keep material, tool boxes, tools, and equipment in a stable position to prevent rolling or falling, and keep them in neat and workmanlike order.

e. Tie up hoses, electrical wires, and welding leads as required. Allow work and walk areas to remain clear. Use only non-conductive ties on electrical cords. Light bulbs on extension cords and on temporary wiring must have guards to protect against bulb breakage.

## 9. Special Activities

Employees may be asked to work on special activities. DZNPS has developed special procedures for performing work, such as asbestos abatement, lead paint removal, confined space work, and protection against falls or arsenic exposure. You will receive additional training in safety requirements before being asked to do this type of work.

## PENALTIES FOR VIOLATION OF WORK & SAFETY RULES

## CATEGORY ONE VIOLATIONS

One violation of any of the following type of rule infraction may lead to immediate termination and a prohibition on rehire:

a. Willful or grossly negligent violation of security rules;

b. Willful or grossly negligent violation of safety, quality or radiological rules;

c. Violation of DZNPS Drug and Alcohol Rules, or the Plant-imposed drug and alcohol policy, including a refusal to be drug-tested;

d. Theft of property;

e. Acts of sabotage;

f. Willful damage or mutilation of property;

g. Possession of firearms or other weapons, ammunition, explosives or incendiaries (unless permit issued by Owner);

h. Gross insubordination;

i. Assault or battery on any personnel;

j.  Picking up or leaving another employee's time card, brass or other identification, or violating the Company's prohibition against working "off the clock";

k.  Falsification of records (such as social security number, name, quality control documents or other);

l.  Use of company equipment for non-business related purpose (*e.g.* computers);

m.  Solicitation or distribution of literature on Owner's property during working time;

n.  Unauthorized possession or removal of Company, Owner or other employee's property;

o.  Any behavior, past or present, or threat of future behavior which prevents the employee from gaining access to the work site because of a prohibition by the Customer or Owner;

p.  Harassment, either sexual or of another nature, of company employees, employees of the Client, the Owner or another company, or of other individuals on the project site; and

q.  Any Category Two (2) violation occurring within one year of any other Category Two violation.

## CATEGORY TWO VIOLATIONS

One violation of any of the following type of rule infraction may lead to suspension and/or termination, with the length of suspension up to the discretion of site management.

a.  Negligent violation of safety, quality or radiological rules not considered in Category One;

b.  Negligent violation of security rules not considered in Category One;

c.  Insubordination;

d.  Refusal to accept work assignment;

e.  Leaving work place and/or project without supervisor's authorization;

f.  Engaging in horseplay;

g.  Fighting on the project;

h.  Sleeping during your working hours;

i.  Eating, drinking or smoking in areas where they are prohibited;

j.  Gambling on project;

k.  Missed work or absenteeism that exceeds the time permitted under the FMLA policy or applicable Work Rules;

l.  Defacing site or buildings;

m.  Intimidating or interfering with other project personnel;

n.  Refusal to participate in safety meetings or training, or to follow prescribed safety requirements or procedures while working;

o.  Failure to report injuries;



**Day&Zimmermann NPS**

*We do what we say.*

This is to certify that I have received, read and understand the <u>DZNPS Employee Orientation Book, Project Work Rules and Jobsite Safety Rules</u>.

ROBERT M. GOFURTH
Name (please print)

_____
Employee Number

_____ 12-07-15
Signature                    Date

NOTE: Ensure that both the Employee and File Copies are signed.

FILE COPY

Letters of Policy / Programs
Attachment C
December 2010
Revision 8
Page 28 of 29



Δ π EXHIBIT ___
Deponent _____
Date_____Rptr._____
WWW.DEPOBOOKPRODUCTS.COM

| **TVA** | **Human Performance Tools** | **NPG-SPP-22.202**<br>**Rev. 0011**<br>**Page 1 of 29** |
| --- | --- | --- |
| **NPG Standard Programs and Processes** | | Quality Related    ☐ Yes    ☑ No<br>PORC Required    ☐ Yes    ☑ No |
| | | Validation Date    06/22/2015<br>Review Frequency    3 years<br>Validated By    Leatha Roberts |
| | | **Effective Date**    **07-14-2017** |

Level of Use: Information Use

Responsible Peer Team/Working Group: Human Performance

| Approved by: | George Hall | 07-09-2017 |
| --- | --- | --- |
| | George Hall, CFAM Corporate Functional Area Manager | Date |

Δ π EXHIBIT 13

Deponent _George Hall_

Date_____ Rptr._____

| DESCRIPTION | Place-keeping involves physically marking steps in a procedure or other guiding document that have been completed or that are not applicable. Effective place-keeping prevents omitting or duplicating steps. |
|---|---|
| WHY | • Prevents omitting or duplicating steps<br>• Aids in navigating a detailed procedure<br>• Prevents incorrect sequencing of steps<br>• Helps return to last step if interrupted |
| WHEN | • When using a continuous-use procedure<br>• When performing a reference-use procedure on risk-important equipment<br>• The application of place-keeping for reference use procedures differs from that for continuous use procedures. When breaks, shift turnover, or extended delays in the job are encountered, the last completed step is documented using the slash method.<br>• A review of the completed steps should be performed to ensure no steps have been missed. |
| HOW | Circle a step number to be performed<br>Read and understand the entire step<br>Perform the step as written<br>   • Check, Initial or Sign blanks/boxes<br>   • Do not slash continuous steps<br>Mark conditional (IF / THEN) steps N/A if not needed<br>Slash the circle after step completion<br><br>If the procedure or work instruction requires that an individual fill in a blank with data, initial or sign blanks/steps, the completion of these actions will constitute place-keeping. |
| AVOID | • Using procedures without page-checking<br>• Signing many blanks with a single arrow<br>• Circling more than one step at a time<br>• Slashing a circle before it is completed<br>• Circle/Slashing several steps together<br>• Not verifying the last step if interrupted |
| References | INPO 06-002 Human Performance Tools for Workers<br>NPG-SPP-22.207 Procedure Use and Adherence |

UA 0664

DZ0000186

# HUMAN PERFORMANCE TOOLS





**Procedure Use and Adherence:**
- Adherence means understanding a procedure's purpose, scope and intent and following instruction



**Self Check STAR**
- When performing work: stop, think about what you are going to do and what you expect, then perform the action and review the results

**Pre-Job Brief**
- Everyone involved should take time to discuss all aspects of the job and plan defenses against worst-case scenarios



**STOP When Unsure**
- Always question what you're doing; STOP if unsure, distracted or something doesn't feel right

**2-Minute Rule**
- Always perform the two-minute rule to reduce risk. It doesn't take a lot of time, but it could be enough to save your life

Reference: NFPG-SRP-22.202: Human Performance Tools

Human Performance Tools reduce errors and avoid risk



Δ π EXHIBIT 14
Deponent _____
Date _____ Rptr _____
WWW.DEPOBOOKPRODUCTS.COM

DZ0000363